## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SUNGARD AS NEW HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 22-90018 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) AUTHORIZING THE DEBTORS TO REPAY CERTAIN PREPETITION SECURED INDEBTEDNESS, (IV) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (V) GRANTING ADEQUATE PROTECTION, (VI) MODIFYING THE AUTOMATIC STAY, (VII) <u>SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF</u>

> **Emergency relief has been requested. Relief is requested no later than 8:00 a.m. on April 12, 2022.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 12, 2022 at 8:00 a.m. (prevailing Central Time) in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002. Participation at the hearing will only be permitted by audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones's home page. The meeting code is "JudgeJones". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]    The Debtors in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), along with the last four digits of the Debtors' tax identification numbers, are: InFlow LLC (9489); Sungard AS New Holdings, LLC (5907); Sungard AS New Holdings II, LLC (9169); Sungard AS New Holdings III, LLC (3503); Sungard Availability Network Solutions Inc. (1034); Sungard Availability Services (Canada) Ltd./Sungard, Services de Continuite des Affaires (Canada) Ltee (3886); Sungard Availability Services Holdings (Canada), Inc. (2679); Sungard Availability Services Holdings (Europe), Inc. (2190); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Sungard Availability Services, LP (6195); and Sungard Availability Services, Ltd. (4711). The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 565 E Swedesford Road, Suite 320, Wayne, PA 19087.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (the "Motion"):[1]

## Preliminary Statement[2]

1.      The Debtors, together with their non-debtor affiliates, are leading providers of disaster recovery services, colocation and network services, cloud and managed services and workplace recovery to customers in North America, Europe and Asia.  The demand for certain of the Debtors' products, however, has fallen off in recent years, resulting in declining revenue and a corresponding reduction in available liquidity.  The Debtors' industry headwinds have been compounded by, among other things, the onset and prolonged duration of the COVID-19 pandemic, overmarket lease obligations both in North America and the UK, and rapidly rising power costs in the UK.  These challenges compelled the Debtors' UK affiliate Sungard Availability Services (UK) Limited ("Sungard AS UK") to commence an administration process under UK law on March 25, 2022.  In connection therewith, the Debtors made the difficult decision to provide financial support for Sungard AS UK's administration process in order to maintain the overall stability of their worldwide business and preserve their international customer base.  Funding the UK administration process, however, left the Debtors themselves with limited resources to commence an orderly chapter 11 process.  In order to ensure that the Debtors had adequate runway to prepare for these cases and make critical payments to vendors, employees and professionals, the Debtors obtained the $7,000,000 Prepetition Bridge Facility on April 7, 2022.  The Prepetition

---

[1]    A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion, are set forth in the *Declaration of Michael K. Robinson, Chief Executive Officer and President of the Debtors in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the DIP Term Sheets (as defined below) or the Interim Order (as defined below).

Bridge Facility was provided by certain of the Term Loan DIP Lenders and, as further described below, was provided on the condition that the Debtors seek authorization at the interim hearing held on this Motion to use a portion of the Interim Term Loan DIP Amount to repay the Prepetition Bridge Facility in full.

2.      As a result of these events, the Debtors have commenced these Chapter 11 Cases with only approximately $5 million of available cash, net of a $13,500,000 liquidity "block" established in favor of the Debtors' ABL lender, PNC, in exchange for PNC's agreement to grant a prospective waiver for an event of default that would have been triggered under the Debtors' prepetition revolving facility upon the commencement of Sungard AS UK's administration proceeding.  Accordingly, the Debtors seek approval of the DIP Facilities and authorization to utilize Cash Collateral to fund these cases and to implement the restructuring transaction outlined in the restructuring support agreement (the "Restructuring Support Agreement") executed substantially contemporaneously with the commencement of these cases

3.      The Restructuring Support Agreement has the support of lenders that hold in excess of 80% of each of the Debtors' Prepetition 1L Term Loan Obligations and Prepetition 2L Term Loan Obligations (collectively, the "Consenting Stakeholders"), and contemplates that the Debtors will implement a consensual restructuring either through (i) a sale of all, substantially all or one or more subsets of the Debtors' assets (the "Sale Scenario") or (ii) the equitization of the Debtors' prepetition funded debt through a chapter 11 plan (the "Equitization Scenario").  In connection therewith, the Consenting Stakeholders establish a "reserve price" for each group of the Debtors' assets and, alternatively, for the assets comprising the Debtors' business as a whole, and have agreed to cap any credit bid they may provide at the reserve price, such that if one or more third

parties submits qualified bids that, standing alone or in the aggregate, exceed the applicable reserve price, the Consenting Stakeholders will not increase their credit bid.

4.     The relief requested in the Motion will enable the Debtors to implement a restructuring that will, whether via a sale process or a plan process, maximize the Debtors' ability to preserve jobs and continue to operate as one or more going concern businesses following the conclusion of these cases.  In the near term, access to the DIP Facilities and Cash Collateral will also enable the Debtors to pay amounts owed over the course of these cases to employees, vendors and other stakeholders who are critical to their operations.  The DIP Facilities are comprised of the following:

    a.     **The ABL DIP Facility**.  The ABL DIP Facility consists of a $50,000,000 senior secured revolving credit facility pursuant to which, upon entry of the Interim Order, Prepetition ABL Obligations (including letters of credit) will be converted, on a dollar for dollar basis, into new postpetition loans or commitments as prepetition receivables upon which the ABL DIP Liens have priority.  In addition, any Prepetition ABL Obligations that remain outstanding as of the entry of the Final Order shall also, under the proposed terms of the ABL DIP Facility, be automatically converted into postpetition loans or commitments.

    b.     **The Term Loan DIP Facility**.  The Term Loan DIP Facility comprises up to $285,900,000 of senior secured multi-draw term loans, consisting of (i) up to $95,300,000 in new money loans and (ii) subject to entry of the Final Order, a roll up of up to $190,600,000 of Prepetition 1L Term Loan Obligations and Prepetition 2L Term Loan Obligations on a cashless dollar for dollar basis as more fully described below.

5.     By the Motion, the Debtors seek authorization to utilize the proceeds of the DIP Facilities and the Cash Collateral on hand to, among other things, (i) continue the operation of their businesses, (ii) make postpetition payments on leases of non-residential real property, (iii) maintain business relationships with vendors, suppliers, and customers, (iv) make payroll, (v) make certain capital expenditures, (vi) fund the costs of the chapter 11 cases (including professional fees and fees of the Office of the United States Trustee for the Southern District of Texas), (vii) continue to satisfy other operational needs, (viii) repay in full, in cash the Debtors'

Prepetition Bridge Facility, (ix) reduce the outstanding Prepetition ABL Obligations by $13,500,000 and (xi) provide up to $10,000,000 in financial support for the UK administration process of Sungard AS UK, subject to the approval of the Required Term Loan DIP Lenders.  Each of these uses is necessary and appropriate under the facts of these cases for the reasons summarized below and set forth in further detail in the Nicholls Declaration and the Hedus Declaration.

6.     As noted above, the Debtors' ability to obtain the $7,000,000 Prepetition Bridge Facility was conditioned on their agreement to seek, as a form of interim relief, the ability to utilize a portion of the Interim Term Loan DIP Amount to repay the Prepetition Bridge Facility.  The Prepetition Bridge Facility was provided by a majority of the Initial Term Loan DIP Lenders, and the Debtors believe that such lenders would not have agreed to fund their substantial share of the Term Loan DIP Facility without the Debtors' commitment to seek authority to repay the Prepetition Bridge Facility promptly following the commencement of these cases.  Second and similarly, the Debtors' ability to procure the ABL DIP Facility was conditioned on the Debtors' commitment to utilize $13,500,000 of the Prepetition ABL Lenders' Cash Collateral to reduce the outstanding Prepetition ABL Obligations, and the Debtors understand that, without the $13,500,000 repayment, the ABL DIP Lenders would not have been willing to provide the ABL DIP Facility.  Moreover, the Debtors are economically incentivized to repay the $13,500,000 and the Prepetition Bridge Facility because their funds were restricted and not available for use in the Debtors' operations and such amounts will no longer accrue interest and fees that otherwise would have been payable during the pendency of these cases.  Finally, the Debtors believe that the extension of additional credit in an amount of up to $10,000,000 to support Sungard AS UK's administration process is both necessary and appropriate to preserve the value of the Debtors' estates for the benefit of all stakeholders.

7.     As set forth in greater detail in the Hedus Declaration, the Debtors conducted a marketing process for debtor in possession financing in the weeks leading up to the Petition Date. After soliciting proposals from third party financing sources and analyzing the challenges presented by the Debtors' capital structure with respect thereto, the Debtors determined that their incumbent lenders were the best—and indeed only—viable financing source, given, among other things, the timeline dictated by the Debtors' liquidity position and the lack of unencumbered assets that might serve as DIP collateral.  Following extensive negotiations with their Prepetition Secured Parties, the Debtors, the ABL DIP Lenders and the Initial Term Loan DIP Lenders agreed upon the terms of the DIP Facilities.

8.     The proposed DIP Facilities and the requested use of Cash Collateral will give the Debtors the runway they need to maximize value for all stakeholders, whether through the Sale Scenario or the Equitization Scenario contemplated by the Restructuring Support Agreement.  If the relief requested were to be denied, the Debtors would undoubtedly suffer severe and immediate harm, likely resulting in the global shutdown of the Debtors' business operations, severe employee dislocation and devastating losses for vendors, customers and stakeholders.  Accordingly, the Debtors seek approval of the Motion and authorization to utilize the DIP Facilities and Cash Collateral in the manner requested herein and in the Interim Order.

**Relief Requested**

9.     By the Motion, the Debtors seek entry of interim and final orders (respectively, the "Interim Order," substantially in the form attached hereto, and the "Final Order," collectively, the "DIP Orders"):

    a.     authorizing the Debtors to obtain senior secured postpetition financing in the form of the ABL DIP Facility (as defined below), as set forth in the term sheet attached as **Exhibit A** to the Interim Order (the "ABL DIP Term Sheet");

b.      authorizing the Debtors to obtain senior secured postpetition financing in the form of the Term Loan DIP Facility (as defined below), as set forth in the term sheet attached as **Exhibit B** to the Interim Order (the "Term Loan DIP Term Sheet" and, together with the ABL DIP Term Sheet, the "DIP Term Sheets");

c.      authorizing the Debtors to use the cash collateral ("Cash Collateral") of the Prepetition Secured Parties (as defined below);

d.      authorizing the Debtors to repay the Prepetition Bridge Facility (as defined below);

e.      authorizing the Debtors to use $13.5 million of the Prepetition ABL Lenders' Cash Collateral to reduce the amount of Prepetition ABL Obligations;

f.      subject to the Carve-Out (as defined below), granting liens and providing the DIP Superpriority Claims (as defined below) with respect to such postpetition financing;

g.      approving the forms of adequate protection to be provided by the Debtors;

h.      modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Orders;

i.      scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order; and

j.      granting related relief.

### Jurisdiction and Venue

10.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4002-1 and

9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## **Background**

13.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).   No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

14.     The Debtors and their non-Debtor affiliates (collectively, the "Company") provide high availability, cloud-connected infrastructure services built to deliver business resilience to their customers in the event of an unplanned business disruption, ranging from man-made events to natural disasters.  Headquartered in Wayne, Pennsylvania, the Debtors employ approximately 580 individuals on a full-time basis in the United States and Canada.  The Company operates 55 facilities (comprising 24 data centers and 31 work area recovery centers) and provides services to approximately 2,001 customers across the United States, the United Kingdom, Canada, Ireland, France, India, Belgium, Luxembourg and Poland.  The Company generated approximately $587 million in revenue for fiscal year 2021 and, as of the Petition Date, the Debtors had approximately $424 million in aggregate principal amount of prepetition funded debt obligations.

**Concise Statement Pursuant to**
**Bankruptcy Rule 4001 and the United States Bankruptcy**
**Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases[3]**

15.     The following chart contains a summary of the material terms of the proposed DIP

Facilities (as defined below), together with references to the applicable sections of the relevant

source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the

*Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case

Procedures").

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Sungard AS New Holdings III, LLC ("Borrower" or "Sungard AS III").<br><br>Term Loan DIP Term Sheet, *Borrower* | Sungard AS III and its direct and indirect subsidiaries who are Debtors.<br><br>ABL DIP Term Sheet, *Borrowers* |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Sungard AS New Holdings, LLC ("Sungard AS"), Sungard AS New Holdings II, LLC ("Holdings") and all other of the Borrower's subsidiaries and affiliates who are Debtors; *provided*, *however*, Sungard AS and its assets shall only be obligated as to the new money provided under the Term Loan DIP Facility.<br><br>Term Loan DIP Term Sheet and ABL DIP Term Sheet, *Guarantors* | Holdings<br><br>ABL DIP Term Sheet, *Guarantors* |

---

[3]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The entities set forth on the exhibit to the Term Loan DIP Term Sheet (each an "Initial Term Loan DIP Lender").<br><br>Each Consenting Term Loan DIP Lender (as defined in the Restructuring Support Agreement) agrees to undertake, on behalf of itself or its designee, the following commitments (collectively, the "Term Loan DIP Commitments"): (i) a subscription commitment, whereby each Initial Term Loan DIP Lender agrees to subscribe to the new-money portion of the Term Loan DIP Facility on the basis of the pro rata share of Prepetition 1L Term Loan Obligations that it beneficially owns; and (ii) a backstop commitment, whereby each Initial Term Loan DIP Lender agrees to fund any new-money portion of the Term Loan DIP Facility that holders of Prepetition 1L Term Loan Obligations do not subscribe for.<br><br>Participation in the new-money portion of the Term Loan DIP Facility shall be offered, on a pro rata basis to all holders of Prepetition 1L Term Loan Obligations based on their beneficial ownership thereof (all such holders electing to participate, collectively, the "Term Loan DIP Lenders").<br><br>Term Loan DIP Term Sheet, *Term Loan DIP Lenders* | PNC Bank, National Association ("PNC" and, in such capacity, the "ABL DIP Lenders").<br><br>ABL DIP Term Sheet, *DIP ABL Lenders* |
| **DIP Agents**<br>Bankruptcy Rule 4001(c)(1)(B) | SRS Acquiom, Inc. (the "Term Loan DIP Agent" and, together with the Term Loan DIP Lenders, the "Term Loan DIP Secured Parties").<br><br>Term Loan DIP Term Sheet, *Term Loan DIP Agent* | PNC, as administrative agent and collateral agent (in such capacity, the "DIP ABL Agent").<br><br>ABL DIP Term Sheet, *DIP ABL Agent* |

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| **DIP Facilities**<br>Bankruptcy Rules 4001(c)(1)(B) | Up to $285.9 million multi-draw senior secured priming debtor in possession term loan facility (the "<u>Term Loan DIP Facility</u>") consisting of<br>    (a) the Interim Term Loan DIP Amount (as defined below),<br>    (b) $95.3 million of the Final Term Loan DIP Amount (as defined below), and<br>    (c) subject to entry of the Final Order, a roll-up of up to $190.6 million (the "<u>Term Loan Roll-Up Amount</u>") of Prepetition Term Loan Obligations (as defined below) held by the Term Loan DIP Lenders on a cashless dollar for dollar basis into loans under the Term Loan DIP Facility. Upon entry of the Final Order, each Term Loan DIP Lender will roll-up, on a 2:1 basis for each dollar provided of the new money portion of the Term Loan DIP Facility its pro rata share of Prepetition 1L Term Loan Obligations beneficially owned by it, and thereafter, its pro rata share of Prepetition 2L Term Loan Obligations beneficially owned by it until the amount rolled-up equals the Roll-Up Amount; *provided, however*, the Roll-Up Amount is subject to the Roll-Up Reduction Provision.<br>The Term Loan DIP Facility shall be structured with multiple tranches with (a) the new money portion of the Term Loan DIP Facility classified as a first-out tranche ("<u>Tranche A</u>"), (b) any roll-up portion of the Prepetition 1L Term Loan Obligations classified as a second-out tranche ("<u>Tranche B</u>"), and (c) any roll-up portion of the Prepetition 2L Term Loan Obligations classified as a last-out tranche ("<u>Tranche C</u>").<br><br>Term Loan DIP Term Sheet, *Term Loan DIP Credit Facility* | A senior secured superpriority priming debtor in possession credit facility (the "<u>ABL DIP Facility</u>" and the loans under the ABL DIP Facility, the "<u>ABL DIP Loans</u>") comprised of a roll-up of the Prepetition Revolving Advances and Swing Loans (if any) (as such terms are defined in the Prepetition ABL Credit Agreement) and any unused commitments under the Prepetition ABL Credit Agreement, on a dollar for dollar basis, into new loans or commitments, as applicable, including without limitation all outstanding letters of credit, under such facility, in an aggregate principal amount not to exceed $50,000,000.<br><br>Upon entry of the Final Order, and solely to the extent that any Prepetition ABL Obligations remain outstanding, such obligations shall automatically be converted into principal obligations constituting ABL DIP Obligations without further action by the Debtors or any other party.<br><br>ABL DIP Term Sheet, *Type and Amount of the DIP Facility* |

| Maturity<br>Bankruptcy Rules<br>4001(b)(1)(B)(iii),<br>4001(c)(1)(B) | All Term Loan DIP Commitments will terminate, and all obligations outstanding under the Term Loan DIP Facility (the "Term Loan DIP Obligations") will be immediately due and payable in full in cash on the earliest to occur of:<br><br>(a)  120 calendar days after the Petition Date (the "Maturity Date") subject to no more than two extensions (each, a "Maturity Extension") of thirty (30) days each if (x) such Maturity Extension is approved in writing by the Required Term Loan DIP Lenders or (y) on the date that is the then-current Maturity Date:<br><br>i.   the Debtors have provided the Required Term Loan DIP Lenders an "extension budget" for the corresponding 30-day period covered by the Maturity Extension which has been approved by the Required Term Loan DIP Lenders and which demonstrates that the Debtors can maintain a minimum liquidity of no less than $2 million of unrestricted cash in deposit accounts subject to the liens of the Term Loan DIP Agent, excluding any new-money DIP Term Loan Facility amounts to be funded for that extension period;<br><br>ii.  the Debtors have received one or more "Qualified Bids" (as defined in the Restructuring Support Agreement) for all, substantially all, or any combination of the Debtors' assets from a party or parties other than the Consenting Stakeholder Purchaser that has not be withdrawn in an amount(s) greater than the applicable "Reserve Price" (as defined in the Restructuring Support Agreement);<br><br>iii. an executed asset purchase agreement, which is reasonably satisfactory to the Required Term Loan DIP Lenders and which remains in full force and effect, for the sale of Lognes campus owned by Sungard Availability Services (France) SAS; and<br><br>iv.  No events of Default or Consenting First Lien Lender/Second Lien Lender Termination Events (unless waived by the Required | All obligations under the ABL DIP Facility shall be due and payable in full in cash on the earliest of (i) the Stated Maturity Date (as defined below); (ii) the date that is thirty (30) calendar days after the Petition Date, if the Final Order has not been entered by the Court on or before such date; (iii) the effective date of any chapter 11 plan for the reorganization of any Debtor; (iv) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code section 363; and (v) the date of the acceleration of the ABL DIP Loans and the termination of the ABL DIP Commitments in accordance with the Definitive Financing Documentation (such earliest date, the "DIP Termination Date").  The principal of, and accrued interest on, the ABL DIP Loans and all other amounts owing to the DIP ABL Agent and the DIP ABL Lenders under the DIP ABL Facility shall be payable on the DIP Termination Date.  "Stated Maturity Date" shall have the meaning of "Maturity Date" set forth in the Term Loan DIP Term Sheet.<br><br>ABL DIP Term Sheet, *Maturity* |
|---|---|---|

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| | Consenting First Lien Lenders or the Required Consenting Second Lien Lenders, as applicable) have occurred or are continuing under this Term Sheet, the Restructuring Support Agreement, the Term Loan DIP Documents, and the Restructuring Term Sheet. <br>(b) the date that is thirty (30) calendar days after the Petition Date if the Final Order has not been entered by the Court on or before such date; <br>(c) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; <br>(d) the date of acceleration of the Term Loan DIP Loans and the termination of the Term Loan DIP Commitments upon the occurrence of an Event of Default (as defined below); <br>(e) the substantial consummation or effective date of any chapter 11 plan; <br>(f) the date the Court orders the conversion of the bankruptcy case of any of the Debtors to a chapter 7 liquidation; and <br>(g) dismissal of the bankruptcy case of any Debtor. <br><br>Term Loan DIP Term Sheet, *Maturity Date* | |
| **Interest Rates** <br>Bankruptcy Rule 4001(c)(1)(B) | Tranche A:  L+9.50% payable monthly in cash; provided that, on any monthly interest payment date, the Borrower may elect to pay up to 8.50% of such interest in kind. <br><br>Tranche B:  L+7.50% payable monthly in cash; provided that, on any monthly interest payment date, the Borrower may elect to pay up to 6.50% of such interest in kind. <br><br>Tranche C:  L+6.75% payable monthly in cash; provided that, on any monthly interest payment date, the Borrower may elect to pay up to 5.75% of such interest in kind. <br><br>Term Loan DIP Term Sheet, *Interest Rate* | All ABL DIP Loans and ABL DIP Obligations shall accrue interest at an interest rate per annum equal to the sum of three percent (3.00%) per annum plus the Alternate Base Rate, subject to the provisions of the Prepetition ABL Credit Agreement with respect to the Default Rate upon the postpetition occurrence and continuance of an Event of Default. <br><br>ABL DIP Term Sheet, *Type and Amount of the DIP Facility* |
| **Use of DIP Facilities and Cash Collateral** <br>Bankruptcy Rule 4001(b)(l)(B)(ii) | Proceeds of the Term Loan DIP Facility to be used solely in accordance with the Term Loan DIP Documents and the Approved Budget (as defined below) (subject to Permitted Variances), which uses shall include (i) payment of certain prepetition amounts in accordance with the then current Approved Budget, (ii) payment of working capital and | In accordance with the then current Approved Budget and Permitted Variances, the proceeds of the ABL DIP Loans under the ABL DIP Facility shall be used only for the following purposes: (i) payment of certain prepetition amounts in accordance with the then current Approved Budget (including prepetition payments to certain critical vendors identified |

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| | other general corporate needs of the Debtors in the ordinary course of business, (iii) payment of the costs and expenses of administering the Chapter 11 Cases, (iv) the indefeasible payment in full of all Bridge Financing Obligations upon entry of the Interim Order, (v) the reduction of the Prepetition ABL Obligations by $13.5 million using Cash Collateral and (vi) subject to the consent of the Required Term Loan DIP Lenders, the provision of loans of up to $10 million to Sungard AS UK to provide necessary funding for its administration process and preserve the value of the Debtors' estates.

No Cash Collateral or proceeds of the Term Loan DIP Facility may be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the Term Loan DIP Facility or the Prepetition Term Loan Agreements; *provided* that any Committee may use up to $50,000 to investigate (but not seek formal discovery or commence any challenge, objection or prosecute) any such claims or causes of action.

No Cash Collateral or proceeds of the Term Loan DIP Facility may be distributed to, or used for the benefit of, any non-Debtor affiliates or subsidiaries of the Debtors, including Sungard AS UK or applied toward (directly or indirectly) its administration (or to an administrator in England) without the prior written approval of the Required Term Loan DIP Lenders.

Term Loan DIP Term Sheet, *Use of Proceeds* | by the Debtors, to the extent set forth in the Approved Budget); (ii) payment of working capital and other general corporate needs of the Debtors in the ordinary course of business, and (iii) payment of the costs and expenses of administering the Chapter 11 Cases (including payments benefiting from the Carve-Out) incurred in the Chapter 11 Cases, including professional fees.

Notwithstanding the foregoing, no portion or proceeds of the ABL DIP Loans, the Carve-Out or the ABL DIP Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition ABL Agent (as defined below) and/or lenders in connection with the Prepetition ABL Facility, *provided* that any Committee may use up to $50,000 to investigate (but not seek formal discovery or commence any challenge, objection or prosecute) any such claims or causes of action.

ABL DIP Term Sheet, *Purpose* |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | 4.00% backstop fee (taken as a percentage of each Initial Term Loan DIP Lender's Term Loan DIP Commitment) payable in kind on the new-money portion of the Term Loan DIP Facility and earned upon entry of the Interim Order.

2.5% transaction fee payable in cash on the new-money portion of the Term Loan DIP Facility that is repaid with the proceeds of any sale of the Debtors' assets outside the ordinary course of business to a purchaser other than the Consenting Stakeholder Purchaser (as defined in the Restructuring Term Sheet).

1.5% per annum unused Term Loan DIP Facility commitment fee payable monthly in cash on the average unused amount of the | DIP ABL Facility Closing Fee shall be $365,000, earned upon entry of the Interim Order.

Letter of Credit Fees will be 4.0% per annum of the aggregate daily face amount of each outstanding Letter of Credit under the ABL DIP Facility.

ABL DIP Term Sheet, *Type and Amount of the DIP Facility* |

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| | Interim Term Loan DIP Amount or the Final Term Loan DIP Amount, as the case may be, between entry of the Interim Order or the Final Order, as the case may be, and the date the Interim Term Loan DIP Amount or the Final Term Loan DIP Amount, as the case may be, has been fully funded. | |
| | $20,000 per annum agent fee payable in cash to the Term Loan DIP Agent for its own account upon entry of the Interim Order and on each anniversary thereafter. | |
| | The Tranche A Term Loan DIP Loans to be made under the Term Loan DIP Facility shall be made a discount of 3.00% of the Tranche A Term Loan DIP Commitments. | |
| | Term Loan DIP Term Sheet, *DIP Fees, Original Issue Discount* | |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The Debtors will prepare and deliver a thirteen-week cash flow forecast, in form and substance acceptable to the Required Term Loan DIP Lenders and the ABL DIP Lenders (the "Initial DIP Budget" and, as updated by subsequent budgets approved, in writing, by the Required Term Loan DIP Lenders and the Required ABL DIP Lenders, the "Approved Budget").  All cash, Cash Collateral and proceeds of the DIP Facilities shall be used solely in accordance with the Approved Budget, subject to Permitted Variances. Interim Order ¶ 22 | |
| **Reporting Information** Bankruptcy Rule 4001(c)(1)(B) | On the Wednesday of each calendar week following the Petition Date and for each calendar week thereafter, by no later than 12:00 p.m. New York City time, the Debtors shall deliver to the DIP Agents and the DIP Lenders (and their advisors) a variance report (each, a "Variance Report") setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in the then-in-effect Approved Budget for the Testing Period (as defined below). The Variance Report shall also provide a reasonably detailed explanation for any variance on a cumulative basis.  The term "Testing Period" means, with respect to the Variance Report required to be delivered, the prior four-week period (except that no such variance reporting shall be required for the periods prior to the Petition Date). The Debtors shall not permit the aggregate cumulative "Receipts" and "Disbursements" variances for any Testing Period of the projected "Receipts" and "Disbursements" to exceed (a) for the first eight (8) Variance Reports, 15% (on a cumulative basis taking into account the variance for any prior Testing Period), and (b) for each Variance Report thereafter, 10% (on a cumulative basis taking into account the variance for any prior Testing Period), as set forth in the then-Approved DIP Budget (such permitted variances, the "Permitted Variance" and such limitations, the "DIP Variance Covenant"); *provided*, *however*, there shall be no DIP Variance Covenant for the first four weeks following the Petition Date. Interim Order ¶¶ 22, 23 | |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The Milestones, as attached to the Interim Order as **Exhibit D**, shall apply to the DIP Facilities unless extended or waived in writing by each of the Company Parties, the Required Consenting Stakeholders, the Required Term Loan DIP Lenders and the Required ABL DIP Lenders. Interim Order ¶ 34 | |

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | The Term Loan DIP Liens, the ABL DIP Liens, Prepetition Liens and liens granted as adequate protection for the Prepetition Secured Parties have the following priority on the DIP Collateral and Prepetition Collateral at the applicable Debtor entities obligated on the applicable DIP Facility or Prepetition Secured Obligation (the "Priority Schedule"): | |

| Term Loan Priority Collateral[4] | ABL Priority Collateral |
|---|---|
| Carve-Out | Carve-Out |
| Prepetition Term Loan Permitted Liens | Prepetition ABL Permitted Liens |
| Term Loan DIP Liens | ABL DIP Liens |
| Prepetition 1L Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens |
| Prepetition 1L Term Loan Liens | Prepetition ABL Liens |
| Prepetition 2L Term Loan Adequate Protection Liens | Term Loan DIP Liens |
| Prepetition 2L Term Loan Liens | Prepetition 1L Term Loan Adequate Protection Liens |
| ABL DIP Liens | Prepetition 1L Term Loan Liens |
| Prepetition ABL Adequate Protection Liens | Prepetition 2L Term Loan Adequate Protection Liens |
| Prepetition ABL Liens | Prepetition 2L Term Loan Liens |

| | | |
|---|---|---|
| | All obligations under the DIP Facilities shall also constitute claims entitled to the benefits of Bankruptcy Code sections 364(c)(1) and 503(b), having a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code ("Superpriority Claims"), subject to the Carve-Out. Interim Order ¶ 9 | |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | "Carve-Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under Bankruptcy Code section 726(b) in an amount not exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all (A) fees, disbursements, costs and expenses (including, for the avoidance of doubt any success fee, transaction fee, deferred fee or other similar fee set forth in the engagement letter of Houlihan Lokey and DH Capital, (the "Allowed Debtor Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code section 327, 328 or 363 (collectively, the "Debtor Professionals") and (B) subject to the Approved Budget, all fees, disbursements, costs and expenses (the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, collectively, the "Allowed Professional Fees") incurred by persons or firms retained by any Committee pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Term Loan DIP Agent, at the | |

---

[4]    References to Term Loan Priority Collateral and ABL Priority Collateral shall include, where applicable, the postpetition equivalents of such collateral.

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| | direction of the Required Term Loan DIP Lenders, of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (these clauses (i) through (iii), the "Pre-Carve Out Amounts"); and (iv) after the first business day following delivery by the Term Loan DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by the Professional Persons (and for the Committee Professionals, subject to the Approved Budget) in an aggregate amount not to exceed $2,000,000 (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"), and together with the Pre-Carve Out Amounts, the "Carve-Out Amount"). <br><br> No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facilities, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the Prepetition Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or Prepetition Secured Party; *provided* that, notwithstanding the foregoing, proceeds from the DIP Facilities and/or Cash Collateral not to exceed $50,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition ABL Obligations and the Prepetition Term Loan Obligations (together, the "Prepetition Facilities") and Prepetition Secured Parties (but not the DIP Facilities and DIP Secured Parties). <br><br> Interim Order ¶ 39 | |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(1)(B) | The earlier of (x) June 26, 2022, (y) for all parties other than any Committee, 75 days after entry of the Interim Order. <br><br> For any Committee, 60 days after date of formation. <br><br> Interim Order ¶ 48 | |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | In exchange for their consent to (i) the priming of the Prepetition Term Loan Liens by the Term Loan DIP Liens, (ii) the priming of the Prepetition ABL Liens by the ABL DIP Liens and (iii) the use of Cash Collateral to the extent set forth in the Interim Order, the Prepetition Secured Parties shall receive adequate protection to the extent of any Diminution in Value of their interests in the Prepetition Collateral, including: <br><br> a. Adequate protection claims to the Prepetition ABL Agent, the Prepetition 1L Agent and the Prepetition 2L Agent entitled to superpriority expense status; <br><br> b. Adequate protection liens in accordance with the Priority Schedule under Liens and Priorities, above; and <br><br> c. Payment of fees and expenses of the Prepetition ABL Agent and Prepetition 1L Agent. <br><br> Interim Order ¶¶ 17-20 | |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) | Until the DIP Obligations are indefeasibly paid in full and all commitments thereunder are terminated (the "DIP Repayment"), the occurrence of any of the following events, unless waived by the Required Term Loan DIP Lenders and/or Required ABL DIP Lenders, as applicable (or as otherwise provided in the DIP Documents), in writing (which may be by electronic mail) and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under the Interim Order, including, without limitation, failure to make any payment under the Interim Order when due or, solely as | |

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| | to the Required Term Loan DIP Lenders, comply with any Milestones; (b) the occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheets or any other DIP Documents; and (c) the Debtors' failure to comply with paragraphs 14, 22, 23, 24, 27, 28, 29, 30 and 31 of the Interim Order shall constitute Events of Default.<br><br>Interim Order ¶ 33 | |
| **Waiver / Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay of Bankruptcy Code section 362 will be modified to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by the Interim Order.<br><br>Interim Order ¶ 25 | |
| **Marshalling; 552(b) Waiver and Waiver of 506(c) Claims** Bankruptcy Rule 4001(c )(1)(x) | Subject to entry of the Final Order, waiver of the equitable doctrine of "marshalling," claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c), and section 552 "equities of the case" exception.<br><br>Interim Order ¶¶ 51-53 | |
| **Waiver / Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The Term Loan DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the Term Loan DIP Liens shall be subject to the Carve-Out and the priorities set forth in the Priority Schedule. Other than as set forth in the Interim Order or in the DIP Documents, the Term Loan DIP Liens shall not be made subject to or *pari passu* with any lien or security interest granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Term Loan DIP Liens shall not be subject to Bankruptcy Code sections 510, 549, or 550.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the Term Loan DIP Liens.<br><br>Interim Order ¶ 7 | The ABL DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien or claim to any of the ABL DIP Collateral, except that the ABL DIP Liens shall be subject to the Carve-Out and the priorities set forth in the Priority Schedule. Other than as set forth in the Interim Order or in the DIP Documents, the ABL DIP Liens shall not be made subject to or *pari passu* with any lien or security interest granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The ABL DIP Liens shall not be subject to Bankruptcy Code sections 510, 549, or 550.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the ABL DIP Liens.<br><br>Interim Order ¶ 8 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's gross negligence, actual | |

| Material Term | Term Loan DIP Facility | ABL DIP Facility |
|---|---|---|
| | fraud, or willful misconduct as determined in a final order by a court of competent jurisdiction. Interim Order ¶ 43 | |

### Statement Regarding Significant Provisions

16.     The Interim Order contains the following provisions (the "Significant Provisions")

identified in section C, paragraph 8 of the Complex Case Procedures:

    a.    ***Milestones.***  The DIP Facilities are subject to the plan and sale milestones, which are attached to the Interim Order as **Exhibit D**.  *See* Interim Order ¶ 34. The Milestones were heavily negotiated between the Debtors and the DIP Lenders not only in connection with the DIP Facilities, but in the broader context of the Debtors' restructuring and the Restructuring Support Agreement.

    b.    ***Term Loan DIP Roll-Up and Repayment of Prepetition Bridge Facility.***  The Debtors are seeking approval of, subject to the entry of the Final Order and the Challenge Period, the roll-up of a portion of the outstanding Prepetition 1L Term Loan Obligations and Prepetition 2L Term Loan Obligations.  *See* Interim Order ¶¶ I(viii).  Given that the Term Loan DIP Roll-Up is subject to the entry of the Final Order, parties in interest will have sufficient notice and an opportunity to object.   Additionally, the Debtors are seeking approval, upon entry of the Interim Order, to repay the Prepetition Bridge Facility in full, in cash with proceeds of the Term Loan DIP Facility.   The Prepetition Bridge Facility carries an interest rate substantially greater than the interest rate under the Term Loan DIP Facility and repayment will cease accrual of interest during the Chapter 11 Cases.

    c.    ***"Creeping" ABL DIP Roll-Up.***  The Debtors are seeking approval of, subject to the Interim Order and Challenge Period, a gradual roll-up of the Prepetition ABL Obligations through the ABL DIP Facility and, subject to entry of the Final Order, a roll-up of any Prepetition ABL Obligations that remain outstanding.  *See* Interim Order ¶¶ I(vii).  The Creeping ABL DIP Roll-Up (as defined below) was a necessary component of the ABL DIP Facility and the Debtors' consensual use of Cash Collateral and remains subject to the Challenge Period, preserving the rights of parties in interest.

    d.    ***Liens on Avoidance Actions or Proceeds of Avoidance Actions.***  The Debtors are seeking approval of the DIP Liens and Replacement Liens on any and all claims and causes of action, including on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (but on not the actions themselves).  However, the inclusion of proceeds of any such avoidance actions as ABL DIP Collateral or Term Loan DIP Collateral is

subject to the entry of the Final Order, and parties in interest will have sufficient notice and an opportunity to object.  *See* Interim Order ¶¶ 5-6.

e.    ***Default Provisions and Remedies.***  The DIP Loan Documents contain Event of Default provisions and will allow for remedies by the DIP Agent (upon direction by the Required Term Loan DIP Lenders and Required ABL DIP Lenders) following the occurrence of an Event of Default or other DIP Termination Event, subject to the Remedies Notice Period or order of the Court, and upon an emergency hearing.  *See* Interim Order ¶ 35.  During the Remedies Notice Period, the Debtors may use Cash Collateral and proceeds of the DIP Facilities to pay such amounts that are critical to the preservation of the Debtors and their estates, and in accordance with the Approved Budget. *See* Interim Order ¶ 36. Therefore, the Interim Order does not provide for the automatic lifting of the stay upon an Event of Default.

f.    ***Limitations on Use of Cash Collateral or DIP Proceeds to Pay Fees for Advisors to Official Committees***. The fees and expenses for advisors to any official committee will be subject to the Approved Budget and proceeds of the DIP Facility and Cash Collateral shall not be used to take certain actions against the DIP Lenders or the Prepetition Secured Lenders, except for an investigation budget in an aggregate amount of up to $50,000.  *See* Interim Order ¶ 39.

g.    ***Release of Claims Against Lenders or Others***.  The Interim Order provides for the release and discharge of each of the DIP Secured Parties and Prepetition Secured Parties from, among other things, any and all liabilities, claims and causes of action arising under, in connection with, arising out of or related to (as applicable) the DIP Documents and the Prepetition Credit Documents (as defined the Interim Order), the obligations owing and the financial obligations made thereunder, the negotiation thereof and the transactions reflected thereby and the obligations and financial obligations made thereunder or otherwise related to the Debtors.  *See* Interim Order ¶ H.  The release is a material inducement to the DIP Secured Parties to provide the DIP Facilities and is being provided in exchange for consideration in the form of the DIP Facilities and the DIP Lenders' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to fund the Chapter 11 Cases. Further, the Debtors are not aware of any meaningful claims against the DIP Secured Parties and Prepetition Secured Parties. The release complies with the requirements of paragraph 9 of the Complex Case Procedures because it is subject to the Challenge Period.  *See* Interim Order ¶ 48.

17.    As stated above, the DIP Facilities are critical to the Debtors' ability to continue to fund their business operations, ensure consensual use of Cash Collateral, and provide comfort and certainty to the Debtors' customers, vendors and workforce.  The terms of the DIP Facilities and

the Interim Order were heavily negotiated by the Debtors and the DIP Lenders, and the DIP

Lenders' agreement to fund the DIP Facilities is dependent on approval of such terms.

18.     In light of the foregoing, the Debtors submit that the Significant Provisions are

appropriate and just under the facts and circumstances of these Chapter 11 Cases.  Accordingly,

the Significant Provisions in the Interim Order should be approved.

**The Debtors' Prepetition Indebtedness**

**I.     Prepetition ABL Facility**

19.     Sungard AS, as a borrower, the other Debtor borrowers party thereto, the Debtor

guarantors as guarantors thereto, PNC Bank, National Association as administrative agent

("Prepetition ABL Agent") and the lenders party thereto from time to time (the "Prepetition ABL

Lenders") are parties to that certain Revolving Credit Agreement, dated as of August 6, 2019 (as

amended, restated, modified, and/or supplemented and as in effect immediately prior to the

Petition Date, the "Prepetition ABL Credit Agreement").  The Prepetition ABL Credit Agreement

provides for a $50 million senior secured revolving credit facility, with a sublimit of $20 million

for letters of credit (the "Prepetition ABL Facility" and the obligations thereunder, the "Prepetition

ABL Obligations").  The Prepetition ABL Facility is secured by a first lien on cash balances (the

"ABL Priority Collateral") and a third lien on the Term Loan Priority Collateral.  As of the Petition

Date, the Debtors owe approximately $29 million under the Prepetition ABL Credit Agreement

and approximately $11 million of letters of credit were outstanding under the Prepetition ABL Facility.

## II.      Prepetition Term Loans

20.      Sungard AS, as borrower, the other Debtor parties thereto as guarantors,[5] Alter Domus Products Corp. as administrative agent ("Prepetition 1L Agent") and the lenders party thereto from time to time (the "Prepetition 1L Term Loan Lenders") are parties to that certain Credit Agreement, dated as of December 22, 2020 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date, the "Prepetition 1L Term Loan Credit Agreement").  The Prepetition 1L Term Loan Credit Agreement originally provided for a $100 million senior secured term loan (the "Prepetition 1L Term Loan").  The Prepetition 1L Term Loan is secured by a first lien on substantially all the Debtors' assets (other than the ABL Priority Collateral (as defined below) (the "Term Loan Priority Collateral")) and a second lien on the ABL Priority Collateral (as defined below).  On April 7, 2022, the Prepetition 1L Term Loan was amended to increase the facility by an additional $7 million to provide the Debtors with sufficient operational liquidity to effectuate a smooth landing into chapter 11 (the "Prepetition Bridge Facility" and the obligations thereunder, the "Bridge Financing Obligations").  As of the Petition Date, the Debtors owe approximately $108.02 million under the Prepetition 1L Term Loan Credit Agreement (inclusive of the Bridge Financing Obligations).

---

[5]     The Debtor guarantors are the same under the Prepetition ABL Facility, the Prepetition 1L Term Loan and the Prepetition New 2L Term Loan (defined below) and include: Sungard AS New Holdings II, LLC, Sungard Availability Services LLC, Sungard Availability Services Holdings (Europe), Inc., Sungard Availability Services, Ltd, Sungard Availability NetWork Solutions, Inc., Sungard Availability Services Technology, LCC, Inflow LLC, Sungard Availability Services, LP, Sungard Availability Services Holdings (Canada), Inc., Sungard Availability Services (Canada) Ltd. / Sungard, Services de Continuite des Affaires (Canada) Ltee, (collective, the "Debtor Guarantors").

21.     Further, Sungard AS, as borrower, and the Debtor Guarantors as guarantors thereto, Alter Domus Products Corp., as administrative agent (the "Prepetition New 2L Agent") and the lenders party thereto from time to time (the "Prepetition New 2L Term Loan Lenders") are parties to that certain Junior Lien Credit Agreement, dated as of May 3, 2019 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the Petition Date, the "Prepetition New 2L Term Loan Credit Agreement").  The Prepetition New 2L Term Loan Credit Agreement provides for a $300 million senior secured term loan (the "Prepetition New 2L Term Loan") and is secured by a second lien on the Term Loan Priority Collateral and a third lien on the ABL Priority Collateral.  As of the Petition Date, the Debtors owe approximately $277.62 million under the Prepetition New 2L Term Loan Credit Agreement (the "Prepetition New 2L Term Loan Obligations").

22.     Finally, Sungard AS, as borrower, certain of the Debtor Guarantors[6] as guarantors thereto, Alter Domus Products Corp., as administrative agent (the "Prepetition Existing 2L Agent" and, together with the Prepetition New 2L Agent, the "Prepetition 2L Agents") and the lenders party thereto from time to time (the "Prepetition Existing 2L Term Loan Lenders" and, collectively with the Prepetition ABL Lenders, the Prepetition 1L Term Loan Lenders and the Prepetition New 2L Term Loan Lenders, the "Prepetition Lenders" and, together with the Prepetition ABL Agent, the Prepetition 1L Agent and the Prepetition 2L Agents, the "Prepetition Secured Parties")[7] as lenders are parties to that certain Junior Lien Credit Agreement, dated as of December 22, 2020 (as amended, restated, modified, and/or supplemented and as in effect immediately prior to the

---

[6]   Sungard Availability Services Holdings (Europe), Inc., Sungard Availability Services, Ltd. and Sungard Availability Services (Canada) Ltd. / Sungard, Services de Continuite des Affaires (Canada) Ltee are not guarantors to the Prepetition Existing 2L Credit Facility.

[7]   "Prepetition Term Loan Lenders" shall mean the Prepetition 1L Term Loan Lenders, the Prepetition New 2L Term Loan Lenders and the Prepetition Existing 2L Term Loan Lenders.

Petition Date, the "<u>Prepetition Existing 2L Term Loan Credit Agreement</u>" and, together with the Prepetition 1L Term Loan Credit Agreement and the Prepetition New 2L Term Loan Credit Agreement, the "<u>Prepetition Term Loans Credit Agreements</u>" and, together with the Prepetition ABL Credit Agreement, the "<u>Prepetition Credit Agreements</u>").   As of the Petition Date, approximately $8.9 million in principal amount of senior secured term loan (the "<u>Prepetition Existing 2L Term Loan</u>" and, together with the Prepetition 1L Term Loan and the Prepetition New 2L Term Loan, the "<u>Prepetition Term Loans</u>" and, collectively with the Prepetition ABL Facility, the "<u>Prepetition Facilities</u>") under the Prepetition Existing 2L Term Loan Credit Facility, which is secured by a second lien on the Term Loan Priority Collateral and a third lien on the ABL Priority Collateral at each Debtor obligated on the Prepetition Existing 2L Term Loan Credit Facility and which liens are *pari passu* with the liens securing the Prepetition New 2L Term Loan Obligations at such Debtors.

## III.   Intercreditor Agreements

23.     The Debtors are party to an amended and restated intercreditor agreement, dated as of December 22, 2020, with the Prepetition 1L Agent and the Prepetition 2L Agent governing, among other things, distributions of payments and treatment of collateral between the Prepetition 1L Term Loan Lenders, the Prepetition New 2L Term Loan Lenders and the Prepetition Existing 2L Term Loan Lenders.

24.     In addition, the Debtors are party to a second amended and restated intercreditor agreement, dated as of May 25, 2021 with the Prepetition ABL Agent, the Prepetition 1L Agent and the Prepetition 2L Agents governing, among other things, distributions of payments and treatment of collateral between the Prepetition ABL Lenders, the Prepetition 1L Lenders, the Prepetition New 2L Term Loan Lenders and the Prepetition Existing 2L Term Loan Lenders.

**The Proposed DIP Facilities**

I.    **Term Loan DIP Facility**

25.    By the Motion, the Debtors seek approval of two debtor in possession financing facilities, the Term Loan DIP facility and the ABL DIP Facility.  As to the Term Loan DIP Facility, certain Prepetition 1L Term Loan Lenders and Prepetition 2L Term Loan Lenders (the "Term Loan DIP Lenders") have committed to provide a first lien super-priority new money delayed-draw Term Loan DIP Facility consisting of three tranches:

  a.    Tranche A: up to $41.15 million in new money loans available upon entry of the Interim Order (the "Interim Term Loan DIP Amount") and up to $54.15 million in new money loans available upon entry of the Final Order (the "Final Term Loan DIP Amount").

  b.    Tranche B:  Subject to the terms of the Final Order, a roll-up of certain obligations under the Prepetition 1L Term Loan.

  c.    Tranche C: Subject to the terms of the Final Order, a roll-up of certain obligations under the Prepetition 2L Term Loan (Tranches B and C together, the "Term Loan DIP Roll-Up Obligations").

26.    The Term Loan DIP Facility will provide the Debtors with the necessary cash to operate during these Chapter 11 Cases.  Pursuant to the Term Loan DIP Term Sheet, and as discussed further herein, proceeds of the Term Loan DIP Facility shall be used, among other things, (i) to maintain normal operations in accordance with the Approved Budget, subject to Permitted Variance, (ii) for the payment in full of all Bridge Financing Obligations and (iii) to provide a loan up of to $10 million to Sungard AS UK to fund its administration process and preserve the value of the Debtors' global businesses.

27.    The Initial Term Loan DIP Lenders will, severally and not jointly, backstop the Term Loan DIP Facility, meaning that such parties have agreed to fund the entirety of the Term Loan DIP Facility commitments, but all Prepetition 1L Term Loan Lenders will have an

opportunity to participate in the Term Loan DIP Facility ratably based on their existing Prepetition 1L Term Loan claim amounts (exclusive of the Bridge Financing Obligations).

28.     The Term Loan DIP Agent and Term Loan DIP Lenders will be granted super-priority administrative claims under Bankruptcy Code section 364(c)(1) for the payment of the obligations under the Term Loan DIP Facility with priority above all other administrative claims, subject to the Carve-Out and *pari passu* with the super-priority administrative claim granted for the payment of the obligations under the ABL DIP Facility at the applicable Debtors obligated on the respective DIP Facilities, as set forth in the Interim Order.

**II.     ABL DIP Facility**

29.     The Debtors are also seeking authorization to obtain senior secured postpetition financing on a superpriority basis under the ABL DIP Facility (together with the Term Loan DIP Facility, the "ABL DIP Facilities") comprised of a "creeping" roll-up of the Prepetition ABL Obligations on a dollar for dollar basis into new loans (x) not to exceed the amount outstanding under the Prepetition ABL Facility on the Petition Date upon entry of the Interim Order and (y)  not to exceed $50,000,000 upon entry of the Final Order and subject to borrowing base availability as set forth in the Prepetition ABL Credit Agreement.  PNC will serve as administrative agent under the ABL DIP Facility (in such capacity, the "ABL DIP Agent").

30.     Pursuant to the ABL DIP Term Sheet, and as discussed further herein, proceeds of the ABL DIP Facility shall be used, among other things, to (i) maintain normal operations in accordance with the Approved Budget and (ii) reduce the Prepetition ABL Obligations by $13.5 million using Cash Collateral.

31.     The ABL DIP Agent and the ABL DIP Lenders will be granted super-priority administrative claims under Bankruptcy Code section 364(c)(1) for the payment of the obligations under the ABL DIP Facility with priority above all other administrative claims, subject to the

Carve-Out and *pari passu* with the super-priority administrative claim granted for the payment of the obligations under the Term Loan DIP Facility at the applicable Debtors obligated on the respective DIP Facilities, as set forth in the Interim Order.

### III.   The Debtors' Need for Debtor in Possession Financing and Use of Cash Collateral

32.     The Debtors require immediate access to the DIP Facilities, in addition to continued use of Cash Collateral, to ensure they are able to continue operating during these Chapter 11 Cases and preserve the value of their estates for the benefit of all parties in interest.  As explained in the Nicholls Declaration,[8] based on the financial forecasts and analysis conducted by the Debtors' management team and advisors, the Debtors cannot operate their businesses and administer these Chapter 11 Cases on Cash Collateral alone.  Nicholls Decl. ¶ 11.  The Debtors do not generate enough operating cash flow in the ordinary course of business to cover their working capital needs in addition to the projected costs of these Chapter 11 Cases and, therefore, absent postpetition financing, would be without funds to operate their businesses.  Nicholls Decl. ¶ 13.

33.     Further, on March 24, 2022, the Debtors entered into that certain Amendment No. 5 and Waiver to Prepetition ABL Credit Agreement with the Prepetition ABL Lender to waive certain expected defaults under the Prepetition ABL Facility that would have been triggered upon the commencement of Sungard AS UK's administration proceeding.  *Id.* ¶ 12.  In connection with the waiver, the Debtors agreed to restrict the use of $13.5 million of Cash Collateral securing the Prepetition ABL Facility.  *Id.*

---

[8]     The "Nicholls Declaration" means the *Declaration of Christopher Nicholls in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* filed contemporaneously herewith.

34.     The DIP Facilities address the Debtors' near-term liquidity constraints by providing the Debtors with immediate access to the Interim Term Loan DIP Amount of $41.15 million in new money financing and up to an additional $54.15 million in new money financing on a final basis, which, as explained in the Hedus Declaration,[9] is anticipated to provide the Debtors with adequate runway to implement the Restructuring Transactions contemplated by the Restructuring Support Agreement.   Hedus Decl. ¶ 20.   The Debtors depend on cash to maintain normal operations, including paying operating disbursements such as rent, payroll, insurance renewal and payment towards critical vendors.  Nicholls Decl. ¶ 16.  Any failure to make payments could cause substantial uncertainty among the Debtors' customer base and could have a material negative impact on the ultimate value of the Debtors' businesses.  Nicholls Decl. ¶ 17.

35.     Access to the DIP Facilities will allow the Debtors to strengthen their cash position immediately, and will send a positive, and credible, message to the Debtors' workforce and commercial counterparties that the Debtors will have sufficient liquidity to maintain ordinary course operations and meet their financial commitments throughout the course of the Chapter 11 Cases.  *Id*.  The absence of such reassurance would likely cause substantial uncertainty and unease among the Debtors' customers, causing customers to turn to competitors for replacement services, given the need for dependability in the Debtors' businesses.  *Id*.

36.     Moreover, the DIP Facilities provide for the consensual use of Cash Collateral, which is a critical element of the Debtors' decision to enter into the DIP Facilities.  The Debtors rely on the use of cash generated from operations to fund working capital, capital expenditures,

---

[9]     The "Hedus Declaration" means the *Declaration of Tom Hedus in Support of Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* filed contemporaneously herewith.

and other general corporate purposes.  *Id* ¶¶ 16, 17.  As explained above, absent the consent of the

Debtors' secured creditors, the Debtors would have been compelled to put on evidence as to the

extent of the secured creditors' interest in the Debtors' existing cash balances and future cash

generated from operations, as well as the appropriate adequate protection for such interests.  Hedus

Decl. ¶ 15.  These issues would have been litigated potentially on the first day of these cases and,

had the Debtors not prevailed, could have caused a significant and value-destructive disruption to

the Debtors' ability to operate in chapter 11 and administer these cases.  Instead, the DIP Facilities

resolve these issues by providing for consensual use of Cash Collateral, which, in turn, allows the

Debtors to preserve the going-concern value of the estates for the benefit of all stakeholders.  *Id*.

¶ 20.

37.    In consideration of the Debtors' financial circumstances and for the reasons

outlined above, the Debtors require immediate access to the DIP Facilities, and authorization to

use the proceeds thereunder for the purposes identified in this Motion and the Interim Order.  *Id* ¶

11.  Accordingly, the Debtors have demonstrated an immediate need for approval of the DIP

Facilities and use of Cash Collateral.

**IV.    Alternative Sources of Financing Are Not Available on Better Terms**

38.    The Debtors believe that the DIP Facilities represent the best terms available to the

Debtors for financing.  As stated in the Hedus Declaration, Houlihan Lokey ("Houlihan")

conducted a marketing process to determine the availability of third party financing sources that

were able to accommodate the Debtors' financial situation.  Hedus Decl. ¶ 14.  As part of this

process, Houlihan canvassed seven potential financing counterparties, with six of the seven

executing non-disclosure agreements.  *Id*.  Houlihan (i) conducted phone calls with the potential

financing counterparties in order to introduce them to the situation and discuss the debtor in

possession financing requirements including the loan sizing, potential collateral coverage, and process considerations; and (ii) invited them to execute a customary non-disclosure agreement and be provided with certain financial information regarding the Debtors and their collateral. *Id.*

39.    Based on the results of this marketing process, the Debtors do not believe that alternative debtor in possession financing on terms superior to those contained in the DIP Facilities is presently available. Specifically, the Debtors determined that financing from a third party source would likely not be feasible, given that the institutions contacted by Houlihan indicated that they were unwilling to lend to the Debtors on a junior lien or unsecured basis and were unwilling to engage in a priming fight with the Debtors' existing secured lenders. *Id.* ¶ 15. With no proposal from any other potential financing source, the Debtors determined to focus their efforts on negotiating financing from their existing secured lenders. *Id.* ¶ 16.

40.    The Debtors conducted extensive, arm's length negotiations with the DIP Lenders over the terms of the DIP Facilities in the period leading to the filing of these cases. These negotiations resulted in DIP Facilities with competitive economic terms that are reasonable under the circumstances. *Id.* ¶¶ 17, 24, 28. Significantly, the DIP Lenders are the only source of actionable financing available to the Debtors and the DIP Facilities represent the only viable postpetition financing available. *Id.* ¶ 16. The DIP Facilities will provide the Debtors with immediate access to the liquidity that is necessary to fund the Debtors' operations, stabilize the Debtors' businesses during the pendency of these Chapter 11 Cases, and ensure that the Debtors have sufficient runway to implement a value-maximizing restructuring consistent with the Restructuring Support Agreement. For all the reasons set forth herein, the DIP Facilities are in the best interests of the Debtors' estates, and the Debtors respectfully request that the Court approve the DIP Facilities on the terms and conditions described herein.

**Basis for Relief**

I.      **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

        A.      **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgement.**

        41.     The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using Cash Collateral.   Courts defer considerably to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not violate any provisions of the Bankruptcy Code.  *See, e.g.*, *In re EXCO Res., Inc.*, No. 18-30155 (D.I. 97) (Bankr. S.D. Tex. Jan. 18, 2019) (order approving postpetition financing as exercise of debtors' business judgment)*; In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

        42.     In determining whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").  The Debtors' determination to move forward with the DIP Facilities is a sound exercise of their business judgment following a careful evaluation of alternatives.  *See* Hedus Decl. ¶ 16.  The DIP Facilities are the only option available to the Debtors under the circumstances, providing continued access to liquidity to fund the Debtors' businesses during the Chapter 11 Cases and the administration of the Chapter 11 Cases, including a sale process.  *Id*.

43.     Moreover, in determining whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc*., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

44.     The Debtors and their advisors determined that the Debtors would require postpetition financing to fund the administration of their Chapter 11 Cases and their ongoing business operations throughout their Chapter 11 Cases.  Hedus Decl. ¶ 10.  The Debtors negotiated the DIP Facilities and the DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.  Hedus Decl. ¶ 33.  As discussed, the Debtors, through negotiations, ultimately determined that the DIP Facilities were the only alternative available after the marketing process yielded no other viable financing proposals.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

### i.     The Roll-Up Loans Should Be Approved

45.     In addition, the Court should approve (i) upon entry of the Final Order and subject to the Challenge Period, the Term Loan DIP Roll-Up Obligations (as defined below) and (ii) upon

entry of the Interim Order and subject to the Challenge Period. the ABL DIP Roll-Up Obligations (as defined below), as an exercise of the Debtors' sound business judgment.  Bankruptcy Code section 363(b) permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

46.     Term Loan DIP Roll-Up:  Subject to entry of the Final Order and the Challenge Period, the Term Loan DIP Facility contemplates that the Term Loan DIP Lenders shall be entitled to roll up their ratable share of Prepetition Term Loan Obligations.  For every dollar of New Money DIP Loans advanced by a Term Loan DIP Lender, such Term Loan DIP Lender shall be entitled to roll up two dollars of such Term Loan DIP Lender's Prepetition 1L Term Loan Obligations into Tranche B Term Loan DIP Loans until the ratio of New Money DIP Loans of such Term Loan DIP Lender to rolled up Prepetition 1L Term Loan Obligations of such Term Loan DIP Lender reaches 1:2.  In the event that the Term Loan DIP Lender advances New Money DIP Loans in an aggregate amount that exceeds the amount of Prepetition 1L Term Loan Obligations of such Term Loan DIP Lender that such Term Loan DIP Lender would otherwise be able to roll up assuming a 1:2 ratio, such Term Loan DIP Lender shall be entitled to roll up that portion of such Term Loan DIP Lender's Prepetition 2L Term Loan Obligations into Tranche C Term Loan DIP Loans necessary to reach a 1:2 ratio (i.e., until such Term Loan DIP Lender has rolled up, in the aggregate,

two dollars of combined Prepetition 1L Term Loan Obligations and Prepetition 2L Term Loan Obligations for every dollar of New Money DIP Loans advanced by such Term Loan DIP Lender).

47.     Importantly, the Debtors' obligations under Tranches B and C of the Term Loan DIP Facility are subject to automatic recharacterization if the Debtors do not receive sufficient value from the sales processes that the Debtors will pursue pursuant to the Restructuring Support Agreement and in accordance with bid procedures to be filed in the near term.  In the event that the obligations under Tranches A, B and C, combined, exceed the sum of (1) the cash proceeds realized by the Debtors from the closing of one or more sales equal to or in excess of the Reserve Price (as defined in the Restructuring Support Agreement) and (2) the credit bid amount, if any, by the Term Loan DIP Lenders in connection with any consummated sale of Term Loan DIP Collateral to the Term Loan DIP Lenders, then an amount of Tranches B and C equal to such excess shall be automatically recharacterized, first, as Prepetition 2L Term Loan Obligations and then, to the extent necessary, as Prepetition 1L Term Loan Obligations, until the total Term Loan DIP Obligations equals the amount received through cash proceeds and credit bidding (the "Roll-Up Recharacterization").  The Roll-Up Recharacterization ensures that the Debtors do not incur DIP Obligations that would threaten the Debtors' administrative solvency.

48.     ABL DIP Roll-Up:  The ABL DIP Facility contemplates that the ABL DIP Lenders shall be entitled to roll-up the Prepetition ABL Obligations.  Upon entry of the Interim Order, the first proceeds of all ABL Priority Collateral shall be deemed applied in reduction of the Prepetition ABL Obligations on a dollar for dollar basis and deemed to have been immediately advanced to the Debtors and converted into ABL DIP Obligations (the "Creeping ABL DIP Roll-Up") until all such obligations have been repaid in full in cash and become ABL DIP Obligations.  Also upon entry of the Interim Order, all letters of credit issued and outstanding as of the Petition Date shall

be deemed terminated and re-issued under the ABL DIP Facility.  Upon entry of the Final Order, and solely to the extent that any Prepetition ABL Obligations remain outstanding, such obligations shall automatically be converted into principal obligations constituting ABL DIP Obligations without further action by the Debtors or any other party (any such amount, together with all amounts rolled up pursuant to the Creeping ABL DIP Roll-Up, the "<u>ABL DIP Roll-Up Obligations</u>").

49.     Repayment of prepetition secured claims are routinely paid outside of a plan of reorganization, including through a "roll-up" where the proceeds of the debtor in possession financing are used to pay off or replace the prepetition debt.  Refinancing prepetition debt is a common feature in debtor in possession financing arrangements, particularly when accomplished pursuant to a final order.

50.     Here, the DIP Roll-Up Obligations are a reasonable exercise of the Debtors' business judgment for multiple reasons.  As described in the Hedus Declaration, inclusion of the Term Loan DIP Roll-Up Obligations was a topic of extensive negotiation between the Debtors and the Term Loan DIP Lenders and was a necessary condition to securing the Term Loan DIP Lenders' commitment to fund the new money under the Term Loan DIP Facility.  Hedus Decl. ¶ 24.  As such, the Debtors would not have access to up to $95.3 million in new money financing without the Term Loan DIP Roll-Up Obligations.  *Id.*  Further, the Debtors conditioned their approval of the Term Loan Roll-Up on the inclusion of the Roll-Up Recharacterization in order to protect against administrative insolvency, while further negotiating for all Prepetition 1L Term Loan Lenders to be able to participate in the Term Loan DIP Facility on a pro rata basis and on the same terms.  *Id.* ¶¶ 25, 26.  Similarly, the Creeping ABL DIP Roll-Up is justified under the circumstances.  As described in the Hedus Declaration, the Debtors could not have obtained

consensual use of Cash Collateral without agreeing to the gradual roll-up of Prepetition ABL Obligations during the interim period, and the eventual roll-up of any outstanding Prepetition ABL Obligations pursuant to the Final Order.

51.     Finally, all ABL DIP Roll-Up Obligations, including the Creeping ABL DIP Roll-Up Obligations, will be subject to the Challenge Period and, therefore, approval of the ABL DIP Roll-Up Obligations will not prejudice the rights of an official committee of unsecured creditors or other parties in interest (with requisite standing) to challenge the validity, perfection, priority, or extent of the Prepetition Secured Parties liens or claims.  In other words, the roll-up does not insulate the Prepetition Secured Parties from any challenge to the rolled-up portion of their claims or liens.  The Debtors believe that this adequately preserves the rights of all parties while ensuring their continued access to Cash Collateral and the new money loans to be advanced under the Term Loan DIP Facility.

### ii.     Payment of Certain Prepetition Obligations Should Be Approved

52.     By the Motion, the Debtors seek authorization to utilize the proceeds of the DIP Facilities and the Cash Collateral on hand to, among other things, (i) reduce the outstanding Prepetition ABL Obligations by $13,500,000 and (ii) repay in full, in cash the Debtors' Prepetition Bridge Facility.  The payment of these prepetition obligations is necessary and appropriate under the facts of these cases for the reasons set forth below and should be approved.

53.     <u>Prepetition ABL Obligations Repayment</u>.  Pursuant to the ABL DIP Facility, the Debtors seek authority to use $13.5 million of Cash Collateral to reduce the Prepetition ABL Obligations.  As summarized above, on March 24, 2022, the Debtors entered into that certain Amendment No. 5 and Waiver to Prepetition ABL Credit Agreement with the Prepetition ABL Lender to waive certain expected defaults under the Prepetition ABL Facility that would have been triggered upon the commencement of administration proceedings by Sungard AS UK.  *Id*. ¶ 27.

In connection with the waiver, the Debtors agreed to restrict the use of $13.5 million of cash collateral securing the Prepetition ABL Facility. *Id.* Shortly thereafter, the parties began negotiating the terms of the ABL DIP Facility. As part of that negotiation, the Prepetition ABL Lender communicated to the Debtors that it was not willing to provide the ABL DIP Facility without the repayment of the $13.5 million in restricted cash. *Id.* In response and in the exercise of their business judgment, the Debtors determined that it was appropriate to use the $13.5 million in restricted Cash Collateral that was otherwise not available for use in the Company's operations to repay and reduce the size of the ABL DIP Facility and secure access to the ABL DIP Facility. *Id.* The Debtors' business judgment was further predicated on the fact that the Debtors will not incur interest on funds that are not available to the Debtors, and thus repaying the $13.5 million in restricted cash at the outset of these cases will ultimately inure to the benefit of the estates. The use of $13.5 million in Cash Collateral to repay Prepetition ABL Obligations is thus reasonable and appropriate under the circumstances and should be approved.

54. <u>Prepetition Bridge Facility Repayment</u>. Pursuant to the Term Loan DIP Facility, the Debtors seek authority to use proceeds of the Term Loan DIP Facility for the indefeasible payment in full of the outstanding Bridge Financing Obligations. Secured just days before the Petition Date, the proceeds of the Bridge Financing Obligations were necessary to provide the Debtors with the ability to fund critical payments of insurance premiums, certain critical vendor and lease payments, employee compensation, and professional fees necessary to ensure the orderly filing of these Chapter 11 Cases. *Id.* ¶ 23. Repayment of the Bridge Financing Obligations was a key point of negotiation over the Term Loan DIP Facility, as certain of the same lenders that will backstop the Term Loan DIP Facility provided the incremental financing giving rise to the Bridge Financing Obligations. *Id.* The Initial Term Loan DIP Lenders who funded the Prepetition Bridge

Facility would have preferred to provide such funding pursuant to the Term Loan DIP Facility. Delaying the funding was not, however, a viable option for Debtors because of their liquidity position and the serious risks to posed to their estates if such funding was not made prior to the filing of these Chapter 11 Cases. *Id.* The Term Loan DIP Lenders made it clear that repayment of the Bridge Financing Obligations was necessary to providing the Term Loan DIP Facility. *Id*. Importantly, the interest rate on the Prepetition Bridge Facility is substantially greater than the interest rate under Tranche A of the Term Loan DIP Facility and the repayment of the Bridge Financing Obligations will stop the accrual of such interest during the pendency of these Chapter 11 Cases. Moreover, the Debtors are economically incentivized to repay Prepetition Bridge Facility because (a) such amount will no longer accrue interest and fees that otherwise would have been payable during the pendency of these cases and (b) the Term Loan DIP Facility carries a lower interest rate than the Prepetition Bridge Facility. Simply stated, the Debtors cannot utilize the funds to be made available under the Term Loan DIP Facility without immediately repaying the rescue financing advanced just days before the Interim Hearing to ensure a smooth landing in chapter 11. Therefore, the Court should approve the repayment of the Bridge Financing Obligations as a reasonable exercise of the Debtors' business judgment.

### iii. The Debtors' Ability to Provide the UK Loans Should be Approved.

55. To preserve the value of Sungard AS UK's assets in administration, the Debtors' directors determined that it would be in the best interest of the Debtors and the Company as a whole for Sungard AS UK to continue operating its business in the ordinary course while the UK administrator explores the orderly sale of Sungard AS UK's assets and the potential transfer of customer contracts to other suppliers. *Id*. ¶ 29. In order to implement a trading administration to operate Sungard AS UK's business, Sungard AS III negotiated a short-term funding agreement with the Benjamin Dymant and Ian Colin Wormleighton (collectively, the "Administrators") of

Teneo Financial Advisory Limited, acting on behalf of Sungard AS UK, whereby Sungard AS would provide a loan facility in an aggregate principal amount not exceeding $7.0 million (or approximately £5,300,000 based on current exchange rate), subject to the terms and conditions of a certain funding agreement, dated March 25, 2022 (the "UK Funding Agreement").[10]  *Id*.

56.     The Debtors intend to loan up to an additional $10 million in Term Loan DIP Facility proceeds to Sungard AS UK, which will be advanced as an upsizing of the UK Funding Agreement and will be subject to the approval of the Required Term Loan DIP Lenders, to continue to provide necessary support for Sungard AS UK's administration process.  Loans under the UK Funding Agreement incur an 8.0% interest rate per annum and have a senior claim on proceeds from the sale of Sungard AS UK's assets and the collection of outstanding customer receivables. *Id*. ¶ 30.  Without this funding, Sungard AS UK would not have sufficient funds to maintain operations.  Nicholls Decl. ¶ 16; Hedus Decl. ¶¶ 11, 29-31.  In the event that Sungard AS UK were to stop providing services to its customers, the Debtors' global reputation would likely be severely impacted, potentially leading to North American customers seeking to replace the Debtors' services.  Nicholls Decl. ¶ 17; Hedus Decl. ¶ 31.  Further, the Debtors are comfortable that (i) asset sale processes are underway for substantially all of Sungard AS UK's assets pursuant to the UK Administration, and (ii) reasonable valuation expectations (and realizable proceeds) exceed the amount forecasted to be advanced under the UK Funding Agreement.  Hedus Decl. ¶ 32.  In light of the foregoing, and after extensive discussions with the Term Loan DIP Lenders, the Debtors determined it was in the best interest of the estates and the Debtors' global businesses to fund the operations of Sungard AS UK and to allow the administration proceeding to be managed through an orderly process.  *Id* ¶ 29.  This conclusion is strengthened by the support of the Term Loan DIP

---

[10]   A copy of the UK Funding Agreement is attached to the Motion as **Exhibit 1**.

Lenders, who agreed (subject to the further consent of the Required Term Loan DIP Lenders, for each future loan made to Sungard AS UK) to provide the necessary financing through the Term Loan DIP Facility.  As a result, the Debtors submit that the funding of up to $10,000,000 to support Sungard UK's administration process should be approved as necessary and appropriate to preserve the value of the Debtors' estates for the benefit of all stakeholders.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

57.     The Debtors propose to obtain financing under the DIP Facilities in part by providing superpriority claims and liens pursuant to Bankruptcy Code section 364(c). Significantly, the Debtors propose to provide first priority liens on the DIP Collateral.

58.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Bankruptcy Code section 364(c) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

59.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to Bankruptcy Code section 364(c).  Specifically, courts look to whether:

> a.      the debtor is unable to obtain unsecured credit under Bankruptcy Code section 364(b), *i.e.*, by allowing a lender only an administrative claim;
>
> b.      the credit transaction is necessary to preserve the assets of the estate; and

      c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

60.    As discussed above, the parties with whom Houlihan engaged as part of the debtor in possession financing marketing process were not interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis, nor were they willing to engage in a "priming fight" with the Debtors' existing secured lenders.  Hedus Decl. ¶ 15.  Accordingly, the DIP Facilities represent the only viable financing proposal and the most favorable terms the Debtors were able to procure after extensive negotiations, and the DIP Facilities' structure is appropriate given the lack of any viable alternatives.

61.    Bankruptcy Code section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facilities if they are unable to obtain unsecured or junior secured credit and either (a) the affected secured lenders consent or (b) adequate protection exists for such priming lien.  Here, as stated above, the Debtors are unable to obtain unsecured or junior secured credit.  Moreover, all priming liens securing the DIP Facilities have been consented to as the Prepetition Term Loan Lenders consented to the priming liens securing the Term Loan DIP Facilities and the Prepetition ABL Lenders consenting to the priming liens securing the ABL DIP Facility.  Accordingly, the relief requested pursuant to Bankruptcy Code section 364(d)(1) is both warranted and appropriate under the circumstances.

41

### C.   No Comparable Alternative to the DIP Facilities Are Reasonably Available.

62.   A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Bankruptcy Code section 364(c).  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

63.   The Debtors, with the assistance of their advisors, engaged in a marketing process to solicit debtor in possession financing proposals from seven potential financing counterparties, which were selected in part based on their experience providing such funding "emergency situations."  Hedus Decl. ¶ 14.  Despite these efforts, the Debtors received only one proposal for debtor in possession financing— a potential revolving facility, which was deemed not actionable both because of the costs associated with the proposed facility and because the Debtors did not believe that they had adequate time to negotiate the terms of such facility in the days leading up to the Petition Date.  *Id*. ¶ 15.  The DIP Facilities represent the best option available to address the Debtors' near-term liquidity requirements and need for continued use of Cash Collateral, and the Debtors respectfully submit that the terms of the proposed DIP Facilities are reasonable and

appropriate in this circumstance.

## II.     The Adequate Protection Provided to Prepetition Secured Parties Should Be Approved

64.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by Bankruptcy Code section 363,[11] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

65.     Pursuant to Bankruptcy Code section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Parties with an interest in collateral, including cash collateral, that a debtor proposes to use during the course of a chapter 11 case are entitled to adequate protection.  *See* 11 U.S.C. § 363(e).  Moreover, a debtor must provide adequate protection to a secured creditor that is being "primed" by the debtor's postpetition secured financing.  11 U.S.C. § 364(d)(1)(B).

66.     Courts generally determine what constitutes adequate protection on a case-by-case basis.  *See In re Columbia Gas Sys., Inc*., No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb.

---

[11]    Bankruptcy Code section 363(a) defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Cont'l Airlines Inc*., 154 B.R. 176, 180–81 (Bankr. D. Del. 1993).

67.     Here, the Debtors are proposing to provide adequate protection to the Prepetition Secured Parties in the form of, among other things, (a) replacement liens, (b) superpriority 507(b) claims, and (c) the payment of reasonable and documented fees and expenses of advisors to certain of the Prepetition Secured Parties. The Debtors submit that the proposed adequate protection is consistent with the relief granted to parties whose collateral is being used during the bankruptcy and whose liens are being primed by postpetition financing.  Therefore, the Court should find that the adequate protection provided to the Prepetition Secured Parties is fair and reasonable and satisfies the requirements of Bankruptcy Code sections 361, 363(e), and 364(d)(1)(B).

**III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

68.     As is customary, the Debtors have agreed, subject to Court approval, to (a) reimburse the DIP Lenders for reasonable and documented legal fees and out-of-pocket expenses, (b) pay certain agency, backstop and transaction fees, and incur original issue discount to the face value of the Term Loan DIP Facility and (c) pay the ABL DIP Facility closing fee.  As set forth in the Hedus Declaration, the Debtors believe that the fees and expenses to be paid under the DIP Facilities are appropriate in light of the facts and circumstances of these Chapter 11 Cases.  Hedus Decl. ¶ 22.  Such fees were negotiated at arm's length and in good faith by the Debtors and the

DIP Lenders, and the Debtors believe that such fees and expenses are reasonable when compared to other similar transactions.  *Id*.

## IV.     The DIP Agents and the DIP Lenders Should Be Afforded Good-Faith Protection under Bankruptcy Code Section 364(e).

69.     Bankruptcy Code section 364(e) protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Bankruptcy Code section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

70.     The DIP Facilities are the result of:  (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing; (ii) extensive arm's length, good faith negotiations between the Debtors and the DIP Lenders; and (iii) several proposals and counterproposals.  The Debtors submit that the terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors ran a marketing process to identify alternative financing sources but did not receive any viable proposals from third-party financing sources other than their existing lenders.  Accordingly, the Court should find that the obligations arising under the DIP Facilities and other financial accommodations made to the Debtors have been extended by the DIP Agents and the DIP Lenders in "good faith" within the meaning of

Bankruptcy Code section 364(e), and therefore the DIP Agents and DIP Lenders are entitled to all of the protections afforded thereby.

## V.      The Automatic Stay Should Be Modified on a Limited Basis.

71.      The Interim Order provides that the automatic stay provisions of Bankruptcy Code section 362 will be modified to allow the DIP Agents to take all actions necessary to perfect the DIP Liens and the Replacement Liens.  Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

### Emergency Consideration

72.      The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these Chapter 11 Cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

73.      To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

74.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt or reject any agreement, contract or lease pursuant to Bankruptcy Code section 365; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

75.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel for PNC Bank,

National Association, as the administrative agent under the Debtors' prepetition revolving credit facility and ABL DIP facility; (d) counsel for Alter Domus Products Corp., as the administrative agent under each of the Debtors' prepetition term loan facilities; (e) counsel for the ad hoc group of term loan lenders and the term loan DIP lenders; (f) counsel for Acquiom Agency Services LLC, as term loan DIP agent under the Debtors' term loan DIP facility; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (k) the state attorneys general in the states where the Debtors conduct their business operations; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

WHEREFORE, the Debtors request entry of orders, substantially in the form of the Interim Order filed with this Motion and the Final Order to be filed prior to the Final Hearing, granting the relief requested herein and granting such other relief as the Court deems just, proper and equitable.

Dated: April 11, 2022
Houston, Texas

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Rebecca Blake Chaikin (*pro hac vice* pending)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email:  mcavenaugh@jw.com
         jwertz@jw.com
         rchaikin@jw.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (*pro hac vice* pending)
Meredith A. Lahaie (*pro hac vice* pending)
Kevin Zuzolo (*pro hac vice* pending)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:  pdublin@akingump.com
         mlahaie@akingump.com
         kzuzolo@akingump.com
-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
Zach D. Lanier (*pro hac vice* pending)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email:  mbrimmage@akingump.com
         llawrence@akingump.com
         zlanier@akingump.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/  *Matthew D. Cavenaugh*
Matthew D. Cavenaugh


## **Certificate of Service**

I certify that on April 11, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  *Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**<u>EXHIBIT 1</u>**

**UK Funding Agreement**



**Dated**    25 March        **2022**

**SUNGUARD AVAILABILITY SERVICES (UK) LIMITED (IN ADMINISTRATION)**

**BENJAMIN DYMANT AND IAN COLIN WORMLEIGHTON**

**SUNGARD AS NEW HOLDINGS LLC**

---

**FUNDING AGREEMENT**

---

DocuSign Envelope ID: 75172603-538F-4CE2-9AE3-4A64D09864B5

## Contents

| Clause | | Page |
|---|---|---|

| 1 | Definitions and interpretations | 1 |
| 2 | Facility | 4 |
| 3 | Interest | 5 |
| 4 | Repayment | 5 |
| 5 | Early Termination | 6 |
| 6 | Costs and expenses | 8 |
| 7 | Exclusion of Administrators' liability | 8 |
| 8 | Assignment and transfer | 9 |
| 9 | Third party rights | 9 |
| 10 | Notices | 9 |
| 11 | General | 10 |
| 12 | Governing law and jurisdiction | 10 |

**This agreement** is made on                              25 March                              2022

**Between**

(1)     **Sungard Availability Services (UK) Limited** (No. 02368123) whose registered office is at c/o Teneo Financial Advisory Limited, 5th Floor, 6 More London Place, London SE1 2DA (**Borrower**) acting by the Administrators (defined below);

(2)     **Benjamin Dymant** and Ian Colin Wormleighton both of Teneo Financial Advisory Limited, 5th Floor, 6 More London Place, London SE1 2DA (together the **Administrators**); and

(3)     **Sungard AS New Holdings LLC** whose registered office is at c/o The Corporation Trust Company, Corporation Trust Centre, 1209 Orange Street, Wilmington DE 19801 (**Funder**)

**It is agreed**

**1        Definitions and interpretations**

1.1     In this agreement:

        **Act** means the Insolvency Act 1986 as amended or re enacted

        **Administration** means the administration of the Borrower which commenced on or about the date of this agreement pursuant to paragraph 22 of Schedule B1 to the Insolvency Act 1986

        **Availability Period** means the two week period from and including the date of this agreement unless extended by agreement of the Parties, subject to early termination pursuant to clause 5 (Early Termination) and the drawing of further funds pursuant to clause 5.8

        **Business** means the provision of data storage and disaster recovery facilities within the United Kingdom

        **Business Day** means any day (other than a Saturday, Sunday or public holiday) during which banks in London are open for normal business

        **Cut-Off Date** is as defined in the definition of Excluded Expenses

        **Day 1 Realisable Assets** means those assets which are available to the Administrators for either possession or realisation at the commencement of the Administration (and do not require provision of the Loan to so realise), and which constitute:

        (a)     all deposits, prepayments, cheques, bills, notes or securities received by the Borrower or the Administrators on behalf of the Borrower on or before the commencement of the Administration and any cash in hand and at bank or in the banking system;

        (b)     the right to return of any rent deposits paid by the Borrower prior to the commencement of the Administration;

        (c)     any claim or potential claim under any insurance arising from any act occurring on or before the date of the Administration;

        (d)     all investments in shares or securities owned by the Borrower in Sungard Availability Services (Poland) Sp z.o.o

DocuSign Envelope ID: 75172603-538F-4CE2-9AE3-4A64D09864B5

(e)      any tax refunds which can be claimed from HMRC and any non-domestic rate refunds which can be claimed from the relevant local authority.

**Early Termination Event** is as set out at clause 5

**Early Termination Event Notice** is as set out at clause 5

**Excluded Expenses** means all the Administrators' remuneration, costs, expenses and all other outgoings incurred by the Borrower as expenses of the administration, which are incurred at any time after the date which is 2 Business Days post receipt by either Party of an Early Termination Notice (**Cut-Off Date**) but not those obligations incurred on an actual, contingent or prospective basis on or prior to the Cut-Off Date

**Facility** means the sterling loan facility made pursuant to clause 2 (Facility)

**Funder's Group** means the Funder and each of its subsidiary undertakings (direct or indirect) from time to time

**Intercompany Loan** means the debt owing by the Funder to the Borrower in the principal amount of £4,135,601.00, together with all interest accrued to the date of the Administration, pursuant to an amended and restated promissory note dated 29 March 2019, as amended from time to time

**Interest** any amounts outstanding as calculated in accordance with clause 3

**Later Realisable Assets** means any assets which are not Day 1 Realisable Assets regardless of whether such assets accrued to or were otherwise owned or obtained by the Company before or after the Administration appointment, including but not limited to:

(a)      the book and other debts and monetary claims owing to the Borrower regarding the Business whether accrued before or after the Administration appointment and whether or not yet due or payable or invoiced, and all guarantees, indemnities, securities, rights of retention of title and liens for the same;

(b)      any lease premiums realisable on any sale or assignment of any leasehold premises held by the Company regarding the Business

(c)      any customer contracts and engagements entered into and all orders placed with the Borrower or the Administrators on behalf of the Borrower before or after the Administration appointment by customers in relation to the Business insofar as the same are capable of being assigned;

(d)      all investments in shares or securities owned by the Borrower in Sungard Availability Services (Ireland) Limited; and

(e)      all shares and securities owned by the Borrower in Sungard Availability Services (India) Limited.

**Limit** means the maximum principal amount of the Facility referred to in clause 2.1

**Loan** means a loan made or to be made available under the Facility or the principal amount outstanding for the time being of that loan

**Party** or **Parties** means a party to this agreement

**Rules** means the Insolvency Rules 2016 as amended or re enacted

**Security** means, save where arising automatically by way of statute, equity or other laws, a mortgage, charge, pledge, assignment by way of security, lien, hypothecation or other encumberance or any other agreement or arrangement having a similar effect (but not a trust, title retention rights or set off rights created by agreement) securing any obligation of any person

**Specified Purpose** means to fund all the Administrators' remuneration, costs, expenses and all other outgoings incurred by the Borrower as expenses of the administration other than Excluded Expenses and provided such remuneration, costs, expenses and outgoings are incurred (whether on an actual, contingent or prospective basis) for the purpose of or as a consequence of running the administration as a trading administration

**Transitional Services** is as defined at clause 6.2

1.2   In this agreement, a reference to:

(a)   a clause is, unless otherwise stated, a reference to a clause of, this agreement;

(b)   a provision of law includes a reference to that provision as replaced, modified or re-enacted from time to time and any subordinate legislation made under that statutory provision from time to time, in each case whether before or after the date of this agreement;

(c)   a person includes any individual, firm, company, corporation, government, state or agency of state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(d)   a **Party**, the **Borrower**, or the **Funder** shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(e)   writing, subject to clause 11.3, includes any mode of reproducing words in a legible and non-transitory form;

(f)   this agreement or any provision of this agreement or any other agreement, document or instrument is to this agreement, that provision or that agreement, document or instrument as amended, novated, supplemented, extended or restated; and

(g)   a time of day is a reference to London time.

1.3   The contents table and headings in this agreement are for convenience only and do not affect the interpretation or construction of this agreement.

1.4   Words importing the singular include the plural and vice versa.

1.5   The words **other**, **include** and **including** do not limit the generality of any preceding words and any words which follow them shall not be construed as being limited in scope to the same class as the preceding words where a wider construction is possible.

1.6   £, GBP, pounds and sterling denote the lawful currency of the United Kingdom.

2       **Facility**

2.1     The Funder grants to the Borrower a sterling loan facility in an aggregate principal amount not exceeding £5,295,007.56 (five million, two hundred and ninety five thousand and seven pounds and fifty six pence) on a committed basis subject to the terms and conditions of this agreement.

2.2     The Borrower shall use all money advanced under this agreement for the Specified Purpose only. The Funder is not obliged to monitor or verify how any amount advanced under this Agreement is used.

2.3     Subject to clause 2.4, the Borrower will utilise the Facility in full on the date of this agreement and agrees to maintain any funds not already committed or defrayed for the Specified Purpose within a bank account controlled by the Administrators.

2.4     Notwithstanding that the Borrower has drawn the Facility in full on the date of this agreement, the Borrower confirms to the Funder that it will not commit or defray amounts from the Loan in respect of the Specified Purpose in excess of £4,000,000 (four million pounds) in any 2 week cumulative period, commencing from the date of this agreement.

2.5     At the end of any 1 week period, commencing from the date of this agreement, the Borrower will provide to the Funder:

(a)     a breakdown of all amounts either committed or defrayed from the Loan for the Specified Purpose, the reasons for such commitment or defrayment and whether amounts stated are committed or defrayed;

(b)     a forecast of the known or anticipated amounts to be committed or defrayed from the Loan for the Specified Purpose and the reasons for such commitment or defrayment for the upcoming 1 week period; and

(c)     in any case, on request to provide evidence for such committed or defrayed amounts as soon as is reasonably possible.

2.6     Should the Borrower conclude that it no longer requires any amount of the Facility, not already defrayed or committed toward the Specified Purpose, the Borrower agrees to return such amount no longer required to the Funder as soon as reasonably practical.

2.7     Whilst any amounts are outstanding under this Facility (but subject to the Administrators remaining in office), the Borrower agrees:

(a)     to provide weekly updates for the period where the Loan is outstanding, in a format to be agreed between the Funder and the Borrower save that such updates shall include, extant workstreams of the Administrators (including updates regarding (i) any ongoing sale processes, (ii) any negotiations with landlords, and (iii) any negotiations with customers), summaries of the financial position of the Business and any noteworthy operational updates or points of interest;

(b)     to consult with the Funder regarding:

(i)      any operational sites which the Borrower is considering closing (and the granting of an appropriate licence, should the Funder wish to occupy any such site itself);

(ii)     any proposed redundancies;

> (iii)    any proposed marketing process or strategies concerning a sale of the Business or assets of the Company (in whole or in part);
>
> (iv)    the selection of any third party advisor regarding a sale of the Business of the Company (in whole or in part),

save in each case that such consultation shall not fetter the Administrators' statutory and other legal or regulatory obligations concerning the Borrower.

Such updates and consultation notifications are to be provided by the Borrower to the Funder by email to the following email addresses: (A) mike@sungardas.com; and (B) tj.anderson@sungardas.com.

**3     Interest**

3.1    Interest shall accrue on the Loan from (and including) the date on which the Loan is drawn until (and including) the date on which the Loan and all accrued interest is repaid in full at a rate of 8% per annum.

3.2    Accrued interest on the Loan shall capitalise and be added to principal amount of each Loan on the 10th calendar day of each month, or if that day is not a Business Day, the next Business Day in that calendar month.

3.3    The Borrower shall pay all accrued but unpaid interest in accordance with clause 4.

**4     Repayment**

4.1    Subject strictly in each case to clauses 4.2, 4.3 and 5:

> (a)    the Loan and Interest will be repaid by the Borrower in full no later than 5 Business Days prior to the effective date on which the Administrators or their successors (if any) are to be discharged as joint administrators of the Borrower pursuant to paragraph 98 of Schedule B1 to the Act; and
>
> (b)    the Loan and Interest will be treated as an expense in the administration of the Borrower and, accordingly, repayment of the Loan and Interest will be made in accordance with the priorities set out in the Act and the Rules. The Parties agree that the Loan and Interest and the liability to repay the Loan and Interest would ordinarily rank and be payable as an expense under subparagraph (2)(a) of rule 3.51 of the Rules. The Parties however agree:
>
> > (i)    regarding repayment of expenses other than Excluded Expenses, to subordinate repayment of the Loan and Interest such that repayment will rank and be repaid immediately after those expenses (other than any Excluded Expenses) that are payable pursuant to sub paragraph (2) (i) of rule 3.51 of the Rules; and
> >
> > (ii)    as regards repayment of Excluded Expenses, the Loan and Interest shall rank and be payable as an expense under subparagraph (2)(a) or rule 3.51 of the Rules,
>
> save that no repayment of the Loan and Interest shall be made from Day 1 Realisable Assets other than in accordance with clause 4.3.

(c)     The Funder agrees neither to make nor to support any application under Rule 3.51(3) of the Rules to vary this subordinated ranking.

4.2     Notwithstanding clause 4.1, the Lender, the Administrators and the Borrower hereby agree:

(a)     that the provision and repayment of the Loan and Interest should not worsen any creditors' position as regards any Day 1 Realisable Assets; and additionally,

(b)     that the purpose of the Loan and Interest is to fund a potentially insolvent administration of the Borrower and, as such, there is a risk of there being insufficient funds within the administration estate of the Borrower from which to make full repayment of the Loan and Interest.

On these bases the Funder agrees that neither the Administrators nor the Borrower will be liable:

(c)     to repay the Loan and Interest at all, save to the extent that the Administrators obtain or realise funds from any Later Realisable Assets, in which case (subject to clause 4.2(d)) such Later Realisable Assets shall be utilised to repay the Loan and Interest in accordance with clause 4.1; and

(d)     for any shortfall in repayment of the Loan or Interest, or any failure to repay the Loan and / or Interest at all, which arises as a result of the administration of the Borrower proving to be insolvent; and

(e)     for payment to the Funder of any funds arising in the Administration where those funds have been or will be applied in funding the costs and expenses of the administration of the Borrower which rank ahead of the Funder pursuant to clause 4.1(b); and

(f)     for the payment to the Funder of any funds arising from Day 1 Realisable Assets.

4.3     Payment of Excluded Expenses will only be made from Day 1 Realisable Assets, save to the extent that the Loan and Interest have been repaid in full in accordance with this clause 4.

4.4     Realisations from the Day 1 Realisable Assets shall only be utilised to repay the Loan in the event that the Administrators obtain an asset realisation surplus from the administration of the Borrower, after the payment of all the Administrators' remuneration, costs, expenses and all other outgoings incurred by the Borrower as expenses of the administration and all creditor claims (aside from the Funder's claim).

4.5     Any amount repaid under this agreement may not be reborrowed.

**5      Early Termination**

5.1     Nothing in this agreement shall obligate the Borrower or the Administrators to continue trading the Business of the Borrower or remain in office as Administrators of the Borrower and the Funder confirms that it will not seek to prevent the Administrators from ceasing to trade the Business of the Borrower.

5.2     The Administrators may unilaterally conclude:

(a)     that there is insufficient funding made available pursuant to this agreement or otherwise to continue in office as Administrators or trading the Business of the Borrower, particularly where there is any risk of the Administration estate itself being insolvent; and / or

(b)    that it is no longer in the interests of the creditors as a whole to continue in office as Administrators or trading the Business of the Borrower; and / or

(c)    that some other statutory, legal or regulatory reason requires the Administrators to either exit the Administration of the Borrower or cease trading the Business; and / or

(d)    that the operational services provided to the Borrower by another member of the Funder's group necessary for the effective operation of the Borrower cease to be provided or are no longer provided free of charge; and / or

(e)    that in their professional opinion, continuing to trade the Business of the Borrower or remaining in office as Administrators is not the correct course,

in which case the Borrower shall provide 2 Business Days written notice of the same to the Funder in order to bring the continued funding agreements detailed in this agreement to an end.

5.3    The Funder may, on 2 Business Days written notice to the Borrower confirm that it no longer wishes to provide continued funding pursuant to the terms of this agreement.

5.4    A notice served pursuant to clauses 5.2 or 5.3 shall constitute an **Early Termination Event** and the notice shall be an **Early Termination Event Notice**. The Availability Period shall terminate on the Cut-Off Date, save in respect of any further drawing pursuant to clause 5.8(b).

5.5    Subject to any limits set out at clause 2, should an Early Termination Event Notice be received, the Borrower shall be entitled to commit for payment or defray any amount of the Loan for the whole amount of the Administrators' remuneration, costs, expenses and all other outgoings incurred by the Borrower as expenses of the administration then outstanding or incurred (on an actual, contingent or prospective basis) on or before the Cut-Off Date, save that the Borrower shall not be entitled to commit for payment or defray the Excluded Expenses.

5.6    The Borrower shall report to the Funder on and provide clear evidence of those amounts so committed or defrayed in accordance with clause 5.5.

5.7    Within 20 Business Days (or earlier to the extent possible) of receipt of Early Termination Event Notice, the Borrower agrees to return to the Funder such of the Loan which has been drawn by the Borrower but not committed for payment or defrayed in accordance with clause 5.5.

5.8    For the amount anticipated to be incurred pursuant to clause 5.5, the Borrower confirms that it will act in good faith towards the Funder in estimating such amounts. Should it become apparent that the anticipated amount is inaccurate then:

(a)    to the extent that the Borrower has anticipated additional funding which is not required for the Specified Purpose, such amounts shall be returned to the Funder within 10 Business Days of the Borrower and the Administrators finalising the expense position; and

(b)    to the extent the Borrower has anticipated too little funding, the Borrower may (subject to the Limit) draw a further Loan after providing 10 Business Days' notice and clear evidence of the costs to be so funded by the Funder.

Nothing in this clause shall obligate the Funder to fund the Excluded Expenses.

5.9 Thereafter, the repayment obligation for such amounts drawn pursuant to an Early Termination Event and any other amounts outstanding regarding the Loan and Interest shall be dealt with in accordance with clause 4.

**6    Other dealings**

6.1 The Borrower and the Administrators agree to consider in good faith any offer to purchase all or part of the Business of the Borrower by the Funder, including where such offer is comprised in part by way of exchanging the Borrower's liabilities hereunder for certain assets of the Borrower, otherwise known as a credit bid.

6.2 In consideration for the Funder entering into this Agreement, the Borrower agrees not to pursue and hereby releases the Intercompany Loan subject to the Funder:

(a) agreeing to continue to provide without charge all and any operational, administrative and back office services (in effect for the period immediately prior to the appointment of the Administrators) provided by the Funder or another member of the Funder's group to the Borrower which are necessary for the Borrower's effective operation (the **Transitional Services**), in such instances where the Funder is providing those services itself or has effective voting control (either directly or via another subsidiary) over another member of its group providing those service; and

(b) using reasonable endeavours to ensure that all and any Transitional Services provided by a member of the group over which the Funder does not have effective voting control (either directly or via another subsidiary) continue to be provided without charge,

in each case for the duration of the Administrators' appointment over the Borrower.

6.3 The Funder and Borrower agree that such Transitional Services shall include but not be limited to:

(a) all and any services provided by Sungard Availability Services (India) Private Limited; and

(b) the continued provision and upkeep of any intellectual property rights, currently licensed to or otherwise used by the Borrower.

6.4 The Borrower confirms that it will not create any Security over any of its assets without the Funder's written consent.

6.5 The Borrower confirms that it will not directly seek to end the fixed price energy arrangements with e.on without the Funder's written consent, the same not to be unreasonably withheld.

**7    Costs and expenses**

Each Party shall bear its own costs in connection with the preparation, negotiation and execution of this agreement.

**8    Exclusion of Administrators' liability**

8.1 Neither the Administrators, nor their firm, members, partners, employees, advisers, representatives or agents shall incur any personal liability whatever in relation to this agreement, any associated arrangements or negotiations or under any document or assurance made under this agreement.

8.2 The Funder, the Administrators and the Borrower agree that neither the Borrower nor the Administrators have provided any advice or recommendation regarding the Funder's entry into this agreement or any consequent effect (desired on not) in respect of the Borrower's wider group and no liability for the same shall accordingly arise in respect of the Administrators personally, nor their firm, members, partners, employees, advisers, representatives or agents (nor shall any liability rank and/or be claimed by the Funder as an expense of the Administration of the Borrower).

8.3 The Administrators are party to this agreement in their personal capacities only to receive the benefit of the terms in their favour contained in this agreement.

**9     Assignment and transfer**

9.1 The Funder may assign or transfer all or any part of its rights under this agreement to any other member of the Funder's Group.

9.2 The Borrower may not assign, create Security in or over or transfer, make the subject of a trust or deal in any other manner with this agreement or any of its rights under this agreement or purport to do any of those things without the prior written consent of the Funder.

**10    Third party rights**

10.1 Subject to clause 10.2, a person who is not a Party shall have no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or rely upon a provision of this agreement. No Party may hold itself out as trustee of any rights under this agreement for the benefit of any third party unless specifically provided for in this agreement. This clause 10 does not affect any right or remedy of any person which exists, or is available, otherwise than under the Contracts (Rights of Third Parties) Act 1999.

10.2 Any subsequently appointed administrator or liquidator of the Borrower shall have the benefits of this agreement as if it were always a Party.

**11    Notices**

11.1 Any notice given under this agreement must be in writing signed by, or on behalf of, the person issuing the notice. Any notice must be delivered by hand or by prepaid recorded delivery first class post to the recipient's registered office address for the time being marked for the attention of Mike Robinson & Terrence Anderson for the Funder and the Administrators for themselves or the Borrower, as appropriate. In the absence of evidence of earlier receipt and subject to clause 11.2, a notice served in accordance with clause 11.1 shall be deemed to have been received:

(a) if delivered by hand, at the time of actual delivery to the address referred to in clause 11.1;

(b) if delivered by prepaid recorded delivery first class post, 2 Business Days from the date of posting.

11.2 If deemed receipt under clause 11.1 occurs on a day which is not a Business Day or after 5.00 pm on a Business Day, the relevant notice shall be deemed to have been received at 9.00 am on the next Business Day.

11.3 For the avoidance of doubt, notice given under this agreement shall not be validly served if sent by fax or e-mail.

## 12    General

12.1    No variation to this agreement will be effective unless made in writing and signed by or on behalf of both Parties. A waiver given or consent granted by the Funder under this agreement will be effective only if given in writing and then only in the instance and for the purpose for which it is given.

12.2    Each provision of this agreement is severable and distinct from the others. If at any time any provision of this agreement is or becomes unlawful, invalid or unenforceable to any extent or in any circumstances for any reason, it will to that extent or in those circumstances be deemed not to form part of this agreement but (except to that extent or in those circumstances in the case of that provision) the legality, validity and enforceability of that and all other provisions of this agreement will not be affected in any way.

12.3    If any provision of this agreement is found to be illegal, invalid or unenforceable in accordance with clause 12.2 but would be legal, valid or enforceable if some part of the provision were deleted, the provision in question will apply with any modification that may be necessary to make it legal, valid or enforceable.

12.4    The failure or delay in exercising a right or remedy under this agreement or by law does not amount to a waiver of that (or any other) right or remedy. No single or partial exercise, or non-exercise or non-enforcement of any right or remedy provided by this agreement or by law prevents or restricts any further or other exercise or enforcement of that (or any other) right or remedy.

12.5    The Funder's rights and remedies contained in this agreement are cumulative and not exclusive of any rights or remedies provided by law.

12.6    This agreement may be executed in any number of counterparts each of which when executed and delivered will be an original. All the counterparts together will form one and the same document.

## 13    Governing law and jurisdiction

This agreement (including any associated non-contractual disputes or claims) is governed by English law and the parties agree to submit to the exclusive jurisdiction of the English Courts in relation to any claim or matter (whether contractual or non-contractual) arising under this agreement.

**The Parties** have signed this agreement on the date first set out above.

Signed by                                                        )
**Benjamin Dymant**                                              )
as Joint Administrator acting without personal                   )
liability for and on behalf of                                   )
**Sungard Availability Services (UK) Limited**                   )       ........................................................

Signed by                              )
**Benjamin Dymant**                    )
on behalf of himself and Ian Colin     )      ........................................................
Wormleighton

Signed by                              )
                                       )
a director for and on behalf of        )
**Sungard AS New Holdings LLC**        )      ........................................................

Signed by
**Benjamin Dymant**
as Joint Administrator acting without personal
liability for and on behalf of
**Sungard Availability Services (UK) Limited**

)
)
)
)
)

Signed by
**Benjamin Dymant**
on behalf of himself and Ian Colin
Wormleighton

)
)
)

Signed by

a director for and on behalf of
**Sungard AS New Holdings LLC**

)
)
)
)