**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| SUNGARD AS NEW HOLDINGS, LLC, *et al.*,[1] | ) ) ) | Case No. 22-90018 (DRJ) |
| Debtors. | ) ) | (Joint Administration Requested) (Emergency Hearing Requested) |

**DECLARATION OF CHRISTOPHER NICHOLLS IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) AUTHORIZING THE DEBTORS TO REPAY CERTAIN PREPETITION SECURED INDEBTEDNESS, (IV) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (V) GRANTING ADEQUATE PROTECTION, (VI) MODIFYING THE AUTOMATIC STAY, (VII) SCHEDULING A FINAL HEARING, AND (VIII) <u>GRANTING RELATED RELIEF</u>**

Pursuant to 28 U.S.C. § 1746, I, Christopher Nicholls, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director at FTI Consulting, Inc. ("<u>FTI</u>"), a full-service financial advisory firm specializing in interim management, restructuring advisory, turnaround consulting, operational due diligence, and performance improvement services across a broad range of industries. I have been working with the above-captioned debtors and debtors in possession

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of the Debtors' tax identification numbers, are: InFlow LLC (9489); Sungard AS New Holdings, LLC (5907); Sungard AS New Holdings II, LLC (9169); Sungard AS New Holdings III, LLC (3503); Sungard Availability Network Solutions Inc. (1034); Sungard Availability Services (Canada) Ltd./Sungard, Services de Continuite des Affaires (Canada) Ltee (3886); Sungard Availability Services Holdings (Canada), Inc. (2679); Sungard Availability Services Holdings (Europe), Inc. (2190); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Sungard Availability Services, LP (6195); and Sungard Availability Services, Ltd. (4711). The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 565 E Swedesford Road, Suite 320, Wayne, PA 19087.

1

(collectively, the "Debtors") since mid-February. Through that time, I have been closely working with management at the Debtors in connection with the Chapter 11 Cases.

2. I submit this declaration ("Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "DIP Motion").[2]

3. In forming the opinions set forth herein, I have relied upon and/or considered, among other things, the following: (a) my experience in chapter 11 cases, including with respect to debtor in possession financing; (b) the DIP Motion; (c) *Declaration of Michael K. Robinson, Chief Executive Officer And President of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"); (d) *Declaration of Tom Hedus in Support of Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the DIP Motion. The material terms of the DIP Facilities are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the DIP Facilities herein or in the DIP Motion is qualified in its entirety by reference to the DIP Documents (as defined in the DIP Motion).

"Hedus Declaration"); and (e) discussions with the Debtors' management and other advisors concerning the Debtors' business and finances.

4. As a professional proposed to be retained by the Debtors, FTI is charging for services provided in this matter, but I am not being specifically compensated for this declaration or testimony other than through payments received by FTI. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**A.     Qualifications**

5. I am a Senior Managing Director of FTI, which is a full-service financial advisory firm specializing in interim management, restructuring advisory, turnaround consulting, operational due diligence, and performance improvement services across a broad range of industries. FTI and its senior professionals have extensive experience with respect to (i) stabilizing and improving a company's financial position, including developing or validating forecasts, business plans, and related assessments of a business's strategic position, (ii) monitoring and managing cash, cash flow, and supplier relationships, (iii) assessing and recommending cost reduction strategies, and (iv) designing and negotiating financial restructuring packages.

6. I personally have over 30 years of experience advising on corporate finance and restructuring transactions. Some of those engagements include representation of the debtors in company restructurings such as Frontier Communications, SFX Entertainment, Reader's Digest, Transtar, Freedom Communications, and iQuor. I have also represented creditors in restructurings such as Intelsat, LSC Communications, Frontpoint, Windstream, Acosta, Deluxe Entertainment, Cumulus, iHeart, Avaya, Cenveo, Cengage, Source Interlink, Broadview, Tribune Media, MediaNews and Allegiance Telecom.

3

7. I obtained a Bachelor of Arts in Economics from Boston University in 1986. After graduating, I began my career at Morgan Stanley and then spent 5 years at Merrill Lynch, working in the corporate bond and investment banking departments.

8. In 1997, I joined GE Capital's Media Communications Group, where I became the head of the telecom workout and risk management teams. During this time, I led restructurings totaling over $10 billion in debt and was a principal in multiple M&A transactions.

9. I started working for FTI in 2005 and am currently a Senior Managing Director and the leader of FTI's Telecom, Media and Technology Practice in New York, as well as a senior member of FTI's Investment Bank. I specialize in balance sheet and operational restructuring, performance improvement, interim management, diligence, valuation, M&A advisory and litigation support.

**B.     The Debtors' Prepetition Cash Balance**

10. As of April 10, 2022, the Debtors had total consolidated liquidity of approximately $5 million of cash and cash equivalents, net of a $13,500,000 liquidity "block" established in favor of the Debtors' ABL lender, PNC, in exchange for PNC's agreement to grant a prospective waiver for an event of default that would have been triggered under the Debtors' prepetition revolving facility upon the commencement of Sungard AS UK's administration proceeding.

11. As described in the Budget attached as **Exhibit C** to the Interim Order, the Debtors are not projected to generate sufficient operating cash flow in the ordinary course of business to operate their businesses, pay postpetition debts as they come due, pay amounts requested under the various first-day motions, or fund other administrative expenses.

12. Further, on March 24, 2022, the Debtors entered into that certain Amendment No. 5 and Waiver to Prepetition ABL Credit Agreement with the Prepetition ABL Lender to waive

certain expected defaults under the Prepetition ABL Facility in advance of Sungard Availability Services (UK) Limited ("Sungard AS UK") filing an administration proceeding. In connection with the waiver, the Debtors agreed to restrict the use of $13.5 million of Cash Collateral securing the Prepetition ABL Facility. In addition, the Debtors determined it was in the best interest of the estates to fund $7.0 million of cash into the United Kingdom to enable the United Kingdom's business to continue to have access to critical global operational resources and preserve customer relationships.

13. Without securing access to the $41.15 million available upon entry of the Interim Order, the Debtors will be unable to operate their businesses and pay debts as they come due during the first 21 days of these Chapter 11 Cases. As such, and given their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of the Prepetition Secured Parties' Cash Collateral to operate their businesses.

C.  **The Debtors' Liquidity Needs and Budget**

14. Since being retained in February, FTI has assisted the Debtors in evaluating their liquidity position and potential financing needs. FTI has worked closely with the Debtors, their management, and their other advisors to evaluate the Debtors' cash requirements for their businesses and the projected costs associated with these Chapter 11 Cases. As part of FTI's evaluation of the Debtors' liquidity position, FTI reviewed, analyzed, and assisted in the development of the Debtors' 13-week and 6-month DIP cash flow forecasts. These forecasts take into account anticipated operating receipts and disbursements during the projected period and consider a number of factors, including the effect of these Chapter 11 Cases on the operations of the Debtors' businesses, fees, and interest expenses associated with the DIP Facilities, professional

fees, and required operational payments, as well as the additional liquidity required for the Debtors to provide necessary support for Sungard AS UK during its administration process.

15. FTI has identified four primary needs of liquidity for the Debtors, as described more fully below: (i) to maintain normal operations in accordance with the approved Budget, including paying operating disbursements such as rent, payroll, insurance renewal and payment towards critical vendors; (ii) to provide a loan of up to $10 million in necessary support for Sungard AS UK's administration process; (iii) to repay in full, in cash the Prepetition Bridge Facility; and (iv) to fund the costs associated with these Chapter 11 Cases, including applicable professional fees and fees payable to the Office of the United States Trustee for the Southern District of Texas.

D. **The Debtors Need Immediate Access to the DIP Proceeds and Cash Collateral and Will Suffer Substantial Harm if They Are Unable to Access Them**

16. The Debtors have a critical need to use the proceeds of the DIP Facilities and Cash Collateral to operate their businesses and preserve the going concern value of the Debtors' estates. Specifically, the DIP Facilities and Cash Collateral are needed for the Debtors to: (i) maintain normal operations in accordance with the approved Budget, including paying operating disbursements such as rent, payroll, insurance renewal and payment towards critical vendors; (ii) provide a loan of up to $10 million in necessary support for Sungard AS UK's administration process; (iii) reduce the outstanding Prepetition ABL Obligations by $13.5 million using Cash Collateral; (iv) repay in full, in cash the Prepetition Bridge Facility[3]; and (v) fund the costs associated with these Chapter 11 Cases, including applicable professional fees and fees payable to the Office of the United States Trustee for the Southern District of Texas. Absent granting the

---

[3] As discussed in the Hedus Declaration, the Initial Term Loan DIP Lenders who funded the Prepetition Bridge Facility indicated they would have preferred to provide such funding pursuant to the Term Loan DIP Facility, but delaying the funding was not a viable option because of the Debtors' liquidity positon and the serious risks posed to their estates if the funding was not made prior to the filing of these Chapter 11 Cases.

relief requested in the DIP Motion, the Debtors and their estates will be immediately and irreparably harmed, as is discussed further below.

17. The Debtors depend on the cash received from their businesses to fund operational disbursements. The Debtors plan to utilize the proceeds from the DIP Facilities and Cash Collateral to, among other things, pay general and administrative expenses, including the salaries of the members of their workforce and pay critical vendors. The Debtors are projected to use approximately $22.7 million in receivables and related cash that is ABL Priority Collateral during the first 30 days of these Chapter 11 Cases. The DIP Facilities will strengthen the Debtors' cash position immediately, and will send a positive, and credible, message to the Debtors' workforce and commercial counterparties that the Debtors will have sufficient liquidity to maintain ordinary course operations and meet their financial commitments throughout the course of these Chapter 11 Cases. The absence of such reassurance would likely cause substantial uncertainty and unease among the Debtors' customers, causing customers to turn to competitors for replacement services, given that the Debtors' customers' critical IT functions and uninterrupted access to data are dependent on the Debtors continuing to provide services.

18. Further, as discussed in the First Day Declaration, soaring energy prices, unfavorable lease terms, and protracted pandemic conditions resulted in the filing of Sungard UK's administration proceeding under UK insolvency law on March 25, 2022. In order to preserve the value of Sungard AS UK's assets in administration and to minimize disruption and damage to the rest of the Company, Sungard AS UK requires funding from the Debtors. Indeed, maintaining Sungard AS UK's operations is of paramount importance to the value of the Debtors' estates because the Debtors require the benefit of services provided by over 400 employees who are either employed in the UK or by Sungard AS UK's Indian subsidiary and such funding will help preserve

the value of the Company's global brand and customer relationships while the Debtors proceed through chapter 11 to maximize the value of their estates for all stakeholders.  The funding under the DIP Facilities will enable the Debtors to provide liquidity to Sungard AS UK while both the Debtors and Sungard AS UK proceed with their respective restructuring processes.  Importantly, the Debtors project that the funding provided to Sungard AS UK (both prepetition and postpetition) will be repaid by proceeds from the ultimate monetization of Sungard AS UK's assets.

19. As described above and in greater detail in the Hedus Declaration and the First Day Declaration, without that funding, a sudden cessation of the Company's operations in the UK would potentially make it impossible to continue to operate the North American business and, at a minimum, seriously jeopardize customer confidence both in the UK and abroad.  Given the Company's operation as a single global brand and the reliance of certain customers on the Company's services in multiple jurisdictions, the Company's global customer base, including its North American customers, would likely seek to replace the Debtors' services as a result.  For those reasons, the Debtors require immediate access to the DIP Facilities in order to protect the value of the Debtors' entire enterprise and by extension, the interests of their stakeholders.

20. More specifically, by funding the UK administration, the Debtors will help to create the necessary runway for Sungard UK to transition customers and staff required for the operation of the North American business in an orderly manner through the sale of key elements of its business, including certain valuable properties in the UK and Ireland and avoid the potential for a devastating collapse of the Company's global customer base.

21. Taking into account all of the above considerations, I believe that the DIP Facilities will provide the Debtors with the necessary liquidity to maintain operational flexibility, protect the value of the Debtors' enterprise and are in the best interest of the Debtors and their estates.

Accordingly, based on the foregoing, I respectfully submit that the Court should approve the DIP Motion.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on this 11th day of April, 2022.

By: _____
Christopher Nicholls
Senior Managing Director
FTI Consulting, Inc.