**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNGARD AS NEW HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 22-90018 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DECLARATION OF MICHAEL K. ROBINSON,**
**CHIEF EXECUTIVE OFFICER AND PRESIDENT OF THE DEBTORS**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1746, I, Michael K. Robinson, declare as follows under penalty of

perjury:

1.      I am the Chief Executive Officer and President of each of the above-captioned

debtors and debtors in possession (collectively, the "Debtors" and, together with their direct and

indirect non-Debtor subsidiaries, the "Company").  I have served in this position since May 2019.

I also serve on the Board of Managers of the Company's ultimate parent company Sungard AS

New Holdings, LLC ("Sungard AS") and the applicable governing body of each other Debtor.

Prior to joining the Company, I was the Chief Executive Officer of Broadview Networks Holdings,

Inc. ("Broadview"), where I led the transformation of Broadview's strategy and business model

from a traditional local telecom service provider to a cloud-based Unified Communications as a

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' tax identification numbers, are: InFlow LLC (9489); Sungard AS New Holdings, LLC (5907); Sungard AS New Holdings II, LLC (9169); Sungard AS New Holdings III, LLC (3503); Sungard Availability Network Solutions Inc. (1034); Sungard Availability Services (Canada) Ltd./Sungard, Services de Continuite des Affaires (Canada) Ltee (3886); Sungard Availability Services Holdings (Canada), Inc. (2679); Sungard Availability Services Holdings (Europe), Inc. (2190); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Sungard Availability Services, LP (6195); and Sungard Availability Services, Ltd. (4711).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 565 E Swedesford Road, Suite 320, Wayne, PA 19087.

Service (UCaaS) provider.  Before assuming the role of Chief Executive Officer at Broadview, I served as the Chief Financial Officer and Executive Vice President for US LEC Corp, a telecommunications services provider.  Over the course of my career, I have also held senior roles at Alcatel (now Nokia), Windward International and Siecor Corporation.

2.     I received my Bachelor of Arts from Emory & Henry College and my Master of Business Administration from Wake Forest University.

3.     I am knowledgeable of and familiar with the Debtors' day-to-day operations, businesses and financial affairs, books and records and the circumstances leading to the commencement of these chapter 11 cases.  I submit this declaration (this "<u>Declaration</u>") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of these chapter 11 cases and in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") filed on the date hereof (the "<u>Petition Date</u>").  I am authorized by each of the Debtors to submit this Declaration on their behalf.

4.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors or advisors to the Debtors or my opinion based upon my experience and knowledge. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## Introduction

5.     For approximately 40 years, the Company has established and maintained resilient and recoverable information technology ("<u>IT</u>") environments for myriad businesses, including financial institutions, healthcare, manufacturing, logistics, transportation and general services.  As described in further detail in Part I of this Declaration, the Company operates through four main business units: Colocation & Network Services, Cloud & Managed Services, Recovery Services

and Workplace Recovery.  Through these business units, the Company helps its approximately 2,000 customers worldwide in essential industries achieve uninterrupted access to their mission-critical data and IT systems through high availability, cloud-connected infrastructure services built to deliver business resilience in the event of an unplanned business disruption caused by, among other things, man-made events or natural disasters (*e.g.*, cyberattacks, power outages, telecommunication disruptions, acts of terrorism, floods, hurricanes and earthquakes).

6.     Headquartered in Wayne, Pennsylvania, the Debtors employ approximately 585 individuals in the United States and Canada.  The Company operates 55 facilities (the "Facilities") (comprising 24 data centers and 31 workplace recovery centers) and provides services to approximately 2,001 customers across nine countries—the United States, the United Kingdom, Canada, Ireland, France, India, Belgium, Luxembourg and Poland.  The Company works with its customers to tailor and seamlessly integrate infrastructure solutions to meet customers' application requirements and to optimize business IT outcomes, using either a consumption-based pricing model or a solution backed by a managed, service level agreement.

7.     As described in more detail herein, the Debtors' capital structure consists of approximately $424 million in aggregate principal amount of prepetition funded debt obligations in the form of a revolving credit facility and three term loan facilities.[2]  This capital structure resulted from a consensual restructuring negotiated by the Company and its then-stakeholders in 2019 and implemented through prepackaged chapter 11 cases in May 2019 (the "Prior Cases"). While the Prior Cases effectuated a swift and successful balance sheet restructuring, they did not comprehensively address the Company's operating cost structure and capacity utilization challenges.  After emerging from the Prior Cases, these operational issues have continued to weigh

---

[2]     The Debtors also are party to certain capital leases.  As of December 31, 2021, the outstanding balance on such capital leases was approximately $15 million.

on the Company's performance and ability to implement its business plan and invest in growth opportunities—efforts that have been further strained by the COVID-19 global pandemic. These challenges are reflected in, among other things, the Company's declining revenue numbers. More specifically, the Company's revenue fell from approximately $833.4 million in 2019 to approximately $587.3 million in 2021 (a decline of $246.1 million, or 29.5%). In addition, the Company's total comprehensive net loss across all of its business lines has grown in the past year from $114.8 million to $169.4 million (an increase in net loss of $54.6 million, or 47.6%).

8.      The Company has attempted to address its operational liabilities in a variety of ways. The Company has implemented cost-cutting measures, including reductions in force of over 40% of their workforce, with the latest occurring in December 2021. In addition, since 2019, the Company has been opportunistically marketing certain of its business assets (as further described herein) and, more recently, the Company has sought to consensually restructure certain uneconomical leases for its data centers and workplace recovery sites. While the Company has been successful in certain of these efforts—including selling workplace recovery facilities in the Midwest and completing sale-leaseback transactions of data centers in the U.S. and Canada—the persistence of declining revenues, significant uneconomical leases and protracted pandemic conditions prompted the need for a thorough evaluation of the Company's strategic alternatives, both in the short-term and the long-term, including more comprehensive asset sales.

9.      While this strategic review was ongoing, the Company's subsidiary in the United Kingdom, Sungard Availability Services (UK) Limited ("Sungard AS UK")—which was facing the same declines in revenue and uneconomical leases as the rest of the Company—was hit by historic energy price increases that had a devastating effect on its operations. As a result, the directors of Sungard AS UK determined that it was necessary for Sungard AS UK to commence

an administration proceeding under UK insolvency law on March 25, 2022.  A detailed discussion of matters pertinent to the administration proceeding, its impact on the Company and the Debtors specifically and the need for the Debtors to provide Sungard AS UK with financial support is set forth below in paragraphs 45 to 50.

10.     The swift decline of Sungard AS UK's financial position and the continuing challenges for the rest of the Company accelerated the Company's need to pursue a more comprehensive restructuring transaction and, after exploring all available options, it determined to commence these chapter 11 cases as to the Debtors.  In the weeks leading up to the filing and with the assistance of its advisors, the Company engaged in expedited yet arm's-length negotiations with an ad hoc group of term loan lenders represented by Proskauer Rose LLP (the "Ad Hoc Group") over the terms of a potential chapter 11 restructuring process, which has been memorialized in a restructuring support agreement (the "Restructuring Support Agreement"), as further described herein and attached hereto as **Exhibit 1**.

11.     The Restructuring Support Agreement provides a flexible structure that will enable the parties to explore the most value-maximizing restructuring alternative available—whether through the sale of all, substantially all or one or more subsets of the Debtors' assets (the "Sale Scenario") or an equitization of the Debtors' prepetition funded debt and compromise of other prepetition liabilities through a chapter 11 plan of reorganization (the "Equitization Scenario").  To fund these chapter 11 cases and the processes contemplated by the Restructuring Support Agreement, subject to Court approval, the Company further secured access to debtor in possession financing facilities in the aggregate amount of $335.9 million, comprising (i) a $50 million senior secured revolving credit facility (the "ABL DIP Facility") and (ii) a $285.9 million senior secured multi-draw term loan facility, consisting of up to $95.3 million in new money loans and up to

$190.6 million in "rolled up" prepetition obligations (the "Term Loan DIP Facility" and, together with the ABL DIP Facility, the "DIP Facilities").

12.     Among other things, the Restructuring Support Agreement incorporates flexibility that would enable the Debtors to implement the Sale Scenario or the Equitization Scenario. Importantly, the Debtors' proposed lenders under the Term Loan DIP Facility (the "Term Loan DIP Lenders") and the Prepetition Term Loan Lenders (as defined herein) party to the Restructuring Support Agreement have agreed that they will establish a "reserve price" for each group of the Debtors' assets and, alternatively, for the assets comprising the Debtors' business as a whole.  With the implementation of the reserve price structure, the Term Loan DIP Lenders and Prepetition Term Loan Lenders have agreed to cap any credit bid they may make for the Debtors' assets at the reserve price, such that if one or more third parties submit qualified bids for the Debtors' assets that, standing alone or in the aggregate, exceed the applicable reserve price, the Term Loan DIP Lenders and Prepetition Term Loan Lenders will agree not to bid above the reserve price.  This structure assures interested bidders that they are not competing against "credit bid currency" up to the full amount of the Debtors' postpetition and prepetition secured indebtedness and the Debtors are hopeful that such cap will increase the likelihood of a robust auction process for the Debtors' assets.  Indeed, the Debtors and their prepetition secured lenders are eager to (i) ensure a true market test on the value of the Debtors and their assets and (ii) maximize the value of the Debtors' estates for the benefit of all stakeholders.  This reserve price feature, which will be incorporated into formal bidding procedures (the "Bidding Procedures") to be filed in the near term and will allow the Debtors to build on their prepetition marketing efforts (as further described below) and run a comprehensive sale process over the next approximately 90 days that will enable the Debtors

to solicit and assess any bid or combination of bids that may maximize the value of their estates for the benefit of all parties in interest.

13.     Accordingly, and with the support of the parties to the Restructuring Support Agreement, the Debtors intend to move efficiently through these chapter 11 cases and ensure that the value of the Debtors' enterprise is maximized for the benefit of the Debtors' stakeholders with complete transparency and cooperation.

## **Background**

14.     On the Petition Date, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court.  The Debtors have filed various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Pleadings") to minimize any disruption that filing these chapter 11 cases may have on their businesses.  I am familiar with the contents of each First Day Pleading, and I believe the relief sought therein is necessary to permit the Debtors to have a smooth transition into chapter 11.  I further believe that the relief requested in the First Day Pleadings will preserve the value of the Debtors' estates.  The facts set forth in each of the First Day Pleadings are incorporated herein by reference.

15.     To familiarize the Court with the Debtors, their businesses and the circumstances leading to these chapter 11 cases, I have organized this Declaration as follow:

- **Part I** provides an overview of the Debtors' history and businesses;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases;

- **Part IV** describes the Restructuring Support Agreement entered into between the Debtors and certain of the Debtors' prepetition creditors and equity holders and provides a summary of the Debtors' proposed DIP Facilities; and

- **Part V** describes evidentiary support for the First Day Pleadings.

I.     **Overview of the Company's History and Businesses.**

16.     Sungard AS was incorporated in Delaware in April 2019, and became the parent of the Sungard AS enterprise when the entities that comprised the Prior Debtors (as defined herein) emerged from the Prior Cases on May 3, 2019.  Before such date, the Company's controlling parent entity was Sungard Availability Services Capital, Inc. ("Predecessor Sungard AS").  The Company is privately held.  A corporate organization chart depicting the ownership structure of the Debtors and their non-Debtor affiliates is attached as **Exhibit 2**.  The Board of Managers of Sungard AS currently comprises the following individuals: (i) Robert Guth, as Chairman; (ii) Jarrett Appleby; (iii) Patrick J. Bartels, Jr.; and (iv) myself.[3]

17.     The Company, as it exists today, is the result of a series of transactions beginning with the 1983 spin-off by Sun Oil Company of its computer services division, which was re-branded as Sundata Corp. and later known as SunGard Data Systems Inc. ("SDS").  In August 2005, SDS and its affiliates (including its parent companies, Sungard Capital Corp. and Sungard Capital Corp. II) were taken private by a consortium of private equity firms in an $11.4 billion leveraged buyout, which, at that time, was the largest privatization of a technology company and one of the largest leveraged buyouts.  On March 31, 2014, SDS and its parent companies spun off the Sungard Availability Services business unit, including Predecessor Sungard AS and its affiliates.

---

[3]     Between March 18, 2022 and March 24, 2022, three members of the Board resigned.  The resigning members, and observer representatives of two firms, were representatives of significant debt and equity holders.  Two of the former Board members are now part of the four-member Ad Hoc Group and had held Board seats since emergence from the Prior Cases; the other two members of the Ad Hoc Group were observers.  Once it became clear that the Debtors would be pursuing restructuring negotiations and transactions, the representation of these parties on the Board was no longer appropriate.  Accordingly, on or before their respective resignations, these former Board members and observers sought separate counsel.  The Ad Hoc Group and the Debtors have acted at arm's-length at all times.

18.     While the Company in its current form offers a diverse suite of services, the Company's main operations and product offerings can be grouped into the following four general business units: (i) Colocation & Network Services; (ii) Cloud & Managed Services; (iii) Recovery Services; and (iv) Workplace Recovery.

- **Colocation & Network Services**: The Company offers colocation[4] services through its Facilities and connectivity at those Facilities to support customers, providing space, reliable power with backup and fully-redundant network connectivity.  The Company also offers customers the option of having the Company procure, manage and deploy network services on their behalf, including traffic management, carrier diversity and workload optimization.

- **Cloud & Managed Services**: The Company offers both public cloud services (through, for example, Amazon Web Services and Microsoft Azure) and private cloud services.  Through its managed services, the Company acts as a trusted partner to customers by providing tools to ensure that they have a simple, secure and integrated model that enables cross-platform deployments and meets compliance, scalability and availability requirements.

- **Recovery Services**:  The Company's Recovery Services offerings include cloud recovery, disaster recovery as a service (DRaaS), business continuity management, data protection, recovery management, infrastructure recovery and discovery and dependency mapping.[5]

- **Workplace Recovery**: The Company's Workplace Recovery services are primarily offered in the form of either dedicated or shared business continuity locations, where customers' employees can resume work duties even if their primary office space is disrupted.

19.     These services are provided through the Company's leased Facilities, which represent over four million gross square feet and over one million square feet of sellable space.  Of the 55 total Facilities, 27 are leased by Debtors and 27 are leased by non-Debtors.  The remaining Facility is the Company's owned campus in Lognes, France.  The owner of such Facility is non-

---

[4]   Colocation involves renting out physical space within data centers and providing associated services, such as power, interconnection, environmental controls, monitoring and security, while allowing customers to deploy and manage their servers, storage and other equipment in secure data centers.

[5]   DRaaS is a cloud-based disaster recovery service that allows an organization to back up its data and IT infrastructure in a third-party cloud computing environment and provide all the disaster recovery tools through a SaaS ("software as a service") solution.

Debtor Sungard Availability Services (France) SAS.  The Debtors' leased Facilities are located across North America, including, among other locations, Pennsylvania, New Jersey, Georgia, Massachusetts, Colorado and Texas in the United States and Toronto and Montreal in Canada.

## II.     The Debtors' Prepetition Capital Structure

20.     As of the Petition Date, certain of the Debtors are obligors (either as borrower or guarantor) on an aggregate principal amount of prepetition funded indebtedness totaling approximately $424 million, as summarized below.[6]

| Facility | Principal Amount Outstanding ($m) |
|---|---|
| Revolving Credit Agreement | $29.0 |
| Prepetition 1L Term Loan Credit Agreement | $108.233 |
| Prepetition Non-Extending 2L Credit Agreement | $8.912 |
| Prepetition New 2L Credit Agreement | $277.622 |
| **Total Outstanding** | **$423.767** |

## A.     Revolving Credit Agreement

21.     Sungard AS New Holdings III, LLC ("Sungard AS III") and all Debtors other than Sungard AS Holdings II, LLC ("Holdings") (collectively, the "Revolving Borrowers"), as borrowers, and Holdings are party to a revolving credit agreement, dated as of August 6, 2019 (as amended by that certain Amendment and Waiver No. 1 to Revolving Credit Agreement, dated as of September 24, 2019, that certain Amendment No. 2 to Revolving Credit Agreement, dated as of August 12, 2020, that certain Amendment No. 3 to Revolving Credit Agreement, dated as of December 22, 2020, that certain Joinder and Amendment No. 4 to Revolving Credit Agreement, dated as of May 25, 2021, that certain Amendment No. 5 and Waiver to Revolving Credit

---

[6]     The Debtors also are party to certain capital leases.  As of December 31, 2021, the outstanding balance on such capital leases was approximately $15 million.

Agreement, dated as of March 24, 2022,[7] that certain Amendment No. 6 to Revolving Credit Agreement, dated as of April 7, 2022 and as further amended, supplemented or otherwise modified, the "Revolving Credit Agreement"), with PNC Bank, National Association as lender and administrative agent ("PNC") and the other lenders from time to time party thereto, pursuant to which PNC committed to make revolving loans to the Revolving Borrowers in an amount of up to $50,000,000.  The obligations under the Revolving Credit Agreement are guaranteed by all Debtors other than Sungard AS.  As of the Petition Date, approximately $29 million in principal amount was outstanding under the Revolving Credit Agreement.[8]

### B.    Prepetition 1L Term Loan Credit Agreement

22.    On December 22, 2020, Sungard AS III agreed to purchase, acquire and assume, pursuant to a purchase and sale transaction (the "Term Loan Purchase and Sale"), the loans of all lenders under an existing Prepetition 1L Term Loan Credit Agreement, and such lenders agreed to sell, transfer and assign such loans for consideration consisting of term loans and delayed-draw commitments issued under a new senior lien credit agreement, dated as of December 22, 2020 (as amended or supplemented by that certain Amendment No. 1 to Credit Agreement, dated as of April 20, 2021, that certain Waiver to Credit Agreement, dated as of March 24, 2022, that certain Amendment No. 2 to Credit Agreement, dated as of April 7, 2022 and as amended, supplemented or otherwise modified, the "Prepetition 1L Term Loan Credit Agreement"), with a syndicate of lenders (the "Prepetition 1L Term Loan Lenders") and Alter Domus Products Corp. as the administrative agent (in its capacity as such, the "Prepetition 1L Agent").  The obligations under

---

[7]    As further described in the Hedus Declaration (as defined herein), in connection with Amendment No. 5 and Waiver to Revolving Credit Agreement, the Debtors agreed to restrict the use of $13.5 million of cash collateral securing the loans under the Revolving Credit Agreement.

[8]    As of the Petition Date, an additional approximately $11 million in letters of credit have been issued under the Revolving Credit Agreement.  These letters of credit are not included into the total principal amount outstanding under the Revolving Credit Agreement.

the Prepetition 1L Term Loan Credit Agreement are guaranteed by all Debtors other than Sungard AS.

23.     Sungard AS III is the borrower under the Prepetition 1L Term Loan Credit Agreement, pursuant to which (i) the dollar-denominated term loans made by the Prepetition 1L Term Loan Lenders to Sungard AS III in the original principal amount of $101,957,944.23 were deemed borrowed (the "Prepetition 1L Term Loans") and (ii) certain Prepetition 1L Term Loan Lenders agreed to provide delayed draw commitments in an original principal amount of $27,948,183.69 (the "First Lien Delayed Draw Commitments" and, together with the Prepetition 1L Term Loans, the "First Lien Loans").

24.     Pursuant to that certain Amendment No. 2, certain members of the Ad Hoc Group (the "Initial Incremental Prepetition 1L Term Loan Lenders") agreed to provide the Debtors with incremental term loans under the Prepetition 1L Term Loan Credit Agreement to support the continuation of ongoing discussions regarding potential financing and restructuring transactions (the "Bridge Financing").  On April 7, 2022, the Debtors and the Initial Incremental Prepetition 1L Term Loan Lenders closed Amendment No. 2 to the Prepetition 1L Term Loan Credit Agreement, which provided the Company with $7.0 million in working capital.

25.     As of the Petition Date, approximately $108,233,409.28 in principal amount was outstanding under the Prepetition 1L Term Loan Credit Agreement.

**C.     Prepetition Non-Extending 2L Credit Agreement**

26.     Sungard AS III and Holdings are party to a junior lien credit agreement, dated as of May 3, 2019 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of August 11, 2020, that certain Amendment No. 2 to Credit Agreement, dated as of December 10, 2020, that certain Amendment No. 3 to Credit Agreement dated as of December 22, 2020

("Amendment No. 3 to Prepetition Non-Extending 2L Credit Agreement") and as further amended, supplemented or otherwise modified, the "Prepetition Non-Extending 2L Credit Agreement"), with a syndicate of lenders (the "Non-Extending 2L Lenders") and Alter Domus Products Corp. as the administrative agent (in such capacity, the "Non-Extending Administrative Agent").

27.     Sungard AS III is the borrower under the Prepetition Non-Extending 2L Credit Agreement, pursuant to which certain Non-Extending Lenders made dollar-denominated term loans to Sungard AS III in the original principal amount of $300,000,000.  The obligations under the Prepetition Non-Extending 2L Credit Agreement are guaranteed by all Debtors other than (i) Sungard AS, (ii) Sungard Availability Services Holdings (Europe), Inc., (iii) Sungard Availability Services, Ltd. and (iv) Sungard Availability Services (Canada) Ltd./Sungard, Services De Continuite Des Affaires (Canada) Ltee.  As described below, on December 22, 2020, Sungard AS III purchased, acquired and assumed approximately $298 million of the amount then-outstanding under the Prepetition Non-Extending 2L Credit Agreement (approximately $312 million).  Those lenders that chose not to exchange their loans for new loans under the Prepetition New 2L Credit Agreement comprise the Non-Extending 2L Lenders.  As of the Petition Date, approximately $8,912,330.41 in principal amount was outstanding under the Prepetition Non-Extending 2L Credit Agreement.

### D.     Prepetition New 2L Credit Agreement

28.     On December 22, 2020, Sungard AS III agreed to purchase, acquire and assume pursuant to the Term Loan Purchase and Sale, the loans of certain lenders under the Prepetition Non-Extending 2L Credit Agreement (immediately prior to giving effect to Amendment No. 3 to Prepetition Non-Extending 2L Credit Agreement) and such lenders agreed to sell, transfer and assign such loans for consideration consisting of term loans issued under a new junior lien credit

agreement, dated as of December 22, 2020 (as amended or supplemented by that certain Amendment No. 1 to Junior Lien Credit Agreement, dated as of April 20, 2021, that certain Waiver to Junior Lien Credit Agreement, dated as of March 24, 2022, that certain Amendment No. 2 to Junior Lien Credit Agreement, dated as of April 7, 2022 and as further amended, supplemented or otherwise modified, the "Prepetition New 2L Credit Agreement"), among the Company, as Borrower, Holdings,  a syndicate of lenders (the "Prepetition New 2L Term Loan Lenders" and, together with the Prepetition 1L Term Loan Lenders and the Non-Extending Lenders, the "Prepetition Term Loan Lenders") and Alter Domus Products Corp. as the administrative agent (in its capacity as such, the "Prepetition 2L Agent").

29.     Sungard AS III is the borrower under the Prepetition New 2L Credit Agreement, pursuant to which the dollar-denominated term loans made by the Prepetition New 2L Term Loan Lenders to Sungard AS III in the original principal amount of $298,348,099.09 were deemed borrowed.  As of the Petition Date, approximately $277,622,988.56 in principal amount was outstanding under the Prepetition New 2L Credit Agreement.

### E.     Intercreditor Agreements

30.     The Debtors are party to an amended and restated intercreditor agreement, dated as of December 22, 2020, with Alter Domus Products Corp., as first lien collateral agent, Alter Domus Products Corp., as second lien collateral agent, Alter Domus Products Corp., as existing first lien collateral agent and Alter Domus Products Corp., as existing second lien collateral agent, governing, among other things, distributions of payments and treatment of collateral between the lenders under the Prepetition 1L Term Loan Credit Agreement, the Prepetition New 2L Credit Agreement and the Prepetition Non-Extending 2L Credit Agreement.

31.    In addition, the Debtors are party to a second amended and restated intercreditor agreement, dated as of May 25, 2021 with PNC, as ABL agent, Alter Domus Products Corp., as new first lien term agent, Alter Domus Products Corp., as existing second lien term agent and Alter Domus Products Corp., as new second lien term agent, governing, among other things, distributions of payments and treatment of collateral between the lenders under the Revolving Credit Agreement, the Prepetition 1L Term Loan Credit Agreement, the Prepetition New 2L Credit Agreement and the Prepetition Non-Extending 2L Credit Agreement.

### F.    Intercompany Relationships

32.    As is customary for a global enterprise of the Company's size and scale, the Debtors are parties to a series of relationships with their affiliates, with whom the Debtors transact on a regular basis in the ordinary course of business.  The Debtors engage in such intercompany transactions in order to, among other things, provide enterprise-wide support services, divide the costs of management fees, complete transactions with administrative ease and facilitate operations on a daily basis.  These transactions are recorded in a number of different ways, including through accounts receivable / payable relationships, intercompany loans and dividends.

### G.    The Debtors' Current Cash Position

33.    As of the Petition Date, the Debtors have approximately $5 million in cash on hand.

### III.    Events Leading to These Chapter 11 Cases

34.    To summarize the events leading to these chapter 11 cases, set forth below is an overview of the following: (i) the Prior Cases and the operational challenges the Company has faced since; (ii) the Company's prepetition sales and marketing efforts; (iii) the administration proceedings in relation to Sungard AS UK; and (iv) the Debtors' entry into the Restructuring Support Agreement and the proposed DIP Facilities.

## A.     The Prior Cases and Operational Challenges

35.     In 2018, it became evident that the Company's legacy capital structure was no longer sustainable.  At that time, the Company commenced efforts to improve its balance sheet while simultaneously ensuring that the Company's customers could continue to trust and rely on the Company for its services.  In connection therewith, the Company engaged in substantial discussions with its key stakeholders through the end of 2018 and into 2019 on the terms of a comprehensive restructuring transaction, which was ultimately memorialized in a restructuring support agreement with the majority of its then-existing capital structure (the "2019 RSA").

36.     Pursuant to the 2019 RSA, on May 1, 2019, Predecessor Sungard AS and certain of its subsidiaries commenced the Prior Cases in the United States Bankruptcy Court for the Southern District of New York.  On May 3, 2019, less than 48 hours after commencing the Prior Cases, the Company successfully emerged from chapter 11, having (i) reduced its funded indebtedness by over $800 million, (ii) preserved the value of the Sungard AS brand and (iii) protected the jobs of the Company's invaluable employees.[9]  All parties anticipated at the time that this swift and efficient balance-sheet restructuring would set Sungard AS on course to be a stronger company with a more sustainable capital structure, well positioned to pursue an investment and growth plan and service its existing and new customers.

37.     The Company, however, continued to face strong and often unexpected headwinds following its emergence from the Prior Cases.  While the Prior Cases addressed the Company's

---

[9]     The debtors in the Prior Cases were as follows (collectively, the "Prior Debtors"): Sungard Availability Services Capital, Inc.; Sungard Availability Services Holdings, LLC; Sungard Availability Network Solutions, Inc.; Sungard Availability Services Technology, LLC; Sungard Availability Services, LP; Inflow, LLC; and Sungard Availability Services Vericenter, Inc.  The Prior Cases were jointly administered under the caption *In re Sungard Availability Servs. Capital, Inc.*, Case No. 19-22915 (RDD) (Bankr. S.D.N.Y.).  Each of the foregoing entities, other than Sungard Availability Services Capital, Inc. and Sungard Availability Services Vericenter, Inc. are debtors and debtors in possession in these chapter 11 cases.  Predecessor Sungard AS was dissolved as part of the restructuring transactions effectuated through the Prior Cases, and Sungard Availability Services Vericenter, Inc. was merged into its wholly-owned parent company, Sungard Availability Services, LP, in August 2021.

significant funded debt obligations, the Company did not restructure its other fixed-costs—most notably, its lease expenses and capacity underutilization—in connection therewith.  Specifically, while the Company's leases for the Facilities are fixed long-term costs, the revenue the Company generates from those Facilities (such as the price of colocation rent) has been falling, depressing the Company's margins.  In addition to rent at its Facilities, the Company continues to be burdened by other sizable fixed costs, including equipment leases, software licenses, hardware maintenance, subcontracting and temporary labor costs and other Facility-related operating costs, such as security.

38.     Moreover, the Company's business plan was premised on transitioning from an infrastructure-focused vendor to a services-oriented partner to its customers.  But faster than expected declines in demand for the Company's legacy products (*i.e.*, its infrastructure offerings) restricted the Company's ability to invest in and grow its newer offerings to offset its losses.  For example, the Company's transition from legacy infrastructure-based colocation disaster recovery solutions that had high profit margins to cloud-based DRaaS has proven challenging because of increased competition from hyperscale cloud providers, such as AWS and Microsoft Azure.  The cloud-based solutions are cheaper than legacy disaster recovery and customers can more easily migrate to other service providers.  Further, DRaaS solutions have changed the way disaster recovery services are now delivered, adding flexibility and remote working.

39.     Compounding these trends, the prolonged duration of the global pandemic has had a significant negative effect on various parts of the Company's businesses and, in particular, its previously high-margin Workplace Recovery services segment.  With traditional offices shifting rapidly to remote working environments due to quarantines, "shelter in place" and "stay at home" orders and other measures to control the spread of the virus, demand for the Company's Workplace

17

Recovery services has decreased dramatically. Even after quarantines were lifted, customers had realized that their workforces could work effectively remotely, reducing current and future demand for the Company's Workplace Recovery services. In addition, many of the Company's customers delayed spending decisions or reduced their IT costs, leading to further customer attrition through decisions not to renew contracts.

40. The Company's challenges are reflected in its declining revenue. In 2019, the Company had revenue of approximately $833.4 million; by 2021, the Company's revenue had fallen to approximately $587.3 million, a decline of 29.5% or $246.1 million. New customer contracts signed in 2019 and 2020 have been insufficient to replace revenue lost to non-renewal of contracts at expiration and renewals at lower prices, and long lead times for introducing new products and bringing new customers onto the Company's systems and offerings prevent any improvements derived from new strategic initiatives and products from reversing the trend of revenue declines on the timeline necessitated by the Company's liquidity position.

41. While the Company has continued to make substantial investments in its businesses and has attempted to sell assets, its cash flow projections demonstrate that, absent the commencement of these chapter 11 cases, the Company would not have a viable path to repay its existing debt. In the past year, the total comprehensive net loss across all of the Company's business unit has grown from approximately $114.8 million to $169.4 million (an increase in net loss of $54.6 million or 47.6%), resulting from high customer churn, uneconomical leases, restructuring costs in the United Kingdom over the last two years and, more recently, dramatic increases in energy prices in the United Kingdom, costs that the Company is largely unable to pass on to customers.

### B.    The Company's Prepetition Sale and Marketing Efforts

42.    Following its emergence from the Prior Cases, the Company continued to engage in a series of discrete marketing and sale efforts to dispose of various non-core assets as contemplated by its business plan.  To that end, in December 2019, the Company again retained an investment banker specializing in technology-based assets, DH Capital, LLC ("DH"), to carry out the potential asset sale processes.[10]  The sale processes included the following:

- **Sale-Leaseback of Owned Data Centers (Smyrna, 1800 Argentia and Lognes Campus)**.  Beginning on or around February 2020, DH contacted approximately 24 parties to explore interest in three of the Company's owned data centers located in (i) Smyrna, Georgia, (ii) Mississauga, Ontario and (iii) Lognes, France.  Ultimately, and despite the impact of COVID-19 on the marketing process, two of the three data-centers were sold, generating approximately $50 million in gross proceeds for the Company.

- **Sale-Leaseback of Workplace Recovery Centers (Cypress, Northbrook and Grand Prairie)**.  Beginning on or around November 2020, DH contacted approximately 33 parties to explore interest in three of the Company's owned workplace recovery centers located in (i) Cypress, California, (ii) Northbrook, Illinois and (iii) Grand Prairie, Texas.  Ultimately, all three properties were sold, generating approximately $21 million in gross proceeds for the Company.

43.    In addition to the above, DH is engaged in ongoing marketing and sale efforts for three leased Workplace Recovery centers, two of which are in Luxembourg and one of which is in Belgium, and is currently in discussions with certain interested parties regarding certain of the Company's other Facilities.  Finally, beginning on or around July 2021, the Company, through DH, launched a marketing process to solicit interest in a transaction that would include a carve-out of one of the Company's business units.

---

[10]    DH's relationship with the Company dates back to 2015, when DH assisted the Company in marketing three data-centers in the Atlanta market.  Subsequently, DH was retained in 2018 to market two additional data-centers in the Chicago market.  In 2019, DH was retained on behalf of an ad hoc group of creditors in the Prior Cases and, following emergence from the Prior Cases, the Company retained DH to assist with implementing the Company's business plan.

44.     These efforts remain ongoing, and the Debtors anticipate seeking authority to continue a sales and marketing process for all or any subset of their businesses in the near term while also continuing to negotiate with landlords.

**C.      Administration Proceedings in Relation to Sungard AS UK**

45.     As noted above, Sungard AS UK has faced particularly strong headwinds in recent months.  Among other things, Sungard AS UK is a party to certain substantial leases that require the payment of above-market rent obligations, where the rent costs are not defrayed from revenue generated from the leased space because the aggregate facility space leased exceeds market demand and is thus (often substantially) under-utilized.  This issue is compounded by the fact that, under its existing customer contracts, Sungard AS UK is unable to pass incremental energy price increases on to customers.  Sungard AS UK initially attempted to address these headwinds by engaging in negotiations with certain of its landlords in an effort to extract bilateral concessions, which would then (if obtained) have been combined with a statutory compromise of Sungard AS UK's liabilities to all of its landlords through either a company voluntary arrangement (under UK insolvency legislation) (a "CVA") or a restructuring plan (under UK companies legislation) (an "RP").

46.     To that end and against the backdrop of rapidly escalating energy costs, beginning on or around February 2022, Sungard AS UK accelerated its negotiations with its largest landlords in the hope of achieving a permanent material reduction in the liabilities owed to such landlords and negotiated with the shareholders of Sungard AS a commitment letter to support its operations if necessary.[11]   Concurrently  with  these  negotiations  and  having  obtained  the  SAS  UK

---

[11]     Specifically, on February 3, 2022, Sungard AS UK together with non-Debtor affiliate Guardian iT, as borrowers, entered into a certain commitment letter that provides, subject to conditions, a commitment for a $20.5 million senior secured delayed draw facility (the "SAS UK Commitment Letter") from certain existing shareholders of Sungard AS.  The facility contemplated by the SAS UK Commitment Letter has not been documented or drawn.

Commitment Letter, Sungard AS UK filed its audited financials for the 2020 fiscal year with the UK Companies House on a going concern basis on February 4, 2022.  After a period of engaging with two of Sungard AS UK's largest landlords, however, it became evident that there was little prospect of reaching a compromise agreement with at least one of the landlords, and thus the requisite statutory majority to approve a CVA or RP could not be achieved.

47.      While Sungard AS UK worked to obtain acceptable lease concessions that might have prevented an administration filing, Russia's invasion of Ukraine heightened the liquidity challenges facing Sungard AS UK by causing an even more dramatic increase in energy costs.  As noted above, Sungard AS UK was largely unable to pass these increased energy costs through to its customers under its existing customer contracts.  Instead, Sungard AS UK was compelled to pay those increased energy costs from its own limited resources.

48.      In light of Sungard AS UK's unprofitability, the steep increase in energy costs, lack of viable funding to meet its obligations and lack of reasonable prospects for a consensual restructuring, the directors of Sungard AS UK determined that insolvency was unavoidable and that the appointment of administrators, pursuant to the UK Insolvency Act 1986, would be in the best interests of Sungard AS UK and its general body of creditors.  Accordingly, on March 25, 2022, the directors appointed administrators to Sungard AS UK.[12]  The administrators are Benjamin Dymant and Ian Colin Wormleighton (collectively, the "Administrators") of Teneo Financial Advisory Limited ("Teneo").[13]

---

[12]   While Sungard AS UK is not a borrower or guarantor under the Debtors' prepetition funded debt, the appointment of administrators to Sungard AS UK would have triggered events of default under the applicable prepetition funded debt agreements.  In order to avoid this cross-default (which, in turn, may have subjected the Debtors to cash dominion by their revolving credit lender), the Debtors negotiated a series of waivers with its prepetition lenders to avoid this outcome.  Those waivers were executed on March 25, 2022, concurrent with the appointment of administrators to Sungard AS UK, thereby avoiding any immediate risk of default.

[13]   Prior to the administration of Sungard AS UK, Teneo and the Administrators were advisors to Sungard AS UK regarding its restructuring efforts.

49.     The administration of Sungard AS UK, without funding to continue the operation of its business (referred to as a "shutdown" administration), could have had dire consequences for the Company as an overall enterprise and the Debtors, specifically.  If faced with a shutdown administration, the Administrators likely would have: (i) advised all customers of Sungard AS UK that it was ceasing to operate; (ii) surrendered all leased sites to the landlords to avoid the continued incurrence of rent and other payments; (iii) notified all creditors that the business had ceased to operate and that they should stop all services and products from being provided or delivered to Sungard AS UK; and (iv) terminated employees, except for those necessary to complete a wind-down of the assets or for those who serve global functions and would be employed by other Company entities.  The Company operates as a single global brand for its customers, who in turn may purchase multiple services from one or more entities in multiple jurisdictions.  A cessation of the Company's operations in the United Kingdom, with little warning or notice to its customers, would be diametrically opposed to the Company's core business of providing uninterrupted mission-critical services—including to regulated banks, healthcare, the UK government, utilities and other large enterprises—eroding any trust those customers have in the Company.  Simply put, the risk of contagion from a shutdown administration could have destroyed the value of the entire enterprise.

50.     Accordingly, to preserve the value of Sungard AS UK's assets in administration and to minimize disruption and damage to the rest of the Company, the directors of both Sungard AS and Sungard AS UK determined that a "trading administration"—whereby the Administrators would continue operating the business of Sungard AS UK, while exploring the orderly sale of assets and the potential transfer of customer contracts to other suppliers—would be in the best interests of creditors of Sungard AS UK (and, by extension, the Company as a whole).  In order to

implement a "trading" administration that would inure to the benefit of all Company stakeholders, Sungard AS UK required funding.  To that end, Sungard AS negotiated a short-term funding agreement with the Administrators, acting on behalf of Sungard AS UK, whereby Sungard AS would provide a loan facility in an aggregate principal amount not exceeding $7.0 million (or approximately £5.3 million at current exchange rates), subject to the terms and conditions of a certain funding agreement, dated March 25, 2022 (the "UK Funding Agreement").  The Company determined that, given the importance of its customer relationships and the potentially disastrous effects that a shutdown administration could have had on the entire enterprise, entry into the UK Funding Agreement was in the best interest of all stakeholders.  In light of the foregoing, the Debtors have obtained a commitment under the proposed DIP Facilities to allow for the continued funding of the administration, subject to the terms and conditions set forth in the DIP Term Sheet.

### D.     Debtors' Prepetition Restructuring Efforts and Stakeholder Engagement

51.     In February 2022, when it became evident that a more comprehensive restructuring of the Company would be required, the Debtors retained the services of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump")[14] as restructuring counsel and FTI Consulting, Inc. as financial advisor who, along with DH, began to assist with the development of possible restructuring alternatives.  In addition, given the increasing likelihood that any restructuring would need to be effectuated through the commencement of chapter 11 cases and given that restructuring is not a core practice of DH, the Debtors determined to hire Houlihan Lokey Capital, Inc. ("Houlihan") as its restructuring investment banker.  The Debtors, with the assistance of these advisors, explored various alternatives, including whether it was practicable to effectuate an out-of-court restructuring, and ultimately determined that an in-court restructuring was necessary.

---

[14]   Since the Company's emergence from the Prior Cases, Akin Gump has acted as corporate counsel to the Company.  Akin Gump was engaged as restructuring counsel in February 2022.

52.    In addition, as set forth above, in order to ensure a smooth landing into chapter 11, the Debtors obtained additional liquidity from certain members of the Ad Hoc Group in the form of the Bridge Financing in the amount of $7.0 million.

## IV.    The Restructuring Support Agreement and the Proposed DIP Financing

53.    As discussed and after considering various alternatives, the Debtors began negotiations regarding potential restructuring transactions with the Ad Hoc Group in March 2022. These good-faith negotiations resulted in the applicable parties' entry into the Restructuring Support Agreement, which is attached hereto as **Exhibit 1**.

### A.    The Restructuring Support Agreement

54.    On April 11, 2022, Sungard AS and the other Company parties that are Debtors in these chapter 11 cases entered into the Restructuring Support Agreement with holders of in excess of 80% of the term loans under the Prepetition 1L Term Loan Credit Agreement and in excess of 80% of the term loans under the Prepetition New 2L Credit Agreement. The Restructuring Support Agreement contemplates a comprehensive restructuring achieved either through the Sale Scenario or through the Equitization Scenario. The key components of the Restructuring Support Agreement are as follows:

- **Sale Scenario**: The Debtors will file a motion seeking approval of Bidding Procedures that will provide a structure for the sale of all, substantially all or one or more groups of the Debtors' assets to one or more purchasers pursuant to Bankruptcy Code section 363. The Sale Scenario may be consummated pursuant to one or more of (x) an asset purchase agreement, (y) a share purchase agreement or (z) a plan of reorganization. As set forth above, in the event of a bid by the Consenting Stakeholder Purchaser (as defined in the Restructuring Support Agreement), the amount of any credit bid by the Consenting Stakeholder Purchaser as part of its proposed purchase price will not exceed a to-be-determined "reserve price."

- **Equitization Scenario**: Concurrently with the contemplated sale process, the Debtors will file and seek confirmation of a chapter 11 plan (the "Plan"). Among other things, the Plan will provide for the distribution of equity in any reorganized Debtor to the Consenting Stakeholders (subject to dilution in

connection with any exit financing, management incentive plan or post-effective date issuances).  The Plan will provide for, among other things, (i) the treatment of claims against and interests in the Debtors consistent with the rights and entitlements set forth under the Bankruptcy Code and (ii) customary releases and exculpation provisions.  The Plan will be withdrawn or modified and prosecuted based on the results of the Sale Scenario.

55.    The Restructuring Support Agreement includes a broad "fiduciary out" that provides, in part, that nothing will require the Debtors to take any action or to refrain from taking any action with respect to the restructuring transactions to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.  In addition, Section 7.02 of the Restructuring Support Agreement permits the Debtors to, among other things, consider, respond to and facilitate "Alternative Restructuring Proposals" (as defined under the Restructuring Support Agreement) and maintain and continue discussions with respect thereto.

56.    In sum, the Restructuring Support Agreement provides the Company with the flexibility it needs to pursue value-maximizing transactions or reorganize for continued operation.  Preserving value for the benefit of the Company's stakeholders depends, in large part, on the Company's ability to proceed swiftly to a viable exit alternative and minimize the effects of the Debtors' chapter 11 cases on the value of the Company's brand—a critical component of the value of the Company's businesses—and the Company's ongoing liquidity position.   Given that customer sentiment in the industry shifts rapidly and stakeholders need their IT services running at all times, time is of the essence.  The Company intends to proceed with a fair and efficient process to preserve and maximize value for all stakeholders, which ultimately will inure to the substantial benefit of all parties in interest.

B.       **The DIP Financing Process**[15]

57.       Pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "DIP Motion"), filed concurrently herewith, the Debtors seek, among other things, approval of the proposed DIP Facilities and the postpetition use of the Prepetition Secured Parties' Cash Collateral.  The DIP Facilities provide much needed liquidity that will allow the Debtors to meet immediate operational needs, including immediate access to $41,150,000.00 upon entry of the Interim Order and the remaining amount of the DIP Facilities upon entry of the Final Order, and provide the liquidity for a smooth transition into chapter 11. The DIP Facilities will also reassure the Company's customers and employees that the Company will be able to continue to meet its commitments during these chapter 11 cases and that the Company's businesses are likely to continue as a going concern, whether pursuant to the Sale Scenario or the Equitization Scenario.

### 1.       The Debtors' Need for Interim Relief

58.       The Debtors require immediate access to the DIP Facilities and the Prepetition Secured Parties' Cash Collateral.  As of the Petition Date, the Debtors are not projected to generate sufficient operating cash flow in the ordinary course of business to operate their businesses, pay postpetition debts as they come due, pay amounts requested under the First Day Pleadings and fund other administrative expenses during the first 21 days of these chapter 11 cases.  The Debtors'

---

[15]   Capitalized terms used in this Section, but not otherwise defined herein, have the meaning ascribed to such terms in the DIP Motion or the Interim DIP Order, as applicable.

businesses are cash intensive, with significant daily costs required to satisfy obligations to vendors, landlords and employees.  Without securing access to the $41,150,000.00 available upon entry of the Interim Order, the Debtors will be unable to operate their businesses and pay debts as they come due during the first 21 days of these chapter 11 cases.  Indeed, without the financing provided through the DIP Facilities, the Debtors would not be able to continue to operate in the ordinary course.  As such, and given their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of the Prepetition Secured Parties' Cash Collateral to operate their businesses.  Further, the failure to obtain access to the DIP Facilities and the Prepetition Secured Parties' Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders and materially diminish the value of the Debtors' estates.

### 2. The DIP Sizing Process

59.    As more thoroughly described in the *Declaration of Christopher Nicholls in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Nicholls Declaration"), filed contemporaneously herewith, in connection with their liquidity situation and the prospect of a chapter 11 filing, the Debtors, with the assistance of FTI, analyzed their projected cash needs and prepared a 13-week DIP cash flow forecast (the "Budget") for the interim period that includes reasonable and necessary foreseeable expenses to be incurred in connection with the operation of the Debtors' businesses.  I believe that

the Budget demonstrates that, with access to the DIP Facilities and the use of Cash Collateral, the Debtors will have adequate liquidity during the interim period.

60.     The Debtors believe that the proposed DIP Facilities are critical to operate their businesses and satisfy all administrative costs and expenses associated with these chapter 11 cases as they come due while the Debtors explore value-maximizing restructuring transactions.

### 3.     Efforts to Obtain Postpetition Financing

61.     As described in the *Declaration of Tom Hedus in Support of Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Hedus Declaration"), filed contemporaneously herewith, the Debtors retained Houlihan to assist with exploring and analyzing restructuring alternatives, including reaching out to potential third-party financing sources to secure additional liquidity that the Debtors need in order to operate during these chapter 11 cases.

62.     I understand that Houlihan contacted a number of financial institutions, including existing lenders, for the purposes of exploring potential DIP financing, and that many of these financial institutions signed non-disclosure agreements.  Ultimately, the Debtors, in consultation with their advisors and based on feedback that Houlihan received from potential third-party lenders, determined that it was unlikely that any potential lender outside of the Debtors' current capital structure would both be interested in providing financing and would be able to move quickly enough to align with the Debtors' timeline for these chapter 11 cases.  Further, I understand

that no third-party was willing to provide financing on subordinated basis to the Debtors' prepetition secured indebtedness nor were any such parties or the Debtors prepared to engage in a potentially value-destructive priming fight.

63. I believe that the terms of the DIP Facilities constitute the only terms the Debtors could achieve on which the DIP Lenders will extend the necessary postpetition financing. Among other things, it is my understanding that the "creeping roll-up" of the obligations under the Revolving Credit Agreement—by applying the prepetition collateral proceeds in reduction of the obligations under the Revolving Credit Agreement in exchange for a DIP Claim on a dollar-for-dollar basis—is a key component of consideration for PNC, without which they have indicated they were unwilling to consent to the DIP Facilities.

64. Based on the results of this process, and given the facts and circumstances of these chapter 11 cases, I understand that the DIP Facilities are the Debtors' best available financing option.

### 4. Repayment of the Bridge Financing

65. As set forth in paragraphs 24 and 52 and as further described in the Hedus Declaration, certain members of the Ad Hoc Group agreed to provide the Debtors with the Bridge Financing. The proceeds of the Bridge Financing were necessary to ensure that the Debtors could fund critical payments relating to insurance premiums, certain vendor and lease payments, employee compensation and professional fees and thereby ensure an orderly transition into chapter 11.

66. As I understand, it is proposed that proceeds of the Term Loan DIP Facility will be used to repay the obligations under the Bridge Financing upon interim approval of the DIP Facilities. The repayment of such obligations from the proceeds of the Term Loan DIP Facility

was a point of vigorous negotiation between the Debtors and the Initial Incremental Prepetition 1L

Term Loan Lenders. In my view, without the commitment that the Debtors would repay the

obligations under the Bridge Financing through the Term Loan DIP Facility, the Debtors would

not have been able to obtain the Term Loan DIP Facility. In addition, the interest rate under the

Bridge Financing is substantially greater than the interest rate for the new money loans under the

Term Loan Facility and, accordingly, the repayment of the obligations under the Bridge Financing

will stop the accrual of such interest during the pendency of the chapter 11 cases.

### 5.    The Proposed Adequate Protection

67.    For the reasons discussed above, the Debtors require access to the Prepetition

Secured Parties' Prepetition Collateral. I understand that the Debtors propose to provide the

Prepetition Secured Parties with the following as adequate protection, among other things:

- replacement liens on the Prepetition Collateral;

- superpriority administrative expense claims for any diminution in value of the Prepetition Collateral; and

- payment of reasonable and documented professional fees and expenses of advisors to the Prepetition Secured Parties.

68.    I have been advised that the required percentages of the Prepetition Secured Parties

have agreed to the foregoing adequate protection package in connection with the incurrence of the

DIP Facility and the use of Cash Collateral.

### C.    CCAA Proceedings

69.    Concurrent with the filing of this Declaration, the Debtors are filing the Foreign

Representative Motion (defined below), by which the Debtors will ask this Court to confirm that

Sungard Availability Services (Canada) Ltd. ("Sungard AS Canada") may act as the "foreign

representative" before the Ontario Superior Court of Justice (Commercial List) ("Canadian Court")

in connection with proposed recognition proceedings pursuant to Part IV of the Companies'

Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended (the "CCAA"). If the relief requested in the Foreign Representative Motion is granted, Sungard AS Canada will then ask the Canadian Court to recognize Sungard AS Canada's chapter 11 case as a "foreign main proceeding" in order to, among other things, protect the Debtors' assets located in Canada. Sungard AS Canada will also ask the Canadian Court to recognize and enforce in Canada certain of the first day and other orders, if granted, to ensure that the Canadian business continues to operate uninterrupted during these proceedings. In the interim period, and following the filing of the petitions for these chapter 11 cases, Sungard AS Canada intends to apply to the Canadian Court for an emergency temporary stay of proceedings in Canada.

## V.     Evidentiary Support for First Day Pleadings

70.     Along with this Declaration, the Debtors have filed the First Day Pleadings, seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases and expedite the restructuring of the Debtors. The First Day Pleadings include:

### Administrative Motions

- "Joint Administration Motion": *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief*

- "Extension Motion": *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs and (E) Rule 2015.3 Financial Reports, and (II) Granting Related Relief*

- "Redaction Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personal Identification Information, (II) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases and (III) Granting Related Relief*

- "Foreign Representative Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Sungard Availability Services (Canada) Ltd./Sungard,*

*Services de Continuite des Affaires (Canada) Ltee to Act as Foreign Representative and (II) Granting Related Relief*

- "Automatic Stay Motion": *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice and (III) Granting Related Relief*

- "Kroll Retention Application": *Debtors' Emergency Application for Entry of an Order Appointing Kroll Restructuring Administration LLC as Claims, Noticing and Solicitation Agent for the Debtors as of the Petition Date*

**Finance Motions**

- "DIP Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Repay Certain Prepetition Secured Indebtedness, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief*

- "Cash Management Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Maintain Existing Business Forms and (C) Perform Intercompany Transactions and (II) Granting Related Relief*

**Operational Motions**

- "Wages Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing, But Not Directing, Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation and Reimbursable Employee Expenses and (B) Continue Employee Compensation and Benefits Programs and (II) Granting Related Relief*

- "Critical Vendor Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claimants, (II) Confirming the Administrative Expense Priority of Outstanding Purchase Orders and (III) Granting Related Relief*

- "Utilities Motion": *Debtors' Emergency Motion for Entry of an Order: (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services; (II) Approving Adequate Assurance Procedures; (III) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; and (IV) Granting Related Relief*

- "Taxes Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing, But Not Directing, Payment of Certain Taxes and Fees and (II) Granting Related Relief*

- "Insurance Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related thereto, and (B) Renew, Supplement, Extend or Purchase Insurance Policies and (II) Granting Related Relief*

- "Equity Trading Motion": *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Beneficial Ownership and Declarations of Worthlessness with Respect to Membership Interests and (II) Granting Related Relief*

71.     The First Day Pleadings seek authority to, among other things, honor employee-related wages and benefits obligations, allow for the payment of certain vendor claims and ensure the continuation of the Debtors' cash management systems and other business operations without interruption, which I believe is essential so that the Debtors can continue to operate their businesses in the ordinary course during these chapter 11 cases.

72.     Specifically, with respect to the Debtors' vendors and suppliers and as set forth further in the Critical Vendor Motion, the Debtors rely on the continuing access to, and relationships with, a network of vendors and service providers.  The Debtors, with the assistance of their advisors, thoroughly examined each of these relationships to determine which vendors were critical to preserving the value of the Debtors' estates and ensuring a seamless transition into chapter 11.  The vendors identified through this process provide services that support and maintain the core of the Debtors' businesses (the Facilities that house data centers and workplace recovery facilities) or provide essential goods and services that allow the Debtors to continue their day-to-day operations, such as contractors and software providers.  On an aggregate basis and consistent with the Approved Budget (as defined in the DIP Motion), the Debtors seek authority to pay up to $4 million on account of Critical Vendor Claims, and approximately $3.2 million on an interim

basis.  I believe that allowing the Debtors' discretion to satisfy Critical Vendor Claims will be to the benefit of the Debtors' estates by helping prevent Critical Vendors from ceasing to provide goods to the Debtors or stop providing critical services.

73.     I believe that the relief requested in the First Day Pleadings is also necessary to allow the Debtors to negotiate a successful restructuring, whether through a plan of reorganization or one or more sale processes, and thereby promptly emerge from chapter 11.

74.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

75.     I am familiar with the contents and substance of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Pleading are incorporated herein by reference.

## Conclusion

76.     This Declaration illustrates the factors that have precipitated the commencement of the chapter 11 cases and the critical need for the Debtors to obtain the relief requested in the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 11, 2022

Michael K. Robinson
Chief Executive Officer and President
The Company

## __Exhibit 1__

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES LAWS, THE BANKRUPTCY CODE, AND OTHER APPLICABLE LAW. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO AND, ACCORDINGLY, IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of April 11, 2022 (the "**Execution Date**"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Sungard AS New Holdings, LLC, a company organized under the Laws of Delaware ("**Sungard AS**") and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**" or the "**Debtors**");

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 or the Restructuring Term Sheet (as defined below) subject to <u>Section 14.02</u>, as applicable.

ii.     the undersigned and non-affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, First Lien Credit Agreement Claims and, as applicable, Sungard AS Interests that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting First Lien Lenders**"); and

iii.    the undersigned and non-affiliated holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Second Lien Credit Agreement Claims and, as applicable, Sungard AS Interests that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Second Lien Lenders**", collectively with the Consenting Term Loan DIP Lenders (as defined herein) and the Consenting First Lien Lenders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and/or recapitalization transactions with respect to the Company Parties on the terms set forth in this Agreement, including, as specified in the restructuring term sheet attached hereto as **Exhibit B** (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**"):

i.      a restructuring transaction involving the sale by the Company Parties of all, substantially all or one or more groups of assets of the Company Parties pursuant to sections 105, 363 and 365 of the Bankruptcy Code (the "**Sale Scenario**"), as contemplated under the Bidding Procedures and the Restructuring Term Sheet.  The Sale Scenario may be consummated pursuant to one or more of (x) an asset purchase agreement; (y) a share purchase agreement; or (z) a plan of reorganization that, in each case, among other things, (1) does not have any financing or diligence contingency, (2) demonstrates that the purchaser(s) has the wherewithal to close the subject transaction and (3) provides that such closing shall occur on or before the applicable Milestone, and in connection therewith, the Bankruptcy Court enters an order or orders approving such transaction(s) and related documentation and authorizing the Company Parties to enter into such transaction and related documentation (each such sale, an "**Acceptable Sale**" and, more than one Acceptable Sale, "**Multiple Sales**"); provided, however, that except for a sale to the Consenting Stakeholder Purchaser (as defined herein), no transaction or combination of transactions shall constitute an Acceptable Sale that does not yield sufficient cash proceeds at closing to fully satisfy the Reserve Price allocable to such assets; and

ii.     in the alternative to the Sale Scenario for all, substantially all or one or more groups of assets of the Company Parties, a restructuring transaction pursuant to which the Consenting Stakeholders shall receive equity of any Reorganized Debtor (as defined herein) pursuant to a plan of reorganization (subject to dilution for equity issued, among other things, (a) in connection with any exit financing, (b) in

2

connection with any management incentive plan and/or (c) after the Plan Effective Date) (such transaction, the "**Equitization Scenario**").

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**") and, with respect to the applicable Company Parties, recognition proceedings commenced under Part IV of the *Companies' Creditors Agreement Act* (Canada) (the "**CCAA**") in the Ontario Superior Court of Justice (Commercial List); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**   *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**ABL DIP Documents**" means the documents governing the ABL DIP Facility, including the ABL DIP Term Sheet and the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, including the ABL DIP Term Sheet.

"**ABL DIP Facility**" means the loans under the debtor in possession financing facility on the terms and conditions set forth in the term sheet attached hereto as **Exhibit C** (the "**ABL DIP Term Sheet**") and on other terms and conditions to be agreed by the Company Parties, the Term Loan DIP Lenders and the ABL DIP Lenders, not inconsistent with the ABL DIP Term Sheet.

"**ABL DIP Facility Agreement Claims**" means any Claim against a Company Party arising under, derived from, secured by, based on, or related to the ABL DIP Facility or any other agreement, instrument or document executed at any time in connection therewith including all obligations and any guaranty thereof.

"**ABL DIP Lenders**" means the lenders providing the ABL DIP Facility under the ABL DIP Documents.

"**Agreement**" has the meaning set forth in the preamble hereof and, for the avoidance of doubt, includes all the exhibits, annexes and schedules hereto in accordance with Section 14.02 (including the Term Sheets (as defined herein)).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties, their assets or the debt, equity, or other interests in any one or more Company Parties that is an alternative to the Restructuring Transactions, including the Equitization Scenario and the Sale Scenario.

"**Announcement**" has the meaning ascribed to it in Section 14.23(b) of this Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Bidding Procedures**" has the meaning set forth in the Restructuring Term Sheet.

"**Bidding Procedures Order**" means the order approving the Bidding Procedures.

"**Bravo**" means the colocation business owned and operated by the Debtors and related assets.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Business Plan**" means a detailed business plan for each segment of the businesses of Sungard AS Global, including disaster recovery services, colocation and other services.  Such business plan shall be in a form and substance acceptable to the Required Consenting Stakeholders and the Debtors and shall include, without limitation, a detailed analysis of (i) the industries in which Sungard AS Global competes and competition within the industries, (ii) customers and customer concentration, (iii) products and pricing, (iv) costs, (v) profit margin and cash flow, (vi) operational and strategic initiatives, including cost cutting initiatives and a lease rationalization plan and (vii) financial projections for following three (3) fiscal years.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

4

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party, including the First Lien Credit Agreement Claims, the Second Lien Credit Agreement Claims, the Non-Extending Second Lien Credit Agreement Claims and any Term Loan DIP Facility Agreement Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Termination Events**" has the meaning ascribed to it in Section 11.02 of this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with the proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting First Lien Lender/Second Lien Lender Termination Events**" has the meaning ascribed to it in Section 11.01 of this Agreement.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.  For the avoidance of doubt, to the extent that any First Lien Credit Agreement Claims held by Consenting First Lien Lenders are rolled up into the Term Loan DIP Facility, all references in this Agreement to such Consenting First Lien Lenders shall mean the Consenting Term Loan DIP Lenders.

"**Consenting Second Lien Lenders**" has the meaning set forth in the preamble to this Agreement.  For the avoidance of doubt, to the extent that any Second Lien Credit Agreement Claims held by Consenting Second Lien Lenders are rolled up into the Term Loan DIP Facility, all references in this Agreement to such Consenting Second Lien Lenders shall mean the Consenting Term Loan DIP Lenders.

"**Consenting Stakeholder Purchaser**" means, in the event the Consenting Stakeholders acquire all, substantially all, or one or more groups of assets pursuant to a sale (if the Reserve Price is not satisfied in the Sale Scenario) in lieu of the Equitization Scenario (as defined below), a new Delaware limited liability company, corporation, or other entity that will be organized and formed by the Consenting Stakeholders to make such acquisition.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Loan DIP Lenders**" means the Term Loan DIP Lenders that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties.

"**Credit Agreement Claims**" means, collectively, the First Lien Credit Agreement Claims, the Non-Extending Second Lien Credit Agreement Claims and the Second Lien Credit Agreement Claims.

5

"**Credit Agreements**" means, collectively, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Non-Extending Second Lien Credit Agreement and the PNC Revolving Credit Agreement.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means the documents set forth in Section 3.01.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Term Sheets**" means the ABL DIP Term Sheet and the Term Loan DIP Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Eagle**" means the data recovery business owned and operated by the Debtors and related assets.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Final DIP Order**" means the final order authorizing the entry into the ABL DIP Documents and the Term Loan DIP Documents.

"**First Day Pleadings**" means the first-day pleadings to be filed in connection with the Chapter 11 Cases.

"**First Lien Credit Agreement**" means that certain Credit Agreement, dated as of December 22, 2020 (as amended or supplemented by that certain Amendment No. 1 to Credit Agreement, dated as of April 20, 2021, that certain Waiver to Credit Agreement, dated as of March 24, 2022, that certain Amendment No. 2 to Credit Agreement, dated as of April 7, 2022 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and among Sungard AS New Holdings III, LLC, as Borrower, Sungard AS Holdings II, LLC, the Lenders from time to time party thereto and Alter Domus Products Corp., as Administrative Agent.

"**First Lien Credit Agreement Claims**" means any Claim against a Company Party arising under, derived from, secured by, based on, or related to the First Lien Credit Agreement or any other agreement, instrument or document executed at any time in connection therewith including all obligations and any guaranty thereof.

"**Interest**" means, collectively, the shares (or any class thereof) of common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Interim DIP Order**" means the interim order authorizing the entry into the ABL DIP Documents and Term Loan DIP Facility Documents.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lease Rationalization Plan**" means an initiative to renegotiate and/or reject certain nonresidential leases of real property in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**Loans**" shall mean the indebtedness under each of the Credit Agreements.

"**Milestones**" means the milestones set forth in Sections 11.03 and 11.04, as such may be extended in accordance with the terms of this Agreement.

"**Non-Extending Second Lien Credit Agreement**" means that certain junior lien credit agreement, dated as of May 3, 2019 (as amended by that certain Amendment No. 1 to Junior Lien Credit Agreement, dated as of August 11, 2020, that certain Amendment No. 2 to Junior Lien Credit Agreement, dated as of December 10, 2020, that certain Amendment No. 3 to Junior Lien Credit Agreement, dated as of December 20, 2020 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Sungard AS New Holdings III, LLC, as Borrower, Sungard AS New Holdings II, LLC, the Lenders party thereto from time to time, and Alter Domus Products Corp., as Administrative Agent.

"**Non-Extending Second Lien Credit Agreement Claims**" means any Claim against a Company Party arising under, derived from, secured by, based on, or related to the Non-Extending Second Lien Credit Agreement or any other agreement, instrument or document executed at any time in connection therewith including all obligations and any guaranty thereof.

"**Pantheon**" means the campus facility assets owned by the Debtors' non-Debtor subsidiary in Lognes, France.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the date on which each of the Debtors filed its respective petition for relief commencing its Chapter 11 Case.

"**Plan**" means the joint chapter 11 plan, if any, with respect to the Company Parties, including all appendices, exhibits, schedules and supplements thereto (including any appendices,

exhibits, schedules and supplements to the Plan that are contained in the Plan Supplement), as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof and this Agreement.

"**Plan Effective Date**" means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan and the Confirmation Order, and the Plan is substantially consummated according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**PNC Revolving Credit Agreement**" means that certain Revolving Credit Agreement, dated as of August 6, 2019 (as amended by that certain Amendment and Waiver No. 1 to Revolving Credit Agreement, dated as of September 24, 2019, that certain Amendment No. 2 to Revolving Credit Agreement, dated as of August 12, 2020, that certain Amendment No. 3 to Revolving Credit Agreement, dated as of December 22, 2020, that certain Joinder and Amendment No. 4 to Revolving Credit Agreement, dated as of May 25, 2021, that certain Amendment No. 5 and Waiver to Revolving Credit Agreement, dated as of March 24, 2022, that certain Amendment No. 6 to Revolving Credit Agreement, dated as of April 7, 2022 and as further amended, restated, amended and restated, replaced, supplemented or otherwise modified from time to time), by and among the borrowers from time to time party thereto, Sungard AS New Holdings II, LLC, the lenders from time to time party thereto and PNC Bank, National Association, as administrative agent.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized Debtor**" means, for each Debtor, such Debtor immediately after consummation of the Restructuring in connection with the Equitization Scenario.

"**Required Consenting First Lien Lenders**" means at least two (2) unaffiliated Consenting First Lien Lenders holding at least 50.1% of the aggregate outstanding principal amount of First Lien Credit Agreement Claims held by all Consenting First Lien Lenders. For the avoidance of doubt, to the extent that any First Lien Credit Agreement Claims held by Consenting First Lien Lenders are rolled up into the Term Loan DIP Facility, all references in this Agreement to Required Consenting First Lien Lenders shall mean the Required Term Loan DIP Lenders.

"**Required Consenting Second Lien Lenders**" means at least two (2) unaffiliated Consenting Second Lien Lenders holding at least 50.1% of the aggregate outstanding principal amount of Second Lien Credit Agreement Claims held by all Consenting Second Lien Lenders. For the avoidance of doubt, to the extent that any Second Lien Credit Agreement Claims held by Consenting Second Lien Lenders are rolled up into the Term Loan DIP Facility, all references in this Agreement to Required Consenting Second Lien Lenders shall mean the Required Term Loan DIP Lenders.

"**Required Consenting Stakeholder Election**" means, to the extent that the Consenting Stakeholder Purchaser is the Successful Bidder for all, substantially all, or one or more groups of the Debtors' assets, the Required Consenting Stakeholders' election to consummate such Restructuring Transaction as a Sale Scenario or an Equitization Scenario.

"**Required Consenting Stakeholders**" means, collectively, the Required Term Loan DIP Lenders, the Required Consenting First Lien Lenders, and the Required Consenting Second Lien Lenders.

"**Required Term Loan DIP Lenders**" means at least two (2) unaffiliated Consenting Term Loan DIP Lenders holding at least 50.1% of the aggregate outstanding principal amount of Term Loan DIP Facility Agreement Claims held by all Consenting Term Loan DIP Facility Lenders.

"**Reserve Price**" means a purchase price to be determined by the Required Consenting Stakeholders in consultation with the Debtors, (i) for each group of the Debtors' assets and, alternatively, (ii) for the assets comprising the Debtors' businesses as a whole.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Credit Agreement**" means that certain Junior Lien Credit Agreement, dated as of December 22, 2020 (as amended or supplemented by that certain Amendment No. 1 to Junior Lien Credit Agreement, dated as of April 20, 2021, that certain Waiver to Junior Lien Credit Agreement, dated as of March 24, 2022, that certain Amendment No. 2 to Junior Lien Credit Agreement, dated as of April 7, 2022 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and among Sungard AS New Holdings III, LLC, the Borrower, Sungard As Holdings II, LLC, the Lenders from time to time party thereto and Alter Domus Products Corp., as Administrative Agent.

"**Second Lien Credit Agreement Claims**" means any Claim against a Company Party arising under, derived from, secured by, based on, or related to the Second Lien Credit Agreement or any other agreement, instrument or document executed at any time in connection therewith including all obligations and any guaranty thereof.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means the solicitation materials with respect to the Plan.

"**Successful Bidder**" means the bidder for all, substantially all, or one or more groups of the Debtors' assets that is determined to have submitted the highest or best bid for such assets pursuant to the Bidding Procedures Order and the Bidding Procedures.

"**Sungard AS**" has the meaning set forth in the preamble to this Agreement.

"**Sungard AS Global**" means, collectively, the Company Parties and their foreign and non-debtor subsidiaries and affiliates.

"**Take Back Debt Facility**" means a first lien credit facility, which may be incurred by a Reorganized Debtor on the Plan Effective Date, as set forth in the Plan, and all related loan documents in connection therewith, and which shall consist of other terms and conditions to be agreed by the applicable Parties in accordance with this Agreement.

"**Take Back Debt Facility Documents**" means the documents governing the Take Back Debt Facility, including the credit agreement, any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

"**Term Loan DIP Facility**" means the loans under the debtor in possession financing facility on the terms and conditions set forth in the term sheet attached hereto as **Exhibit D** (the "**Term Loan DIP Term Sheet**") and on other terms and conditions to be agreed by the Company Parties and the Term Loan DIP Lenders, not inconsistent with the Term Loan DIP Term Sheet.

"**Term Loan DIP Documents**" means the documents governing the Term Loan DIP Facility, including the Term Loan DIP Term Sheet and the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, including the Term Loan DIP Term Sheet.

"**Term Loan DIP Facility Agreement Claims**" means any Claim against a Company Party arising under, derived from, secured by, based on, or related to the Term Loan DIP Facility or any other agreement, instrument or document executed at any time in connection therewith including all obligations and any guaranty thereof.

"**Term Loan DIP Lenders**" means the lenders providing the Term Loan DIP Facility under the Term Loan DIP Documents.

"**Term Sheets**" means, collectively, the term sheets attached as exhibits to this Agreement, including the Restructuring Term Sheet and the DIP Term Sheets.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.04 or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

1.02.    <u>Interpretation</u>.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to counsel specified in Section 14.10 other than counsel to the Company Parties.

**Section 2.    *Effectiveness of this Agreement.***  This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern time, on the Agreement Effective

Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Stakeholders;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Consenting Stakeholders:

(i)     holders of at least two-thirds (2/3) of the aggregate outstanding principal amount of the First Lien Credit Agreement Claims; and

(ii)    holders of at least two-thirds (2/3) of the aggregate outstanding principal amount of the Second Lien Credit Agreement Claims;

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 14.10 hereof (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.**      *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring Transactions shall include, as applicable and dependent upon the Restructuring Transaction actually implemented as determined in accordance with the Restructuring Term Sheet:  (A) the Plan; (B) the Disclosure Statement; (C) the Confirmation Order; (D) the Solicitation Materials and any motion seeking approval thereof; (E) the order of the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the Plan Supplement; (H) the DIP Orders, ABL DIP Documents, Term Loan DIP Documents and DIP Motion; (I) the Bidding Procedures, the Bidding Procedures Order and the motion seeking approval thereof; (J) the Take Back Debt Facility Documents; (K) the Purchase Agreement (as defined in the Restructuring Term Sheet); (L) a written contribution and direction agreement by and among the Consenting Stakeholders; (M) the corporate governance documents and other organizational documents of any Reorganized Debtor and its subsidiaries; and (N) such other agreements and documentation reasonably desired or necessary to consummate and document the Restructuring Transactions.

3.02.   The Definitive Documents (and, consistent with Section 12 hereof, any modifications, restatements, supplements or amendments to any of them) not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation in good faith and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument relating to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Term Sheets) and be in form and substance reasonably satisfactory in all respects to each of: (i) the Company Parties; and (ii) the Required Consenting Stakeholders.

**Section 4.**        ***Commitments of the Consenting Stakeholders.***

4.01.    <u>Affirmative Commitments</u>.    During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of itself and all of its Company Claims/Interests (as applicable) pursuant to this Agreement to:

(a)        support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any shareholders' or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate in their capacity as holders of Company Claims/Interests (as applicable)), in each case, in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, including the Equitization Scenario and the Sale Scenario, as applicable;

(b)        use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(c)        use commercially reasonable efforts to oppose any party or person taking or seeking to take any actions contemplated in Section 4.02 of this Agreement;

(d)        provide the Company with a Reserve Price by the Milestone set forth in Section 11.03(viii);

(e)        validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders, ballots or other means of voting or participating in the Restructuring Transactions with respect to all of its Company Claims/Interests (which, for the avoidance of doubt, shall mean all of the Credit Agreement Claims and existing Interests in the Company Parties set forth in such Transfer Agreement or Joinder, as applicable, together with any other Company/Claims Interests including any Claims in respect of the loans under the Term Loan DIP Facility, as applicable, acquired during the Agreement Effective Period);

(f)        give any notice, order, instruction or direction to the applicable Administrative Agent under the applicable Credit Agreements necessary or appropriate to give effect to the Restructuring Transactions, or, as applicable, the agent under the Term Loan DIP Facility;

(g)        subject to the consent rights set forth in Section 3.02 hereof, negotiate in good faith and use commercially reasonable efforts to execute, deliver and implement the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(h)        cooperate and coordinate with the Company Parties and use commercially reasonable efforts to support and consummate the Restructuring Transactions, including in each of the Equitization Scenario and the Sale Scenario, to the extent applicable, and execute any document and give any notice, order, instruction or direction necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions, including, for the avoidance of doubt, using commercially reasonable efforts to obtain any necessary federal,

state, local and foreign regulatory approvals necessary to consummate the Restructuring Transactions;

(i)      cooperate in good faith and coordinate with the Company Parties to structure and implement the Restructuring Transactions in a tax efficient manner; and

(j)      negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions or agreements to address any legal, financial or structural impediment that may arise that would prevent, hinder, impede, delay or are necessary to effectuate the consummation of the Restructuring Transactions.

4.02.   <u>Negative Commitments</u>.  Except as set forth in Section 5, during the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of all of its Company Claims/Interests (as applicable) pursuant to this Agreement that it shall not, directly or indirectly, and shall not direct any other person to:

(a)      object to, delay, impede, or take any other action that is reasonably likely to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      object to, delay, impede, or take any other action that is reasonably likely to delay, impede, interfere with or frustrate (A) the use of cash collateral or the incurrence of any debtor in possession financing by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the DIP Orders or (B) implementation of the Sale Scenario pursuant to the Bidding Procedures and the Bidding Procedures Order;

(c)      exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims against, or Interests in, the Company Parties other than in accordance with this Agreement and the Definitive Documents;

(d)      propose, file, support, solicit, or vote for any Alternative Restructuring Proposal;

(e)      file or have filed on its behalf any motion, pleading, or other document, including the Definitive Documents, with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, any other Definitive Documents, or the Plan;

(f)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(g)      exercise any right or remedy for the enforcement, collection or recovery of any Company Claims/Interests including rights or remedies arising from or asserting or bringing any

claims under or with respect to the applicable Credit Agreements or its Interests in the Company Parties;

(h)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(i)      to the extent the Reserve Price is set pursuant to Section 11.03, provide a credit bid in excess of such Reserve Price.

4.03.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)      During the Agreement Effective Period and as and to the extent applicable, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees severally, and not jointly, that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials after the commencement of the Chapter 11 Cases:

(i)      support confirmation of the Plan, including the solicitation, confirmation and consummation of the Plan, as may be applicable and will not direct and/or instruct any Administrative Agent under the applicable Credit Agreements to take any actions inconsistent with this Agreement;

(ii)      vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the votes on the Plan and its actual receipt of the Solicitation Materials and the applicable ballot(s);

(iii)      to the extent it is required to vote pursuant to Section (ii) and is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any support, vote or election referred to in clauses (a)(i), (ii) and (iii) above; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall prevent any Consenting Stakeholder from changing, withholding, amending or revoking (or causing the same) its vote, election, or consent with respect to the Plan if this Agreement has been terminated with respect to such Consenting Stakeholder in accordance with its terms.

(b)      During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees, in respect of each of its Company Claims/Interests, that it will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with, any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c)      No Expenses or Liabilities.   Nothing in this Agreement shall require any Consenting Stakeholder to incur any material expenses, liabilities, or other obligations, or agree to

any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Stakeholder other than as contemplated by this Agreement.  Notwithstanding the immediately preceding sentence, nothing in this Section 4.03 shall serve to limit, alter or modify any Consenting Stakeholder's express obligations under the terms of this Agreement.

**Section 5.** *Additional Provisions Regarding the Consenting Stakeholders' Commitments.* Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (c) prevent any Consenting Stakeholder from enforcing this Agreement or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.** *Commitments of the Company Parties.*

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)     subject to the consent rights set forth in Section 3.02 hereof, negotiate in good faith and use commercially reasonable efforts to execute, deliver and implement the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(d)     use commercially reasonable efforts to provide counsel for the Consenting Stakeholders a reasonable opportunity (which shall be no less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, absent exigent circumstances, and, without limiting any consent rights set forth in this Agreement, consult in good faith with respective counsel to the Consenting Stakeholders regarding the form and substance of any such proposed filing) to review draft copies of all substantive pleadings and proposed orders;

(e)     cooperate and coordinate with the Consenting Stakeholders and use commercially reasonable efforts to support and consummate the Restructuring Transactions, including in each of the Equitization Scenario and the Sale Scenario, to the extent applicable, and execute any document and give any notice, order, instruction or direction in each case reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions, including, for the avoidance of doubt, using commercially reasonable efforts to

16

obtain any necessary federal, state, local and foreign regulatory and/or third party approvals necessary to consummate the Restructuring Transactions;

(f)     cooperate in good faith and coordinate with the Consenting Stakeholders to structure and implement the Restructuring Transactions in a tax efficient manner;

(g)     negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions or agreements to address any legal, financial or structural impediment that may arise that would prevent, hinder, impede, delay or are necessary to effectuate the consummation of the Restructuring Transactions;

(h)     use commercially reasonable efforts to oppose any party or person taking or seeking to take any actions contemplated in Section 6.02 of this Agreement;

(i)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, and/or (iii) dismissing the Chapter 11 Cases; and

(j)     under the circumstances outlined in the Bidding Procedures, pursue a sale process, including engaging in negotiations with one or more third parties that the Company Parties determine, in the exercise of reasonable business judgment, proposes, or would reasonably be expected to propose, a transaction which would result in an Acceptable Sale or Multiple Sales during the Chapter 11 Cases in accordance with this Agreement, the Restructuring Term Sheet, the Plan and the Bidding Procedures, it being understood that nothing herein shall limit the ability of the Company Parties to take the actions contemplated by Section 7.01 or otherwise limit its ability to take all actions necessary to pursue the Restructuring Transactions consistent with this Agreement.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall not direct any other person to, to the extent applicable,:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)     file any motion, pleading, or other document, including the Definitive Documents, with the Bankruptcy Court or any other court (including any modifications or amendments thereof)

that, in whole or in part, is not materially consistent with this Agreement, any other Definitive Documents, or the Plan.

**Section 7.**     *Additional Provisions Regarding Company Parties' Commitments.*

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including any directors, officers, managers, or employees of an equity holder in their capacity as a member of any such body), after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.

7.02.    Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 7.01, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives:  shall have the right to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into a Confidentiality Agreement or nondisclosure agreement with any Entity that the Company Parties determine, in the exercise of reasonable business judgment, under the circumstances outlined in the Bidding Procedures, proposes, or would reasonably be expected to propose, a transaction which would or would reasonably be expected to, result in an Acceptable Sale or Multiple Sales; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against, or Interests in, a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of such an Alternative Restructuring Proposal or make a public announcement regarding their intention to do so, the Company Parties shall, on a confidential basis (x) provide counsel to the Consenting Stakeholders a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring Proposal within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal and (y) provide such information to the foregoing advisors regarding any discussions relating to an Alternative Restructuring Proposal (including copies of any materials provided to such parties hereunder) as necessary to keep counsel to the Consenting Stakeholders reasonably informed as to the status and substance of such discussions.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.    Nothing in this Agreement shall create any additional fiduciary obligations on the part of any Company Party or any members, partners, managers, managing members, equity holders, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, equity holder, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Company Party or its affiliated entities, that such persons or entities did not have prior to the execution of this Agreement.

**Section 8.**    *Transfer of Interests and Securities.*

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless, in the case of any Company Claims/Interests, the transferee either (i) is a Consenting Stakeholder or (ii) executed and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or a Joinder.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    With respect to the Transfer of any Interests only, such Transfer shall not in the reasonable business judgment of the Company Parties and its legal and tax advisors adversely (a) affect the Company Parties' ability to maintain the value of and utilize their net operating loss carryforwards or other tax attributes or (b) the Company Parties' ability to obtain the regulatory consents or approvals necessary to effectuate the Restructuring Transactions.

8.04.    This Agreement shall in no way be construed to preclude any Consenting Stakeholder from acquiring additional Company Claims/Interests to the extent such acquisition will not adversely impact the Company Parties; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders, if applicable) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within three (3) Business Days of such acquisition. For the avoidance of doubt, any party that becomes a Term Loan DIP Lender or otherwise holds a Term Loan DIP Facility Agreement Claim under the Term Loan DIP Facility shall, as a condition to becoming a Term Loan DIP Lender or otherwise holding such Term Loan DIP Facility Agreement Claim, (y) become a Consenting Stakeholder under this Agreement with respect to such Term Loan DIP Facility Agreement Claim and (z) be bound to this Agreement in its capacity as a Term Loan DIP Lender and a Consenting Stakeholder (in addition to any other capacity).

8.05.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.   Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations (including any obligation by any Company Party to issue a "cleansing letter" or otherwise make a public disclosure of information) otherwise arising under such Confidentiality Agreements.

8.06.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an Entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.   To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.   In the event any Qualified Marketmaker is a Consenting Stakeholder as of the Agreement Effective Date, its obligations hereunder shall be limited to the Claims/Interests it beneficially owns as of the Agreement Effective Date.

8.07.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**   *Representations and Warranties of Consenting Stakeholders.*   Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement (or Joinder or Transfer Agreement, as applicable) and as of the Plan Effective Date:

(a)   it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests, other than those reflected in, such Consenting Stakeholder's signature page to this Agreement, Joinder or a Transfer Agreement, as applicable

(as may be updated pursuant to Section 8);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests as contemplated by this Agreement subject to applicable Law;

(e)      (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(f)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability; and

(g)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with any other Entity or person with respect to Company Claims/Interests that have not been disclosed to all Parties to this Agreement.

**Section 10.      *Representations, Warranties and Covenants of Company Parties.*** Each of the Company Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, severally and not jointly, as of the date such Party executes and delivers this Agreement, and as of the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the CCAA or the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate

21

the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)       the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)       except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)       except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties with respect to Company Claims/Interests that have not been disclosed to all Parties to this Agreement.

**Section 11.** *Termination Events*.

11.01.   Consenting First Lien Lender and Consenting Second Lien Lender Termination Events.  In accordance with Section 14.10 hereof, by the delivery to the Company Parties of a written notice, this Agreement may be terminated by (i) the Required Consenting First Lien Lenders as to all Consenting First Lien Lenders or (ii) the Required Consenting Second Lien Lenders as to all Consenting Second Lien Lenders upon the occurrence and continuation of any of the following events, unless waived, in writing, by (x) the Required Consenting First Lien Lenders or (y) the Required Consenting Second Lien Lenders, as applicable on a prospective or retroactive basis (collectively, the "**Consenting First Lien Lender/Second Lien Lender Termination Events**"):

(a)       the occurrence of a material breach of this Agreement by any Company Party, which breach has not been cured (if susceptible to cure) within five (5) Business Days after written notice in accordance with Section 14.10 hereof to the Company Parties and the non-terminating Parties;

(b)       the occurrence of any Event of Default under the ABL DIP Facility or Term Loan DIP Facility, which Event of Default results in the termination of the ABL DIP Facility or Term Loan DIP Facility by the ABL DIP Lenders or Term Loan DIP Lenders, as applicable;

(c)       the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the filing of a motion by a Company Party seeking such relief;

(d)       the dismissal of one or more of the Chapter 11 Cases, or the filing of a motion by a Company Party seeking such relief;

(e)       the appointment of a trustee, receiver or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases, or the filing of a motion by a Company Party seeking such relief;

22

(f)      the rejection of this Agreement, or the filing of a motion by a Company Party seeking such relief;

(g)      if (i) any Definitive Document does not materially comply with Section 3 of this Agreement, (ii) any other document or agreement necessary to consummate the Restructuring Transactions is not reasonably satisfactory to the Required Consenting First Lien Lenders or the Required Consenting Second Lien Lenders, as applicable, or (iii) the Company withdraws the Plan without the consent of the Required Consenting Stakeholders as set forth in the Restructuring Term Sheet;

(h)      any Company Party files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement without the prior written consent of the applicable threshold of Consenting Stakeholders;

(i)      any Company Party (i) makes a public announcement that it intends to accept an Alternative Restructuring Proposal or (ii) enters into a definitive agreement with respect to an Alternative Restructuring Proposal that, for the avoidance of doubt, is not an Acceptable Sale or Multiples Sales;

(j)      the failure to meet a Milestone (other than with respect to the Required Consenting Stakeholders' obligation to provide the Reserve Price), unless such failure is result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(k)      other than as contemplated pursuant to the Restructuring Transactions, any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Stakeholders;

(l)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; provided, however, that the Company Parties shall have five (5) Business Days after the issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (A) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (B) is reasonably acceptable to the Required Consenting Stakeholders;

(m)      the Bankruptcy Court enters any order authorizing the use of post-petition financing that is not in a form and substance acceptable to the Required Consenting Stakeholders;

(n)      any Company Party files a motion, application, or adversary proceeding (or any Company Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Loans or asserting any other cause of action against the Consenting First Lien Lenders or the Consenting Second Lien Lenders, as applicable, or with respect to or relating to such Loans or the prepetition liens securing any of the Loans;

23

(o)      if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(p)      the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any Company Party or that would materially and adversely affect any Company Party's ability to operate their businesses in the ordinary course;

(q)      if (A) any of the Sale Order, Confirmation Order or the order(s) approving the Disclosure Statement or Solicitation Materials is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the consent of the Required Consenting Stakeholders, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to timely object to such motion;

(r)      (i) the Required Consenting First Lien Lenders or (ii) the Required Consenting Second Lien Lenders terminate this Agreement pursuant to this Section 11.01; or

(s)      the Company Parties deliver a notice in connection with Section 7.01 hereof.

11.02.   Company Party Termination Events.  In accordance with Section 14.10 hereof, by the delivery to counsel to the Consenting Stakeholders of a written notice, this Agreement may be terminated by the Company Parties upon the occurrence and continuation of any of the following events, unless waived, in writing, by the Company Parties on a prospective or retroactive basis (collectively, the "**Company Termination Events**"):

(a)      the breach in any material respect by one or more of the Consenting Stakeholders holding an amount of First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims that would result in non-breaching Consenting First Lien Lenders and the Consenting Second Lien Lenders, holding less than two-thirds of the aggregate principal amount of First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims, of any provision set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of seven (7) Business Days after the receipt by the Consenting First Lien Lenders or the Consenting Second Lien Lenders, as applicable of notice of such breach to all Parties of such breach and a description thereof;

(b)      to the extent consistent with Section 7.01 hereof, the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      (i) the Required Consenting First Lien Lenders or (ii) the Required Consenting Second Lien Lenders terminate this Agreement pursuant to Section 11.01 hereof; or

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided, however, that the Company Parties have made commercially reasonable, good faith efforts to cure, vacate or have overruled such ruling or order prior to terminating this Agreement; provided, further, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

11.03.  Milestones.   The following Milestones shall apply to this Agreement unless extended or waived in writing by each of the Company Parties and the Required Consenting Stakeholders:

(i)      by no later than April 11, 2022, the Debtors shall have commenced the Chapter 11 Cases;

(ii)      by no later than April 14, 2022, the Bankruptcy Court shall have entered the Interim DIP Order;

(iii)      by no later than April 22, 2022, the Debtors shall have filed the motion for approval of the Bidding Procedures;

(iv)      by no later than May 11, 2022, the Debtors shall have provided a draft Lease Rationalization Plan to the Consenting Stakeholders;

(v)      by no later than May 13, 2022, the Bankruptcy Court shall have entered the Final DIP Order and the Bidding Procedures Order;

(vi)      by no later than May 20, 2022, the Debtors shall have delivered a draft Business Plan to the Consenting Stakeholders;

(vii)      by no later than May 21, 2022, the Debtors and the Required Consenting Stakeholders shall have agreed on an acceptable Lease Rationalization Plan;

(viii)      by no later than June 3, 2022, the Debtors shall have filed the Plan, the Disclosure Statement, and the Solicitation Materials;

(ix)      by no later than June 7, 2022, the Debtors and the Required Consenting Stakeholders shall have agreed on an acceptable Business Plan;

(x)      by no later than June 27, 2022, the Required Consenting Stakeholders shall have provided the Debtors with the Reserve Price;

(xi)    by no later than two (2) Business Days after the Required Consenting Stakeholders provide the Debtors with the Reserve Price, the Debtors shall have filed with the Bankruptcy Court a notice of the Reserve Price;

(xii)   to the extent applicable, by no later than seven (7) days after the Debtors' determination that the Consenting Stakeholder Purchaser's bid for all, substantially all, or any group of the Debtors' assets is the Successful Bid for such assets pursuant to the Bidding Procedures Order, the Consenting Stakeholder Purchaser shall have made the Required Consenting Stakeholder Election with respect to such assets;

(xiii)  to the extent applicable, by no later than July 29, 2022, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the Confirmation Order; and

(xiv)   to the extent applicable, by no later than August 5, 2022, the Plan Effective Date shall have occurred or, in the event of the Sale Scenario to the Consenting Stakeholder Purchaser, the consummation of such sale shall have occurred.

11.04.   <u>Sale Process Milestones</u>.  The following Sale Process Milestones shall apply to this Agreement unless extended or waived in writing by each of the Company Parties and the Required Consenting Stakeholders:

(i)     Milestones for the sale of Pantheon:

(A)    by no later than May 14, 2022, the deadline to submit second round bids shall have occurred;

(B)    by no later than June 30, 2022, a definitive agreement for a sale with a purchase price reasonably acceptable to the Required Consenting Stakeholders shall have been executed; and

(C)    by no later than September 15, 2022, the closing of such sale shall have occurred.

(ii)    Milestones for the sale of either (i) all or substantially all remaining assets of the Debtors or (ii) one or more subsets thereof, which must include Bravo and/or Eagle and may include any other remaining assets:

(A)    by no later than July 7, 2022, the Bid Deadline shall have occurred;

(B)    by no later than July 12, 2022, to the extent more than one Qualified Bid in excess of the applicable Reserve Price is received for (i) all or substantially all assets or (ii) one or more subsets thereof, an auction for such assets shall have occurred;

(C)    by no later than July 14, 2022, the Bankruptcy Court shall have entered an order approving the sale of such assets; *provided*,

*however*, that in the event the Consenting Stakeholder Purchaser's bid is the only Qualified Bid for such assets, this Milestone shall be automatically extended by seven (7) days and, should the Consenting Stakeholder Purchaser elect to consummate such transaction through the Plan pursuant to the Required Consenting Stakeholder Election, this Milestone shall not apply. To the extent Bravo or Eagle is not included in such transaction, the sale of Bravo or Eagle will be subject to Milestones to be agreed upon, by no later than July 14, 2022, by the Debtors and the Required Consenting Stakeholders which shall include Milestones for (i) the Bid Deadline, (ii) an auction, (iii) the Bankruptcy Court's entry of an order approving the sale, and (iv) the closing of the sale; and

(D)    by no later than July 29, 2022, subject to Sections 11.03(xiv) and 11.04(i)(C), the closing of sale(s) of all or substantially all assets of the Debtors, including Bravo and Eagle, shall have occurred; *provided*, *however*, that (i) such date may be extended for an additional one month, solely to the extent that the Company Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the closing of such sale have occurred other than the receipt of regulatory or other approval of a governmental unit necessary for occurrence of the closing and (ii) the Parties shall negotiate in good faith for a further reasonable extension of the closing date of such sale if the Company Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the closing of such sale have occurred other than the receipt of regulatory or other approval of a governmental unit necessary for occurrence of the closing.

11.05.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Required Consenting Stakeholders and each Company Party.

11.06.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice upon the consummation of the Plan on (i) the Plan Effective Date, or (ii) in the event an Acceptable Sale or Multiple Sales are to be implemented under the Plan or another joint chapter 11 plan with respect to the Company Parties, upon the effective date of the Plan, such other joint chapter 11 plan or any other plan in respect of the Company Parties proposed under chapter 11 of the Bankruptcy Code after consummation of an Acceptable Sale or Multiple Sales, as the case may be.

11.07.  <u>Effect of Termination</u>.  Upon the occurrence of a Consenting First Lien Lender/Second Lien Lender Termination Event, unless waived by the applicable Parties, each Party subject to such termination shall be released from its commitments, undertakings, and

agreements under or related to this Agreement and any of the Definitive Documents and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims/Interests or causes of action, and there shall be no liability or obligation hereunder on the part of any Party hereto; provided that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations under this Agreement before the date of such Consenting First Lien Lender/Second Lien Lender Termination Event or (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 14.21 hereunder.  Upon the occurrence of a Consenting First Lien Lender/Second Lien Lender Termination Event prior to the Plan Effective Date, or in the event of the Sale Scenario, after the consummation of an Acceptable Sale or Multiple Sales, prior to the effective date of the Plan, such other joint chapter 11 plan or any other plan proposed in respect of the Company Parties under chapter 11 of the Bankruptcy Code, any and all consents, agreements, undertakings, tenders, waivers, forbearances, and ballots tendered or delivered by the Parties subject to such termination before such Consenting First Lien Lender/Second Lien Lender Termination Event shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.07 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court before the entry of the Confirmation Order by the Bankruptcy Court.  The automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof, and the Company Parties hereby waive the automatic stay for such purposes.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserves its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

**Section 12.**     *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     Subject to the consent rights set forth in Section 3.02 hereof, this Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by each Company Party and the Required Consenting Stakeholders; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Stakeholders holding Company Claims/Interests within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, the consent of each such affected Consenting Stakeholder shall also be required to effectuate such proposed modification, amendment, waiver, or supplement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**     *Releases*.

13.01.     Releases, Exculpation, Injunction. In connection with the Restructuring Transactions, each of the Parties shall provide customary releases to the maximum extent permissible by law to the Parties hereto and their respective affiliates, employees, officers, directors, professionals and other entities typically included in customary releases for transactions similar to the Restructuring Transactions.  In addition, any Plan shall include customary exculpation and injunction provisions to the maximum extent permissible by law for the benefit of such parties.

**Section 14.**     *Miscellaneous.*

14.01.     Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer, acceptance or solicitation with respect to any securities, loans or other instruments or a solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer, acceptance or solicitation will be made only in compliance with all applicable provisions of securities Laws, provisions of the Bankruptcy Code, and other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  _Rules of Construction_.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  _Successors and Assigns; Third Parties_.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  _Notices_.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

     Sungard AS New Holdings, LLC
     565 East Swedesford Road
     Suite 320
     Wayne, PA 19087
     Attention: General Counsel
     Email:  sgas.legalnotices@sungardas.com

     with copies (which shall not constitute notice) to:

     Akin Gump Strauss Hauer & Feld LLP
     1 Bryant Park
     New York, New York 10036
     Attention:  Philip C. Dublin, Meredith A. Lahaie and Daniel Fisher
     Email: pdublin@akingump.com; mlahaie@akingump.com; dfisher@akingump.com

     and

     Akin Gump Strauss Hauer & Feld LLP
     2001 K Street NW
     Washington, DC 20006
     Attention:  Alan J. Feld
     Email: ajfeld@akingump.com

(b)      if to a Consenting Stakeholder, to the address set forth on the signature page hereto, or the applicable Joinder or Transfer Agreement, with a copy (which shall not constitute notice) to:

Proskauer Rose LLP
One International Place
Boston, MA 02110-2600
Attention: Charles A. Dale
Email:  cdale@proskauer.com

and

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attention: David M. Hillman & Joshua A. Esses
Email: dhillman@proksauer.com
          jesses@proskauer.com

Any notice given by delivery, mail, electronic mail (Email) or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that, without limiting any other remedies available at law or in equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Relationship Among Consenting Stakeholders</u>.

(a)     None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties or their affiliates, or any of the Company Parties' or their affiliates' creditors or other stakeholders, including, without limitation, any holders of Credit Agreement Claims or Company Claims/Interests, and, other than as expressly set forth in this Agreement, there are no commitments among or between the Consenting Stakeholders.  It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company without the consent of the Company or any other Consenting Stakeholder, subject to applicable securities laws, this Agreement (including Section 8 of this Agreement), and any applicable Confidentiality Agreement.  No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company shall in any way affect or negate this understanding and agreement.

(b)     The Company Parties understand that the Consenting Stakeholders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the Consenting Stakeholders and shall not apply to any affiliate of a Consenting Stakeholder.

14.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent,

acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.21.  <u>Survival</u>.

(a)    Notwithstanding (i) any transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 14 (excluding Section 14.23) and Section 8.03 shall survive such transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; <u>provided</u> that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

(b)    Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Company Parties and in contemplation of possible chapter 11 filings by the Company Parties and that the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

14.22.  <u>Tax</u>.  To the extent practicable and applicable, and subject to the consent of the Required Consenting Stakeholders, the Restructuring Transactions will be structured so as to preserve or otherwise maximize the availability and/or use of favorable tax attributes (including tax basis) of the Company Parties and to otherwise obtain the most beneficial structure for the Company Parties or the Reorganized Debtors and the holders of the equity of any Reorganized Debtor post-Plan Effective Date, and the Company Parties will cooperate on a reasonable basis with the Consenting Stakeholders in connection with making such determination, including by timely providing the Consenting Stakeholders with reasonable information relevant to making such determination.

14.23.  <u>Publicity</u>.

(a)    The Company Parties shall not (i) use or disclose to any person the name of any Consenting Stakeholder, including in any press release, without such Consenting Stakeholder's prior written consent or (ii) disclose to any person, other than legal, accounting, financial and other advisors to the Company Parties who have a need to know such information in connection with the Restructuring, the amount or percentage of any the Loans held by any Consenting Stakeholder; <u>provided</u> that the Company shall be permitted to disclose at any time the aggregate amount of, and aggregate percentage of Loans or Interests held by the Consenting Stakeholders. The Consenting Stakeholders hereby consent to the disclosure by the Company in the Definitive Documents, or in any motion or other pleading seeking approval of any aspect of the Restructuring Transactions, or as otherwise required by law or regulation or by the Company's existing financing agreements, of the execution, terms and contents of this Agreement and the aggregate amount of, and aggregate percentage of, the Loans and Interests held by the Parties.

(b)    In the event that the Company Parties seek to disseminate a press release, public filing, public announcement or other communications (collectively, an "**<u>Announcement</u>**") regarding the commencement of the Chapter 11 Cases, the Restructuring Transactions or any terms thereof, it shall use commercially reasonable efforts to provide a draft of such Announcement to

counsel to the Consenting Stakeholders for review and comment at least 24 hours before the public disclosure of such Announcement and shall act in good faith in considering and consulting with respective counsel to the Consenting Stakeholders regarding the form and substance of any such Announcement.

[*Remainder of Page Intentionally Left Blank*]

## EXHIBIT A

**Sungard AS Affiliate Entities**

Sungard AS New Holdings II, LLC

Sungard AS New Holdings III, LLC

Sungard Availability Services Holdings, LLC

Sungard Availability Network Solutions, Inc.

Sungard Availability Services Technology, LLC

Inflow LLC

Sungard Availability Services, LP

Sungard Availability Services Holdings (Europe), Inc.

Sungard Availability Services Holdings (Canada), Inc.

Sungard Availability Services, Ltd.

Sungard Availability Services (Canada) Ltd./Sungard, Services De Continuite Des Affaires (Canada) Ltee

# **EXHIBIT B**

**Restructuring Term Sheet**

*Execution Version*

**SUNGARD AS NEW HOLDINGS, LLC, ET AL.**

---

**Term Sheet**
**Summary of Principal Terms and Conditions**
**Restructuring of Sungard AS New Holdings, LLC and Its Subsidiaries**

**April 11, 2022**

---

This term sheet (this "**Restructuring Term Sheet**") describes the principal terms and conditions of one or more restructuring and certain related transactions (the "**Restructuring**") concerning Sungard AS New Holdings, LLC ("**Sungard AS**") and certain of its affiliates.

Subject in all respects to the terms of the restructuring support agreement to which this Restructuring Term Sheet is attached (together with the exhibits and schedules to such agreement, including this Restructuring Term Sheet, each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**") and the Definitive Documents (as defined in the Restructuring Support Agreement), the Restructuring will be consummated through cases commenced under chapter 11 (collectively, the "**Chapter 11 Cases**") of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), and recognition proceedings commenced under Part IV of the *Companies' Creditors Arrangement Act* (Canada) (the "**Recognition Proceedings**") in the Ontario Superior Court of Justice (Commercial List). Capitalized terms used herein but otherwise not defined shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

Without limiting the generality of the foregoing, this Restructuring Term Sheet and the undertakings contemplated herein are subject in all respects to due diligence and the negotiation, execution, and delivery of the Definitive Documents. The transactions contemplated by this Restructuring Term Sheet will be subject to the terms and conditions to be set forth in the Definitive Documents. This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Until publicly disclosed upon the prior written agreement of the Debtors and the Required Consenting Stakeholders, this Restructuring Term Sheet shall remain strictly confidential and may not be shared with any other party or person without the consent of the Debtors and the advisors to the Consenting Stakeholders.

The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring or any related restructuring or similar transaction have not been fully evaluated and any such evaluation may affect the terms and structure of any Restructuring or related restructuring or similar transactions.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.

**TRANSACTION OVERVIEW**

| Parties | |
|---|---|
| **Debtors** | Sungard AS and certain of its direct and indirect subsidiaries identified on Exhibit 1 attached hereto. |
| **Company** | The Debtors and all of their direct and indirect non-Debtor subsidiaries and affiliates. |
| **Reorganized Debtors** | "**Reorganized Debtor**" means, for each Debtor, such Debtor immediately after consummation of the Restructuring in connection with the Equitization Scenario (as defined herein). |

| **Capital Structure** | *Funded Debt* | *Approximate Principal Amount Outstanding* |
|---|---|---|
| | **ABL Facility** | $29 million |
| | **First Lien Term Loans** (collectively, the "**First Lien Credit Agreement Claims**") | $108 million |
| | **Second Lien Term Loans** (collectively, the "**Second Lien Credit Agreement Claims**") | |
| | • Second Lien Credit Agreement | $277.6 million |
| | • Non-Extending Second Lien Credit Agreement | $8.9 million |

| **Consenting Stakeholder Purchaser** | In the event the Consenting Stakeholders acquire all, substantially all, or one or more groups of assets pursuant to a sale (if the Reserve Price is not satisfied in the Sale Scenario) in lieu of the Equitization Scenario (as defined below), a new Delaware limited liability company, corporation, or other entity that will be organized and formed by the Consenting Stakeholders to make such acquisition. The Consenting Stakeholder Purchaser shall have the right to assign its rights and obligations, in whole or in part, including its right to acquire any particular asset or group of assets, to one or more of its affiliates. The corporate governance and capitalization of the Consenting Stakeholder Purchaser shall be determined by the Required Consenting Stakeholders. |
|---|---|
| **Reserve Price** | A purchase price to be determined by the Required Consenting Stakeholders in consultation with the Debtors, (i) for each group of the Debtors' assets and, alternatively, (ii) for the assets comprising the Debtors' businesses as a whole.[1] |

---

[1] The Debtors and Required Consenting Stakeholders shall determine an amount of cash that is sufficient to fund the Debtors' post-closing obligations under any Purchase Agreement between the Debtors and the Consenting Stakeholder Purchaser and/or one or more third party purchasers that are a Successful Bidder for any of the Debtors' assets pursuant to the Bidding Procedures as well as accrued and unpaid Bankruptcy Court approved fees for estate professionals, and

| The Restructuring Transactions | |
|---|---|
| **The Restructuring Transactions** | The Debtors shall commence the Chapter 11 Cases and shall simultaneously pursue (i) restructuring transaction(s) involving the sale by the Debtors of all, substantially all of the Debtors' assets, or one or more subsets of such assets pursuant to section 363 of the Bankruptcy Code (the "**Sale Scenario**") and (ii) a chapter 11 plan of reorganization (the "**Plan**") pursuant to which, among other things, the Consenting Stakeholders shall receive the equity in any Reorganized Debtor (the "**Equitization Scenario**"), in accordance with the Milestones and terms and conditions set forth in the Restructuring Support Agreement. |
| **The Sale Scenario** | A sale or sales by the Debtors of all of their right, title, and interest in, to, and under all or substantially all of the Debtors' assets, or one or more groups of such assets to one or more purchasers, free and clear of all liens, claims, interests, or encumbrances (except certain permitted encumbrances as determined by the Debtors and any purchaser, and subject to any defenses or claims of the Debtors with respect thereto, with liens to attach to the proceeds of such sale(s)), and the assumption and assignment of executory contracts and unexpired leases, pursuant to Bankruptcy Code sections 105, 363(b), (f), (m) and (k) and 365.<br><br>The Sale Scenario may be consummated pursuant to one or more of (x) an asset purchase agreement, (y) a share purchase agreement (each of (x) or (y), a "**Purchase Agreement**"), or (z) a plan of reorganization that, among other things, (1) does not have any financing or diligence contingency, (2) demonstrates that the purchaser(s) has the wherewithal to close such transaction, and (3) provides that such closing shall occur on or before the applicable Milestone, and in connection therewith, the Bankruptcy Court enters an order or orders approving such transaction(s) and related documentation and authorizing the Debtors to enter into such transaction and related documentation (each such sale or sales, an "**Acceptable Sale**"); provided, however, that except for a sale to the Consenting Stakeholder Purchaser, no transaction or combination of transactions shall constitute an Acceptable Sale that does not yield sufficient cash proceeds at closing to fully satisfy the Reserve Price allocable to such assets. |
| **Bidding Procedures** | The Sale Scenario shall be conducted in accordance with bidding procedures in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, and as approved by the Bankruptcy Court (the "**Bidding Procedures**" and the order approving such Bidding Procedures, the "**Bidding Procedures Order**").  Only bids that comply in all respects with the Bidding Procedures shall be considered by the Debtors (each such bid, a "**Qualified Bid**"). For the avoidance of doubt, third party bids shall only constitute a Qualified Bid if (in addition to all other requirements set forth in the Bidding Procedures) such bid by itself or, if for a subset of the Debtors' assets, when combined with one or more other bids for subsets of the Debtors' assets, propose a cash purchase price sufficient to fully satisfy (at closing) the Reserve Price for the group of assets covered by such bid(s).<br><br>For the avoidance of doubt, in the event of a bid by the Consenting Stakeholder |

reasonable and necessary wind-down activities through consummation of a chapter 11 plan or conversion or dismissal of the chapter 11 cases.

| | |
|---|---|
| | Purchaser, the amount of any credit bid pursuant to Bankruptcy Code section 363(k) by the Consenting Stakeholder Purchaser as part of its proposed purchase price shall not exceed the Reserve Price (the "**Credit Bid Cap**"). Any credit bid by the Consenting Stakeholder Purchaser shall constitute a Qualified Bid and comply in all reasonable respects with the applicable requirements for a Qualified Bid in the Bidding Procedures. |
| **The Equitization Scenario** | In connection with the Equitization Scenario, the Debtors shall file and prosecute the Plan. Among other things, the Plan shall provide for the distribution of equity in any Reorganized Debtor to the Consenting Stakeholders (subject to dilution for reorganized equity issued, among other things, (a) in connection with exit financing, (b) in connection with any management incentive plan, and/or (c) after the Plan Effective Date). |
| | If the Reserve Price is not satisfied, the Debtors shall, with the consent of the Required Consenting Stakeholders, withdraw the Plan or modify the Plan in a manner that is in form and substance acceptable to the Required Consenting Stakeholders if the Required Consenting Stakeholders determine to purchase all, substantially all, or one or more groups of assets of the Debtors as a Consenting Stakeholder Purchaser in lieu of the Sale Scenario. |
| **Required Consenting Stakeholder Election** | To the extent that the Consenting Stakeholder Purchaser is a Successful Bidder pursuant to the Bidding Procedures, the Required Consenting Stakeholders may elect to consummate any Restructuring Transaction pursuant to which the Consenting Stakeholder Purchaser acquires all, substantially all, or one or more groups of the Debtors' assets as a Sale Scenario or an Equitization Scenario. The Required Consenting Stakeholders shall submit such election to the Company in accordance with the applicable Milestone(s), and the Company shall file a notice of such election with the Bankruptcy Court within two days of such election. |
| **DIP Financing** | The Term Loan DIP Lenders shall provide the Debtors with the Term Loan DIP Facility in accordance with the terms and conditions outlined in the term sheet attached as Exhibit D to the Restructuring Support Agreement (the "**Term Loan DIP Term Sheet**"). The obligations under the Term Loan DIP Facility are referred to herein as the "**Term Loan DIP Facility Claims**." |
| | The ABL DIP Lenders shall provide the Debtors with the ABL DIP Facility in accordance with the terms and conditions outlined in the term sheet attached as Exhibit C to the Restructuring Support Agreement (the "**ABL DIP Term Sheet**"). The obligations under the ABL DIP Facility are referred to herein as the "**ABL DIP Facility Claims**" and, together with the Term Loan DIP Facility Claims, the "**DIP Facility Claims**." |
| **Restructuring Fees and Expenses** | The Debtors shall pay the reasonable and documented fees and expenses of the Consenting Stakeholders in connection with the Restructuring, including the reasonable and documented fees and disbursements of Proskauer Rose, LLP and Gray Reed & McGraw LLP. |
| **Treatment of Claims/Interests in** | In the Equitization Scenario, the Plan shall provide for the following treatment of claims against, and interests in, the Debtors unless less favorable treatment is |

4

| Plan | otherwise agreed to by the holder of such claims:[2] |
|------|------|
| | (a) <u>Administrative Claims</u>:  Allowed administrative, priority, and priority tax claims will be paid in full in cash upon the Plan Effective Date or as soon as reasonably practicable thereafter. |
| | (b) <u>Other Secured Claims</u>:[3] in full and final satisfaction of such claims, each such holder shall receive at the Debtors' discretion:  (i) payment in full in cash of the unpaid portion of such Other Secured Claim on the Plan Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms in the ordinary course); (ii) the Debtors' interest in the collateral securing such claim; or (iii) such other treatment rendering such claims unimpaired. |
| | (c) <u>Term Loan DIP Facility Claims</u>: in full and final satisfaction of such claims, the Term Loan DIP Facility Claims shall be (i) paid in full in cash, or (ii) afforded such other treatment as is acceptable to the Required Term Loan DIP Lenders (as defined in the Term Loan DIP Term Sheet) (in their sole discretion). |
| | (d) <u>ABL DIP Facility Claims</u>: in full and final satisfaction of such claims, the ABL DIP Facility Claims shall be (i) paid in full in cash or (ii) afforded such other treatment as is acceptable to the Required ABL DIP Lenders (as defined in the ABL DIP Term Sheet) (in their sole discretion). |
| | (e) <u>First Lien Credit Agreement Claims</u>: in full and final satisfaction of such claims, the First Lien Credit Agreement Claims shall be (i) paid in full in cash after the DIP Facility Claims have been indefeasibly paid in full, or (ii) afforded such other treatment as is acceptable to the Required Term Loan DIP Lenders and the Debtors, or (iii) afforded such other treatment as is consistent with applicable law. |
| | (f) <u>Second Lien Credit Agreement Claims</u>: in full and final satisfaction of such claims, the Second Lien Credit Agreement Claims shall be (i) paid in full in cash after the DIP Facility Claims and the First Lien Credit Agreement Claims have been indefeasibly paid in full (or afforded treatment acceptable to the Required Consenting holders of such claims), or (ii) afforded such other treatment as is acceptable to the Required Term Loan DIP Lenders and the Debtors, or (iii) afforded such other treatment as is consistent with applicable law. |
| | (g) <u>General Unsecured Claims</u>:[4] [TBD] |
| | (h) <u>Intercompany Claims</u>: Intercompany Claims shall be, at the option of the Debtors, with the consent of the Required Consenting Stakeholders, or |

[2] To the extent that the Sale Scenario contemplates a chapter 11 plan (a "**Sale Scenario Plan**"), any such Sale Scenario Plan shall be on terms to be agreed by and among the Debtors and the Required Consenting Stakeholders, consistent with applicable law.

[3] "**Other Secured Claims**" means any secured claim against any Debtor, other than (a) claims arising under the ABL Facility; (b) First Lien Credit Agreement Claims; (c) Second Lien Credit Agreement Claims; or (d) claims arising under the DIP Facilities.

[4] "**General Unsecured Claims**" means any prepetition, general unsecured claim against one or more Debtor, excluding claims held by one or more Debtors, non-debtor direct or indirect subsidiaries of the Debtors; <u>provided</u>, <u>however</u>, that any deficiency claim arising from the First Lien Credit Agreement Claims or Second Lien Credit Agreement Claims shall not be a General Unsecured Claim.

| | |
|---|---|
| | Reorganized Debtors, as applicable, (a) reinstated or (b) distributed, contributed, set off, cancelled, and released without any distribution on account thereof. |
| | (i) <u>Intercompany Interests</u>: Intercompany Interests shall be, at the option of the Debtors, with the consent of the Required Consenting Stakeholders, or the Reorganized Debtors, as applicable, reinstated or (b) cancelled and released without any distribution on account thereof. |
| | (j) <u>Section 510(b) Claims</u>: Section 510(b) Claims shall receive no recovery |
| | (k) <u>Existing Equity Interests</u>: Holders of existing equity interests in shall receive no recovery |
| **Releases, Exculpation, Injunction** | In connection with the Restructuring Transactions, each of the Parties shall provide customary releases to the maximum extent permissible by law to the other Parties and their respective affiliates, employees, officers, directors, professionals and other entities typically included in customary releases for transactions similar to the Restructuring Transactions.  In addition, any Plan shall include customary exculpation and injunction provisions to the maximum extent permissible by law for the benefit of such parties. |

| **Consenting Stakeholder Purchaser Sale Terms** ||
|---|---|
| **Purchase Price** | The aggregate consideration for a sale of all, substantially all, or one or more groups of the Debtors' assets to the Consenting Stakeholder Purchaser shall consist of the following (collectively, the "**Purchase Price**"): (i) pursuant to Bankruptcy Code section 363(k), a credit bid from the Consenting Stakeholder Purchaser in an amount up to the Reserve Price allocable to such assets;  and (ii) assumption of the Assumed Liabilities. |
| **Purchased Assets**[5] | "**Purchased Assets**" in a sale to a Consenting Stakeholder Purchaser shall include substantially all assets of the Debtors, or all assets of the Debtors related to the applicable group of the Debtors' assets, unless designated as "Excluded Assets" in the Purchase Agreement.  Purchased Assets may, subject to applicable diligence and negotiation (including potential incremental purchase price in cash) include without limitation: (i) all accounts receivable and pre-paid expenses; (ii) all cash and cash equivalents; (iii) all intellectual property rights; (iv) all of the Debtors' owned personal property, equipment, fixtures, and other assets customarily considered 'PP&E' or any rights under leases relating thereto to the extent such leases constitute Assumed Contracts (as defined below) and all stock, partnership, membership and other equity or similar interests owned by the Debtors in any entity that is not a guarantor under the Credit Agreements or the Indentures; (v) all deposits and prepaid or deferred charges and expenses of the Debtors; (vi) all right, title, and interest of the Debtors in each owned real property and under each real property lease which is an Assumed Contract and any present or future rights, title and interests arising from or related to the foregoing; (vii) all of the documents that are used or useful in, held for use in or intended to be used in, or that arise in any way out of, the applicable business of the Debtors; (viii) all Assumed Contracts; (ix) all third party property and casualty insurance proceeds to the extent received or receivable in respect of the Purchased Assets; (x) all general intangibles of the |

---

[5] Subject to ongoing due diligence.

| | |
|---|---|
| | Debtors; (xi) all goodwill associated with the Purchased Assets; (xii) all claims, causes of action, and rights of recovery related to the Purchased Assets, including against counterparties to the Assumed Contracts, actions arising under chapter 5 of the Bankruptcy Code, and for taxes relating to the Purchased Assets; (xiii) any permits, licenses, certificates or similar documents from any governmental entity relating to the Purchased Assets; (xiv) all equity interests; and (xv) any claim, right, or interest in any credit, refund, rebate, abatement, or other recovery relating to the Purchased Assets, for taxes or otherwise, including those arising under the Assumed Contracts. |
| **Assumed Liabilities/Excluded Liabilities**[6] | "**Assumed Liabilities**" in a sale to a Consenting Stakeholder Purchaser shall include the following liabilities of the Debtors and any other liabilities set forth as such in the Purchase Agreement: (i) all liabilities of the Debtors under the Assumed Contracts (including cure costs not to exceed an amount to be agreed by the Debtors and the Consenting Stakeholder Purchaser); (ii) trade payables related to the Purchased Assets incurred in the ordinary course of business prior to and during the Chapter 11 Cases as set forth on a schedule to be attached to the Purchase Agreement in the sole discretion of the Consenting Stakeholder Purchaser; provided, however, that under no circumstances shall the amount of trade payables assumed by the Consenting Stakeholder Purchaser exceed an amount to be agreed; (iii) all liabilities arising out of the operation of the Purchased Assets for periods following the Closing Date; (iv) liabilities arising after the Closing Date with respect to employees of the Debtors that accept offers of employment with the Consenting Stakeholder Purchaser; and (v) tax liabilities relating to the Purchased Assets for a tax period (or the portion thereof) beginning on the Closing Date excluding, for the avoidance of doubt, (x) all income tax or similar liabilities of the Debtors for any tax period, (y) all transfer and other similar taxes payable with respect to the Sale Scenario and (z) any tax or similar liability related to the Excluded Assets.<br><br>All pre-petition and post-petition liabilities related to the Purchased Assets, other than Assumed Liabilities, shall be "**Excluded Liabilities**" to the extent set forth as such in the Purchase Agreement. |
| **Assumed Contracts/Excluded Contracts**[7] | "**Assumed Contracts**" in a sale to the Consenting Stakeholder Purchaser shall include the Debtors' contracts, supply agreements, leases, and other written obligations related to the Purchased Assets, to the extent not previously rejected with the consent of Consenting Stakeholder Purchaser, set forth on a schedule to be attached to the Purchase Agreement, subject to the right of Consenting Stakeholder Purchaser to amend such schedule at any time prior to the Closing Date and, if applicable, the Effective Date, to remove any contract, lease, or other obligation from such schedule (an "**Excluded Contract**"); provided that, without limiting the foregoing, subject to Bankruptcy Court approval, the Consenting Stakeholder Purchaser may have the right at any time within sixty (60) days after the Closing Date and, if applicable, the Effective Date to (i) elect to designate any contract which has not been rejected by the Debtors to be an Assumed Contract, and (ii) to remove an Assumed Contract from the schedule if such Assumed Contract is subject to a cure dispute or other dispute as to the assumption or |

---

[6] Subject to ongoing due diligence.
[7] Subject to ongoing due diligence.

| | |
|---|---|
| | assignment of such Assumed Contract that has not been resolved to the satisfaction of Consenting Stakeholder Purchaser. If prior to the Closing Date and, if applicable the Effective Date, there are contracts or leases related to the Purchased Assets that have not been designated as an Assumed Contract or Excluded Contract, then the Debtors shall not assume or reject any such contract and lease, pursuant to section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, until the Consenting Stakeholder Purchaser so directs the Debtors (subject to the Consenting Stakeholder Purchaser holding the Debtors harmless in all respects with respect to such contracts and leases during the post-Closing Period); *provided*, *however*, that the Debtors may assume or reject a contract or lease not related to the Purchased Assets in connection with an Acceptable Sale to a third party bidder. Consenting Stakeholder Purchaser shall not assume or otherwise have any liability with respect to any Excluded Contract. |
| **Consenting Stakeholder Purchaser Representations and Warranties** | The Consenting Stakeholder Purchaser will make customary representations and warranties in the context of 363 sale/credit bid transactions as will be agreed among the Debtors and the Consenting Stakeholder Purchaser. |
| **Sellers Representations and Warranties** | The Debtors will make customary representations and warranties in the context of 363 sale/credit bid transactions as will be agreed among the Debtors and the Consenting Stakeholder Purchaser. |
| **Sellers Covenants** | The Debtors will make customary and other negative and operating covenants in the context of 363 sale/credit bid transactions as will be agreed among the Debtors and the Consenting Stakeholder Purchaser. |
| **Tax Cooperation** | The Debtors and Consenting Stakeholders shall agree to cooperate in good faith to structure the Restructuring Transactions in a tax efficient manner for the Debtors and the Consenting Stakeholders. |
| **Regulatory Approvals** | Regulatory approvals may be required in connection with the Restructuring Transactions, including to the extent applicable, under the HSR Act and applicable foreign jurisdictions (collectively, the "**Regulatory Approvals**"). |
| **Closing Conditions** | A Purchase Agreement between the Debtors and Consenting Stakeholder Purchaser shall contain, among other things, the following conditions to the obligation of the Consenting Stakeholder Purchaser to consummate the Sale Scenario (in addition to other conditions that may be agreed upon by the Consenting Stakeholder Purchaser and the Debtors in the Purchase Agreement or otherwise): <br><br> • Entry of the Sale Order, as applicable, in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Debtors, the Consenting Stakeholder Purchaser, and the Required Consenting Stakeholders and such Sale Order not being subject to any stay or appeal; <br><br> • The Bankruptcy Court shall have entered an interim and a final order, in form and substance acceptable to the Required Term Loan DIP Lenders and the Required ABL DIP Lenders in their sole discretion (collectively, the "**DIP Orders**"), approving the DIP Facilities, and the Debtors' entry into the related |

|  | DIP Facilities (the "**DIP Facilities Documents**"), which DIP Orders shall have remained in full force and effect, shall not be the subject of a pending appeal and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Required Term Loan DIP Lenders and the Required ABL DIP Lenders; |
|---|---|
|  | • No injunctions or other order or similar ruling or determination of any governmental authority preventing or delaying the consummation of the 363 Sale; |
|  | • A written contribution and direction agreement shall have been entered into by and among the Required Consenting Stakeholders; |
|  | • No default, Default or Event of Default as defined in the DIP Facilities Documents shall have occurred; |
|  | • Lien releases and termination statements with respect to all material liens (other than permitted liens) on the purchased assets; |
|  | • The Regulatory Approvals shall have been received; |
|  | • Accuracy of the Debtors' representations and warranties on the Closing Date subject to a materially adverse change standard; |
|  | • No material breach of the Debtors' covenants; |
|  | • No material adverse change (as customarily defined with customary exceptions and limitations) shall have occurred; and |
|  | • Payment in full of fees and expenses of the Consenting Stakeholder Purchaser and the Consenting Stakeholders to the extent not otherwise reimbursed in connection with the Term Loan DIP Facility. |
| **Termination** | A Purchase Agreement between the Company and Consenting Stakeholder Purchaser will contain customary termination provisions, including, but not limited to: |
|  | (i) by agreement of each of the Debtors and the Consenting Stakeholder Purchaser with the consent of the Required Consenting Stakeholders; |
|  | (ii) by either the Debtors, the Consenting Stakeholder Purchaser or the Required Consenting Stakeholders if the Closing Date does not occur on or prior to the applicable Milestone, provided that the Consenting Stakeholder Purchaser with the consent of the Required Consenting Stakeholders can extend such date in its sole discretion for an agreed upon period of time, so long as funding is available under the DIP Facilities or otherwise and the maturity date, if applicable, of such DIP Facilities are similarly extended; |
|  | (iii) by either the Debtors or the Consenting Stakeholder Purchaser (with the consent of the Required Consenting Stakeholders) if a court of competent jurisdiction or other governmental authority has issued an order or any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the closing under the Asset Purchase Agreement and such order or action has become final and non-appealable; and |
|  | (iv) by notice from the Consenting Stakeholder Purchaser or Required Consenting Stakeholders: |

|  | (1) | upon a material breach by the Debtors of the Purchase Agreement or the Sale Order; |
|---|---|---|
|  | (2) | upon any Company entity taking steps in furtherance of the dismissal or conversion of any of the Chapter 11 Cases; |
|  | (3) | upon the appointment of a trustee or examiner with expanded powers; |
|  | (4) | upon failure to meet any Milestone; |
|  | (5) | if for any reason the Consenting Stakeholder Purchaser is unable, pursuant to Bankruptcy Code section 363(k), to credit bid in payment of any portion of the Purchase Price contemplated to be so credit bid; |
|  | (6) | if, at the end of the Auction (if any), the Consenting Stakeholder Purchaser is not determined by Debtors to be the bidder with a Winning Bid; |
|  | (7) | upon any Event of Default or Termination Date (as defined in the DIP Orders); |
|  | (8) | upon permanent denial of required Regulatory Approvals; or |
|  | (9) | upon the termination of the Restructuring Support Agreement. |
| **Labor Matters** | As of the Closing Date, the Consenting Stakeholder Purchaser shall set initial terms and conditions of employment, including, without limitation, wages, benefits, job duties and responsibilities and work assignment for Employees related to the Purchased Assets that are offered and accept employment with the Consenting Stakeholder Purchaser and other employee matters to be agreed among the Debtors and the Consenting Stakeholder Purchaser. | |
| **Definitive Documents and Due Diligence** | The Definitive Documents governing the Restructuring Transactions shall include, as applicable and dependent upon the Restructuring Transaction actually implemented as determined in accordance with the Restructuring Term Sheet: (A) the Plan; (B) the Disclosure Statement; (C) the Confirmation Order; (D) the Solicitation Materials and any motion seeking approval thereof; (E) the order of the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the Plan Supplement; (H) the DIP Orders, DIP Facilities Documents and DIP Motion; (I) the Bidding Procedures, the Bidding Procedures Order and the motion seeking approval thereof; (J) the Purchase Agreement between the Debtors and a Consenting Stakeholder Purchaser; (K) a written contribution and direction agreement by and among the Consenting Stakeholders; (L) the corporate governance documents and other organizational documents of Reorganized Sungard AS and its subsidiaries; and (M) such other agreements and documentation reasonably desired or necessary to consummate and document the Restructuring Transactions.<br><br>The signing of the Definitive Documents will be subject to, among other things, the negotiation by the Debtors, the Consenting Stakeholder Purchaser and the Required Consenting Stakeholders of acceptable terms and conditions for the Definitive Documents as well as additional legal, accounting, financial, tax, business and regulatory due diligence.  For the avoidance of doubt, this Restructuring Term Sheet is non-binding and in the event of any inconsistency | |

| | between this Restructuring Term Sheet and any Definitive Document, such Definitive Document shall govern. |

## **Exhibit 1**

**Debtors**

Sungard AS New Holdings, LLC

Sungard AS New Holdings II, LLC

Sungard AS New Holdings III, LLC

Sungard Availability Services Holdings, LLC

Sungard Availability Network Solutions, Inc.

Sungard Availability Services Technology, LLC

Inflow LLC

Sungard Availability Services, LP

Sungard Availability Services Holdings (Europe), Inc.

Sungard Availability Services Holdings (Canada), Inc.

Sungard Availability Services, Ltd.

Sungard Availability Services (Canada) Ltd./Sungard, Services De Continuite Des Affaires (Canada) Ltee

**<u>EXHIBIT C</u>**

**ABL DIP Term Sheet**

*Execution Version*

SUNGARD AVAILABILITY SERVICES
DEBTOR-IN-POSSESSION REVOLVING CREDIT FACILITY
SUMMARY OF TERMS AND CONDITIONS

This Term Sheet provides an outline of a proposed superpriority senior secured debtor-in-possession revolving credit financing facility.  This Term Sheet is for discussion purposes only, and is non-binding, and is neither an expressed nor implied offer with regard to any financing, to arrange, provide or purchase any loans in connection with the transactions contemplated hereby or to arrange, provide or assist in arranging or providing the potential financing described herein.  Without limiting the generality of the foregoing, proposals contained herein shall be subject to, among other things, completion of due diligence.  Any agreement to provide the DIP Facility or any other financing arrangement shall be subject to definitive documentation acceptable to the DIP Agent and DIP Lenders (as defined below), each acting in its sole discretion.

| Borrowers: | Sungard AS New Holdings III, LLC (the "Company") and its direct and indirect subsidiaries (a) other than Sungard Availability Services (Canada) Ltd. (the "Canadian Borrower") that as borrowers (the "U.S. Borrowers") are parties to that certain Revolving Credit Agreement dated as of August 6, 2019 (as amended, amended and restated, supplemented or otherwise modified, the "Prepetition ABL Credit Agreement"[1], and the facility documented thereunder, the "Prepetition ABL Facility"), by and among the Company, as parent, the borrowers party thereto, the guarantors party thereto, and lenders party thereto and PNC Bank, National Association, as administrative agent and collateral agent (in such capacity, the "Prepetition ABL Agent", as debtors and debtors-in-possession in cases (the "Cases") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") to be commenced in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") (the date of commencement of the Cases, the "Petition Date"), and (b) the Canadian Borrower (together with the U.S. Borrowers, the "Borrowers"), which shall be a debtor in the Cases and which shall commence proceedings under Part IV of the Companies' Creditors Arrangement Act (Canada) in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to recognize the Canadian Borrower's chapter 11 Case in Canada (the "Recognition Proceeding).  The obligations of the Borrowers shall be joint and several. |
|---|---|
| Guarantor: | Sungard AS New Holdings II, LLC, as debtor and debtor-in-possession in the Cases (the "Guarantor", and together with the Borrowers, the "Debtors")).  All obligations of the Borrowers |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Prepetition ABL Credit Agreement.

| | |
|---|---|
| | under the ABL DIP Facility shall be unconditionally guaranteed on a joint and several basis by the Guarantor. |
| <u>Type and Amount of the DIP Facility:</u> | A senior secured superpriority priming debtor-in-possession credit facility (the "<u>DIP ABL Facility</u>" and the loans under the DIP Facility, the "<u>DIP ABL Loans</u>") comprised of a roll-up of the Prepetition Revolving Advances and Swing Loans (if any) and any unused commitments under the Prepetition ABL Credit Agreement, on a dollar-for-dollar basis, into new loans or commitments, as applicable, including without limitation all outstanding letters of credit, under such facility, in aggregate principal amount not to exceed $50,000,000.<br><br>The DIP ABL Loans may be incurred, subject to the satisfaction or waiver of all conditions thereto set forth in the Definitive Financing Documentation (as defined below), as follows: (a) following the entry by the Bankruptcy Court of an order (the "<u>Interim DIP Order</u>"), in form and substance acceptable to the DIP ABL Lenders, authorizing the DIP ABL Facility on an interim basis (the "<u>Interim DIP Order Entry Date</u>") in an aggregate principal amount up to the amount of the Obligations under the Prepetition ABL Facility ("<u>Prepetition ABL Obligations</u>") (the "<u>Interim DIP Funding</u>") and (b) on and after the entry by the Bankruptcy Court of a final order (the "<u>Final DIP Order</u>" and together with the Interim DIP Order, the "<u>DIP Order</u>"), in form and substance acceptable to the DIP ABL Lenders, authorizing the DIP ABL Facility on a final basis (the "<u>Final DIP Order Entry Date</u>").<br><br>The Interim DIP Order shall provide, among other things, that (a) $13,500,000 of Cash of the Debtors maintained in a deposit account with and controlled by the Prepetition ABL Agent shall be repaid to the ABL Lenders upon entry of the Interim DIP Order and applied on a dollar-for-dollar basis as a permanent reduction to the Maximum Revolving Advance Amount, subject to the rights of third parties with respect to a Challenge (as defined below, and (b) the first proceeds of all Receivables constituting ABL Priority Collateral (and the postpetition equivalents thereof) and other ABL Priority Collateral (as defined below) (other than, for the avoidance of doubt, proceeds from the Term Loan DIP Facility) shall be deemed applied in reduction of the Prepetition ABL Obligations on a dollar for dollar basis and immediately deemed advanced to the Debtors under the DIP ABL Facility (subject to the limitations on advances set forth in Section 2.01(a) of the Prepetition ABL Credit Agreement) (the "<u>Creeping ABL Roll-Up</u>") until all such obligations have been repaid in full in cash and become indebtedness and obligations under the DIP ABL Facility |

|  | (the "DIP ABL Obligations"), subject to the rights of third parties with respect to a Challenge below.  The Final DIP Order shall provide, among other things, that any remaining Prepetition ABL Obligations shall be deemed repaid by an advance made to the Debtors under the DIP ABL Facility following entry of the Final DIP Order, subject to the rights of third parties with respect to a Challenge.

All DIP ABL Loans and DIP ABL Obligations shall accrue interest at an interest rate per annum equal to the sum of three percent (3.00%) per annum plus the Alternate Base Rate, subject to the provisions of the Prepetition ABL Credit Agreement with respect to the Default Rate upon the postpetition occurrence and continuance of an Event of Default (as defined below).

Advance Rates shall be as set forth in the Prepetition ABL Credit Agreement.

DIP ABL Facility Closing Fee shall be $365,000, earned upon entry of the Interim DIP Order.

The Availability Block Amount shall be $5,000,000.

The Letter of Credit Sublimit shall be as set forth in the Prepetition ABL Credit Agreement.  Letter of Credit Fees shall be as set forth in the Prepetition ABL Credit Agreement, except that the fee referred to in clause (x) of Section 2.23(a) thereof shall be the aggregate daily face amount of each outstanding Letter of Credit multiplied by 4.00%.  All Letters of Credit issued under the Prepetition ABL Facility and outstanding on the Petition Date shall be deemed terminated and re-issued under the DIP ABL Facility.

All post-petition collections of Receivables shall be deposited or transferred into the Controlled Account. |
|---|---|
| DIP ABL Lenders: | PNC Bank, National Association. |
| DIP ABL Agent: | PNC Bank, National Association, as administrative agent and collateral agent (in such capacity, the "DIP ABL Agent"). |
| Maturity: | All obligations under the DIP ABL Facility shall be due and payable in full in cash on the earliest of (i) the Stated Maturity Date (as defined below); (ii) the date that is thirty (30) calendar days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court on or before such date; (iii) the effective date of any chapter 11 plan for the reorganization of any |

| | |
|---|---|
| | Debtor; (iv) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code §363; and (v) the date of the acceleration of the DIP ABL Loans and the termination of the DIP ABL Commitments in accordance with the Definitive Financing Documentation (such earliest date, the "DIP Termination Date"). The principal of, and accrued interest on, the DIP ABL Loans and all other amounts owing to the DIP ABL Agent and the DIP ABL Lenders under the DIP ABL Facility shall be payable on the DIP Termination Date.  "Stated Maturity Date" shall have the meaning set forth in the Term Loan DIP Term Sheet. |
| Purpose: | In accordance with the then current Approved Budget and Permitted Variances (each as defined in the Term Loan DIP Term Sheet), the proceeds of the DIP ABL Loans under the DIP ABL Facility shall be used only for the following purposes: (i) payment of certain prepetition amounts in accordance with the then current Approved Budget (including prepetition payments to certain critical vendors identified by the Debtors, to the extent set forth in the Approved Budget) and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Debtors, which orders shall be in form and substance satisfactory to the DIP ABL Lenders; (ii) to the extent set forth in the then current Approved Budget and in accordance with the terms of the DIP ABL Facility and the DIP Order, (a) payment of working capital and other general corporate needs of the Debtors in the ordinary course of business, and (b)  payment of the costs and expenses of administering the Cases and the Recognition Proceedings (including (i) payments benefiting from the Carve-Out, and (ii) solely with respect to assets of the Canadian Borrower in Canada, the administration charge granted in the Recognition Proceedings, not to exceed $500,000 (the "Administration Charge")) incurred in the Cases and the Recognition Proceedings, including professional fees subject to the terms and conditions set forth in the Term Loan DIP Term Sheet.<br><br>Notwithstanding the foregoing, no portion or proceeds of the DIP ABL Loans, the Carve-Out or the DIP ABL Collateral (as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition ABL Agent and/or lenders in connection with the Prepetition ABL Facility, subject to a customary carve out for investigations. |

| | |
|---|---|
| <u>Priority and Security under DIP ABL Facility</u>: | All indebtedness and/or obligations of the Debtors to the DIP ABL Lenders and to the DIP ABL Agent, including without limitation all principal and accrued interest, costs, fees, expenses, and any exposure of any DIP ABL Lender or any of its affiliates in respect of cash management incurred on behalf of the Debtors (the following security, collectively, the "<u>DIP ABL Liens</u>"), shall be:<br><br>a)   Secured pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out and the Administration Charge (solely with respect to assets of the Canadian Borrower in Canada), by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority lien on, and security interest in, all DIP ABL Collateral, wherever located, which property was not subject to valid, perfected, non-avoidable and enforceable liens as of the Petition Date;<br><br>b)   Secured pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out and the Administration Charge (solely with respect to assets of the Canadian Borrower in Canada), the Term Loan DIP Liens on the Term Loan DIP Collateral in favor of the Term Loan DIP Lenders, and any replacement liens granted to the Prepetition Term Loan Lenders as adequate protection of their interests in the Debtors' property, by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable junior lien on, and security interest in, all Term Loan Priority Collateral (as defined in the Intercreditor Agreement (as defined below)), wherever located, that is subject to a perfected lien or security interest on the Petition Date, or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Bankruptcy Code § 546(b);<br><br>c)   Secured pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out and the Administration Charge (solely with respect to assets of the Canadian Borrower in Canada), by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority senior priming lien on, and security interest in, all assets of the Debtors comprising ABL Priority Collateral (as defined in that certain Second Amended and Restated Intercreditor Agreement, dated as of May 25, 2021, by and among, the Prepetition ABL Agent, Alter Domus Products Corp. as New First Lien Term Agent, Alter Domus Products Corp. as Existing Second Lien Term Agent, and Alter Domus Products Corp. as New Second Lien Term Agent (as amended, amended and restated, supplemented or otherwise modified, the "<u>Intercreditor Agreement</u>"); |

| | |
|---|---|
| | d) Subject in all respects to the provisions of the Intercreditor Agreement.<br><br>The property securing the DIP ABL Liens is collectively referred to as the "<u>DIP ABL Collateral</u>" and shall include, without limitation, all assets (whether tangible, intangible, real, personal or mixed) of the Debtors, whether now owned or hereafter acquired and wherever located, that would have constituted ABL Priority Collateral had the Chapter 11 Cases not been commenced.<br><br>All obligations under the DIP ABL Facility shall also constitute claims entitled to the benefits of Bankruptcy Code § 364(c)(1) and § 503(b), having, subject to the Carve-Out, a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code ("<u>Superpriority Claims</u>"), pari passu with any superpriority claims granted pursuant to the DIP Order on account of the Term Loan DIP Obligations of the Borrowers and Guarantor. |
| <u>Carve-Out</u> | The Carve-Out shall have the meaning set forth in the Term Loan DIP Term Sheet. The allocation of funding of the Post-Carve Out Trigger Cap (as defined in the Interim DIP Order) and the Administration Charge from ABL Priority Collateral and Term Loan Priority Collateral will be determined by good faith negotiation between Required Term Loan DIP Lenders and the Required ABL DIP Lenders, or by order of the Court if the parties are unable to agree. |
| <u>Prepayments:</u> | *Voluntary*: Prepayments under the DIP Facility may be made at any time without premium or penalty (other than breakage costs to the extent applicable).<br><br>*Mandatory*: The Definitive Financing Documentation shall require mandatory prepayments customarily found in loan documents for similar debtor-in-possession financings and other mandatory prepayments deemed by the DIP ABL Lenders appropriate to the specific transaction, including, without limitation, prepayments from proceeds of (i) sales of DIP ABL Collateral and (ii) insurance and condemnation proceeds in respect of DIP ABL Collateral. |
| <u>Conditions Precedent to the Closing:</u> | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP ABL Lenders appropriate to the specific transaction, including, without limitation: (i) upon entry of |

| | |
|---|---|
| | the Final DIP Order, execution and delivery of an amendment and restatement to the Prepetition ABL Credit Agreement (the "DIP ABL Credit Agreement") and other definitive documentation evidencing the DIP ABL Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise acceptable to the DIP ABL Lenders and the Debtors (the "Definitive Financing Documentation"); (ii) entry of the Interim DIP Order, in form and substance acceptable to the DIP ABL Lenders, Required Term Loan DIP Lenders (as defined in the Term Loan DIP Term Sheet) and the Debtors, which Interim DIP Order shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the prior written consent of the DIP ABL Lenders in their sole discretion; (iii) delivery of the initial Approved Budget acceptable to the DIP ABL Lenders in their sole discretion; and (iv) the Bankruptcy Court's entry of an interim 'cash management order' on terms and conditions acceptable to the DIP ABL Lenders in their reasonable discretion. |
| Conditions Precedent to Each DIP ABL Loan: | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP ABL Lenders appropriate to the specific transaction, including, without limitation, (i) compliance of each advance of a DIP ABL Loan with the Approved Budget then in effect, (ii) no default or event of default, (iii) accuracy of representations and warranties in all material respects, (iv) delivery of a notice of borrowing, (v) the DIP Order shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the prior written consent of the DIP ABL Lenders in their sole discretion.<br><br>For the avoidance of doubt, such conditions precedent shall not apply to any DIP ABL Loan deemed made as a result of any Creeping ABL Rollup, but such DIP ABL Loans shall be subject to the limitations on advances set forth in Section 2.01(a) of the Prepetition ABL Credit Agreement. |
| Representations and Warranties: | The Definitive Financing Documentation shall contain representations and warranties consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases), customarily found in loan documents for similar debtor-in-possession ABL financings, and/or as reasonably required by the DIP ABL Lenders. |

| Reporting Covenants, Affirmative Covenants and Negative Covenants: | The Definitive Financing Documentation shall contain reporting requirements, affirmative covenants and negative covenants consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases), customarily found in loan documents for similar debtor-in-possession ABL financings, and/or as reasonably required by the DIP ABL Lenders, including without limitation: (i) compliance with the Approved Budget, subject to permitted variances consistent with the terms of the Term Loan DIP Term Sheet, (ii) delivery of updates of the Approved Budget, which updates shall be approved by the DIP ABL Lenders and the Required Term Loan DIP Lenders, (iii) delivery of weekly variance reports; (iv) a prohibition on transferring any cash or cash equivalents that constitutes DIP ABL Collateral to a subsidiary of the Company that is not a Guarantor except as otherwise provided for by an Approved Budget; (v) compliance with the Milestones (as defined below), (vi) compliance with the DIP Orders; (vii) a prohibition on filing, proposing, or supporting any plan of reorganization that does not indefeasibly satisfy the DIP ABL Obligations in full in cash.  Without limitation of the foregoing, from and after entry of the Interim DIP Order, the Debtors shall provide the DIP ABL Agent with (a) weekly Approved Budget updates and weekly variance reports, and (b) copies of all financial and operational reporting as and when provided under the Term Loan DIP Term Sheet. |
|---|---|
| Milestones: | To include certain milestones relating to the timing for filing and confirmation of a plan of reorganization, and the filing and consummation of asset sales pursuant to Bankruptcy Code § 363 and § 365, as set forth in the DIP Order. |
| Financial Covenants: | Variance Covenant as set forth in the DIP Order. |
| Approved Budget: | The Approved Budget shall be as set forth in the Term Loan DIP Term Sheet.  Without limitation of the foregoing, the Approved Budget shall include weekly reporting of the Debtors' Cash. |
| Borrowing Base: | Notwithstanding anything to the contrary in this Term Sheet and in the Prepetition ABL Credit Agreement, the Debtors shall not be required to deliver any weekly Borrowing Base Certificate unless a postpetition Event of Default has occurred and is continuing. |
| Cash Collateral: | The DIP Order shall authorize the Debtors to use prepetition and postpetition cash collateral subject to the terms set forth in the DIP Order, subject to the Approved Budget and the Variance Covenant. |

| | |
|---|---|
| <u>Adequate Protection for Prepetition ABL Facility:</u> | The DIP Order shall provide the Prepetition ABL Facility (to the extent outstanding) adequate protection acceptable to the lenders thereunder, which may include the provision of replacement liens, superpriority administrative expense claims, current cash payment of reasonable fees and expenses including attorneys' fees and expenses, subject in all respects to the Intercreditor Agreement. |
| <u>Events of Default:</u> | The Definitive Financing Documentation shall contain events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default reasonably required by the DIP ABL Lenders, including without limitation (a) non-compliance with the Milestones and covenants set forth in this Term Sheet, (b) the occurrence and/or continuance of an "Event of Default" under the Term Loan DIP Facility, and (c) the dismissal of the Cases, or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code. |
| <u>Remedies:</u> | The DIP ABL Agent and the DIP ABL Lenders shall have customary remedies, including, without limitation, the right (after providing five (5) business days' prior notice to the Debtors and the official creditors' committee of the occurrence of the DIP Termination Date, with respect to the DIP Collateral (the "<u>Notice Period</u>")) to realize on all DIP Collateral, subject to the terms of the DIP Orders. |
| <u>Indemnification and Expenses:</u> | The Debtors that are Borrowers or the Guarantor, jointly and severally, shall indemnify and hold harmless the DIP ABL Agent, the DIP ABL Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Company or any of its affiliates) that relates to the DIP ABL Facility or the transactions contemplated thereby; <u>provided</u> that, no Indemnified Person shall be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct. |

| | |
|---|---|
| | No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Person be liable on any theory of liability for any special,  indirect, consequential or punitive damages. |
| | In addition, (a) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel, local counsel, and financial advisors (collectively, the "<u>DIP Professionals</u>")) of the DIP ABL Agent and the DIP ABL Lenders in connection with the DIP ABL Facility and the transactions contemplated thereby shall be paid by the Debtors from time to time, whether or not the Closing Date occurs, and (b) all out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of the DIP Professionals) of the DIP ABL Agent and the DIP ABL Lenders, for enforcement costs associated with the DIP ABL Facility and the transactions contemplated thereby shall be paid by the Debtors. |
| <u>Assignments and Participations</u>: | Assignments under the DIP ABL Facility are subject to the consent of the DIP ABL Agent and the Company, which consent shall not be unreasonably withheld or delayed, except, in each case, with respect to any assignment to a lender, an affiliate of such a lender or a fund engaged in investing in commercial loans that is advised or managed by such a lender. No participation shall include voting rights, other than for matters requiring consent of 100% of the lenders. |
| <u>Governing Law</u>: | State of New York, except as governed by the Bankruptcy Code. |
| <u>Miscellaneous</u>: | The DIP Order shall, among other things: |
| | a)  contain a 'good faith finding' under Bankruptcy Code § 364(e); |
| | b)  (1) set a time limit acceptable to the DIP ABL Agent for challenges by third parties to any indebtedness, obligations, and/or liens under the Prepetition ABL Facility and to the assertion by third parties of any other claims and causes of action against the Prepetition ABL Agent and/or lenders under the Prepetition ABL Facility arising from or related thereto (any of the foregoing, a "<u>Challenge</u>"), and (2) contain |

usual and customary stipulations, admissions, waivers, and releases, by the Debtors, with respect to such indebtedness, obligations, liens, challenges, claims, and causes of action;

c)   provide that the DIP ABL Lenders shall have the unconditional right to credit bid the outstanding DIP ABL Obligations and Prepetition ABL Obligations on a dollar-for-dollar basis in connection with any disposition of estate property that is ABL Priority Collateral (or the postpetition equivalent thereof) or other than in the ordinary course of business, whether pursuant to Bankruptcy Code § 363, a plan of reorganization, or otherwise (a "Disposition"), subject to the priority of the DIP ABL Liens and the provisions of the Intercreditor Agreement;

d)   provide that no obligations of the Debtors under the Term Loan DIP Facility or any prepetition Term Loan facility may be credit bid in any Disposition against the purchase price of any ABL Priority Collateral;

e)   provide that if any Disposition includes both prepetition or postpetition ABL Priority Collateral and Term Priority Collateral (as defined in the Intercreditor Agreement), and the DIP ABL Agent and any prepetition or postpetition term loan agents or term loan lenders are unable after negotiating in good faith to agree on the allocation of the purchase price between the prepetition or postpetition ABL Priority Collateral and Term Priority Collateral, any of such agents may apply to the Bankruptcy Court to make a determination of such allocation, and the Bankruptcy Court's determination in a final order shall be binding upon the parties.

The Final DIP Order shall provide, among other things, waivers of Bankruptcy Code § 506(c), the § 552(b) 'equities of the case' exception, and marshaling.

The Definitive Financing Documentation shall include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk based capital guidelines, increased costs and payments free and clear of withholding taxes).

**<u>Exhibit D</u>**

**Term Loan DIP Term Sheet**

*Execution Version*

**SUNGARD AS**
**<u>TERM LOAN DIP FINANCING TERM SHEET</u>**

*This debtor in possession financing term sheet (including all exhibits, schedules and annexes hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement (as defined below) (the "<u>Term Sheet</u>"), which is attached as Exhibit D to the Restructuring Support Agreement, dated as of April 11, 2022 (as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>Restructuring Support Agreement</u>"), summarizes the indicative terms pursuant to which the Term Loan DIP Lenders (as defined below) would provide debtor in possession financing to Sungard AS New Holdings III, LLC ("<u>Sungard AS III</u>") and its U.S. and Canadian affiliates who have filed chapter 11 cases (the "<u>Chapter 11 Cases</u>") in the Bankruptcy Court (as defined below) (collectively, the "<u>Debtors</u>"), and solely with respect to Sungard Availability Services (Canada) Ltd./Sungard, Services De Continuite Des Affaires (Canada) Ltee ("<u>Sungard AS Canada</u>"), proceedings under Part IV of the Companies' Creditors Arrangement Act (Canada) commenced in the Ontario Superior Court of Justice (Commercial List) ("<u>Canadian Court</u>"). The terms and conditions set forth herein are subject to change.  The consummation of such financing is subject to (i) the accuracy and completeness in all material respects of all representations that the Debtors make to the Term Loan DIP Lenders under the Term Loan DIP Credit Agreement and all written information that the Debtors furnish to the Term Loan DIP Lenders and (ii) authorization and approval by the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>").  This Term Sheet does not purport to summarize all of the terms, conditions, covenants, representations, warranties, and other provisions which would be contained in the definitive documentation for the transactions described herein.  This Term Sheet is confidential.  This document and related discussions constitute settlement discussions subject to Federal Rule of Evidence 408 and any and all similar state or local statutes and rules.  Capitalized terms used but not defined in this Term Sheet shall have the meanings ascribed to such terms in the Restructuring Support Agreement or the restructuring term sheet attached as Exhibit B to the Restructuring Support Agreement (the "<u>Restructuring Term Sheet</u>").*

| Borrower | Sungard AS New Holdings III, LLC |
|---|---|
| **Guarantors** | Sungard AS New Holdings II, LLC and all other of the Borrower's subsidiaries and affiliates who are Debtors; *provided*, *however*, that Sungard AS Holdings, LLC  and its assets shall only be obligated as to the new money portion of the Term Loan DIP Facility. |
| **Facility Description** | Up to $285,900,000 multi-draw senior secured priming debtor in possession term loan facility (the "<u>Term Loan DIP Facility</u>") consisting of:<br><br>    (a) the Interim Term Loan DIP Amount (as defined below);<br><br>    (b) up to $54,150,000 of the Final Term Loan DIP Amount (as defined below); and |

<table>
<tr>
<td></td>
<td>(c) subject to entry of the Final DIP Order, a roll-up of up to $190,600,000 (the "<u>Roll-Up Amount</u>") of Prepetition Term Loan Obligations (as defined below) held by the Term Loan DIP Lenders, which amounts shall be exclusive of the Bridge Financing Obligations (as defined below) (because such obligations will be repaid upon entry of the Interim DIP Order), on a cashless dollar-for-dollar basis into loans under the Term Loan DIP Facility.  Upon entry of the Final DIP Order, each Term Loan DIP Lender will roll-up, on a 2:1 basis for each dollar actually funded of the new money portion of the Term Loan DIP Facility (and automatically upon any further funding of the new money portion of the Term Loan DIP Facility), its pro rata share of Prepetition 1L Term Loan Obligations (as defined below) beneficially owned by it, and thereafter, its pro rata share of Prepetition 2L Term Loan Obligations (as defined below) beneficially owned by it until the amount rolled-up equals the Roll-Up Amount; <u>provided</u>, <u>however</u>, that the Roll-Up Amount is subject to the Roll-Up Reduction Provision (as set forth below).

The Term Loan DIP Facility shall be structured with multiple tranches with (a) the new money portion of the Term Loan DIP Facility classified as a first-out tranche ("<u>Tranche A</u>"), (b) any roll-up portion of the Prepetition 1L Term Loan Obligations classified as a second-out tranche ("<u>Tranche B</u>"), and (c) any roll-up portion of the Prepetition 2L Term Loan Obligations classified as a last-out tranche ("<u>Tranche C</u>").</td>
</tr>
<tr>
<td><b>Term     Loan     DIP Lenders</b></td>
<td>The entities set forth on <u>Exhibit 1</u> hereto (each an "<u>Initial Term Loan DIP Lender</u>").

Each Consenting Term Loan DIP Lender (as defined in the Restructuring Support Agreement) agrees to undertake, on behalf of itself or its designee, the following commitments (collectively, the "<u>Term Loan DIP Commitments</u>"): (i) a subscription commitment, whereby each Initial Term Loan DIP Lender agrees to subscribe to the new-money portion of the Term Loan DIP Facility on the basis of their pro rata share of Prepetition 1L Term Loan Obligations beneficially owned by them; and (ii) a backstop commitment, whereby each Initial Term Loan DIP Lender agrees to fund any new-money portion of the Term Loan DIP Facility that holders of Prepetition 1L Term Loan Obligations do not subscribe for.

Participation in the new-money portion of the Term Loan DIP Facility shall be offered, on a pro rata basis to all holders of Prepetition 1L Term Loan Obligations based on their beneficial</td>
</tr>
</table>

| | |
|---|---|
| | ownership thereof (all such holders electing to participate, collectively, the "Term Loan DIP Lenders"). |
| **Required Term Loan DIP Lenders** | Two (2) or more unaffiliated Consenting Term Loan DIP Lenders holding at least 50.1% of the aggregate outstanding principal amount of Term Loan DIP Obligations (the "Required Term Loan DIP Lenders") held by all Consenting Term Loan DIP Lenders. |
| **Term Loan DIP Agent** | Acquiom Agency Services LLC (the "Term Loan DIP Agent" and, together with the Term Loan DIP Lenders, the "Term Loan DIP Secured Parties"). |
| **Interim Availability** | $41,150,000 (the "Interim Term Loan DIP Amount") to be made available in one or more draws in accordance with the Approved Budget after the Bankruptcy Court's entry of the Interim DIP Order (as defined below) and the satisfaction or waiver by the Required Term Loan DIP Lenders of the other applicable conditions precedent to each such draw. |
| **Final Availability** | $95,300,000 million (the "Final Term Loan DIP Amount") to be made available in one or more draws in accordance with the Approved Budget after the Bankruptcy Court's entry of the Final DIP Order and upon the satisfaction or waiver by the Required Term Loan DIP Lenders of the other applicable conditions precedent to each such draw; provided that the "Final Term Loan DIP Amount" includes $16,330,000 which will only be available in the event of the Maturity Extensions.<br><br>The Interim Term Loan DIP Amount and the Final Term Loan DIP Amount may be made in multiple delayed draws in accordance with the Approved Budget in an aggregate principal amount for all such delayed draws not to exceed the Interim Term Loan DIP Amount and the Final Term Loan DIP Amount, as applicable, upon the satisfaction or waiver by the Required Term Loan DIP Lenders of conditions precedent to each such draw to be agreed. |
| **Term Loan DIP Liens & Term Loan DIP Collateral** | Subject to (a) the Carve Out (as defined below), (b) prepetition and postpetition liens of the ABL Agent (as defined below) on the ABL Priority Collateral (as defined below), (c) solely with respect to assets of Sungard AS Canada in Canada, the administration charge granted by the Canadian Court in respect of certain Canadian related professional fees, not to exceed $500,000 (the "Administration Charge") and (d) certain liens senior by operation of law and otherwise permitted by the Prepetition 1L Term Loan Documents, but solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the prepetition liens securing the Prepetition 1L Term Loan Obligations  as of the |

| | |
|---|---|
| | Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code the "Permitted Liens"), the Term Loan DIP Facility and the obligations of the Debtors thereunder including, without limitation, all principal and accrued interest, the Roll-Up Amount, premiums (if any), costs, fees, expenses, disbursements, reimbursement obligations (whether contingent or otherwise), indemnities and any and all other amounts due or payable under the Term Loan DIP Facility (collectively, the "Term Loan DIP Obligations"), (i) will be entitled to super priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code and (ii) will be secured by a fully perfected security interest pursuant to Section 364(c)(2), Section 364(c)(3) and Section 364(d)(l) of the Bankruptcy Code in all property and assets of the Debtors and their Estates (the "Term Loan DIP Liens") of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing and subject to entry of the Final DIP Order, the proceeds of Avoidance Actions (collectively, the "Term Loan DIP Collateral").  For avoidance of doubt, Term Loan DIP Collateral shall include a pledge of the stock of any direct non-guarantor foreign subsidiary to the maximum extent permitted by applicable law.<br><br>The Term Loan DIP Liens shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. |
| **Interest Rate** | Tranche A:  L+9.50% payable monthly in cash; provided that, on any monthly interest payment date, the Borrower may elect to pay up to 8.50% of such interest in kind.<br><br>Tranche B:  L+7.50% payable monthly in cash; provided that, on any monthly interest payment date, the Borrower may elect to pay up to 6.50% of such interest in kind.<br><br>Tranche C:  L+6.75% payable monthly in cash; provided that, on any monthly interest payment date, the Borrower may elect to pay up to 5.75% of such interest in kind. |
| **Term Loan DIP Fees** | 4.00% backstop fee (taken as a percentage of each Term Loan DIP Lender's Term Loan DIP Commitment) payable in kind on the new- |

4

| | |
|---|---|
| | money portion of the Term Loan DIP Facility and earned upon entry of the Interim DIP Order.<br><br>2.5% transaction fee payable in cash on the new-money portion of the Term Loan DIP Facility that is repaid with the proceeds of any sale of the Debtors' assets outside of the ordinary course of business to a purchaser other than the Consenting Stakeholder Purchaser (as defined in the Restructuring Term Sheet).<br><br>1.5% per annum unused Term Loan DIP Facility commitment fee payable monthly in cash on the average unused amount of the Interim Term Loan DIP Amount or the Final Term Loan DIP Amount, as the case may be, between entry of the Interim DIP Order or the Final DIP Order, as the case may be, and the date the Interim Term Loan DIP Amount or the Final Term Loan DIP Amount, as the case may be, has been fully funded.<br><br>To the Term Loan DIP Agent, the agent's fees set forth in the letter agreement between the Term Loan DIP Agent and the Borrower. |
| **Original Issue Discount** | The Tranche A Term Loan DIP Loans to be made under the Term Loan DIP Facility shall be made a discount of 3.00% of the Tranche A Term Loan DIP Commitments. |
| **Use of Proceeds** | Subject to Bankruptcy Court approval, proceeds of the Term Loan DIP Facility to be used solely in accordance with the Term Loan DIP Documents (as defined below) and the Approved Budget (as defined below) (subject to Permitted Variances), which shall include the indefeasible payment in full of all Bridge Financing Obligations upon entry of the Interim DIP Order.<br><br>No cash collateral or proceeds of the Term Loan DIP Facility may be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Facilities or the Prepetition Credit Agreements (as defined below); provided that the official committee of unsecured creditors (the "Creditors' Committee"), if any, may use up to $50,000 to investigate (but not seek formal discovery or commence any challenge, objection or prosecute) any such claims or causes of action.<br><br>No cash collateral or proceeds of the Term Loan DIP Facility may be distributed to, or used for the benefit of, any non-Debtor affiliates or subsidiaries of the Debtors, including Sungard Availability Services (UK) Limited or applied toward (directly or indirectly) its administration (or to an administrator in England) without the prior |

5

| | |
|---|---|
| | written approval of the Required Term Loan DIP Lenders. |
| **Maturity** | All Term Loan DIP Commitments will terminate, and all obligations outstanding under the Term Loan DIP Facility (the "Term Loan DIP Obligations") will be immediately due and payable in full in cash on the earliest to occur of: |

<div style="margin-left:2em">

(a) 120 calendar days after the Petition Date (the "Maturity Date") subject to no more than two extensions (each, a "Maturity Extension") of thirty (30) days each if (x) such Maturity Extension is approved in writing by the Required Term Loan DIP Lenders or (y) on the date that is the then-current Maturity Date:

<div style="margin-left:2em">

i. the Debtors have provided the Required Term Loan DIP Lenders an "extension budget" for the corresponding 30-day period covered by the Maturity Extension which has been approved by the Required Term Loan DIP Lenders and which demonstrates that the Debtors can maintain a minimum liquidity of no less than $2 million of unrestricted cash in deposit accounts subject to the liens of the Term Loan DIP Agent, excluding any new-money DIP Term Loan Facility amounts to be funded for that extension period;

ii. the Debtors have received one or more "Qualified Bids" (as defined in the Restructuring Support Agreement) for all, substantially all, or any combination of the Debtors' assets from a party or parties other than the Consenting Stakeholder Purchaser that has not be withdrawn in an amount(s) greater than the applicable "Reserve Price" (as defined in the Restructuring Support Agreement)[1];

iii. an executed asset purchase agreement, which is reasonably satisfactory to the Required Term Loan DIP Lenders and which remains in full force and effect, for the sale of Lognes campus owned by Sungard Availability Services (France) SAS; and

iv. no Events of Default shall have occurred and be continuing.

</div>
</div>

---

[1] For the avoidance of doubt, a credit bid of any portion of the Term Loan DIP Obligations shall not constitute a Qualified Bid for purposes of a Maturity Extension.

<table>
<tr><td></td><td>

(b) the date that is thirty (30) calendar days after the Petition Date if the Final DIP Order has not been entered by the Bankruptcy Court on or before such date;

(c) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;

(d) the date of acceleration of the Term Loan DIP Loans and the termination of the Term Loan DIP Commitments upon the occurrence of an Event of Default (as defined below);

(e) the substantial consummation or effective date of any chapter 11 plan;

(f) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a chapter 7 liquidation; and

(g) dismissal of the bankruptcy case of any Debtor.

</td></tr>
<tr><td>

**Affirmative Covenants**

</td><td>

The Term Loan DIP Documents shall include affirmative covenants that are substantially the same as those set forth in the Prepetition 1L Term Loan Credit Agreement (as defined below) (modified as necessary to reflect the commencement of the chapter 11 cases) with such other covenants as the Term Loan DIP Lenders shall reasonably require in the Term Loan DIP Documents, including the following:

(a) compliance with the Milestones (as defined below);

(b) compliance with the Approved Budget and the Term Loan DIP Variance Covenant (as defined below);

(c) compliance with reporting and information delivery requirements to be set forth in the Term Loan DIP Documents and access to information (including historical information) and personnel, including, without limitation,

    a. meetings (which shall be telephonic or virtual unless otherwise agreed) with the Debtors' management and professional advisors, no less frequently than weekly, with access to all information reasonably requested upon reasonable prior notice;

    b. providing operating key performance indicators and customer retention reporting;

</td></tr>
</table>

<table>
<tr>
<td></td>
<td>

  c. providing verbal weekly financing performance updates;

  d. providing verbal weekly updates on the Business Plan (as defined in Restructuring Support Agreement), including, without limitation operational and strategic initiatives (including cost cutting and lease rationalization initiatives); and

  e. providing verbal updates, no less frequently than weekly, regarding the sale process.

 (d) compliance with the Interim DIP Order and the Final DIP Order;

 (e) delivery to counsel to the Term Loan DIP Lenders of, to the extent reasonably practicable, all material filings the Debtors intend to file with the Bankruptcy Court at least three days in advance of such filing; and

 (f) the Debtors' use of commercially reasonable efforts to obtain and maintain, beginning 15 days after entry of the Interim DIP Order, a private rating in respect of the Term Loan DIP Facility from at least two of S&P, Fitch and Moody's (but not a specific rating).

</td>
</tr>
<tr>
<td>**Negative Covenants**</td>
<td>

The Term Loan DIP Documents shall include negative covenants that are substantially the same as those set forth in the Prepetition 1L Term Loan Credit Agreement (modified as necessary to reflect the commencement of the chapter 11 cases) with such other covenants as the Term Loan DIP Lenders shall reasonably require in the Term Loan DIP Documents, including covenants prohibiting the following unless otherwise agreed by the Required Term Loan DIP Lenders:

 (a) incur any post-petition indebtedness outside of the ordinary course of business except the Term Loan DIP Facility, customary debt carveouts satisfactory to the Required Term Loan DIP Lenders and other debt permitted with the written consent of the Required Term Loan DIP Lenders;

 (b) create or permit to exist any liens or encumbrances on any assets, other than ABL DIP Liens, "Permitted Liens," liens securing the Term Loan DIP Facility, the Administration Charge (solely with respect to assets of Sungard As Canada in Canada), customary lien carveouts satisfactory to the

</td>
</tr>
</table>

<table>
<tr><td></td><td>

Required Term Loan DIP Lenders and any liens permitted with the written consent of the Required Term Loan DIP Lenders;

(c) create or permit to exist any other superpriority claim which is pari passu with or senior to the claims of the Term Loan DIP Lenders under the Term Loan DIP Facility, except for the Carve-Out, ABL DIP Facility and ABL Credit Agreement and, the Administration Charge (solely with respect to assets of Sungard AS Canada in Canada);

(d) sell any assets (including, without limitation, any disposition under Bankruptcy Code section 363) without the prior written consent of the Required Term Loan DIP Lenders, unless such sale indefeasibly satisfies the Term Loan DIP Obligations in full in cash;

(e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the Term Loan DIP Lenders (in their capacities as such);

(f) file or propose any plan of reorganization, other than a plan filed in connection with the Equitization Scenario (as defined in the Restructuring Support Agreement) that does not indefeasibly satisfy the Term Loan DIP Obligations in full in cash or is materially inconsistent with the Restructuring Support Agreement;

(g) pay pre-petition indebtedness, except as expressly provided for herein or in the Approved Budget; and

(h) make any investments, debt repayments or dividends except as expressly provided for herein or in the Approved Budget.
</td></tr>
<tr><td>

**Restructuring Support Agreement; Milestones**
</td><td>

The Term Loan DIP Facility is intended to facilitate a restructuring of the Debtors through a Sale Scenario and/or an Equitization Scenario (each as defined in the Restructuring Support Agreement) (the "<u>Restructuring Transactions</u>").

In accordance with the Restructuring Support Agreement, and in furtherance of the Restructuring Transactions, the Debtors shall be required to comply with the milestones set forth in Sections 11.03 and 11.04 of the Restructuring Support Agreement ("<u>Milestones</u>").
</td></tr>
</table>

| Events of Default | The Term Loan DIP Documents shall include the following "Events of Default": |
| --- | --- |
| | (a) failure to comply with any of the Milestones; |
| | (b) if the Debtors request authority to obtain any financing not consented to by the Required Term Loan DIP Lenders; |
| | (c) the filing of any chapter 11 plan or related disclosure statement not consented to by the Required Term Loan DIP Lenders, other than a chapter 11 plan that indefeasibly satisfies the Term Loan DIP Obligations in full in cash; |
| | (d) the appointment of a chapter 11 trustee or an examiner with enlarged powers; |
| | (e) the filing of any motion seeking approval of a sale of any Term Loan DIP Collateral without the consent of the Required Term Loan DIP Lenders, other than a sale that indefeasibly satisfies the Term Loan DIP Obligations in full in cash; |
| | (f) the conversion of any of the Debtors' cases to chapter 7; |
| | (g) termination of the Debtors' exclusive right to propose a chapter 11 plan; |
| | (h) breach of any of the Debtors' affirmative or negative covenants, subject to applicable grace periods; |
| | (i) the Debtors fail to comply with the Interim DIP Order or the Final DIP Order in any material respect; |
| | (j) the Bankruptcy Court enters an order modifying, reversing, revoking, staying, rescinding, or vacating the Interim DIP Order, the Final DIP Order or any other Term Loan DIP Document; |
| | (k) (i) the occurrence of any Consenting First Lien Lender/Second Lien Lender Termination Event (unless waived in writing by the Required Consenting First Lien Lenders or the Required Consenting Second Lien Lenders, as applicable) under the Restructuring Support Agreement or (ii) the Restructuring Support Agreement is terminated for any reason; |

| | |
|---|---|
| | (l)  dismissal of any of the Debtors' chapter 11 cases; and |
| | (m) other events of default that are usual and customary for debtor in possession loan facilities of this nature. |
| **Budget** | The Debtors will prepare and deliver a thirteen week cash flow forecast, in form and substance acceptable to the Required Term Loan DIP Lenders (the "<u>Initial Term Loan DIP Budget</u>" and as updated by subsequent budgets approved, in writing, by the Required Term Loan DIP Lenders, the "<u>Approved Budget</u>").  All cash, cash collateral and proceeds of the Term Loan DIP Facility shall be used solely in accordance with the Approved Budget. |
| **Variance Reporting** | On the Wednesday of each calendar week following the day the chapter 11 bankruptcy petition is filed  (the "<u>Petition Date</u>") and for each calendar week thereafter, by no later than 12:00 p.m. New York City time, the Debtors shall deliver to the Term Loan DIP Agent and the Term Loan DIP Lenders (and their advisors) a variance report (each, a "<u>Variance Report</u>") setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in the then-in-effect Approved Budget for the Testing Period (as defined below). |
| | The Variance Report shall also provide a reasonably detailed explanation for any variance on a cumulative basis.  The term "Testing Period" means, with respect to the Variance Report required to be delivered, the prior four week period (except that no such variance reporting shall be required for the periods prior to the Petition Date). |
| | The Debtors shall not permit the aggregate cumulative "Receipts" and "Disbursements" variances for any Testing Period of the projected "Receipts" and "Disbursements" to exceed (a) for the first eight (8) Variance Reports, 15% (on a cumulative basis taking into account the variance for any prior Testing Period), and (b) for each Variance Report thereafter, 10% (on a cumulative basis taking into account the variance for any prior Testing Period), as set forth in the then-Approved Term Loan DIP Budget (such permitted variances, the "<u>Permitted Variance</u>" and such limitations, the "<u>Term Loan DIP Variance Covenant</u>"); <u>provided</u>, <u>however</u>, there shall be no Term Loan DIP Variance Covenant for the first four weeks following the Petition Date; and <u>provided</u>, <u>further</u>, that any fees, costs or expenses of the Debtors' professionals shall not be included for purposes of determining if the Term Loan DIP Variance Covenant has been satisfied. |

| | |
|---|---|
| **Prepetition ABL Debt** | The Debtors owe $29.0 million in principal plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("Prepetition ABL Obligations") pursuant to that certain Revolving Credit Agreement, dated as of August 6, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition ABL Credit Agreement and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition ABL Credit Documents") by and among Sungard AS III as borrower, the other Debtors as guarantors, the financial institutions party thereto from time to time as lenders (the "Prepetition ABL Lenders") and PNC Bank, National Association as administrative and collateral agent (the "ABL Agent"). |
| | The Prepetition ABL Obligations are secured by (i) a first priority lien on "ABL Priority Collateral" as defined in that certain Intercreditor Agreement, dated August 6, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Intercreditor Agreement"), among the ABL Agent, the Prepetition 1L Agent (as defined below) and the Prepetition 2L Agent (as defined below) and (ii) a third priority lien on "Term Loan Priority Collateral" as defined in the Intercreditor Agreement. |
| **Prepetition 1L Debt** | The Debtors owe $108,233,409 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("Prepetition 1L Term Loan Obligations") under that certain *Credit Agreement*, dated as of December 22, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition 1L Term Loan Credit Agreement" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition 1L Term Loan Documents") by and among Sungard AS III as borrower, the other Debtors as guarantors, the financial institutions party thereto from time to time as lenders (the "Prepetition 1L Term Loan Lenders"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacities, the "Prepetition 1L Agent"). The Prepetition 1L Term Loan Obligations include $7.21 million of principal plus accrued interest, premiums (if any), costs, fees, expenses and other obligations incurred pursuant to that certain *Amendment No. 2 to Credit Agreement*, dated as of April 7, 2022 (the "Bridge Financing Obligations"). |
| | The Prepetition 1L Term Loan Obligations are secured by (i) a first priority lien on Term Loan Priority Collateral and (ii) a second |

| | |
|---|---|
| | priority lien on ABL Priority Collateral. |
| **Prepetition 2L Debt** | The Debtors owe $286,535,318 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("Prepetition 2L Term Loan Obligations" and together with the Prepetition 1L Term Loan Obligations, the " Prepetition Term Loan Obligations") under that certain (a) *Junior Lien Credit Agreement*, dated as of May 3, 2019, as amended by Amendment No. 1 as of August 1, 2020, as amended by Amendment No. 2 as of December 10, 2020, and as further amended by Amendment No. 3 as of December 22, 2020 (as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition Existing 2L Term Loan Credit Agreement") and (b) *Junior Lien Credit Agreement*, dated as of December 22, 2020 (as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition New 2L Term Loan Credit Agreement" and together with the Prepetition 1L Term Loan Credit Agreement and the Prepetition Existing 2L Term Loan Credit Agreement, the "Prepetition Term Loan Credit Agreements") and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition 2L Term Loan Documents") each by and among Sungard AS III as borrower, the other Debtors as guarantors, the financial institutions party thereto from time to time as lenders (collectively, the "Prepetition 2L Term Loan Lenders" and together with the Prepetition 1L Term Loan Lenders, the "Prepetition Term Loan Lenders"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacities, the "Prepetition 2L Agent" and together with the Prepetition 1L Agent, the "Prepetition Term Loan Agents" and together with the Prepetition 1L Term Loan Lenders and the Prepetition 2L Term Loan Lenders, the "Prepetition Secured Parties").<br><br>The Prepetition 2L Term Loan Obligations are secured by (i) a second priority lien on Term Loan Priority Collateral and (ii) a third priority lien on ABL Priority Collateral. |
| **Adequate Protection** | In exchange for the consent of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders to the use of cash collateral and the priming Term Loan DIP Liens (other than with respect to ABL Agent's liens on ABL Priority Collateral), the DIP Orders shall provide:<br><br>    a.  Adequate protection claims to the ABL Agent, the Prepetition 1L Agent, the Prepetition 2L Agent entitled to |

| | |
|---|---|
| | superpriority expense status;<br>b. Adequate protection liens to the ABL Agent, the Prepetition 1L Agent and the Prepetition 2L Agent, which liens shall rank junior to Permitted Liens and Term Loan DIP Liens on the Term Loan Priority Collateral and senior to liens securing the Prepetition ABL Obligations, the Prepetition 1L Term Loan Obligations and the Prepetition 2L Term Loan and otherwise subject to the priorities set forth in the Intercreditor Agreements; and<br>c. Payment of fees and expenses of the Prepetition ABL Agent and Prepetition 1L Agent. |
| **Marshalling; 552(b) Waiver and Waiver of 506(c) Claims** | Subject to entry of the Final DIP Order, waiver of the equitable doctrine of "marshalling," claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c), and section 552 "equities of the case" exception. |
| **Credit Bid** | Subject to entry of the Interim DIP Order and section 363(k) of the Bankruptcy Code, the Term Loan DIP Agent (at the direction of the Required Term Loan DIP Lenders) shall have the unconditional right to credit bid the outstanding Term Loan DIP Obligations (including the Roll-Up Amount) on a dollar-for-dollar basis in connection with a sale to the Consenting Stakeholder Purchaser as set forth in the Restructuring Support Agreement, or any other non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale.<br><br>Subject to entry of the Interim DIP Order and section 363(k) of the Bankruptcy Code, the Prepetition 1L Agent at the direction of the requisite Prepetition 1L Term Loan Lenders under the Prepetition 1L Term Loan Credit Agreement shall have the unconditional right to credit bid the Prepetition 1L Term Loan Obligations on a dollar-for-dollar basis in connection with a sale to the Consenting Stakeholder Purchaser as set forth in the Restructuring Support Agreement, or any other non-ordinary course sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale.<br><br>Subject to entry of the Interim DIP Order and section 363(k) of the Bankruptcy Code, the Prepetition 2L Agents at the direction of the requisite Prepetition 2L Term Loan Lenders under the Prepetition 2L Term Loan Credit Agreements shall have the unconditional right to credit bid the Prepetition 2L Term Loan Obligations on a dollar-for-dollar basis in connection with a sale to the Consenting Stakeholder Purchaser as set forth in the Restructuring Support Agreement, or |

| | |
|---|---|
| | any other non-ordinary course sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale. |
| **Assignments** | Any Term Loan DIP Lender may transfer its Term Loan DIP Loans (or rights to subscribe to Term Loan DIP Loans) to any of its affiliates; provided such assignee consents/commits to the Restructuring Support Agreement and a Restructuring Transaction. No other transfer or assignment of the Term Loan DIP Loans shall be permitted unless (i) such transfer or assignment has the prior written consent of the Required Term Loan DIP Lenders and (ii) such assignee consents/commits to the Restructuring Support Agreement and a Restructuring Transaction. |
| **Prepayments** | Voluntary prepayments on substantially the same terms as required under the Prepetition 1L Term Loan Documents.<br><br>Mandatory prepayments on substantially the same terms as required under the Prepetition 1L Term Loan Documents.<br><br>No amounts prepaid may be reborrowed without Required Term Loan DIP Lender consent. |
| **Expense Reimbursement / Indemnity** | Upon entry of the Interim DIP Order and subject to the terms thereof, the Debtors shall reimburse the Term Loan DIP Lenders for all amounts incurred including the fees and expenses of (a) Proskauer Rose LLP and (b) Gray Reed & McGraw LLP. |
| **Prepetition Lien Acknowledgment** | The Interim DIP Order and the Final DIP Order shall contain customary representations, acknowledgements and releases with respect to the amount, validity, and priority of the Prepetition Term Loan Obligations and liens granted under the Prepetition Term Loan Documents supporting such obligations. |
| **Carve Out** | "Carve-Out" means the following expenses: (i) all fees required to be paid under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, all fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and, subject to the amounts set forth in the Approved Budget, any official committee of creditors (the "Committee") before or on the first business day following delivery by the Term Loan DIP Agent at the direction of the Required Term Loan DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (including, for the |

avoidance of doubt any success fee, transaction fee, deferred fee or other similar fee set forth in the engagement letters of Houlihan Lokey and DH Capital); and (iv) after the first business day following delivery by the Term Loan DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by retained estate professionals in the Chapter 11 Cases in an aggregate amount not to exceed $2,000,000 (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

No portion of the Carve-Out (including the Post-Carve Out Trigger Notice Cap), any cash collateral, any other Term Loan DIP Collateral, or any proceeds of the Term Loan DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of allowed professional fees, disbursements, costs or expenses incurred by any person, including, without limitation, the Committee, in connection with (i) challenging the Term Loan DIP Secured Parties' or the Prepetition Secured Parties' liens or claims, (ii) preventing, hindering or delaying any of the Term Loan DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the Term Loan DIP Collateral, (iii) the filing of any chapter 11 plan or related disclosure statement not consented to by the Required Term Loan DIP Lenders, other than a chapter 11 plan that indefeasibly satisfies the Term Loan DIP Obligations in full in cash, (iv) the filing of any motion seeking approval of a sale of any Term Loan DIP Collateral without the consent of the Required Term Loan DIP Lenders, other than a sale that indefeasibly satisfies the Term Loan DIP Obligations in full in cash, or (v) initiating or prosecuting any claim or action against any Term Loan DIP Secured Party or Prepetition Secured Party; provided that, notwithstanding the foregoing, proceeds from the Term Loan DIP Facility and/or cash collateral not to exceed $50,000 in the aggregate may be used on account of allowed professional fees incurred by Committee professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition ABL Obligations and the Prepetition Term Loan Obligations and Prepetition Secured Parties (but not the Term Loan DIP Facility and Term Loan DIP Secured Parties).

For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the Term Loan DIP Agent at the direction of the Required Term Loan DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may be delivered following the

16

| | |
|---|---|
| | occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **KEIP & KERP** | The Interim DIP Order and Final DIP Order shall provide for a carve-out from the cash proceeds realized by the Debtors from the closing of one or more Acceptable Sale(s) (as defined in the Restructuring Support Agreement) equal to or in excess of the Reserve Price (as defined in the Restructuring Support Agreement) in an amount sufficient to fund all amounts due under a key employee incentive plan and key employee retention plan, which plans shall be in form and substance reasonably acceptable to the Required Term Loan DIP Lenders and approved by the Bankruptcy Court. |
| **Roll-Up Reduction Provision** | In the event that the Term Loan DIP Obligations exceed the Collateral Realization Amount (as defined below), then the Roll-Up Amount shall be automatically recharacertized as Prepetition 2L Term Loan Obligations and then, to the extent necessary, as Prepetition 1L Term Loan Obligations, until the Term Loan DIP Obligations equals the Collateral Realization Amount.<br><br>The "Collateral Realization Amount" is the sum of (1) the cash proceeds realized by the Debtors from the closing of one or more Acceptable Sale(s) (as defined in the Restructuring Support Agreement) equal to or in excess of the Reserve Price (as defined in the Restructuring Support Agreement) and (2) the credit bid amount, if any, by the Term Loan DIP Lenders in connection with any consummated sale of Term Loan DIP Collateral to the Term Loan DIP Lenders or their designee. |
| **Term Loan DIP Documentation** | The Debtors, the Term Loan DIP Lenders, the Term Loan DIP Agent and the Prepetition 1L Term Loan Lenders shall negotiate documentation evidencing the Term Loan DIP Facility (which shall be in form and substance acceptable to the Debtors and the Term Loan DIP Lenders) (collectively, the "Term Loan DIP Documents"), which shall include:<br><br>a. an interim order entered by the Bankruptcy Court authorizing the Debtors to incur debtor in possession financing (including authorization to borrow the Interim Term Loan DIP Amount) on the terms and conditions set forth herein and in the Term Loan DIP Documents (the "Interim DIP Order");<br><br>b. a final order entered by the Bankruptcy Court authorizing the Debtors to incur debtor in possession financing (including authorization to borrow the Final Term Loan DIP Amount) on the terms and conditions set forth herein and in the Term Loan DIP Documents (the "Final DIP Order"); and |

17

|  | c.  at the Term Loan DIP Lenders' election, either a long-form Term Loan DIP term sheet or Term Loan DIP Credit Agreement and related notes, security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type. |
|---|---|

## **Exhibit 1**

### **Initial Term Loan DIP Lenders**

1. ALCOF II NUBT, L.P. by Arbour Lane Fund II GP, LLC

2. ALCOF III NUBT, L.P. by Arbour Lane Fund III GP, LLC

3. Blackstone Alternative Credit Advisors, LP

4. Carlyle Investment Management, LLC

5. FS Credit Opportunities Corp., by FS Global Advisor, LLC

6. FS KKR Capital Corp., by FS/KKR Advisor, LLC

## EXHIBIT E

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among Sungard AS New Holdings, LLC ("**Sungard AS**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:


**[CONSENTING STAKEHOLDER]**

[INSERT ENTITY NAME]


_____
Name:
Title:

Address:



E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| First Lien Credit Agreement | |
| Second Lien Credit Agreement | |
| Non-Extending Second Lien Credit Agreement | |
| Company Interests | |
| Term Loan DIP Facility Agreement Claims | |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## <u>EXHIBIT F</u>

### Form of Transfer Agreement

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**<u>Agreement</u>**"),[2] by and among Sungard AS New Holdings, LLC ("**<u>Sungard AS</u>**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:


**[CONSENTING STAKEHOLDER]**


[INSERT ENTITY NAME]


_____

Name:
Title:

Address:



E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Credit Agreement | |
| Second Lien Credit Agreement | |
| Non-Extending Second Lien Credit Agreement | |
| Company Interests | |
| Term Loan DIP Facility Agreement Claims | |

---

[2]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**<u>Exhibit 2</u>**

**Corporate Organization Chart**

# Corporate Structure Chart

