## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNGARD AS NEW HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 22-90018 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
## OF AN ORDER (I) AUTHORIZING THE DEBTORS
## TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT
## SYSTEM AND MAINTAIN EXISTING BANK ACCOUNTS,
## (B) MAINTAIN EXISTING BUSINESS FORMS AND (C) PERFORM
## <u>INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF</u>

**Emergency relief has been requested. Relief is requested no later than April 12, 2022 at 8:00 a.m.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 12, 2022 (prevailing Central Time) in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002. Participation at the hearing will only be permitted by audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones's home page. The meeting code is "JudgeJones". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' tax identification numbers, are: InFlow LLC (9489); Sungard AS New Holdings, LLC (5907); Sungard AS New Holdings II, LLC (9169); Sungard AS New Holdings III, LLC (3503); Sungard Availability Network Solutions Inc. (1034); Sungard Availability Services (Canada) Ltd./Sungard, Services de Continuite des Affaires (Canada) Ltee (3886); Sungard Availability Services Holdings (Canada), Inc. (2679); Sungard Availability Services Holdings (Europe), Inc. (2190); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Sungard Availability Services, LP (6195); and Sungard Availability Services, Ltd. (4711). The location of the Debtors' service address for purposes of these chapter 11 cases is: 565 E Swedesford Road, Suite 320, Wayne, PA 19087.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this motion (the "<u>Motion</u>"):[1]

## <u>Relief Requested</u>

1.     By this Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "<u>Interim Order</u>" and the "<u>Final Order</u>"):  (i) authorizing the Debtors to continue to (a) operate their Cash Management System (as defined below) and maintain their existing Bank Accounts (as defined below), including honoring certain prepetition obligations related thereto, (b) maintain existing Business Forms (as defined below) and (c) perform Intercompany Transactions (as defined below); and (ii) granting related relief. Additionally, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

## <u>Jurisdiction and Venue</u>

2.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are Bankruptcy Code sections 105(a), 345, 363, 503 and 507, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the

---

[1]    A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion, are set forth in the *Declaration of Michael K. Robinson, Chief Executive Officer and President of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), filed contemporaneously with this Motion and incorporated by reference herein.

"Bankruptcy Rules") and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

6.      The Debtors and their non-Debtor affiliates (collectively, the "Company") provide high availability, cloud-connected infrastructure services built to deliver business resilience to their customers in the event of an unplanned business disruption, ranging from man-made events to natural disasters.  Headquartered in Wayne, Pennsylvania, the Debtors employ approximately 585 individuals in the United States and Canada.  The Company operates 55 facilities (comprising 24 data centers and 31 work area recovery centers) and provides services to approximately 2,001 customers across the United States, the United Kingdom, Canada, Ireland, France, India, Belgium, Luxembourg and Poland. The Company generated approximately $587 million in revenue for fiscal year 2021 and, as of the Petition Date, the Debtors had approximately $424 million in aggregate principal amount of prepetition funded debt obligations.

## The Cash Management System

### I.      Overview.

7.      In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System"), which is comparable to the

centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective and efficient manner.  The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer and disburse funds generated from their operations and to facilitate cash monitoring, forecasting and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and utilizes cash management controls for entering, processing and releasing funds, including in connection with Intercompany Transactions (as defined below).  The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

## II.   The Cash Management System.

8.     The Cash Management System is summarized on **Exhibit 1** annexed to the proposed Interim Order and proposed Final Order attached hereto and is comprised of seven active Debtor-owned and controlled bank accounts and one inactive Debtor-owned and controlled bank account (each a "Bank Account" and, collectively, the "Bank Accounts"), each of which is identified on **Exhibit 2** annexed to the proposed Interim Order and proposed Final Order attached hereto, with the following banking institutions (the "Cash Management Banks"):

> a.     five active Bank Accounts and two inactive Bank Account maintained at PNC Bank, N.A. ("PNC", and the Bank Accounts maintained at PNC collectively, the "U.S. Bank Accounts"); and
>
> b.     two active Bank Accounts maintained at Bank of Montreal ("Bank of Montreal").

9.     As of the Petition Date, the Debtors have approximately $5 million in cash on hand.[2]  The Bank Accounts, including the inactive Bank Account, are described further in the following table:

---

[2]    The information represented here is a projection of what the balance will be on the Petition Date based on information available as of the current date and is subject to change before the Petition Date.

| Bank Account(s) | Account Description |
|---|---|
| **Concentration Account**<br><br>*PNC Account ending 6896* | The Debtors maintain a concentration account with PNC (the "PNC Concentration Account"), which serves as the Debtors' centralized operating account for the Cash Management System. Funds are swept daily into the PNC Concentration Account from the Debtors' PNC A/R Account (as defined below).<br><br>The PNC Concentration Account funds the PNC AP Funding Account (as defined below) and the PNC US Payroll Funding Account as needed. Prepetition, borrowings under the Debtors' revolving credit facility were funded into the PNC Concentration Account, and interest or principal repayments of the Debtors' debt were made out of this account. |
| **Deposit Account**<br><br>*PNC Account ending 6845* | The Debtors maintain a deposit account with PNC (the "PNC A/R Account"), which receives all customer receipts. The PNC A/R Account is a zero-balance account with funds swept daily to the PNC Concentration Account.<br><br>The Debtors maintain a lockbox account with PNC (the "PNC Lockbox") in connection the PNC A/R Account. Customers of the Debtors are directed to send check payments to the PNC Lockbox. All funds received through the PNC Lockbox are deposited into the PNC A/R Account and then swept daily into the PNC Concentration Account. |
| **Disbursement Account**<br><br>*PNC Account ending 6888* | The Debtors maintain a disbursement account with PNC (the "PNC AP Funding Account") that transfers funds from the PNC Concentration Account in an amount to cover accounts payable. |
| **Payroll Account**<br><br>*PNC Account ending 6861* | The Debtors maintain an account with PNC to administer certain payroll-related obligations (the "PNC US Payroll Funding Account"). The Debtors have historically funded the PNC US Payroll Funding Account with cash from the PNC Concentration Account. The PNC US Payroll Funding Account is a zero-balance account. |
| **Canadian Accounts**<br><br>*Bank of Montreal Account ending 6994*<br>*Bank of Montreal Account ending 5730* | The Debtors maintain two accounts with Bank of Montreal (the "Canadian Accounts") that support the operations of the Debtors' businesses in Canada (in American dollars and Canadian dollars). The Canadian Accounts sit outside of the cash management system among the U.S. Bank Accounts at PNC, as detailed in **Exhibit 1**.<br><br>In connection with the Canadian Accounts, the Debtors maintain a lockbox account through Bank of Montreal to process certain checks received from customers. These amounts are then regularly swept into the Canadian Accounts. |

| Bank Account(s) | Account Description |
|---|---|
| **Inactive Account**<br><br>*PNC Account ending 3014*<br>*PNC Account ending 6837* | There is no activity in the inactive Bank Accounts, which are a zero-balance accounts. |

## III.   Intercompany Transactions.

### A.   Overview of Intercompany Transactions.

10.     The Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other and with certain of their non-Debtor affiliates (collectively, the "Intercompany Transactions"), resulting in intercompany receivables and payables (collectively, the "Intercompany Claims"). The Intercompany Transactions have historically included intercompany loans, dividends and recharge fees for expense reimbursements related to general expenses, management fees and support services. At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or between a Debtor and a non-Debtor affiliate. The Debtors closely track all funds and transfers in their respective accounting systems and, therefore, can ascertain, trace and account for all Intercompany Transactions.

11.     The Intercompany Transactions are an essential component of the Debtors' complex global operations. More specifically, the Debtors engage in Intercompany Transactions to, among other things, provide enterprise-wide support services, divide the costs of management fees, complete transactions with administrative ease and facilitate operations on a daily basis. The Intercompany Transactions are trackable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with pre-bankruptcy procedures. Any interruption of the Intercompany Transactions would severely disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders. Accordingly, the Debtors seek authority—

and, to the extent applicable, relief from the automatic stay—to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis, in a manner substantially consistent with the Debtors' past practice.

**B.      Intercompany Loans.**

12.      Certain Debtors have documented, interest-bearing loan agreements with certain other Debtor or non-Debtor affiliates, which exist for the purpose of managing operational costs and expenses across the Debtors' global enterprise.[3]  Historically, certain Debtors have made payments of approximately $68,837 annually to non-Debtor Sungard AS France on account of interest due on the France Loan and approximately $218,514 annually to non-Debtor Sungard AS UK on account of interest due on the UK Loan.[4] For the avoidance of doubt, the Debtors do not intend, and are not seeking authority, to make interest payments under the Canada Loans, France Loan or UK Loan or any other intercompany loans during the pendency of these chapter 11 cases.

**C.      Intercompany Recharge Fees for Expense Reimbursement.**

13.      The Debtors have historically completed various operations-related Intercompany Transactions in the ordinary course of business with both Debtors and non-Debtor affiliates. These transactions are not subject to any formal written agreements among the Debtors and their non-Debtor affiliates and do not occur with any particular frequency.  Rather, as needed, the Debtors and their non-Debtor affiliates pay for each other's expenses and then recharge the amount

---

[3]      For example, (a) Debtor Sungard Availability Services, LP ("Sungard AS, LP") owes approximately $31.0 million in the aggregate with respect to three loans advanced by Debtor Sungard Availability Services (Canada), Ltd. ("Sungard AS Canada," and such loans, the "Canada Loans"), (b) Debtor Sungard AS, LP owes approximately €4.0 million with respect to a loan advanced by non-Debtor Sungard Availability Services (France) SAS ("Sungard AS France," and such loan, the "France Loan"),  and (c) Debtor Sungard AS New Holdings, LLC ("Sungard AS") owes approximately $5.6 million with respect to a loan advanced by non-Debtor Sungard Availability Services (UK) Limited ("Sungard AS UK," and such loan, the "UK Loan").

[4]      The Debtors did not make any interest payments to Debtor Sungard AS Canada on account of the Canada Loans in 2020, 2021 or 2022.

of the expenditure for reimbursement.  Historically, these recharge fees have included costs associated with currency exchange discrepancies and insurance and software licenses, among others.  Primarily, these transactions occur for administrative ease.  For example, the Debtors and their non-Debtor affiliates expend funds and reimburse each other to avoid currency exchanges and to purchase certain supplies, such as software licenses, in bulk.

14.     While certain of these recharge fees would result in funds leaving the Debtors' estates, the intercompany recharge system for expense reimbursement operates in such a way that most frequently, Debtor entities are reimbursed for expenditures made for the benefit of the enterprise as a whole.  Historically, Debtor entities are paid approximately $75,000 monthly on account of expense reimbursements from non-Debtor entities and, in turn, pay approximately $130,000 monthly to non-Debtor entities for expense reimbursements.

15.     The Debtors seek authority to continue this practice of paying certain expenses and being reimbursed by their non-Debtor affiliates for administrative convenience in the ordinary course of business on a postpetition basis, consistent with past practice.

**D.     Transfer Pricing.**

16.     On January 1, 2018, the Debtors entered into the Intragroup Business Support Services Agreement (the "Services Agreement") with certain foreign non-Debtors, which provides for shared business operations services in the following areas, among others: marketing and sales; executive management; finance and accounting; human resources; information technology; legal and operations.  In August 2018, the Debtors developed a transfer pricing report in connection with the Services Agreement (the "Transfer Pricing Report").

17.     Pursuant to the Services Agreement and the Transfer Pricing Report, all global costs are aggregated and divided into several categories, including but not limited to:  CEO; finance; marketing; sales and operations.  The Debtors then apportion these costs among the jurisdictional

divisions of their global enterprise based on the Debtors' evaluation, in consultation with their third-party advisors, of criteria outlined in the Transfer Pricing Report, which are applicable to the various cost categories.  For example, one basis for allocation is to mirror the percentage of worldwide sales attributable to a jurisdictional division, a second method is to allocate costs by project (when a project is specific to a distinct jurisdictional division of the global enterprise) and a third method is to allocate costs on a full-time-employee (or "FTE") basis, allocating the expense for work performed based upon the jurisdictional division benefited, as determined by employee interviews.

18.     After all costs are aggregated, costs allocable to the operations in the United States are removed from the aggregated total.  Per the Transfer Pricing Report, the remaining amount is marked up by 10% to simulate an arm's-length transaction.  Any amounts allocable to operations benefiting a particular international entity are also removed from the aggregated total.  Once all such deductions are made, the remaining figure is the calculated net charge (the "Net Charge")— that is, the amount that would be charged to the jurisdictional divisions in the global enterprise if those entities had unlimited resources.  Ultimately, however, the amounts charged out to the various entities are the lesser of:  (a) a jurisdictional division's retained earnings; (b) the dollar amount difference between the pre-tax net profit percentage for that jurisdiction and 3% of that jurisdiction's revenue; or (c) the computed Net Charge.

19.     Historically, this allocation process has been completed annually, with reconciliation occurring at the beginning of the following year.  In 2020, the total global costs were approximately  $625.0 million,  and  the  Debtors  charged  approximately  $16.9 million  to international affiliates pursuant to the above-described methodology (the majority of which were charged to Sungard AS Canada).  In 2021, the total global costs were approximately $565.6 million

and the Debtors charged Sungard AS Canada approximately $12 million.  In 2021, the Debtors did not recoup any amounts from international affiliates, other than Sungard AS Canada, pursuant to the above-described methodology primarily due to insufficient revenue across the Debtors' global businesses.  Without a sufficient revenue, a positive charge cannot be generated for an affiliate under the Debtors' Transfer Pricing Report.  As of February 28, 2022, total global costs were approximately $92.6 million.

20.     Accordingly, the Debtors seek authority to pay any accrued but unpaid expenses related to the Services Agreement on behalf of the Debtor and non-Debtor entities, to continue to pay such amounts on a postpetition basis in the ordinary course of business consistent with the Services Agreement and the Transfer Pricing Report, and to seek reimbursement from non-Debtor affiliates in accordance with the above-described reimbursement procedure pursuant to the Transfer Pricing Report.

### E.     Costa Rica and India Support Services.

21.     The Debtors have established a support service network based primarily out of Costa Rica and India.  Payments for these services result in Intercompany Claims, because services are paid primarily by Debtor Sungard AS, LP and recharged to non-Debtor Sungard AS UK.

22.     Services provided out of India are performed by non-Debtor Sungard Availability Services (India) Private Limited ("Sungard AS India"), a subsidiary of non-Debtor Sungard AS UK.  Support services provided by non-Debtor Sungard AS India include service of certain client contracts, finance work, operation of service centers and research and development for the operations team.  The Debtors pay non-Debtor Sungard AS India directly for the services provided on a cost-plus basis.  Services are invoiced to the Debtors monthly.  In turn, the Debtors recharge non-Debtor Sungard AS UK for its share of the services provided.  On average, the Debtors pay approximately $1.7 million per month to non-Debtor Sungard AS India and recharge

10

approximately $135,000 per month to non-Debtor Sungard AS UK on account of these services. As of the Petition Date, the Debtors owe approximately $13.3 million to non-Debtor Sungard AS India on account of these services.  For avoidance of doubt, the Debtors are not seeking authority to pay prepetition balances owed to non-Debtor Sungard AS India through this Motion.

23.     Services provided out of Costa Rica are performed by a third-party contractor, Sykes Enterprises, Inc. ("Sykes"), pursuant to an agreement with Debtor Sungard AS, LP dated as of March 31, 2016 (the Debtors do not have an affiliated entity in Costa Rica).   Under this agreement, Sykes provides services to the Debtors and their non-Debtor affiliates.  The Debtors pay Sykes directly for the services provided on a cost-plus basis.  In turn, the Debtors recharge non-Debtor Sungard AS UK for its share of the services provided.  On average, the Debtors pay approximately $383,546 per month to Sykes and recharge approximately $50,000 per month to non-Debtor Sungard AS UK on account of these services.

24.     The Debtors seek authority to continue to operate in accordance with established practices regarding the provision of and payment for the above-described critical support services.

**IV.     Bank Fees.**

25.     In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur approximately $13,000 per month on account of the Bank Fees in the aggregate.  Historically, the Bank Fees have been *de minimis* and have been debited directly out of the Debtors' Bank Accounts.  Accordingly, as of the Petition Date, the Debtors estimate that they do not currently owe their Cash Management Banks any amounts on account of unpaid Bank Fees.  The Debtors seek authority to continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historical practices.

## V.    Business Forms.

26.    As part of their Cash Management System, the Debtors use various preprinted business forms (the "Business Forms") in the ordinary course.  To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Bankruptcy Court authorize the Debtors' continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms.   Once the Debtors have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor In Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

## VI.    PNC Commercial Card Program.

27.    As part of the Cash Management System, the Debtors maintain a sponsored corporate card program administered by PNC (the "PNC Commercial Card Program") to cover expenses relating to various emergency needs in operations and other miscellaneous site related expenses incurred by the Debtors, as approved by the Debtors' management.  Debtor Sungard AS, LP and Debtor Sungard AS Canada are party to the card services agreement entered into in respect of the PNC Commercial Card Program (the "PNC Commercial Card Agreement").  Obligations owed to PNC under the PNC Commercial Card Program and the PNC Corporate Card Agreement are secured by approximately $500,000 held in the PNC Concentration Account.

28.    Use of the PNC Commercial Card Program is an integral part of the Debtors' cash management and account functions and is essential to the continued operation of the Debtors'

businesses.  As such, any interruption or inability to continue using this program could impose a substantial hardship on the Debtors' businesses.  For example, the Debtors' employees charge business expenses incurred in the ordinary course of performing their jobs to credit cards that are part of the PNC Commercial Card Program.  If the Debtors are not permitted to continue the PNC Commercial Card Program, a replacement corporate card program would be needed.  This result would present a substantial administrative burden on the Debtors and their employees, as they would have to implement a new system with no corresponding benefit to the estates.

29.     In 2021, the Debtors' average monthly spend under the PNC Commercial Card Program was approximately $167,000.  As of the Petition Date, the Debtors estimate that the amount outstanding on account of the PNC Commercial Card Program does not exceed $65,000. The Debtors seek authorization, but not direction, to continue the PNC Commercial Card Program and to pay all outstanding claims and fees with respect thereto, in each case, in the ordinary course of business.  For the avoidance of doubt, the Debtors will not seek to pay any outstanding expenses or fees related to the PNC Commercial Card Program in advance of the date they become due and payable.

## **Basis for Relief**

### I.      **Maintaining the Existing Cash Management System Is Necessary to the Debtors' Ongoing Business Operations and Restructuring Efforts.**

30.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for payment of taxes including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor in possession status of the chapter

11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement. These requirements are intended to provide a clear distinction between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.

31.     Continuation of the Cash Management System nonetheless should be permitted pursuant to Bankruptcy Code section 363(c)(1), which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively simple matter. The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *See In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business). In granting such relief, courts recognize that an integrated cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets.*" In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995); *see also In re Columbia Gas Sys., Inc.,* 136 B.R. 930, 1061 (Bankr. D. Del. 1992), *aff'd in relevant part,* 997 F.2d 1039, 1061 (3d Cir. 1993) (stating that requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient.").

32.     Requiring the Debtors to adopt a new cash management system during these chapter 11 cases would be costly, burdensome and disruptive to the Debtors' operations. Any modification to or disruption of the Cash Management System could have a negative effect on the Debtors' ongoing business operations and restructuring efforts. Maintaining the current Cash

Management System will facilitate the Debtors' transition into chapter 11 by minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Moreover, maintaining the current Cash Management System will allow the Debtors' employees to attend to their daily responsibilities rather than organize and administer a new system.

33.     Parties in interest will not be harmed by the Debtors' maintenance of their existing Cash Management System because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations except as authorized by the Court.  The Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval.  Maintaining the Cash Management System is in the best interests of the Debtors' estates and creditors.

34.     For these reasons, the Debtors request that the Court authorize the Cash Management Banks to continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. The Debtors further request that the Court order the Cash Management Banks to receive, process, honor and pay any and all checks, wire transfers, credit card payments and other instructions, and drafts payable through, or drawn or directed on, such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, wires or credit card payments are dated prior to or subsequent to the Petition Date.

35.     The Debtors also request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion, either at the direction of the Debtors or on a good-faith belief that the Court has authorized such prepetition

check or item to be honored, such Cash Management Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. Such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.

36.     Finally, the Debtors request that the Court authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees and prepetition amounts owed on account of the PNC Commercial Card Program, and further authorize the Cash Management Banks to chargeback returned items to the Bank Accounts, whether such items are dated prior to, on or subsequent to the Petition Date, in the ordinary course of business.

## II.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.

37.     To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they be authorized to continue to use their Business Forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.  Given the limited nature of the Business Forms, parties in interest will not be prejudiced if the Debtors are authorized to continue using their Business Forms substantially in the forms existing immediately before the Petition Date.  Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing forms such as letterhead would be an unnecessary additional expense.

## III.   The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Status to Postpetition Intercompany Balances Between Debtors.

38.     Intercompany Transactions are made among the Debtors and non-Debtor affiliates in the ordinary course of business as part of the comprehensive Cash Management System.  The

Debtors intend to continue Intercompany Transactions in the ordinary course of business on a postpetition basis.  The Debtors currently maintain detailed records of Intercompany Transactions and ascertain, trace and account for Intercompany Transactions on a daily basis and intend to maintain records of such Intercompany Transactions.  The continued transfer of funds between and among the Debtors and their non-Debtor affiliates in the ordinary course is necessary to preserve the assets of the Debtors' estates because all of the Debtors and non-Debtor affiliates must act in concert to operate and maintain the business of the Company's going-concern enterprise.  Any termination of the Intercompany Transactions would significantly disrupt the Cash Management System and would result in adverse consequences to the Debtors and their estates.  Accordingly, the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors, and, as such, the Debtors should be authorized to continue performance in the ordinary course.

39.    As the Intercompany Transactions are essential components of the Cash Management System, the Debtors request the authority to continue conducting the Intercompany Transactions in the ordinary course of business on a postpetition basis and request that, pursuant to Bankruptcy Code sections 503(b)(1) and 364(b), all Intercompany Claims on account of valid postpetition transfers from a Debtor or a non-Debtor affiliate to a Debtor be accorded administrative expense status.  This relief will ensure that no Debtor or non-Debtor affiliate will fund the operations of a Debtor at the expense of such entity's creditors.

**Emergency Consideration**

40.    The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.  An immediate and orderly transition into chapter 11 is critical to

the viability of the Debtors' operations, and any delay in granting the relief requested could hinder their operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

### **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

41.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### **Reservation of Rights**

42.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt or reject any agreement, contract or lease pursuant to Bankruptcy Code section 365; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) that may be satisfied

pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Interim Order or Final Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## <u>Notice</u>

43.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel for PNC Bank, National Association, as the administrative agent under the Debtors' prepetition revolving credit facility and ABL DIP facility; (d) counsel for Alter Domus Products Corp., as the administrative agent under each of the Debtors' prepetition term loan facilities; (e) counsel for the ad hoc group of term loan lenders and the term loan DIP lenders; (f) counsel for Acquiom Agency Services LLC, as term loan DIP agent under the Debtors' term loan DIP facility; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (k) the state attorneys general in the states where the Debtors conduct their business operations; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

WHEREFORE, the Debtors request entry of the orders, substantially in the form of the Interim and Final Orders filed with this Motion, granting the relief requested herein and granting such other relief as the Court deems just, proper and equitable.

Dated: April 11, 2022
Houston, Texas

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Rebecca Blake Chaikin (*pro hac vice* pending)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email:  mcavenaugh@jw.com
          jwertz@jw.com
          rchaikin@jw.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (*pro hac vice* pending)
Meredith A. Lahaie (*pro hac vice* pending)
Matthew D. Friedrick (*pro hac vice* pending)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:  pdublin@akingump.com
          mlahaie@akingump.com
          mfriedrick@akingump.com
-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
Zach D. Lanier (*pro hac vice* pending)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email:  mbrimmage@akingump.com
          llawrence@akingump.com
          zlanier@akingump.com

*Proposed Co-Counsel to the Debtors and Debtors in*
*Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Matthew D Cavenaugh*
Matthew D. Cavenaugh


**Certificate of Service**

I certify that on April 11, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Matthew D Cavenaugh*
Matthew D. Cavenaugh