United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 12, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SUNGARD AS NEW HOLDINGS, LLC, *et al.*,[1] | Case No. 22-90018 (DRJ) |
| Debtors. | **Re: Docket No. 3** |

### INTERIM ORDER (I) AUTHORIZING THE
### DEBTORS TO OBTAIN POSTPETITION FINANCING,
### (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
### (III) AUTHORIZING THE DEBTORS TO REPAY CERTAIN PREPETITION
### SECURED INDEBTEDNESS, (IV) GRANTING LIENS AND PROVIDING
### SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (V) GRANTING
### ADEQUATE PROTECTION, (VI) MODIFYING THE AUTOMATIC STAY, (VII)
### SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF

Upon the motion, dated April 11, 2022 (the "Motion") of Sungard AS New Holdings, LLC

and its affiliated debtors in possession (collectively, the "Debtors") in the above-captioned chapter

11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim

Order")[2] and a final order (the "Final Order") pursuant to sections 105, 361, 362, 363, 364(c)(l),

364(c)(2), 364(c)(3), 364(d), 364(e), 503, 507 and 552 of chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2, 7007-1, 9013-1, 9013-

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' tax identification numbers, are: InFlow LLC (9489); Sungard AS New Holdings, LLC (5907); Sungard AS New Holdings II, LLC (9169); Sungard AS New Holdings III, LLC (3503); Sungard Availability Network Solutions Inc. (1034); Sungard Availability Services (Canada) Ltd./Sungard, Services de Continuite des Affaires (Canada) Ltee (3886); Sungard Availability Services Holdings (Canada), Inc. (2679); Sungard Availability Services Holdings (Europe), Inc. (2190); Sungard Availability Services Holdings, LLC (6403); Sungard Availability Services Technology, LLC (9118); Sungard Availability Services, LP (6195); and Sungard Availability Services, Ltd. (4711).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 565 E Swedesford Road, Suite 320, Wayne, PA 19087.

[2]   Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Term Sheet (as defined below).

4 and 9014-2 of the Bankruptcy Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of Texas (the "Court"), *inter alia*:

(i)      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis under a postpetition revolving credit facility (the "ABL DIP Facility " and the loans thereunder, the "ABL DIP Loans") comprised of a roll-up of the Prepetition ABL Obligations (as defined below) on a dollar-for-dollar basis into new loans or commitments, as applicable, (A) in aggregate principal amount up to the amount of the Prepetition ABL Obligations (the "Interim ABL DIP Amount") and (B) in the aggregate principal amount not to exceed $50,000,000 upon entry of the Final Order (the "Final ABL DIP Amount") pursuant to the terms and conditions of this Interim Order, the Final Order and that certain *ABL DIP Financing Term Sheet* attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "ABL DIP Term Sheet"), by and among Sungard AS New Holdings III, LLC, as borrower ("Borrower" or "Sungard AS III"), Sungard AS New Holdings II, LLC ("Holdings"), as guarantor, and all other Debtors other than Sungard AS New Holdings, LLC ("TopCo"), as additional borrowers or guarantors, PNC Bank, National Association ("PNC"), as administrative agent under the ABL DIP Facility (in such capacity, the "ABL DIP Agent") and the lenders party thereto from time to time (the "ABL DIP Lenders").

(ii)      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (A) under a new money delayed-draw term loan facility (the "Term Loan DIP Facility" and, together with the ABL DIP Facility, the "DIP Facilities") consisting of (1) $41,150,000 in new money loans available from and after entry of the Interim Order in accordance with the terms of the Approved Budget (as defined below) (the "Interim Term Loan DIP Amount") and (2) an additional $54,150,000 in new money loans available from and after entry of the Final

Order in accordance with the terms of the Approved Budget (the "Final Term Loan DIP Amount" and, together with the Interim Term Loan DIP Amount, the "New Money Amount"); provided, that $16,330,000 of the "Final Term Loan DIP Amount" shall be available only in the event of the Maturity Extensions (as defined in the Term Loan DIP Term Sheet (as defined below), and (B) subject to entry of the Final Order, pursuant to a roll-up of certain of the Prepetition Term Loan Obligations (as defined below) pursuant to the terms and conditions of this Interim Order, the Final Order and that certain *Term Loan DIP Financing Term Sheet* attached hereto as **Exhibit B** (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Term Loan DIP Term Sheet" and, together with the ABL DIP Term Sheet, the "DIP Term Sheets"), by and among Borrower, as borrower, Holdings, as guarantor, and all other Debtors as additional guarantors as to the New Money Amount and all other Debtors other than TopCo as additional guarantors as to the Term Loan Roll-Up Loans (as defined below), Acquiom Agency Services LLC, as administrative agent and collateral agent under the Term Loan DIP Facility (in such capacities, the "Term Loan DIP Agent" and, together with the ABL DIP Agent, the "DIP Agents") and the lenders party thereto from time to time (the "Term Loan DIP Lenders" and, together with the ABL DIP Lenders, the "DIP Lenders" and, collectively with the DIP Agents, the "DIP Secured Parties").

(iii)    approving the terms of, and authorizing the Debtors to perform under, the ABL DIP Term Sheet and to execute and deliver any other agreements, instruments and documents related to the ABL DIP Facility (collectively, the "ABL DIP Documents"), which shall be on terms consistent with the ABL DIP Term Sheet and this Interim Order and otherwise in form and substance reasonably acceptable to the ABL DIP Lenders (or as otherwise provided in the ABL

DIP Documents), the Required Term Loan DIP Lenders and the Debtors, and to perform such other acts as may be necessary or desirable in connection with the ABL DIP Documents;

(iv)     approving the terms of, and authorizing the Debtors to perform under, the Term Loan DIP Term Sheet and to execute and deliver any other agreements, instruments and documents related to the Term Loan DIP Facility (collectively, the "Term Loan DIP Documents" and, together with the ABL DIP Documents, the "DIP Documents"), which shall be on terms consistent with the Term Loan DIP Term Sheet and this Interim Order and otherwise in form and substance reasonably acceptable to the Required Term Loan DIP Lenders (or as otherwise provided in the Term Loan DIP Documents), the Required ABL DIP Lenders and the Debtors, and to perform such other acts as may be necessary or desirable in connection with the Term Loan DIP Documents;

(v)     authorizing the Debtors to enter into the Term Loan DIP Facility and the ABL DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Secured Parties (respectively, the "Term Loan DIP Obligations" and the "ABL DIP Obligations" and, collectively, the "DIP Obligations"), and granting the DIP Agents and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined below) and as otherwise set forth in this Interim Order;

(vi)     granting to the Term Loan DIP Agent and the ABL DIP Agent (in each case on behalf of the applicable DIP Secured Parties) automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in Bankruptcy Code section 363(a), (including, without limitation, all cash and cash equivalents and other amounts from time to time

4

on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined below), (the "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(vii)    authorizing and directing the Debtors to use the proceeds of the DIP Facilities and Cash Collateral to:  (a) repay in full, in cash, the Prepetition Bridge Facility (as defined below); (b) use $13.5 million of the Prepetition ABL Lenders' Cash Collateral to reduce the Prepetition ABL Obligations; (c) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, commitment fees and the fees and disbursements of the DIP Professionals (as defined below); (d) make permitted adequate protection payments as specified in this Interim Order or the DIP Term Sheets; and (e) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents;

(viii)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties (as defined below) for any Diminution in Value (as defined below) of their interests in the Estates' (as defined below) interests in the Prepetition Collateral, including the Cash Collateral;

(ix)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(x)      authorizing the Term Loan DIP Agent and ABL DIP Agent, at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, respectively, upon the occurrence of an Event of Default (as defined below), but subject in all respects to the terms of this Interim Order, to:   (A) terminate the funding obligations under the DIP Documents in accordance with their terms; (B) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (C) be granted relief from the automatic stay to foreclose on the Term Loan DIP Liens (as defined below) and the ABL DIP Liens (as defined below), respectively;

(xi)     authorizing payment of the DIP Fees (as defined below);

(xii)    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order and providing for the immediate effectiveness of this Interim Order; and

(xiii)   scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the Declaration of Thomas Hedus in support of the Motion, filed concurrently with the Motion (the "Hedus Declaration"), the Declaration of Christopher Nicholls in support of the Motion, filed concurrently with the Motion (the "Nicholls Declaration"), the DIP Term Sheets, and any other DIP Documents, and the evidence submitted and argument made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d) and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court;

and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (the "Estates") pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their Estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor; and

Based upon the record established at the Interim Hearing, the Court makes the following findings of fact and conclusions of law:[3]

A.   **Disposition.**  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.   **Petition Date**.  On April 11, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. Immediately thereafter, Sungard Availability Services (Canada) Ltd./Sungard, Services de Continuite des Affaires (Canada) Ltee ("Sungard Canada") brought an application to commence

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

proceedings under the Companies' Creditors Arrangement Act (Canada) in the Ontario Superior Court of Justice (Commercial List) (the "Recognition Proceedings").

C.    **Debtors in Possession**.  The Debtors are operating their businesses and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  As of the date hereof, no trustee or examiner has been appointed.

D.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are Bankruptcy Code sections 105, 361, 362, 363, 364, 507 and 552, Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

E.    **Committee**.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to Bankruptcy Code section 1102 (a "Committee").

F.    **Notice**.  Upon the record presented to the Court at the Interim Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Term Loan DIP Agent; (d) counsel to Term Loan DIP Lenders; (e) counsel to the ABL DIP Agent; (f) counsel to the Prepetition 1L Agent (as defined below); (g) counsel to the Prepetition 2L Agents (as defined below); (h) the United States Attorney's Office for the Southern

District of Texas; (i) the Internal Revenue Service; (j) the state attorneys general for states in which the Debtors conduct business; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>"), which notice was appropriate under the circumstances and sufficient for the entry of this Interim Order.  No further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth herein is necessary or required.

G.   **<u>Debtors' Stipulations</u>**.   Subject to Paragraph 48 hereof: (i) each stipulation, admission and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations (as defined below), shall be binding upon the Debtors, their Estates and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes; and (ii) the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  Without prejudice to the rights of parties in interest as set forth in Paragraph 48 herein, the Debtors, on their own behalf and on behalf of their Estates, admit, stipulate, acknowledge and agree as follows (Paragraphs G(i) through G(xvi) below are referred to, collectively, as the "<u>Debtors' Stipulations</u>"):

(i)   *Prepetition ABL Facility.*   Pursuant to that certain Revolving Credit Agreement, dated as of August 6, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition ABL Credit Agreement</u>") and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees (including that certain Guaranty Agreement, dated as of August 6, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL Guaranty</u>") (collectively, the "<u>Prepetition ABL Credit Documents</u>")), among Sungard AS III, the other

Debtor borrowers thereto, Holdings, as guarantor thereto, (collectively, the "Prepetition ABL Obligors") and PNC, as administrative agent and collateral agent (the "Prepetition ABL Agent" and, together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties") and the financial institutions party thereto from time to time as lenders (the "Prepetition ABL Lenders"), the Prepetition ABL Lenders provided secured financing to the Debtors.

(ii)    *Prepetition ABL Obligations*.  As of the Petition Date, pursuant to the Prepetition ABL Documents, the Debtors were indebted and jointly and severally liable to the Prepetition ABL Secured Parties for loans and advances in the aggregate principal amount of $29,000,000 outstanding and letters of credit issued and outstanding in the approximate aggregate amount of $11,050,000 under the Prepetition ABL Credit Documents million, together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Debtors' obligations pursuant to the Prepetition ABL Documents (the "Prepetition ABL Obligations").

(iii)    *Prepetition ABL Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition ABL Credit Documents, prior to the Petition Date, the Prepetition ABL Obligors granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, a security interest in and continuing lien (the "Prepetition ABL Liens") on all of their right, title and interest in substantially all of their assets (the "Prepetition Collateral").  The Prepetition ABL Liens securing the Prepetition ABL Obligations pursuant to the Prepetition ABL Credit Documents are (i) first priority with respect to the "ABL Priority Collateral" as defined

in that certain Second Amended and Restated Intercreditor Agreement, dated May 25, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>ABL/Term Loan Intercreditor Agreement</u>"), among the Prepetition ABL Agent, the Prepetition 1L Agent and the Prepetition 2L Agents and (ii) third priority with respect to the "Term Loan Priority Collateral," as defined in the ABL/Term Loan Intercreditor Agreement.

(iv)   *Validity, Extent, Perfection and Priority of Prepetition ABL Liens Securing Prepetition ABL Obligations.*  As of the Petition Date:  (a) the Prepetition ABL Liens on the Prepetition Collateral securing the Prepetition ABL Obligations were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (i) the Prepetition 1L Term Loan Liens (as defined below) and the Prepetition 2L Term Loan Liens (as defined below) as to the Term Loan Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement (collectively, the "<u>Term Loan Priority Liens</u>") and (ii) certain liens senior by operation of law and otherwise permitted by the Prepetition ABL Documents, but solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition ABL Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by Bankruptcy Code section 546(b) (the "<u>Prepetition ABL Permitted Liens</u>"); (c) the Prepetition ABL Obligations constitute legal, valid, binding and non-avoidable obligations of the Prepetition ABL Obligors enforceable in accordance with the terms of the applicable Prepetition ABL Credit Documents; (d) no offsets, recoupments, challenges,

11

objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition ABL Credit Documents; (f) the Debtors have waived, discharged and released any right to, and are forever barred from bringing any, Challenge (as defined below) to any of the Prepetition ABL Obligations, the priority of the Prepetition ABL Secured Parties' obligations thereunder and the legality, validity, extent and priority of the Prepetition ABL Liens; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of Bankruptcy Code sections 502 and 506.

(v)     *Prepetition 1L Term Loan Facility.*     Pursuant to that certain Credit Agreement, dated as of December 22, 2020, as amended or supplemented by that certain Amendment No. 1 to Credit Agreement, dated as of April 20, 2021, that certain Waiver to Credit Agreement, dated as of March 24, 2022, that certain Amendment No. 2 to Credit Agreement, dated as of April 7, 2022 (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition 1L Term Loan Credit Agreement" and, together with all related security agreements, collateral agreements,

pledge agreements, control agreements and guarantees, including that certain Guaranty Agreement, dated as of December 22, 2020, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition 1L Term Loan Guaranty") (collectively, the "Prepetition 1L Term Loan Documents"), among Sungard AS, Holdings, and the Debtor guarantors party thereto (collectively, the "Prepetition 1L Term Loan Obligors"), Alter Domus Products Corp. ("Alter Domus"), as administrative agent and collateral agent (in such capacities, the "Prepetition 1L Agent") and the financial institutions party thereto from time to time as lenders (the "Prepetition 1L Term Loan Lenders" and, together with the Prepetition 1L Agent, the "Prepetition 1L Term Loan Secured Parties"), the Prepetition 1L Term Loan Lenders provided secured term loans to the Debtors.

(vi)   *Prepetition 1L Term Loan Obligations*.  As of the Petition Date, pursuant to the Prepetition 1L Term Loan Documents, the Prepetition 1L Term Loan Obligors were indebted and jointly and severally liable to the Prepetition 1L Term Loan Secured Parties in the aggregate principal amount outstanding under the Prepetition 1L Term Loan Documents of approximately $108,023,409, together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Debtors' obligations pursuant to the Prepetition 1L Term Loan Documents, the "Prepetition 1L Term Loan Obligations," and the liens securing the Prepetition 1L Term Loan Obligations, the "Prepetition 1L Term Loan Liens").  The Prepetition 1L Term Loan Obligations include $7 million of principal plus accrued interest, premiums (if any), costs, fees, expenses and

other obligations incurred pursuant to that certain *Amendment No. 2 to Credit Agreement*, dated as of April 7, 2022 (the "<u>Bridge Financing Obligations</u>")

(vii)  *Prepetition Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition 1L Term Loan Credit Documents, prior to the Petition Date, the Debtors granted to the Prepetition 1L Agent, for the benefit of the Prepetition 1L Secured Parties, Prepetition 1L Term Loan Liens on the Prepetition Collateral to secure the Prepetition 1L Term Loan Obligations.

(viii) *Validity, Extent, Perfection and Priority of Prepetition 1L Term Loan Liens Securing Prepetition 1L Term Loan Obligations*.  As of the Petition Date:  (a) the Prepetition 1L Term Loan Liens on the Prepetition Collateral securing the Prepetition 1L Term Obligations were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition 1L Term Loan Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition 1L Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (x) the Prepetition ABL Agent's Prepetition Liens on the ABL Priority Collateral (the "<u>ABL Priority Liens</u>") and (y) certain liens senior by operation of law and otherwise permitted by the Prepetition 1L Term Loan Documents, but solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition 1L Term Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by Bankruptcy Code section 546(b) (the "<u>Prepetition Term Loan Permitted Liens</u>"); (c) the Prepetition 1L Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations of the Prepetition 1L Term Loan Obligors enforceable in accordance with the terms of the applicable Prepetition 1L Term Loan Credit Documents; (d) no

offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition 1L Term Loan Liens or Prepetition 1L Term Loan Obligations exist, and no portion of the Prepetition 1L Term Loan Liens or Prepetition 1L Term Loan Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition 1L Term Loan Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition 1L Term Loan Documents; (f) the Debtors have waived, discharged and released any right to, and are forever barred from bringing any, Challenge to any of the Prepetition 1L Term Loan Obligations, the priority of the Prepetition 1L Term Loan Secured Parties' obligations thereunder, and the legality, validity, extent and priority of the Prepetition 1L Term Loan Liens; and (g) the Prepetition 1L Term Loan Obligations constitute allowed, secured claims within the meaning of Bankruptcy Code sections 502 and 506.

(ix)   *Prepetition Existing 2L Term Loan Facility.*   Pursuant to that certain Junior Lien Credit Agreement, dated as of May 3, 2019, as amended by Amendment No. 1 as of August 1, 2020, as amended by Amendment No. 2 as of December 10, 2020, and as further amended by Amendment No. 3 as of December 22, 2020 (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition

Existing 2L Term Loan Credit Agreement" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements and guarantees, including that certain Guaranty Agreement, dated as of May 3, 2019, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Existing 2L Term Loan Guaranty") (collectively, the "Prepetition Existing 2L Term Loan Documents"), among Sungard AS III and Holdings and the other Debtor guarantors party thereto (which, for the avoidance of doubt, does not include Debtors Sungard Availability Services Holdings (Europe), Inc. or Sungard Canada), as guarantors (the "Prepetition Existing 2L Term Loan Guarantors" and, together with Sungard AS III and Holdings, the "Prepetition Existing 2L Term Loan Obligors"), Alter Domus, as administrative agent and collateral agent (in such capacities, the "Prepetition Existing 2L Agent") and the financial institutions party thereto from time to time as lenders (the "Prepetition Existing 2L Term Loan Lenders" and, together with the Prepetition Existing 2L Agent, the "Prepetition Existing 2L Term Loan Secured Parties"), the Prepetition Existing 2L Term Loan Lenders provided secured term loans to the Debtors.

(x)     *Prepetition New 2L Term Loan Facility.*  Pursuant to that certain Junior Lien Credit Agreement, dated as of December 22, 2020 (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition New 2L Term Loan Credit Agreement"[4] and, together with all related security agreements, collateral agreements, pledge agreements, control agreements and guarantees, including that certain Guaranty Agreement, dated as of December 22, 2020, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition New 2L Term Loan Guaranty") (collectively, the "Prepetition New 2L Term Loan

---

[4]   "Prepetition Term Loan Credit Agreements" means the Prepetition 1L Term Loan Credit Agreement, the Prepetition Existing 2L Term Loan Credit Agreement and the Prepetition New 2L Term Loan Credit Agreement.

Documents" and, together with the Prepetition Existing 2L Term Loan Documents, the "Prepetition 2L Term Loan Documents"), among Sungard AS III, Holdings, the other Debtor guarantors party thereto (collectively, the "Prepetition New 2L Term Loan Obligors" and, together with the Prepetition Existing 2L Term Loan Obligors, the "Prepetition 2L Term Loan Obligors"), Alter Domus, as administrative agent and collateral agent (in such capacities, the "Prepetition New 2L Agent" and, together with the Prepetition Existing 2L Agent, the "Prepetition 2L Agents") and the financial institutions party thereto from time to time as lenders (the "Prepetition New 2L Term Loan Lenders" and, together with the Prepetition New 2L Agent, the "Prepetition New 2L Secured Parties" and, together with the Prepetition Existing 2L Secured Parties, the "Prepetition 2L Secured Parties"),[5] the Prepetition New 2L Term Loan Lenders provided secured term loans to the Debtors.

(xi)    *Prepetition 2L Term Loan Obligations*.  As of the Petition Date, pursuant to (i) the Prepetition New 2L Term Loan Documents, the Prepetition New 2L Term Loan Obligors were indebted and jointly and severally liable to the Prepetition New 2L Term Loan Secured Parties in the aggregate principal amount outstanding under the Prepetition New 2L Term Loan Documents of approximately $277,662,988 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees and related expenses and disbursements), indemnification obligations and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Prepetition New 2L Term Loan Obligors' obligations pursuant

---

[5]    The Prepetition 1L Term Loan Lenders, the Prepetition Existing 2L Term Loan Lenders and the Prepetition New 2L Term Loan Lenders are, collectively, the "Prepetition Term Loan Lenders."  The Prepetition ABL Secured Parties, the Prepetition 1L Secured Parties and the Prepetition 2L Secured Parties are, collectively, the "Prepetition Secured Parties."

to the Prepetition New 2L Term Loan Credit Documents (the "Prepetition New 2L Term Loan Obligations") and (ii) the Prepetition Existing 2L Term Loan Documents, the Prepetition Existing 2L Term Loan Obligors were indebted and jointly and severally liable to the Prepetition Existing 2L Term Loan Secured Parties in the aggregate principal amount outstanding under the Prepetition Existing 2L Term Loan Documents of approximately $8,912,330 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Prepetition Existing 2L Term Loan Obligors' obligations pursuant to the Prepetition Existing 2L Term Loan Credit Documents, the "Prepetition Existing 2L Term Loan Obligations" and, together with the Prepetition New 2L Term Loan Obligations and the Prepetition 1L Term Loan Obligations, the "Prepetition Term Loan Obligations" and, the Prepetition Term Loan Obligations and the Prepetition ABL Obligations together, the "Prepetition Secured Obligations").

(xii) *Prepetition Existing 2L Liens and Prepetition Existing 2L Collateral.* As more fully set forth in the Prepetition Existing 2L Term Loan Credit Documents, prior to the Petition Date, the Prepetition Existing 2L Term Loan Obligors granted to the Prepetition Existing 2L Agent, for the benefit of the Prepetition Existing 2L Term Loan Secured Parties, prepetition liens securing the Prepetition Existing 2L Term Loan Obligations (the "Prepetition Existing 2L Term Loan Liens") on substantially all of the assets of the Prepetition Existing 2L Term Loan Obligors (the "Prepetition Existing 2L Collateral").

(xiii) *Prepetition New 2L Liens and Prepetition New 2L Collateral*. As more fully set forth in the Prepetition New 2L Term Loan Credit Documents, prior to the Petition Date, the Prepetition New 2L Term Loan Obligors granted to the Prepetition New 2L Agent, for the benefit of the Prepetition New 2L Term Loan Secured Parties, prepetition liens securing the Prepetition New 2L Term Loan Obligations (the "<u>Prepetition 2L New Term Loan Liens</u>" and, together with the Prepetition Existing 2L Term Loan Liens, the "<u>Prepetition 2L Term Loan Liens</u>") on the Prepetition Collateral.

(xiv) *Validity, Extent, Perfection and Priority of Prepetition 2L Term Loan Liens Securing Prepetition 2L Term Loan Obligations*. As of the Petition Date: (a) the Prepetition 2L Term Loan Liens on the Prepetition Existing 2L Collateral or the Prepetition Collateral, as applicable, securing the Prepetition 2L Term Loan Obligations were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition 2L Term Loan Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition 2L Term Loan Liens were senior in priority over any and all other liens on the Prepetition Existing 2L Collateral or the Prepetition Collateral, as applicable, subject only to (x) the ABL Priority Liens, (y) the Prepetition 1L Term Loan Liens and (z) certain liens senior by operation of law and otherwise permitted by the Prepetition 2L Term Loan Documents, but solely to the extent that any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition 2L Term Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by Bankruptcy Code section 546(b); (c) the Prepetition 2L Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations of the Prepetition 2L Term Loan Obligors enforceable in accordance with the terms of the applicable Prepetition

2L Term Loan Credit Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition 2L Term Loan Liens or Prepetition 2L Term Loan Obligations exist, and no portion of the Prepetition 2L Term Loan Liens or Prepetition 2L Term Loan Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition 2L Term Loan Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition 2L Term Loan Documents; (f) the Debtors have waived, discharged and released any right to, and are forever barred from bringing any, Challenge to any of the Prepetition 2L Term Loan Obligations, the priority of the Prepetition 2L Term Loan Secured Parties' obligations thereunder and the legality, validity, extent and priority of the Prepetition 2L Term Loan Liens; and (g) the Prepetition 2L Term Loan Obligations constitute allowed, secured claims within the meaning of Bankruptcy Code sections 502 and 506.

(xv)   *ABL/Term Loan Intercreditor Agreement*.  The Prepetition ABL Agent, the Prepetition 1L Agent and the Prepetition 2L Agents are parties to the ABL/Term Loan Intercreditor Agreement, which was acknowledged and agreed to by the Prepetition ABL Obligors, the Prepetition 1L Term Loan Obligors and the Prepetition 2L Term Loan Obligors and which governs the respective rights, obligations and priorities of the Prepetition ABL Secured

Parties, the Prepetition 1L Term Loan Secured Parties and the Prepetition 2L Term Loan Secured Parties with respect to the matters referred to therein. The ABL/Term Loan Intercreditor Agreement shall continue to govern the rights of the respective parties thereto.

(xvi) *1L/2L Term Loan Intercreditor Agreement*. The Prepetition 1L Agent and the Prepetition 2L Agents are parties to the Amended and Restated Intercreditor Agreement, dated December 22, 2020 (the "1L/2L Term Loan Intercreditor Agreement"), which was acknowledged and agreed to by the Prepetition 1L Term Loan Obligors and the Prepetition 2L Term Loan Obligors and which governs the respective rights, obligations and priorities of the Prepetition 1L Term Loan Secured Parties and the Prepetition 2L Term Loan Secured Parties with respect to the matters referred to therein. The 1L/2L Term Loan Intercreditor Agreement shall continue to govern the rights of the respective parties thereto.

H. **Releases**. Subject to Paragraph 48 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases, and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the DIP Secured Parties, the Prepetition Secured Parties and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings,

actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Documents and the Prepetition Credit Documents,[6] the obligations owing and the financial obligations made thereunder, the negotiation thereof and the transactions reflected thereby and the obligations and financial obligations made thereunder or otherwise related to the Debtors, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order. The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition 1L Term Loan Obligations, the Prepetition 2L Term Loan Obligations and the Prepetition ABL Obligations (together, the "Prepetition Obligations") that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

       (i)   *Cash Collateral*.  All or substantially all of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, cash obtained at any time thereafter (exclusive of proceeds of the DIP Facilities), securities or other property, wherever located, whether subject to control agreements or otherwise, whether as

---

[6]   The "Prepetition Credit Documents" are, collectively, the Prepetition ABL Credit Documents, Prepetition 1L Term Loan Credit Documents and the Prepetition 2L Term Loan Credit Documents.

original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

     **I.**        **Findings Regarding Postpetition Financing**

        (i)   *Request for Postpetition Financing*. The Debtors seek authority to (a) enter into the DIP Facilities on the terms described herein and in the DIP Documents and (b) use Cash Collateral on the terms described herein, in the DIP Term Sheets and the DIP Documents to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget. At the Final Hearing, the Debtors will seek approval of the Final Order, which shall be in form and substance acceptable to the Required ABL DIP Lenders, the Required Term Loan DIP Lenders and the Debtors. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

        (ii)   *Priming of the Prepetition Liens*. The priming of (x) the Prepetition 1L Term Loan Liens and the Prepetition 2L Term Loan Liens held by the Prepetition 1L Agent and Prepetition 2L Agents, respectively, (together, the "Prepetition Term Loan Agents") securing the Prepetition Term Loan Obligations (the "Prepetition Term Loan Liens") and (y) the Prepetition ABL Liens held by the Prepetition ABL Agent securing the Prepetition ABL Obligations, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facilities and to continue to operate their businesses for the benefit of their Estates and creditors. The Debtors would not be able to obtain debtor in possession financing in a sufficient amount without granting such priming liens. Consistent with the requirements of Bankruptcy Code section 364(d), the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order pursuant to Bankruptcy Code sections 361, 363 and

364, for any diminution in the value ("Diminution in Value") of their respective interests in the Prepetition Collateral (including Cash Collateral).

        (iii)   *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facilities and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) repay in full, in cash, the Bridge Financing Obligations, (ii) use $13.5 million of the Prepetition ABL Lenders' Cash Collateral to reduce the Prepetition ABL Obligations, (iii) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases and the Recognition Proceedings, (iv) fund any obligations benefitting from the Carve-Out and the Administration Charge (as defined in DIP Term Sheets and solely with respect to Sungard Canada in Canada), (v) permit the orderly continuation of the operation of their businesses, (vi) maintain business relationships with customers, vendors and suppliers, (vii) make payroll, (viii) satisfy other working capital and operational needs, and (ix) provide financial support for the UK administration process of Sungard Availability Services (UK) Limited's ("Sungard AS UK").  The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.  Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)  *No Credit Available on More Favorable Terms*.  The DIP Facilities are the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities.  Further, all Prepetition 1L Term Loan Lenders and Prepetition 2L Term Loan Lenders are adequately protected and/or have consented to the Debtors incurring debtor-in-possession financing, the priming of their respective Prepetition 1L Term Loan Liens and Prepetition 2L Term Loan Liens, and the use of their Cash Collateral, on the terms and subject to the conditions set forth in the Term Loan DIP Documents and this Interim Order.  The Prepetition ABL Lenders are similarly adequately protected and/or have consented to the Debtors incurring debtor-in-possession financing, the priming of their respective Prepetition ABL Liens, and the use of their Cash Collateral, on the terms and subject to the conditions set forth in the ABL DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in Bankruptcy Code sections 503(b), 507(a) and 507(b); (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein;

(2) superpriority claims and priming liens to the extent set forth in this Interim Order, the DIP

Term Sheets, and the DIP Documents; and (3) the other protections set forth in this Interim Order.

(v)  *Use of Cash Collateral and Proceeds of the DIP Facilities*.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facilities and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facilities shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget, subject to the Permitted Variances (as defined below).

(vi)  *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facilities and authorization to use Cash Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

(vii)  *Creeping ABL DIP Roll-Up*.

1.  Subject to the Challenge Period and effective immediately upon entry of the Interim Order, the first proceeds of all ABL Priority Collateral shall be deemed applied in reduction of the Prepetition ABL Obligations on a dollar for dollar basis and immediately advanced to the Debtors under the ABL DIP Facility (the "Creeping ABL DIP Roll-Up") until all such obligations have been repaid in full in cash and become ABL DIP Obligations.  Upon entry of the Interim Order, all letters of credit issued and outstanding as of the Petition Date shall be deemed terminated and re-issued under the ABL DIP Facility.  Upon entry of the Final Order, and solely to the extent that any Prepetition ABL Obligations remain outstanding, such obligations shall automatically be converted into principal obligations constituting ABL DIP Obligations without further action by

the Debtors or any other party (any such amount, together with all amounts rolled up pursuant to the Creeping ABL DIP Roll-Up, the "ABL DIP Roll-Up Obligations").

    (viii) *Term Loan DIP Roll-Up*

    1.    Subject to entry of the Final Order and the Challenge Period, the Term Loan DIP Lenders shall be entitled to roll up (the "Term Loan DIP Roll-Up") their ratable share of Prepetition Term Loan Obligations as follows.  For every dollar of New Money DIP Loans advanced by a Term Loan DIP Lender, such Term Loan DIP Lender shall be entitled to roll up two dollars of such Term Loan DIP Lender's Prepetition 1L Term Loan Obligations beneficially owned by it (or any of its Affiliates or Approved Funds (as each such term is defined in the Prepetition 1L Term Loan Credit Agreement)) as of the date of such roll-up until the ratio of New Money DIP Loans of such Term Loan DIP Lender to rolled up Prepetition 1L Term Loan Obligations of such Term Loan DIP Lender reaches 1:2; provided, that, if such Term Loan DIP Lender advances New Money DIP Loans in an aggregate amount that exceeds the amount of Prepetition 1L Term Loan Obligations of such Term Loan DIP Lender that such Term Loan DIP Lender would otherwise be able to roll up assuming a 1:2 ratio, such Term Loan DIP Lender shall be entitled to roll up that portion of such Term Loan DIP Lender's Prepetition 2L Term Loan Obligations beneficially owned by it (or any of its Affiliates or Approved Funds (as each such term is defined in the Prepetition 2L Term Loan Credit Agreement)) as of the date of such roll-up necessary to reach a 1:2 ratio (i.e., until such Term Loan DIP Lender has rolled up, in the aggregate, two dollars of combined Prepetition 1L Term Loan Obligations and Prepetition 2L Term Loan Obligations for every dollar of New Money DIP Loans advanced by such Term Loan DIP Lender); it being understood and agreed that any Term Loan DIP Lender may assign all or any portion of its right to roll up Prepetition 1L Term Loan Obligations or Prepetition 2L Term Loan Obligations to any of its

Affiliates or Approved Funds.  The aggregate amount of all Prepetition 1L Term Loan Obligations rolled up by the Term Loan DIP Lenders shall be the "1L Roll-Up Amount", the aggregate amount of all Prepetition 2L Term Loan Obligations rolled up by the Term Loan DIP Lenders shall be the "2L Roll-Up Amount" and the 1L Roll-Up Amount together with the 2L Roll-Up Amount shall be the "Term Loan Roll-Up Amount" and the obligations thereunder, the "Term Loan DIP Roll-Up Obligations" (and, together with the ABL DIP Roll-Up Obligations, the "DIP Roll-Up Obligations").

2. Subject to the entry of, and subject to the terms of, the Final Order as to the Term Loan DIP Roll-Up Obligations and upon entry of this Interim Order as to the Creeping ABL DIP Roll-Up, the conversion (or "roll-up") of relevant Prepetition Secured Obligations shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Secured Parties as DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facilities and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations.  Notwithstanding any other provision of this Interim Order, the Final Order, or the DIP Documents, all rights of the Prepetition Secured Parties shall be fully preserved.  The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Agents and the DIP Lenders would not be willing to provide the DIP Facilities or extend credit to the Debtors thereunder without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations. Moreover, the roll-up of (a) the Prepetition Term Loan Obligations into the Term Loan DIP Roll-Up Obligations upon entry of the Final Order and (b) the Prepetition ABL Obligations into ABL DIP Roll-Up Obligations upon entry of this Interim Order will enable the Debtors to obtain urgently needed financing to administer these Chapter 11 Cases and fund their operations.

(ix)     *Roll-Up Recharacterization*.  Following entry of the Final Order and in the event that the Term Loan DIP Obligations exceed the Collateral Realization Amount (as defined below), then an amount of Term Loan DIP Obligations in respect of the Term Loan Roll-Up Amount equal to such excess shall be automatically be recharacertized, first, as Prepetition 2L Term Loan Obligations and then, to the extent necessary, as Prepetition 1L Term Loan Obligations, until the Term Loan DIP Obligations equals the Collateral Realization Amount (the "Roll-Up Recharacterization").  The "Collateral Realization Amount" is the sum of (1) the cash proceeds realized by the Debtors from the closing of one or more Acceptable Sale(s) (as defined in the Restructuring Support Agreement) equal to or in excess of the Reserve Price (as defined in the Restructuring Support Agreement) and (2) the credit bid amount, if any, by the Term Loan DIP Lenders in connection with any consummated sale of Term Loan DIP Collateral to the Term Loan DIP Lenders or their designee.

J.     **Adequate Protection**.  In exchange for their consent to (i) the priming of the Prepetition Term Loan Liens by the Term Loan DIP Liens, (ii) the priming of the Prepetition ABL Liens by the ABL DIP Liens and (iii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Parties shall receive adequate protection to the extent of any Diminution in Value of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

K.     **Sections 506(c) and 552(b)**.  Upon entry of the Final Order, the Debtors waive, for the benefit of the Prepetition Secured Parties and the DIP Secured Parties (solely in their capacities as such) (a) the provisions of Bankruptcy Code section 506(c), (b) any "equities of the case" under

Bankruptcy Code section 552(b) and (c) the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or DIP Collateral, as applicable.

     L.      **<u>Good Faith of the DIP Secured Parties</u>**.

        (i)    *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facilities and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facilities are essential to the Debtors' Estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by Bankruptcy Code section 364(e).

        (ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  Based on the Motion, the First Day Declaration, the Hedus Declaration, the Nicholls Declaration and the record presented to the Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facilities, including the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by this Interim Order and DIP Documents and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances.

(iii)   *Good Faith Pursuant to Section 364(e)*.   The terms and conditions of the DIP Facilities and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.   Use of Cash Collateral and credit to be extended under the DIP Facilities shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition Secured Parties within the meaning of Bankruptcy Code section 364(e).

(iv)   *Consent to DIP Facilities and Use of Cash Collateral.* The Prepetition Secured Parties have consented, deemed to have consented or have not objected to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Documents solely in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

M.   **Good Cause**.   Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.   Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to meet payroll, maintain business relationships with customers, vendors and suppliers, satisfy working capital and operational needs, and pay other expenses necessary to maximize the value of the Estates.   The terms of the DIP Facilities, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

N.    **Immediate Entry**.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.    <u>DIP Financing Approved</u>.   The Motion is granted as set forth herein on an interim basis, entry into the DIP Facilities is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Documents.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

**DIP Facilities Authorization**

2.    <u>Authorization of the DIP Financing</u>.   The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order,

as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, any closing fees and commitment fees, as well as any reasonable and documented fees and disbursements of Proskauer Rose LLP, Gray Reed & McGraw LLP, Pryor Cashman LLP, Hunton Andrews Kurth LLP, Thompson Coburn Hahn & Hessen LLP and any other professionals retained by the DIP Agents (at the direction of the respective DIP Lenders), the Required Term Loan DIP Lenders or the Required ABL DIP Lenders (the "DIP Professionals"), as set forth herein and in the DIP Term Sheets, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents and such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

3.     Authorization to Borrow.  To prevent immediate and irreparable harm to the Debtors' Estates, and to enable the Debtors to continue to operate their businesses and preserve and maximize the value of their Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow (i) from the Term Loan DIP Lenders, the Interim Term Loan DIP Amount, subject to any limitations on, or conditions to, borrowing under the Term Loan DIP Documents and (ii) from the ABL DIP Lenders, the Interim

ABL DIP Amount subject to any limitations on, or conditions to, borrowing under the ABL DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to repay in full, in cash, the Bridge Facility Obligations, use $13.5 million of Cash Collateral to reduce the Prepetition ABL Obligations, provide working capital for the Debtors and pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents, and the Approved Budget.

4.      DIP Obligations.   The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations; *provided, however,* TopCo shall not be liable for any DIP Obligations other than the New Money Amount.  The DIP Obligations shall become due and payable, without notice or demand, on the applicable Termination Date (as defined below).  Except as provided in Paragraph 48, no obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligations or DIP Liens) to the DIP Secured Parties, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any

applicable law (including, without limitation, under Bankruptcy Code sections 502(d), 544, and 547 to 550 or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

        5.      <u>Term Loan DIP Collateral</u>.  To secure the Term Loan DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3), and 364(d), the Term Loan DIP Agent (for the benefit of the Term Loan DIP Lenders), is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "<u>Term Loan DIP Liens</u>") on the Term Loan DIP Collateral.  "<u>Term Loan DIP Collateral</u>" means, collectively, all assets of each Debtor and its Estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than assets, contracts, leases and other licenses solely to the extent a Term Loan DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be Term Loan DIP Collateral, and upon entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (but not such actions themselves); *provided, however,* the Term Loan DIP Collateral of TopCo shall be

available solely to secure the New Money Amount.  For the avoidance of doubt, Term Loan DIP Collateral shall include a pledge of the stock of any direct non-guarantor foreign subsidiary of any Debtor to the maximum extent permitted by law.

6.     ABL DIP Collateral.  To secure the ABL DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3), and 364(d), the ABL DIP Agent (for the benefit of the ABL DIP Lenders), is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "ABL DIP Liens") the ABL DIP Collateral.  "ABL DIP Collateral," means collectively, all assets of each Debtor (other than TopCo) and its Estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than assets, contracts, leases and other licenses solely to the extent a ABL DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be ABL DIP Collateral, and upon entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (but not the actions themselves).

7.     Term Loan DIP Liens.  The Term Loan DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the Term Loan DIP Liens shall be subject to the Carve-Out and the priorities set forth in Paragraph 9 below.  Other than as set forth herein or in the DIP Documents, the Term Loan DIP Liens shall not be made subject to or *pari*

*passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Term Loan DIP Liens shall not be subject to Bankruptcy Code section 510, 549, or 550.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the Term Loan DIP Liens.

8.    <u>ABL DIP Liens</u>.  The ABL DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien or claim to any of the ABL DIP Collateral, except that the ABL DIP Liens shall be subject to the Carve-Out and the priorities set forth in Paragraph 9 below.  Other than as set forth herein or in the DIP Documents, the ABL DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The ABL DIP Liens shall not be subject to Bankruptcy Code section 510, 549, or 550.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the ABL DIP Liens.

9.    <u>DIP Liens and Prepetition Liens</u>.  The Term Loan DIP Liens, the ABL DIP Liens, Prepetition Liens and liens granted hereunder as adequate protection for the Prepetition

Secured Parties, as addressed further herein, shall in each case be subject to the Carve-Out and otherwise have the following priority on the DIP Collateral and Prepetition Collateral at the applicable Debtor entities obligated on the applicable DIP Facility or Prepetition Secured Obligation:

| Term Loan Priority Collateral[7] | ABL Priority Collateral |
|---|---|
| Carve-Out | Carve-Out |
| Prepetition Term Loan Permitted Liens | Prepetition ABL Permitted Liens |
| Term Loan DIP Liens | ABL DIP Liens |
| Prepetition 1L Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens |
| Prepetition 1L Term Loan Liens | Prepetition ABL Liens |
| Prepetition 2L Term Loan Adequate Protection Liens | Term Loan DIP Liens |
| Prepetition 2L Term Loan Liens | Prepetition 1L Term Loan Adequate Protection Liens |
| ABL DIP Liens | Prepetition 1L Term Loan Liens |
| Prepetition ABL Adequate Protection Liens | Prepetition 2L Term Loan Adequate Protection Liens |
| Prepetition ABL Liens | Prepetition 2L Term Loan Liens |

10.     <u>DIP Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of this Interim Order, pursuant to Bankruptcy Code section 364(c)(1), the ABL DIP Lenders are hereby granted allowed superpriority administrative expense claims on account of the ABL DIP Obligations (the "<u>ABL DIP Superpriority Claims</u>" ) and the Term Loan DIP Lenders are hereby

---

[7]     Reference to Term Loan Priority Collateral and ABL Priority Collateral shall include, where applicable, the postpetition equivalents of such collateral.

granted allowed superpriority administrative expense claims on account of the Term Loan DIP Obligations (the "Term Loan DIP Superpriority Claims" and, together with the ABL DIP Superpriority Claims, the "DIP Superpriority Claims") in each of the Chapter 11 Cases and any Successor Cases (a) except as set forth herein (including with respect to the Carve-Out and the Administration Charge (solely with respect to Sungard Canada in Canada)), with priority over any and all administrative expense claims and any claims of any kind against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114, and any other provision of the Bankruptcy Code, as provided under Bankruptcy Code section 364(c)(1) and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other Estate representative to the extent permitted by law; *provided, however*, only the Term Loan DIP Superpriority Claims may be asserted against TopCo and only to the extent of the New Money Amount.

11.     <u>Term Loan DIP Roll-Up Obligations</u>.  Upon entry of the Final Order, and subject to the Roll-Up Recharacterization, Prepetition Term Loan Obligations in an aggregate amount equal to the Term Loan Roll-Up Amount shall be converted into principal obligations constituting Term Loan DIP Obligations, without any further action by the Debtors or any other party, in the amounts set forth in Paragraph I(vii) above.

12.     <u>ABL DIP Roll-Up Obligations</u>.  Upon entry of this Interim Order, the first proceeds of all ABL Priority Collateral shall be deemed applied in reduction of the Prepetition ABL Obligations on a dollar for dollar basis and deemed to have been immediately advanced to

the Debtors and converted into ABL DIP Obligations without any further action by the Debtors or any other party.   In addition, subject to the terms of, and upon entry, of the Final Order, any Prepetition ABL Obligations that remain outstanding as of the date of entry of the Final Order, if any, shall be deemed converted into ABL DIP Obligations without any further action by the Debtors or any other party.

13.    No Obligation to Extend Credit.  The DIP Secured Parties shall have no obligation to make any loan or advance under the relevant DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required Term Loan DIP Lenders or the Required ABL DIP Lenders, as applicable and, in accordance with the terms of the relevant DIP Documents.

14.    Use of Proceeds of DIP Facilities.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities only for the purposes specifically set forth in this Interim Order and the DIP Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents. Upon entry of this Interim Order (x) proceeds of the Term Loan DIP Facility shall be used for the indefeasible payment in full of all Bridge Financing Obligations and (y) proceeds of the Term Loan DIP Facility may be used to support the UK administration process of Sungard AS UK in an amount not to exceed $10 million, with the prior written consent of the Required Term Loan DIP Lenders.

(ii)    No Monitoring Obligation.   The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facilities, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facilities at any time is in accordance with the requirements of this Interim Order and the DIP Documents.

## Authorization to Use Cash Collateral

15.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date, which authorization shall enable the Debtors to, among other things, utilize $13.5 million of Cash Collateral to reduce the Prepetition ABL Obligations.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

16.    Consent of Prepetition Secured Parties.  The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facilities on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, including the priorities set forth in Paragraph 9 hereof, and (c) the Approved Budget.

17.    Adequate Protection for Prepetition ABL Secured Parties.  As adequate protection for any Diminution in Value of the Prepetition ABL Secured Parties' interest in the applicable Estates' interests Prepetition Collateral resulting from the use, sale, and lease of the Prepetition Collateral and the subordination of the Prepetition ABL Liens as and to the extent set forth in Paragraph 9 hereof, the Prepetition ABL Agent shall receive, for the benefit of the Prepetition ABL Secured Parties:

(a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(l) on the DIP Collateral (other than DIP Collateral at TopCo) (the "Prepetition ABL Adequate Protection Liens "), which (x) shall have the priority ascribed to such Prepetition ABL Adequate Protection Liens in Paragraph 9 hereof, and (y) shall not be made subject to or *pari passu* with any other lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to Bankruptcy Code sections 510, 549, or 550;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (other than in the Chapter 11 Case of TopCo) (the "Adequate Protection ABL Superpriority Claims"), subject only to (i) the Carve-Out and the Administration Charge (solely with respect to Sungard Canada in Canada),  (ii) as to the ABL Priority Collateral (and the postpetition equivalent thereof that constitutes DIP Collateral), the ABL DIP Obligations (including the ABL DIP Superpriority Claims), and (iii) as to the Term Loan Priority Collateral (and the postpetition equivalent thereof that constitutes DIP Collateral), the Term Loan DIP Obligations (including the Term Loan DIP Superpriority Claims), the Adequate Protection 1L Term Loan Superpriority Claims, and the Adequate Protection 2L Term Loan Superpriority Claims, pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind

or nature whatsoever as to and to the extent provided by Bankruptcy Code sections 503(b) and 507(b); and

(c) monthly reimbursement payments of the Prepetition ABL Agent's reasonable fees and expenses including professional fees of counsel (without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date).

18.     _Adequate Protection for Prepetition 1L Term Loan Secured Parties_.  As adequate protection for any Diminution in Value of the Prepetition 1L Term Loan Secured Parties' interest in the Prepetition Collateral resulting from use, sale, and lease of the Prepetition Collateral and the subordination of the Prepetition 1L Term Loan Liens as and to the extent set forth in Paragraph 9 hereof, the Prepetition 1L Term Loan Agent shall receive, for the benefit of the Prepetition 1L Term Loan Secured Parties:

(a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(l) on the DIP Collateral (other than DIP Collateral at TopCo) (the "Prepetition 1L Term Loan Adequate Protection Liens "), which (x) shall have the priority ascribed to such Prepetition 1L Term Loan Adequate Protection Liens in Paragraph 9 hereof, and (y) shall not be made subject to or _pari passu_ with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to Bankruptcy Code sections 510, 549, or 550;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (other than the Chapter 11 Case of TopCo) (the "Adequate Protection 1L Term Loan Superpriority Claims"), subject only to (i) the Carve-Out and the Administration Charge (solely with respect to Sungard Canada in Canada),  (ii) as to the ABL Priority Collateral (and the postpetition equivalent thereof that constitutes DIP Collateral), the ABL DIP Obligations (including the ABL DIP Superpriority Claims) and the Adequate Protection ABL Superpriority Claims and (iii) as to the Term Loan Priority Collateral (and the postpetition equivalent thereof that constitutes DIP Collateral), the Term Loan DIP Obligations (including the Term Loan DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by Bankruptcy Code sections 503(b) and 507(b); and

(c) monthly reimbursement payments of Prepetition 1L Agent's reasonable fees and expenses including professional fees of counsel (without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date) in accordance with paragraph 42 below.

19.     Adequate Protection for Prepetition 2L Term Loan Secured Parties.  As adequate protection for any Diminution in Value of the Prepetition 2L Term Loan Secured Parties' interest in the Prepetition Existing 2L Collateral or the Prepetition Collateral, as applicable, resulting from the use, sale, and lease of the Prepetition Collateral and the subordination of the

Prepetition 2L Term Loan Liens as and to the extent set forth in Paragraph 9 hereof, the Prepetition 2L Agents shall receive, for the benefit of the Prepetition 2L Term Loan Secured Parties:

(a) (i) as to the Prepetition Existing 2L Agent, continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(l) on the DIP Collateral at the entities obligated on the Prepetition Existing 2L Loans (the "Prepetition Existing 2L Term Loan Adequate Protection Liens "), which (x) shall have the priority ascribed to such Prepetition Existing Term Loan Adequate Protection Liens in Paragraph 9 hereof  and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to Bankruptcy Code sections 510, 549, or 550 and (ii) as to the Prepetition New 2L Agent, continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(l) on the DIP Collateral (other than DIP Collateral at TopCo) (the "Prepetition New 2L Term Loan Adequate Protection Liens" and, together with the Prepetition Existing Term Loan Adequate Protection Liens, the "Prepetition 2L Term Loan Adequate Protection Liens" and, collectively with the Prepetition ABL Adequate Protection Liens and the Prepetition 1L Term Loan Adequate Protection Liens, the "Replacement Liens"); and

(b) administrative superpriority expense claims in each of the Chapter 11 Cases of the applicable obligors on the Prepetition 2L Term Loans  (the "Adequate

45

Protection 2L Term Loan Superpriority Claims"), subject only to (i) the Carve-Out and the Administration Charge (solely with respect to Sungard Canada in Canada), (ii) as to the ABL Priority Collateral (and the postpetition equivalent thereof that constitutes DIP Collateral), the ABL DIP Obligations (including the ABL DIP Superpriority Claims), the Adequate Protection ABL Superpriority Claims, and the Adequate Protection 1L Term Loan Superpriority Claims and (iii) as to the Term Loan Priority Collateral (and the postpetition equivalent thereof that constitutes DIP Collateral), the Term Loan DIP Obligations (including the Term Loan DIP Superpriority Claims) and the Adequate Protection 1L Term Loan Superpriority Claims , pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by Bankruptcy Code sections 503(b) and 507(b).

20.    Adequate Protection Reservation.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the applicable Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**Provisions Common to DIP Financing and Use of Cash Collateral**

21.     Amendment of the DIP Documents.    The Debtors, the Term Loan DIP Agent (acting at the direction of the Required Term Loan DIP Lenders) and the ABL DIP Agent (acting at the direction of the Required ABL DIP Lenders) (or as otherwise provided in the DIP Documents) may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors and the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable, (or as otherwise provided in the DIP Documents) agree and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facilities, (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facilities, or (iii) change any event of default, add any covenants, or amend the covenants to be materially more restrictive; *provided*, *however*, any such amendment, waiver, consent, or other modification shall be served by the Debtors on the U.S. Trustee and counsel to any Committee two days in advance of its effectiveness, to the extent reasonably practicable.  No consent to any such amendment, waiver, consent or modification shall be implied by any action, inaction or acquiescence of the DIP Secured Parties.

22.     Approved Budget.

(i)     Attached to this Interim Order as **Exhibit C** is a 13-week budget approved by the Required Term Loan DIP Lenders and the Required ABL DIP Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "Approved Budget"). Commencing at 5:00 P.M. (Eastern Time) on the Wednesday of each full calendar week after the

Petition Date, and continuing at 5:00 P.M. (Eastern Time) on the Wednesday of every calendar week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the Required Term Loan DIP Lenders and Required ABL DIP Lenders, it shall become the "Approved Budget" for purposes of the DIP Documents, this Interim Order, and the Final Order (together with this Interim Order, the "DIP Orders").   Any amendments, supplements or modifications to the Approved Budget or an Approved Variance Report (as defined below) shall be subject to the prior written approval of counsel to the Required Term Loan DIP Lenders and counsel to the Required ABL DIP Lenders prior to the implementation thereof.  If the Required Term Loan DIP Lenders and/or the Required ABL DIP Lenders have not objected, in writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved Budget or an Approved Variance Report, within three (3) business days after their receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the Required Term Loan DIP Lenders and/or the Required ABL DIP Lenders.  Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the Required Term Loan DIP Lenders and Required DIP ABL Lenders, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

(ii)      The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facilities and Cash Collateral under this Interim Order shall be used by the Debtors solely in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order and the DIP Documents.

(iii)      Other than with respect to the Carve-Out and the Administration Charge (solely with respect to Sungard Canada in Canada), and except as provided in Paragraphs 37 and

38, none of the DIP Secured Parties' and the Prepetition Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facilities or Cash Collateral beyond the maturity date of the DIP Facilities or the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)    Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

23.    <u>Budget Reporting</u>.  The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances.   By not later than 5:00 PM (Eastern Time) on Wednesday of each calendar week following the Petition Date (the "<u>First Testing Date</u>"), and no later than 12:00 PM (Eastern Time) on each Wednesday thereafter (together with the First Testing Date, each a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Agents, the DIP Lenders and the advisors to the Committee (if any), a report, setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in the then-in-effect Approved Budget for the Testing Period (as defined below) (such report, the "<u>Weekly Variance Report</u>").  The term "<u>Testing Period</u>" means, with respect to the Weekly Variance Report required to be delivered, the prior four week period (except that no such variance reporting shall be required for the periods prior to the Petition Date).

24.    <u>Budget Testing</u>.  By not later than 12:00 PM Eastern Time on the First Testing Date and on each Wednesday thereafter (each such date, a "<u>Monthly Variance Testing Date</u>" and each such four-week period, the "<u>Monthly Testing Period</u>"), the Debtors shall provide to the DIP Agents, the DIP Lenders and the advisors to the Committee (if any) a report detailing:

(i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Monthly Testing Period for all operating disbursements, excluding fees and expenses of the professionals and advisors of the Debtors and any Committee; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Testing Period by the Debtors against the aggregate disbursements for the Monthly Testing Period, as set forth in the applicable Approved Budget (a "Monthly Variance Report" and, together with the Weekly Variance Report, the "Approved Variance Reports").  The Debtors shall comply with the following (collectively, the "Permitted Variances"):  as of any Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow all operating disbursements to be greater than (a) for the first eight (8) Weekly Variance Reports, 115% (on a cumulative basis taking into account the variance for any prior Testing Period), and (b) for each Weekly Variance Report thereafter, 110% (on a cumulative basis taking into account the variance for any prior Testing Period) of the estimated disbursement for such items in the Approved Budget (the "Variance Covenant"), each for such Monthly Testing Period; provided, however, there shall be no Variance Covenant for the first four weeks following the Petition Date.

25.     Modification of Automatic Stay.  The automatic stay of Bankruptcy Code section 362 is hereby modified to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

26.     Perfection of DIP Liens and Replacement Liens.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens, and the Replacement Liens, without the necessity of filing

or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agents (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) and the Prepetition Agents (as defined below) (for the benefit of the DIP Secured Parties and the Prepetition Secured Parties, respectively) are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agents and the Prepetition Agents all such financing statements, mortgages, notices and other documents as each may reasonably request.  The DIP Agents (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) and the Prepetition Agents may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.  To the extent that the Prepetition ABL Agent or Prepetition 1L Agent or Prepetition 2L Agents (collectively, the "Prepetition Agents") are, with respect to the

DIP Collateral, the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agents, as applicable, (for the benefit of the DIP Secured Parties) shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Agents shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Prepetition Agents' respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agents until the DIP Obligations have been indefeasibly repaid in full in cash, subject to lien priorities listed in Paragraph 9 of this Interim Order; *provided*, that the DIP Agents (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) may, in their sole discretion, require the Debtors and the Prepetition Agents to (and the Debtors and the Prepetition Agents shall) use commercially reasonable efforts to provide the DIP Agents, as applicable, with such possession or control as is necessary to perfect the DIP Obligations and DIP Liens.  Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for ten (10) business days to permit the DIP Agents (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) and the Prepetition Agents to enter into

any agreements or file any documents (including credit agreements, financing statements, mortgages, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agents and the Prepetition Agents to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.  Notwithstanding anything in the DIP Documents to the contrary, the ABL DIP Agent and the Term Loan DIP Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

27.     Access to Books and Records.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agents and the DIP Lenders all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agents and the DIP Lenders, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agents and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective senior management independent public accountants to the extent required by the DIP Documents or the Prepetition Credit Documents, and (iv) permit the DIP Secured Parties and their consultants, advisors and other representatives, to consult with the Debtors' management and advisors on

matters concerning the Debtors' businesses, financial condition, operations and assets, as provided for in the DIP Documents.

28.     <u>Proceeds of Subsequent Financing</u>.   If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facilities, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by (x) any Term Loan Priority Collateral (including any postpetition equivalents thereof), then all cash proceeds derived from such credit or debt shall immediately be turned over to the Term Loan DIP Agent (for the benefit of the Term Loan DIP Lenders) or (y) any ABL Priority Collateral (including any postpetition equivalents thereof), then all cash proceeds derived from such credit or debt shall immediately be turned over to the ABL DIP Agent (for the benefit of the ABL DIP Lenders), in each case to be distributed in accordance with the priorities set forth in Paragraph 9 of this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facilities) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full of the Prepetition Obligations, the Prepetition Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

29.     <u>Cash Management</u>.   The Debtors shall maintain their cash management system consistent with the terms and conditions of any interim and/or final order granting the Debtors authorization to continue their cash management systems and certain related relief (as amended, supplemented or otherwise modified, the "<u>Cash Management Order</u>"), the DIP Documents, and this Interim Order.

30.     <u>Maintenance of DIP Collateral</u>.   Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall insure the DIP Collateral as required under the DIP Documents or the Prepetition Credit Documents, as applicable.

31.     <u>Disposition of DIP Collateral</u>.   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral, other than (i) in the ordinary course of business, (ii) pursuant to bid procedures approved the Court in these Chapter 11 Cases in accordance with the Restructuring Term Sheet or (iii) as otherwise permitted by this Interim Order, the Final Order or the DIP Documents, without the prior consent of the Required Term Loan DIP Lenders and Required ABL DIP Lenders.

32.     <u>Termination Date</u>.   On the applicable Termination Date, all applicable DIP Obligations shall be immediately due and payable and, all commitments to extend credit under the applicable DIP Facilities will terminate.

33.     <u>Events of Default</u>. Until the DIP Obligations are indefeasibly paid in full and all commitments thereunder are terminated (the "<u>DIP Repayment</u>"), the occurrence of any of the following events, unless waived by the Required Term Loan DIP Lenders and/or Required ABL DIP Lenders, as applicable (or as otherwise provided in the DIP Documents), in writing (which may be by electronic mail) and in accordance with the terms of the DIP Documents, shall constitute

an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or, solely as to the Required Term Loan DIP Lenders, comply with any Milestones; (b) the occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheets or any other DIP Documents; and (c) the Debtors' failure to comply with paragraphs 14, 22, 23, 24, 27, 28, 29, 30 and 31 herein shall constitute Events of Default.

34.     Milestones. As a condition to the Term Loan DIP Facility, the Debtors have agreed to the milestones set forth on the attached **Exhibit D** hereto (the "Milestones").  For the avoidance of doubt, unless waived in writing by the Required ABL DIP Lenders and Required Term Loan DIP Lenders, the failure of the Debtors to meet the Milestones (other than the Required Term Loan DIP Lenders' obligation to provide the Reserve Price) by the applicable specified deadlines set forth therefor shall constitute an Event of Default under the Term Loan DIP Documents and this Interim Order.

35.     Rights and Remedies Upon Event of Default. Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion or notice to, hearing before, or order from the Court, other than, subject to the terms of this Interim Order: (a) the DIP Agents (at the direction of the applicable Required Term Loan DIP Lenders or Required ABL DIP Lenders , as applicable, or as otherwise provided in the DIP Documents) may send a written notice to the Debtors, counsel to any Committee, the Information Officer (solely with respect to Sungard Canada) and the U.S. Trustee  (any such declaration shall be referred to herein as a "Termination Declaration"), which shall be filed on the docket of the Chapter 11 Cases, declaring (1) all DIP Obligations owing under

the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facilities, (3) the termination of the DIP Facilities and the DIP Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) the DIP Agents (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Estates absent further order of the Court. The earliest date on which a Termination Declaration is delivered by any DIP Agent (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) and filed on the Docket shall be referred to herein as the "Termination Date." Following a Termination Date, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facilities, absent further order of the Court. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to any Committee, and the U.S. Trustee. After the DIP Repayment, the Prepetition Agents shall be entitled to make a Termination Declaration with respect to the foregoing subclause (a)(4) in accordance with the same procedures set forth herein.

36.     <u>Emergency Hearing</u>.  Upon the delivery of a Termination Declaration, the Debtors, the Committee (if any), the applicable DIP Secured Parties and the applicable Prepetition Secured Parties consent to a hearing on an expedited basis to consider whether (a) an Event of Default has occurred and (b) any other appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral).  During the five (5) business days following the date a Termination Declaration is delivered (such five (5) business day period, the "<u>Remedies Notice Period</u>"), the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.  At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary or otherwise fashioned an appropriate remedy, including whether an Event of Default has occurred, the Debtors' right to use Cash Collateral shall immediately cease, unless otherwise provided herein, and the DIP Agents and DIP Lenders shall have the rights set forth immediately below.

37.     <u>Certain Rights and Remedies Following Termination Date</u>.  Following a Termination Date and upon either the expiration of the Remedies Notice Period or pursuant to an order of the Court (which may authorize the remedies set forth in this paragraph or any other appropriate remedy as then determined by the Court) upon an emergency motion by any DIP Agent (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) to be heard on no less than five (5) business days' notice (and the Debtors shall not object to such shortened notice) (the "<u>Termination Enforcement Order</u>"), the DIP Agents shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, the ABL/Term Loan Intercreditor Agreement, this Interim Order and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims based on the priorities set forth

in Paragraph 9 of this Interim Order and subject to the ABL/Term Loan Intercreditor Agreement, subject to the Carve-Out.  Following entry of the Termination Enforcement Order, except as otherwise ordered by the Court (including in any Termination Enforcement Order): (a) the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the applicable DIP Agent (for the benefit of the applicable DIP Secured Parties) one-hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents and this Interim Order (including the priorities set forth in Paragraph 9 of this Interim Order and the terms of the ABL/Term Loan Intercreditor Agreement); (b) the applicable DIP Agent (at the direction of the Required Term Loan DIP Lenders, Required ABL DIP Lenders or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to, (i) sell or otherwise dispose of all or any portion of the applicable DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) pursuant to Bankruptcy Code section 363 (or any other applicable provision) on terms and conditions pursuant to Bankruptcy Code sections 363, 365, and other applicable provisions of the Bankruptcy Code and the ABL/Term Loan Intercreditor Agreement, and (ii) assume and assign any lease or executory contract included in the applicable DIP Collateral to the DIP Agent's designees in accordance with and subject to Bankruptcy Code section 365, (c) the applicable DIP Agent (at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable) may direct the Debtors to (and the Debtors shall comply with such direction to) dispose of or liquidate the applicable DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property subject to the terms of the ABL/Term Loan

Intercreditor Agreement, (d) the applicable DIP Agent may (at the direction of the Required Term Loan DIP Lenders or ABL DIP Lenders, as applicable), or may direct the Debtors to, (and the Debtors shall comply with such direction to) collect accounts receivable, without setoff by any account Debtor  subject to the terms of the ABL/Term Loan Intercreditor Agreement, (e) the applicable DIP Agent (for the benefit of the applicable DIP Secured Parties) shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production of any inventory with respect to the applicable DIP Collateral, and (f) the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Secured Parties in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Secured Parties in a manner consistent with the priorities set forth in Paragraph 9 of this Interim Order and the ABL/Term Loan Intercreditor Agreement.

38.     <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under the Interim Order, the DIP Documents, the ABL/Term Loan Intercreditor Agreement and applicable law, after the occurrence of a Termination Date and the entry of a Termination Enforcement Order, and subject to Paragraph 48, for the purpose of exercising any remedy with respect to the DIP Collateral (in accordance with the priorities in Paragraph 9 of this Interim Order and the ABL/Term Loan Intercreditor Agreement), the applicable DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) (collectively, the "<u>Enforcement Agents</u>") shall have the right (to be exercised at the direction of the Required Term Loan DIP Lenders or ABL DIP Lenders, as applicable), at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors, (ii) enter into the premises of any Debtor in

connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, to complete any work in process), and (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided, however*, the Enforcement Agents may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) landlord waivers or consents, (c) the terms of the ABL/Term Loan Intercreditor Agreement or (d) further order of this Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; provided, however, the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy law and the ABL/Term Loan Intercreditor Agreement.   The Enforcement Agents will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupy any real property or use the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupy or use such assets or properties).   Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this paragraph.

    39.   Carve-Out.   Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Replacement Liens, the Adequate Protection Superpriority Claims and the Prepetition Secured Obligations shall be subject to payment of the Carve-Out (defined below).

(i)        "Carve-Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under Bankruptcy Code section 726(b) in an amount not exceed $75,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all (A) fees, disbursements, costs and expenses (including, for the avoidance of doubt any success fee, transaction fee, deferred fee or other similar fee set forth in the engagement letter of Houlihan Lokey and DH Capital, (the "Allowed Debtor Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code section 327, 328 or 363 (collectively, the "Debtor Professionals") and (B) subject to the Approved Budget, all fees, disbursements, costs and expenses (the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, collectively, the "Allowed Professional Fees") incurred by persons or firms retained by any Committee pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Term Loan DIP Agent, at the direction of the Required Term Loan DIP Lenders, of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (these clauses (i) through (iii), the "Pre-Carve Out Amounts"); and (iv) after the first business day following delivery by the Term Loan DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by the Professional Persons (and for the Committee Professionals, subject to the Approved Budget) in an aggregate amount not to exceed $2,000,000 (the amounts set forth in this clause (iv) being the "Post-Carve Out

Trigger Notice Cap"), and together with the Pre-Carve Out Amounts, the "Carve-Out Amount").

For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered

by email (or other electronic means) by  the Term Loan DIP Agent, at the direction of the Required

Term Loan DIP Lenders, to the Debtors, their lead restructuring counsel, the United States Trustee,

counsel to the ABL Agent, counsel to the Prepetition Agents and counsel to the Committee (if any),

which notice may be delivered following the occurrence and during the continuation of an Event

of Default (as defined below) and acceleration of the DIP Obligations under the DIP Facilities,

stating that the Post-Carve Out Trigger Notice Cap has been invoked.  No portion of the Carve-

Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facilities, including

any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out,

shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses

incurred by any person, including, without limitation, any Committee, in connection with

challenging the DIP Secured Parties' or the Prepetition Secured Parties' liens or claims,

preventing, hindering or delaying any of the DIP Secured Parties' or the Prepetition Secured

Parties' enforcement or realization upon any of the DIP Collateral, the filing of any chapter 11 plan

or related disclosure statement not consented to by the Required Term Loan DIP Lenders and the

Required ABL DIP Lenders, other than a chapter 11 plan that indefeasibly satisfies the Term Loan

DIP Obligations and the ABL DIP Obligations in full in cash, the filing of any motion seeking

approval of a sale of any Term Loan DIP Collateral without the consent of the Required Term Loan

DIP Lenders, other than a sale that indefeasibly satisfies the Term Loan DIP Obligations in full in

cash, the filing of any motion seeking approval of a sale of any ABL DIP Collateral without the

consent of the Required ABL DIP Lenders, other than a sale that indefeasibly satisfies the ABL

DIP Obligations in full in cash, or initiating or prosecuting any claim or action against any DIP

Secured Party or Prepetition Secured Party; *provided* that, notwithstanding the foregoing, proceeds from the DIP Facilities and/or Cash Collateral not to exceed $50,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition ABL Obligations and the Prepetition Term Loan Obligations (together, the "Prepetition Facilities") and Prepetition Secured Parties (but not the DIP Facilities and DIP Secured Parties).

(ii)     Carve-Out Reserve.  Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Facilities or cash on hand into a segregated account (the "Funded Reserve Account") held by PNC in trust for the benefit of Professional Persons an amount equal to the aggregate amount of the estimated accrued fees of Professional Persons, based on the estimates provided weekly, (the "Weekly Fee Estimates"), remaining unpaid as of the Friday of the preceding week (and not previously funded to the Funded Reserve Account). Promptly after the delivery of the Carve Out Trigger Notice, the Debtors shall fund from the Term Loan DIP Facility or cash on hand into the Funded Reserve Account an amount equal to (i) the aggregate amount of estimated accrued and unpaid fees of Professional Persons incurred before or on the first business day following delivery by the Term Loan DIP Agent, at the direction of the Required Term Loan DIP Lenders, of a Carve Out Trigger Notice (to the extent not previously funded to the Funded Reserve Account) and (ii) the Post-Carve Out Trigger Notice Cap.

(iii)     The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees and other obligations included within the Carve-Out as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; *provided* that when all Allowed

Professional Fees have been paid in full (regardless of when such Allowed Professional Fees are allowed by the Court), any funds remaining in the Funded Reserve Account shall revert to the Term Loan DIP Agent for the benefit of the Term Loan DIP Lenders.  Funds transferred to the Funded Reserve Account shall be subject to the Term Loan DIP Liens, Term Loan DIP Superpriority Claims, Replacement Liens, and Adequate Protection Superpriority Claims granted hereunder to the extent of such reversionary interest; *provided*, that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out.[8]

(iv)     Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or any other Court order, the Funded Reserve Account and the amounts on deposit in the Funded Reserve Account shall be available and used only to satisfy obligations of Professionals Persons benefitting from the Carve-Out, and the other obligations that are a part of the Carve-Out. The failure of the Funded Reserve Account to satisfy Professional Fees in full shall not affect the priority of the Carve-Out; provided that, to the extent that the Funded Reserve Account is actually funded, the Carve-Out shall be reduced by such funded amount dollar-for-dollar.  In no way shall the Carve-Out, Funded Reserve Account or the Approved Budget or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(v)     <u>Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Carve-Out

---

[8]     The allocation of funding of the Post-Carve Out Trigger Cap from ABL Priority Collateral and Term Loan Priority Collateral will be determined by good faith negotiation between the Required Term Loan DIP Lenders and the Required ABL DIP Lenders or by order of the Court.

Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve-Out Trigger Notice Cap.

(vi)     <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>. None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

40.     <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Interim Order</u>.  The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by Bankruptcy Code section 364(e).  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties and Prepetition Secured Parties are entitled to the protections provided in Bankruptcy Code section 364(e).  Any such modification, amendment or vacate shall not affect

the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

41.     Approval of DIP Fees.   In consideration for the DIP Facilities and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, commitment fees, original issue discounts, extension fees and the reasonable and documented fees and expenses of the DIP Secured Parties in connection with the relevant DIP Facility, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "DIP Fees").   The DIP Fees shall be fully earned and payable in accordance with the terms of the DIP Documents, without the need for any further order of this Court.   The DIP Fees shall be part of the DIP Obligations.   Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facilities in each case is hereby approved in full.

42.     DIP Lender Professionals' Fees.   Professionals for the DIP Secured Parties (the "DIP Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses.   The DIP Lender Professionals shall submit copies of summary invoices to the Debtors, the U.S. Trustee, and counsel for any Committee.   The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.   If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the fees and expenses of any DIP Lender

Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, then the Debtors, U.S. Trustee, or any Committee, as the case may be, shall file with this Court and serve on such DIP Lender Professional an objection (the "Fee Objection"), and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the DIP Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

43.    Indemnification.    The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's gross negligence, actual fraud, or willful misconduct as determined in a final order by a court of competent jurisdiction.

44.    Right to Credit Bid.    To the fullest extent permitted by and subject to Bankruptcy Code section 363(k), in connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to Bankruptcy

Code section 363, any plan of reorganization or plan of liquidation under Bankruptcy Code section 1129, or a sale or disposition by a chapter 7 trustee for any of the Debtors under Bankruptcy Code section 725 (any of the foregoing sales or dispositions, a "Sale"):  (i) the ABL DIP Lenders shall have the unconditional right to credit bid the outstanding ABL DIP Obligations and Prepetition ABL Obligations, including any accrued interest and expenses, in a Sale (including any deposit in connection with such sale), on a dollar-for-dollar basis in connection with any disposition of estate property that is ABL Priority Collateral (or the postpetition equivalent thereof), subject to the priorities as set forth herein; (ii) the Term Loan DIP Agent (at the direction of the Required Term Loan DIP Lenders) shall have the unconditional right to credit bid the outstanding Term Loan DIP Obligations (including the Roll-Up Amounts, subject to entry of the Final Order) and Prepetition Term Loan Obligations, including any accrued interest and expenses, in a Sale (including any deposit in connection with such sale), on a dollar-for-dollar basis in connection with any disposition of estate property that is Term Loan Priority Collateral (or the postpetition equivalent thereof); (iii) unless otherwise permitted in the ABL/Term Loan Intercreditor Agreement, no obligations of the Debtors under the Term Loan DIP Facility or the Prepetition Term Loan Facilities may be credit bid for the purchase price of any ABL Priority Collateral; (iv) unless otherwise permitted in the ABL/Term Loan Intercreditor Agreement, no obligations of the Debtors under the ABL DIP Facility or the Prepetition ABL Facility may be credit bid for the purchase price of any Term Loan Priority Collateral; and (v) if any Sale includes both prepetition or postpetition ABL Priority Collateral and Term Priority Collateral and the DIP Secured Parties and Prepetition Secured Parties, as applicable, are unable after negotiating in good faith to agree on the allocation of the purchase price between the prepetition or postpetition ABL Priority Collateral and Term Priority Collateral, any of such agents may apply to the Court to make a determination

of such allocation.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, any credit bid made by the Consenting Stakeholder Purchaser (as defined in the Restructuring Support Agreement) through the credit bid rights described herein shall not exceed the applicable Reserve Price to be established in accordance with the Restructuring Support Agreement.

45.     <u>Proofs of Claim</u>.   Neither the DIP Secured Parties nor the Prepetition Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Documents or the Prepetition Credit Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties and the Prepetition Secured Parties with regard to all claims arising under the DIP Documents and the Prepetition Credit Documents, and, as a result, the Prepetition Obligations shall be deemed allowed for all purposes in accordance with Bankruptcy Code section 502(a).

46.     <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. Except as otherwise permitted in this Interim Order and the Approved Budget (including with respect to the Investigation), the DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out (including the Post-Carve Out Trigger Notice Cap) may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral other than (i) in the ordinary course of business, (ii) in accordance with bid procedures to be approved by the Court in accordance with the Restructuring Support Agreement or (iii) with the prior written consent of the Required Term Loan DIP Lenders or Required ABL

DIP Lenders, as applicable; (c) using or seeking to use, outside the ordinary course of business, any insurance proceeds constituting DIP Collateral without the prior written consent of the applicable Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable; (d) incurring any indebtedness without the prior written consent of the applicable Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable, except to the extent permitted under the DIP Documents; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Credit Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition Liens or the Prepetition Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, the Prepetition Obligations, or any other rights or interests of the DIP Secured Parties or the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition Obligations.

47.    <u>Turn Over.</u>   Prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the commitment in accordance with the DIP Documents, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition Secured Parties) receives or is paid the proceeds of any DIP Collateral other than as expressly permitted in the DIP Documents and this Interim Order, such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the applicable DIP Secured Parties and shall immediately turn over such amounts to the applicable DIP Agent for distribution to the applicable DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

48.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in Paragraph G and releases in Paragraph H hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order and upon their Estates upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other party-in-interest, including any Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than the earlier of (x) June 26, 2022, (y) with respect to parties in interest with requisite standing other than any Committee, seventy-five (75) calendar days following the date of entry of the Interim Order and (z) with respect to any Committee, sixty (60) calendars days after the date of formation of the Committee, (such time period established by the earlier of clauses (x), (y) and (z) shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the

termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "Challenge"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "Challenge Period Termination Date") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"); *provided, however*, the Challenge Period Termination Date may be extended for cause by order of the Court..  The filing of a motion seeking standing to file a Challenge before expiration of the Challenge Period, which attaches a proposed Challenge, shall extend the Challenge Period with respect to solely that party until two (2) business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, notion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Obligations shall be deemed to be fully allowed claims within the

meaning of Bankruptcy Code section 506, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided*, that all other stipulations (other than those subject to a successful Challenge) shall remain binding on any Committee or other party-in-interest.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 48 or to require or permit an extension of the Challenge Period Termination Date.  To the extent any such Challenge is timely and properly commenced, the Prepetition Agent and any other Prepetition Secured Party shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves and the other Prepetition Secured Parties in any such proceeding as adequate protection, except if a Challenge results in a determination that any part of the prepetition secured liens or encumbrances are invalid.  Notwithstanding anything to the contrary herein, Challenges

may be brought against the DIP Roll-Up Obligations, and the Court may order appropriate relief in the event of any Successful Challenge to the DIP Roll-Up Obligations.

49.     No Third-Party Rights.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

50.     No Lender Liability.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties shall (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2).

51.     Section 506(c) Claims.  Subject to entry of a Final Order and as a further condition of the DIP Facilities and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents and for the consensual use of Cash Collateral of the Prepetition Secured Parties (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor

Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to Bankruptcy Code section 105 or section 506(c) or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties.

52.     No Marshaling.   Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

53.     Section 552(b).  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable.

54.     Limitation on Liability. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition, the DIP Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising

in any manner or fashion from any cause, (iii) any Diminution in Value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person.

55.     <u>Release of DIP Secured Parties</u>.   Upon entry of this Interim Order and subject to Paragraph 48, the Debtors, on their own behalf and their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations, other than any Challenge with respect to the DIP Roll-Up Obligations.

56.     <u>Insurance Proceeds and Policies</u>.   Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agents (for the benefit of the DIP Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

57.     <u>Key Employee Incentive Program and Key Employee Retention Program Carve Out</u>.  The cash proceeds realized by the Debtors from the closing of one or more Acceptable Sale(s) (as defined in the Restructuring Support Agreement), other than a credit bid sale to the

Consenting Stakeholder Purchaser (as defined in the Restructuring Support Agreement), equal to or in excess of the Reserve Price (as defined in the Restructuring Support Agreement) shall be available to the Debtors in an amount sufficient to fund all amounts due under a key employee incentive plan and key employee retention plan, which plans shall be in form and substance reasonably acceptable to the Required Term Loan DIP Lenders and approved by the Court.

58.     No Waiver by Failure to Seek Relief.  The failure of the DIP Secured Parties or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

59.     Binding Effect of Interim Order.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

60.     Discharge.  Except as otherwise agreed in writing by the applicable DIP Agent (acting at the direction of the Required Term Loan DIP Lenders or ABL DIP Lenders, as applicable) and the applicable Prepetition Agent (acting at the direction of applicable Prepetition Secured Parties), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of

Bankruptcy Code section 1141(d), unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, "payment in full" as provided by the DIP Documents), on or before the effective date of such confirmed plan of reorganization.

61.     <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder; *provided*, that TopCo shall not be liable for any DIP Obligations other than the New Money Amount.

62.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facilities, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facilities which survive such discharge by their terms), and all commitments to extend credit under the DIP Facilities are terminated; and (ii) in respect of the Prepetition Facilities, all of the Prepetition Obligations pursuant to the Prepetition Credit Documents and this Interim Order, have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in the

Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Obligations have been indefeasibly paid in full.

63.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts with any provision of the Motion, the DIP Term Sheets or any DIP Document (executed as of the date of this Interim Order), the provisions of this Interim Order shall control.

64.     <u>Final Hearing</u>. The Final Hearing on the Motion shall be held on May 11 2022, at 10:30 a.m., prevailing Central Time; <u>provided</u> that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the consent of the DIP Agents (acting at the direction of the Required Term Loan DIP Lenders or Required ABL DIP Lenders, as applicable).  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court.  Any objections or responses to entry of the Final Order shall be filed on or before 4:00 p.m., prevailing Central Time, on May 4, 2022.

65.     <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Order and the transactions contemplated hereby.

66.     <u>Enforceability</u>.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

67.     <u>Headings</u>. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

68.     <u>Retention of Jurisdiction</u>.   This Court retains jurisdiction with respect to all matters arising from or related to the DIP Documents and the implementation of this Interim Order and to enforce the same.

**Signed:  April 12, 2022.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>EXHIBIT A</u>**

**ABL DIP Term Sheet**

SUNGARD AVAILABILITY SERVICES
DEBTOR-IN-POSSESSION REVOLVING CREDIT FACILITY
SUMMARY OF TERMS AND CONDITIONS

This Term Sheet provides an outline of a proposed superpriority senior secured debtor-in-possession revolving credit financing facility.  This Term Sheet is for discussion purposes only, and is non-binding, and is neither an expressed nor implied offer with regard to any financing, to arrange, provide or purchase any loans in connection with the transactions contemplated hereby or to arrange, provide or assist in arranging or providing the potential financing described herein.  Without limiting the generality of the foregoing, proposals contained herein shall be subject to, among other things, completion of due diligence.  Any agreement to provide the DIP Facility or any other financing arrangement shall be subject to definitive documentation acceptable to the DIP Agent and DIP Lenders (as defined below), each acting in its sole discretion.

| | |
|---|---|
| Borrowers: | Sungard AS New Holdings III, LLC (the "Company") and its direct and indirect subsidiaries (a) other than Sungard Availability Services (Canada) Ltd. (the "Canadian Borrower") that as borrowers (the "U.S. Borrowers") are parties to that certain Revolving Credit Agreement dated as of August 6, 2019 (as amended, amended and restated, supplemented or otherwise modified, the "Prepetition ABL Credit Agreement"[1], and the facility documented thereunder, the "Prepetition ABL Facility"), by and among the Company, as parent, the borrowers party thereto, the guarantors party thereto, and lenders party thereto and PNC Bank, National Association, as administrative agent and collateral agent (in such capacity, the "Prepetition ABL Agent", as debtors and debtors-in-possession in cases (the "Cases") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") to be commenced in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") (the date of commencement of the Cases, the "Petition Date"), and (b) the Canadian Borrower (together with the U.S. Borrowers, the "Borrowers"), which shall be a debtor in the Cases and which shall commence proceedings under Part IV of the Companies' Creditors Arrangement Act (Canada) in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to recognize the Canadian Borrower's chapter 11 Case in Canada (the "Recognition Proceeding).  The obligations of the Borrowers shall be joint and several. |
| Guarantor: | Sungard AS New Holdings II, LLC, as debtor and debtor-in-possession in the Cases (the "Guarantor", and together with the Borrowers, the "Debtors")).  All obligations of the Borrowers |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Prepetition ABL Credit Agreement.

| | |
|---|---|
| | under the ABL DIP Facility shall be unconditionally guaranteed on a joint and several basis by the Guarantor. |
| <u>Type and Amount of the DIP Facility:</u> | A senior secured superpriority priming debtor-in-possession credit facility (the "<u>DIP ABL Facility</u>" and the loans under the DIP Facility, the "<u>DIP ABL Loans</u>") comprised of a roll-up of the Prepetition Revolving Advances and Swing Loans (if any) and any unused commitments under the Prepetition ABL Credit Agreement, on a dollar-for-dollar basis, into new loans or commitments, as applicable, including without limitation all outstanding letters of credit, under such facility, in aggregate principal amount not to exceed $50,000,000.<br><br>The DIP ABL Loans may be incurred, subject to the satisfaction or waiver of all conditions thereto set forth in the Definitive Financing Documentation (as defined below), as follows: (a) following the entry by the Bankruptcy Court of an order (the "<u>Interim DIP Order</u>"), in form and substance acceptable to the DIP ABL Lenders, authorizing the DIP ABL Facility on an interim basis (the "<u>Interim DIP Order Entry Date</u>") in an aggregate principal amount up to the amount of the Obligations under the Prepetition ABL Facility ("<u>Prepetition ABL Obligations</u>") (the "<u>Interim DIP Funding</u>") and (b) on and after the entry by the Bankruptcy Court of a final order (the "<u>Final DIP Order</u>" and together with the Interim DIP Order, the "<u>DIP Order</u>"), in form and substance acceptable to the DIP ABL Lenders, authorizing the DIP ABL Facility on a final basis (the "<u>Final DIP Order Entry Date</u>").<br><br>The Interim DIP Order shall provide, among other things, that (a) $13,500,000 of Cash of the Debtors maintained in a deposit account with and controlled by the Prepetition ABL Agent shall be repaid to the ABL Lenders upon entry of the Interim DIP Order and applied on a dollar-for-dollar basis as a permanent reduction to the Maximum Revolving Advance Amount, subject to the rights of third parties with respect to a Challenge (as defined below, and (b) the first proceeds of all Receivables constituting ABL Priority Collateral (and the postpetition equivalents thereof) and other ABL Priority Collateral (as defined below) (other than, for the avoidance of doubt, proceeds from the Term Loan DIP Facility) shall be deemed applied in reduction of the Prepetition ABL Obligations on a dollar for dollar basis and immediately deemed advanced to the Debtors under the DIP ABL Facility (subject to the limitations on advances set forth in Section 2.01(a) of the Prepetition ABL Credit Agreement) (the "<u>Creeping ABL Roll-Up</u>") until all such obligations have been repaid in full in cash and become indebtedness and obligations under the DIP ABL Facility |

| | |
|---|---|
| | (the "<u>DIP ABL Obligations</u>"), subject to the rights of third parties with respect to a Challenge below.  The Final DIP Order shall provide, among other things, that any remaining Prepetition ABL Obligations shall be deemed repaid by an advance made to the Debtors under the DIP ABL Facility following entry of the Final DIP Order, subject to the rights of third parties with respect to a Challenge.<br><br>All DIP ABL Loans and DIP ABL Obligations shall accrue interest at an interest rate per annum equal to the sum of three percent (3.00%) per annum plus the Alternate Base Rate, subject to the provisions of the Prepetition ABL Credit Agreement with respect to the Default Rate upon the postpetition occurrence and continuance of an Event of Default (as defined below).<br><br>Advance Rates shall be as set forth in the Prepetition ABL Credit Agreement.<br><br>DIP ABL Facility Closing Fee shall be $365,000, earned upon entry of the Interim DIP Order.<br><br>The Availability Block Amount shall be $5,000,000.<br><br>The Letter of Credit Sublimit shall be as set forth in the Prepetition ABL Credit Agreement.  Letter of Credit Fees shall be as set forth in the Prepetition ABL Credit Agreement, except that the fee referred to in clause (x) of Section 2.23(a) thereof shall be the aggregate daily face amount of each outstanding Letter of Credit multiplied by 4.00%.  All Letters of Credit issued under the Prepetition ABL Facility and outstanding on the Petition Date shall be deemed terminated and re-issued under the DIP ABL Facility.<br><br>All post-petition collections of Receivables shall be deposited or transferred into the Controlled Account. |
| <u>DIP ABL Lenders</u>: | PNC Bank, National Association. |
| <u>DIP ABL Agent</u>: | PNC Bank, National Association, as administrative agent and collateral agent (in such capacity, the "<u>DIP ABL Agent</u>"). |
| <u>Maturity</u>: | All obligations under the DIP ABL Facility shall be due and payable in full in cash on the earliest of (i) the Stated Maturity Date (as defined below); (ii) the date that is thirty (30) calendar days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court on or before such date; (iii) the effective date of any chapter 11 plan for the reorganization of any |

| | |
|---|---|
| | Debtor; (iv) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code §363; and (v) the date of the acceleration of the DIP ABL Loans and the termination of the DIP ABL Commitments in accordance with the Definitive Financing Documentation (such earliest date, the "<u>DIP Termination Date</u>"). The principal of, and accrued interest on, the DIP ABL Loans and all other amounts owing to the DIP ABL Agent and the DIP ABL Lenders under the DIP ABL Facility shall be payable on the DIP Termination Date.  "<u>Stated Maturity Date</u>" shall have the meaning set forth in the Term Loan DIP Term Sheet. |
| <u>Purpose</u>: | In accordance with the then current Approved Budget and Permitted Variances (each as defined in the Term Loan DIP Term Sheet), the proceeds of the DIP ABL Loans under the DIP ABL Facility shall be used only for the following purposes: (i) payment of certain prepetition amounts in accordance with the then current Approved Budget (including prepetition payments to certain critical vendors identified by the Debtors, to the extent set forth in the Approved Budget) and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Debtors, which orders shall be in form and substance satisfactory to the DIP ABL Lenders; (ii) to the extent set forth in the then current Approved Budget and in accordance with the terms of the DIP ABL Facility and the DIP Order, (a) payment of working capital and other general corporate needs of the Debtors in the ordinary course of business, and (b)  payment of the costs and expenses of administering the Cases and the Recognition Proceedings (including (i) payments benefiting from the Carve-Out, and (ii) solely with respect to assets of the Canadian Borrower in Canada, the administration charge granted in the Recognition Proceedings, not to exceed $500,000 (the "<u>Administration Charge</u>")) incurred in the Cases and the Recognition Proceedings, including professional fees subject to the terms and conditions set forth in the Term Loan DIP Term Sheet.<br><br>Notwithstanding the foregoing, no portion or proceeds of the DIP ABL Loans, the Carve-Out or the DIP ABL Collateral (as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition ABL Agent and/or lenders in connection with the Prepetition ABL Facility, subject to a customary carve out for investigations. |

| | |
|---|---|
| Priority and Security under DIP ABL Facility: | All indebtedness and/or obligations of the Debtors to the DIP ABL Lenders and to the DIP ABL Agent, including without limitation all principal and accrued interest, costs, fees, expenses, and any exposure of any DIP ABL Lender or any of its affiliates in respect of cash management incurred on behalf of the Debtors (the following security, collectively, the "DIP ABL Liens"), shall be: |

a)   Secured pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out and the Administration Charge (solely with respect to assets of the Canadian Borrower in Canada), by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority lien on, and security interest in, all DIP ABL Collateral, wherever located, which property was not subject to valid, perfected, non-avoidable and enforceable liens as of the Petition Date;

b)   Secured pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out and the Administration Charge (solely with respect to assets of the Canadian Borrower in Canada), the Term Loan DIP Liens on the Term Loan DIP Collateral in favor of the Term Loan DIP Lenders, and any replacement liens granted to the Prepetition Term Loan Lenders as adequate protection of their interests in the Debtors' property, by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable junior lien on, and security interest in, all Term Loan Priority Collateral (as defined in the Intercreditor Agreement (as defined below)), wherever located, that is subject to a perfected lien or security interest on the Petition Date, or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Bankruptcy Code § 546(b);

c)   Secured pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out and the Administration Charge (solely with respect to assets of the Canadian Borrower in Canada), by a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority senior priming lien on, and security interest in, all assets of the Debtors comprising ABL Priority Collateral (as defined in that certain Second Amended and Restated Intercreditor Agreement, dated as of May 25, 2021, by and among, the Prepetition ABL Agent, Alter Domus Products Corp. as New First Lien Term Agent, Alter Domus Products Corp. as Existing Second Lien Term Agent, and Alter Domus Products Corp. as New Second Lien Term Agent (as amended, amended and restated, supplemented or otherwise modified, the "Intercreditor Agreement");

|  | d) Subject in all respects to the provisions of the Intercreditor Agreement.

The property securing the DIP ABL Liens is collectively referred to as the "<u>DIP ABL Collateral</u>" and shall include, without limitation, all assets (whether tangible, intangible, real, personal or mixed) of the Debtors, whether now owned or hereafter acquired and wherever located, that would have constituted ABL Priority Collateral had the Chapter 11 Cases not been commenced.

All obligations under the DIP ABL Facility shall also constitute claims entitled to the benefits of Bankruptcy Code § 364(c)(1) and § 503(b), having, subject to the Carve-Out, a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code ("<u>Superpriority Claims</u>"), pari passu with any superpriority claims granted pursuant to the DIP Order on account of the Term Loan DIP Obligations of the Borrowers and Guarantor. |
|---|---|
| <u>Carve-Out</u> | The Carve-Out shall have the meaning set forth in the Term Loan DIP Term Sheet. The allocation of funding of the Post-Carve Out Trigger Cap (as defined in the Interim DIP Order) and the Administration Charge from ABL Priority Collateral and Term Loan Priority Collateral will be determined by good faith negotiation between Required Term Loan DIP Lenders and the Required ABL DIP Lenders, or by order of the Court if the parties are unable to agree. |
| <u>Prepayments:</u> | *Voluntary*: Prepayments under the DIP Facility may be made at any time without premium or penalty (other than breakage costs to the extent applicable).

*Mandatory*: The Definitive Financing Documentation shall require mandatory prepayments customarily found in loan documents for similar debtor-in-possession financings and other mandatory prepayments deemed by the DIP ABL Lenders appropriate to the specific transaction, including, without limitation, prepayments from proceeds of (i) sales of DIP ABL Collateral and (ii) insurance and condemnation proceeds in respect of DIP ABL Collateral. |
| <u>Conditions Precedent to the Closing:</u> | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP ABL Lenders appropriate to the specific transaction, including, without limitation: (i) upon entry of |

| | the Final DIP Order, execution and delivery of an amendment and restatement to the Prepetition ABL Credit Agreement (the "<u>DIP ABL Credit Agreement</u>") and other definitive documentation evidencing the DIP ABL Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise acceptable to the DIP ABL Lenders and the Debtors (the "<u>Definitive Financing Documentation</u>"); (ii) entry of the Interim DIP Order, in form and substance acceptable to the DIP ABL Lenders, Required Term Loan DIP Lenders (as defined in the Term Loan DIP Term Sheet) and the Debtors, which Interim DIP Order shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the prior written consent of the DIP ABL Lenders in their sole discretion; (iii) delivery of the initial Approved Budget acceptable to the DIP ABL Lenders in their sole discretion; and (iv) the Bankruptcy Court's entry of an interim 'cash management order' on terms and conditions acceptable to the DIP ABL Lenders in their reasonable discretion. |
|---|---|
| <u>Conditions Precedent to Each DIP ABL Loan</u>: | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP ABL Lenders appropriate to the specific transaction, including, without limitation, (i) compliance of each advance of a DIP ABL Loan with the Approved Budget then in effect, (ii) no default or event of default, (iii) accuracy of representations and warranties in all material respects, (iv) delivery of a notice of borrowing, (v) the DIP Order shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the prior written consent of the DIP ABL Lenders in their sole discretion.<br><br>For the avoidance of doubt, such conditions precedent shall not apply to any DIP ABL Loan deemed made as a result of any Creeping ABL Rollup, but such DIP ABL Loans shall be subject to the limitations on advances set forth in Section 2.01(a) of the Prepetition ABL Credit Agreement. |
| <u>Representations and Warranties</u>: | The Definitive Financing Documentation shall contain representations and warranties consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases), customarily found in loan documents for similar debtor-in-possession ABL financings, and/or as reasonably required by the DIP ABL Lenders. |

| | |
|---|---|
| Reporting Covenants, Affirmative Covenants and Negative Covenants: | The Definitive Financing Documentation shall contain reporting requirements, affirmative covenants and negative covenants consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases), customarily found in loan documents for similar debtor-in-possession ABL financings, and/or as reasonably required by the DIP ABL Lenders, including without limitation: (i) compliance with the Approved Budget, subject to permitted variances consistent with the terms of the Term Loan DIP Term Sheet, (ii) delivery of updates of the Approved Budget, which updates shall be approved by the DIP ABL Lenders and the Required Term Loan DIP Lenders, (iii) delivery of weekly variance reports; (iv) a prohibition on transferring any cash or cash equivalents that constitutes DIP ABL Collateral to a subsidiary of the Company that is not a Guarantor except as otherwise provided for by an Approved Budget; (v) compliance with the Milestones (as defined below), (vi) compliance with the DIP Orders; (vii) a prohibition on filing, proposing, or supporting any plan of reorganization that does not indefeasibly satisfy the DIP ABL Obligations in full in cash.  Without limitation of the foregoing, from and after entry of the Interim DIP Order, the Debtors shall provide the DIP ABL Agent with (a) weekly Approved Budget updates and weekly variance reports, and (b) copies of all financial and operational reporting as and when provided under the Term Loan DIP Term Sheet. |
| Milestones: | To include certain milestones relating to the timing for filing and confirmation of a plan of reorganization, and the filing and consummation of asset sales pursuant to Bankruptcy Code § 363 and § 365, as set forth in the DIP Order. |
| Financial Covenants: | Variance Covenant as set forth in the DIP Order. |
| Approved Budget: | The Approved Budget shall be as set forth in the Term Loan DIP Term Sheet.  Without limitation of the foregoing, the Approved Budget shall include weekly reporting of the Debtors' Cash. |
| Borrowing Base: | Notwithstanding anything to the contrary in this Term Sheet and in the Prepetition ABL Credit Agreement, the Debtors shall not be required to deliver any weekly Borrowing Base Certificate unless a postpetition Event of Default has occurred and is continuing. |
| Cash Collateral: | The DIP Order shall authorize the Debtors to use prepetition and postpetition cash collateral subject to the terms set forth in the DIP Order, subject to the Approved Budget and the Variance Covenant. |

| | |
|---|---|
| <u>Adequate Protection for Prepetition ABL Facility:</u> | The DIP Order shall provide the Prepetition ABL Facility (to the extent outstanding) adequate protection acceptable to the lenders thereunder, which may include the provision of replacement liens, superpriority administrative expense claims, current cash payment of reasonable fees and expenses including attorneys' fees and expenses, subject in all respects to the Intercreditor Agreement. |
| <u>Events of Default:</u> | The Definitive Financing Documentation shall contain events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default reasonably required by the DIP ABL Lenders, including without limitation (a) non-compliance with the Milestones and covenants set forth in this Term Sheet, (b) the occurrence and/or continuance of an "Event of Default" under the Term Loan DIP Facility, and (c) the dismissal of the Cases, or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code. |
| <u>Remedies:</u> | The DIP ABL Agent and the DIP ABL Lenders shall have customary remedies, including, without limitation, the right (after providing five (5) business days' prior notice to the Debtors and the official creditors' committee of the occurrence of the DIP Termination Date, with respect to the DIP Collateral (the "<u>Notice Period</u>")) to realize on all DIP Collateral, subject to the terms of the DIP Orders. |
| <u>Indemnification and Expenses:</u> | The Debtors that are Borrowers or the Guarantor, jointly and severally, shall indemnify and hold harmless the DIP ABL Agent, the DIP ABL Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Company or any of its affiliates) that relates to the DIP ABL Facility or the transactions contemplated thereby; <u>provided</u> that, no Indemnified Person shall be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct. |

| | No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.<br><br>In addition, (a) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel, local counsel, and financial advisors (collectively, the "<u>DIP Professionals</u>")) of the DIP ABL Agent and the DIP ABL Lenders in connection with the DIP ABL Facility and the transactions contemplated thereby shall be paid by the Debtors from time to time, whether or not the Closing Date occurs, and (b) all out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of the DIP Professionals) of the DIP ABL Agent and the DIP ABL Lenders, for enforcement costs associated with the DIP ABL Facility and the transactions contemplated thereby shall be paid by the Debtors. |
|---|---|
| <u>Assignments and Participations</u>: | Assignments under the DIP ABL Facility are subject to the consent of the DIP ABL Agent and the Company, which consent shall not be unreasonably withheld or delayed, except, in each case, with respect to any assignment to a lender, an affiliate of such a lender or a fund engaged in investing in commercial loans that is advised or managed by such a lender. No participation shall include voting rights, other than for matters requiring consent of 100% of the lenders. |
| <u>Governing Law</u>: | State of New York, except as governed by the Bankruptcy Code. |
| <u>Miscellaneous</u>: | The DIP Order shall, among other things:<br><br>a)  contain a 'good faith finding' under Bankruptcy Code § 364(e);<br><br>b)  (1) set a time limit acceptable to the DIP ABL Agent for challenges by third parties to any indebtedness, obligations, and/or liens under the Prepetition ABL Facility and to the assertion by third parties of any other claims and causes of action against the Prepetition ABL Agent and/or lenders under the Prepetition ABL Facility arising from or related thereto (any of the foregoing, a "<u>Challenge</u>"), and (2) contain |

<table>
<tr>
<td></td>
<td>

usual and customary stipulations, admissions, waivers, and releases, by the Debtors, with respect to such indebtedness, obligations, liens, challenges, claims, and causes of action;

c)   provide that the DIP ABL Lenders shall have the unconditional right to credit bid the outstanding DIP ABL Obligations and Prepetition ABL Obligations on a dollar-for-dollar basis in connection with any disposition of estate property that is ABL Priority Collateral (or the postpetition equivalent thereof) or other than in the ordinary course of business, whether pursuant to Bankruptcy Code § 363, a plan of reorganization, or otherwise (a "<u>Disposition</u>"), subject to the priority of the DIP ABL Liens and the provisions of the Intercreditor Agreement;

d)   provide that no obligations of the Debtors under the Term Loan DIP Facility or any prepetition Term Loan facility may be credit bid in any Disposition against the purchase price of any ABL Priority Collateral;

e)   provide that if any Disposition includes both prepetition or postpetition ABL Priority Collateral and Term Priority Collateral (as defined in the Intercreditor Agreement), and the DIP ABL Agent and any prepetition or postpetition term loan agents or term loan lenders are unable after negotiating in good faith to agree on the allocation of the purchase price between the prepetition or postpetition ABL Priority Collateral and Term Priority Collateral, any of such agents may apply to the Bankruptcy Court to make a determination of such allocation, and the Bankruptcy Court's determination in a final order shall be binding upon the parties.

The Final DIP Order shall provide, among other things, waivers of Bankruptcy Code § 506(c), the § 552(b) 'equities of the case' exception, and marshaling.

The Definitive Financing Documentation shall include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk based capital guidelines, increased costs and payments free and clear of withholding taxes).

</td>
</tr>
</table>

# EXHIBIT B

**Term Loan DIP Term Sheet**

**SUNGARD AS NEW HOLDINGS III, LLC**

**Senior Secured Superpriority Term Loan**
**Debtor-in-Possession Credit Facility Term Sheet**

**Dated as of April 11, 2022**

This Senior Secured Superpriority Term Loan Debtor-in-Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "**Term Sheet**") describes the principal terms and conditions of a proposed senior secured superpriority debtor-in-possession term loan facility (the "**Term Loan DIP Credit Facility**") to be provided by the Term Loan DIP Lenders (as defined below) to Sungard AS New Holdings III, LLC, a Delaware limited liability company (the "**Borrower**"), in connection with cases (collectively, the "**Chapter 11 Cases**") filed by the Borrower and the Guarantors (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on April 11, 2022 (the "**Petition Date**") and solely with respect to Sungard Availability Services (Canada) Ltd./Sungard, Services De Continuite Des Affaires (Canada) Ltee ("**Sungard AS Canada**"), proceedings (the "**Recognition Proceedings**") under Part IV of the *Companies' Creditors Arrangement Act* (Canada) commenced in the Ontario Superior Court of Justice (Commercial List) ("**Canadian Court**"). The Term Loan DIP Credit Facility is being provided by the Term Loan DIP Lenders in reliance upon the promulgation and consummation of the Restructuring Transactions (as defined below).

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party other than (i) the Debtors' directors, officers, employees, accountants, attorneys and other professional advisors retained by any of the Debtors in connection with the transactions contemplated hereby, (ii) the Prepetition ABL Secured Parties and (iii) in a Bankruptcy Court filing in connection with the Chapter 11 Cases. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

Capitalized terms used but not defined herein have the meanings assigned to them in the Restructuring Support Agreement, dated as of April 11, 2022 (including all amendments, modifications, exhibits, and supplements thereto, the "**RSA**") by and among the Company Parties and the Consenting Stakeholders (each, as defined therein) or the restructuring term sheet attached as Exhibit A to the RSA (the "**Restructuring Term Sheet**").

| | |
|---|---|
| **BORROWER:** | Sungard AS New Holdings III, LLC, a Delaware limited liability company, in its capacity as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **GUARANTORS:** | Sungard AS New Holdings, LLC, a Delaware limited liability Company ("**TopCo**"), Sungard AS New Holdings II, LLC, a Delaware limited liability company ("**Holdings**"), and each subsidiary of the Borrower set forth on Exhibit B-1 hereto, each of which shall be a Debtor in the Chapter 11 Cases (collectively, the "**Guarantors**" and each, individually, a "**Guarantor**"). The |

| | |
|---|---|
| | guaranty provisions set forth in <u>Exhibit B-2</u> attached hereto are hereby incorporated herein by reference. |
| | Notwithstanding anything to the contrary, the Guaranteed Obligations of TopCo shall be limited to the Term Loan DIP Obligations in connection with the Tranche A Term Loan DIP Loans and TopCo shall not be liable for any Term Loan DIP Obligations in connection with the Tranche B Term Loan DIP Loans or the Tranche C Term Loan DIP Loans. |
| **TERM LOAN DIP LENDERS:** | The entities forth on <u>Exhibit A</u> hereto (each an "**Initial Term Loan DIP Lender**" and collectively, the "**Initial Term Loan DIP Lenders**"), together with any holders of Prepetition 1L Term Loan Obligations that subscribe for Final Term Loan DIP Commitments in accordance with the procedures described under "Term Loan DIP Credit Facility" (the Initial Term Loan DIP Lenders, together with such additional subscribing lenders, each a "**Term Loan DIP Lender**" and collectively, the "**Term Loan DIP Lenders**"). |
| **TERM LOAN DIP AGENT:** | Acquiom Agency Services LLC shall be the sole administrative agent and collateral agent for the Term Loan DIP Lenders (in such capacities, the "**Term Loan DIP Agent**"). The Term Loan DIP Agent and each Term Loan DIP Lender hereby agree to the agency provisions set forth in <u>Exhibit F</u> hereto, which are incorporated herein by reference. |
| **TERM LOAN DIP CREDIT FACILITY:** | The Term Loan DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of (i) new money delayed-draw term loans to be made from time to time during the Availability Period (as defined below) in accordance with the Draw Schedule set forth below in an aggregate principal amount (exclusive of capitalized DIP Fees (as defined below)) not to exceed at any time outstanding aggregate principal commitments of $95,300,000 (it being understood and agreed that such amount includes $16,330,000 which shall only be available in connection with the Maturity Extensions) (the "**Term Loan DIP Commitment**"), of which up to $41,150,000 of the Term Loan DIP Commitment will be funded on the Interim Closing Date (as defined below) (the "**Interim Commitment**") and up to the full remaining Term Loan DIP Commitment will be funded on or after the Final Closing Date (as defined below) (the "**Final Commitment**") and (ii) subject to entry of the Final Order, a roll-up of up to $190,600,000 (the "**Roll-Up Amount**") of Prepetition Term Loan Obligations (as defined below) of the Term Loan DIP Lenders beneficially held by such Term Loan DIP Lenders as of the date of such roll-up, which amounts shall be exclusive of the Bridge Financing Obligations (as defined below) (which obligations shall be repaid upon entry of the Interim Order), on a cashless dollar-for-dollar basis into loans under the Term Loan DIP Credit Facility, *provided* that after giving effect to the principal balance of all Term Loan DIP New Money Loans, the aggregate principal balance of all |

Term Loan DIP New Money Loans shall not exceed the Term Loan DIP Commitment; *provided*, *further*, that no Term Loan DIP Lender shall be obligated to make Term Loan DIP New Money Loans in an amount in excess of the portion of the Term Loan DIP Commitment set forth next to such Term Loan DIP Lender's name in the table set forth on <u>Annex A</u> hereto (and which Term Loan DIP Commitment shall be subject to reductions as set forth below).  Subject to the entry of the Final Order, each Term Loan DIP Lender will first roll-up on a 2:1 basis for each dollar actually funded of the new-money portion of the Term Loan DIP Credit Facility (and automatically upon any further funding of the new-money portion of the Term Loan DIP Credit Facility) its pro rata share of Prepetition 1L Term Loan Obligations (as defined below) beneficially owned by it (or any of its Affiliates or Approved Funds (as each such term is defined in the Prepetition 1L Term Loan Credit Agreement)) as of the date of such roll-up and thereafter its pro rata share of Prepetition 2L Term Loan Obligations (as defined below) beneficially owned by it (or any of its Affiliates or Approved Funds (as each such term is defined in the Prepetition 2L Term Loan Credit Agreements (as defined below))) as of the date of such roll-up until the amount rolled-up equals the Roll-Up Amount (it being understood and agreed that a Term Loan DIP Lender may assign all or any portion of its right to roll-up Prepetition 1L Term Loan Obligations or Prepetition 2L Term Loan Obligations to any of its Affiliates or Approved Funds).  Notwithstanding the foregoing, the Roll-Up Amount shall be subject to the Roll-Up Reduction Provision (as set forth below).

All holders of Prepetition 1L Term Loan Obligations shall have the right to participate in the Term Loan DIP Credit Facility after the Interim Closing Date and prior to the Final Closing Date by providing the Term Loan DIP Commitment in respect of the new-money portion of the Term Loan DIP Credit Facility based on their pro rata beneficial ownership of Prepetition 1L Term Loan Obligations; provided that the Term Loan DIP Commitment subscribed to by the holders of Prepetition 1L Term Loan Obligations (other than the Initial Term Loan DIP Lenders) (such holders, the "**Participating Term Loan DIP Lenders**") shall be the Final Commitment, which shall be allocated first to the immediate draw(s) under the Final Commitment to the maximum extent until the percentage of the funded Term Loan DIP New Money Loans held by the Participating Term Loan DIP Lenders in the funded Term Loan DIP New Money Loans held by all Term Loan DIP Lenders shall equal the percentage of the Term Loan DIP Commitments held by the Participating Term Loan DIP Lenders in the Term Loan DIP Commitments held by all Term Loan DIP Lenders.  Such participation by holders of Prepetition 1L Term Loan Obligations shall be pursuant to solicitation procedures to be agreed among the Term Loan DIP Agent, the Initial Term Loan DIP Lenders and the Borrower.

In connection with the forgoing, each Initial Term Loan DIP Lender's Term Loan DIP Commitment constitutes (i) a subscription commitment, whereby each Initial Term Loan DIP Lender agrees to subscribe on the basis of its *pro rata* share of Prepetition 1L Term Loan Obligations based on its beneficial ownership thereof, which subscription commitment shall be allocated, first, to the Interim Commitment in respect of any new-money portion of the Term Loan DIP Credit Facility, and then to the Final Commitment, and (ii) a backstop commitment, whereby each Initial Term Loan DIP Lender agrees to provide a Final Commitment in respect of any new-money portion of the Term Loan DIP Credit Facility that holders of Prepetition 1L Term Loan Obligations do not subscribe for based on their beneficial ownership thereof.

The Initial Term Loan DIP Lenders have agreed, pursuant to their allocations of the Final Commitment set forth herein, to provide such backstop for the full Final Commitment (it being understood and agreed that the Initial Term Loan DIP Lenders' Final Commitments may be reduced on a dollar-for-dollar basis for each dollar of Final Commitments received from holders of Prepetition 1L Term Loan Obligations that subscribe for such Final Commitments in accordance with the provisions hereof.   As consideration for such backstop by the Initial Term Loan DIP Lenders, the Initial Term Loan DIP Lenders shall receive their pro rata shares of the Backstop Fee described under "DIP Fees". Each Initial Term Loan DIP Lender acknowledges and agrees that holders of Prepetition 1L Term Loan Obligations may so subscribe for such Final Commitments, in which case, such Initial Term Loan DIP Lenders and such holders of Prepetition 1L Term Loan Obligations shall enter into Assignment Agreements in the form of Exhibit E pursuant to which such Initial Term Loan DIP Lenders shall transfer and assign, without recourse, and such holders of Prepetition 1L Term Loan Obligations shall assume the Final Commitments subscribed for by such holders of Prepetition 1L Term Loan Obligations.

Upon completion of the solicitation to all holders of Prepetition 1L Term Loan Obligations, and the assignment by Initial Term Loan DIP Lenders of Final Commitments required to effect the results of such solicitation, Exhibit A hereto shall be amended, with the consent of the Term Loan DIP Agent, the Required Term Loan DIP Lenders and the Borrower, to reflect the final list of Term Loan DIP Lenders and Term Loan DIP Commitments.

All payments of principal and proceeds of Term Loan DIP Collateral shall be applied under the Term Loan DIP Credit Facility (a) first, to the new money term loans under the Term Loan DIP Credit Facility (the "**Tranche A Term Loan DIP Loans**") until paid in full, (b) second, to any roll-up portion of the Prepetition 1L Term Loan Obligations (the "**Tranche B Term Loan DIP Loans**") until paid in full and (c) third, to any roll-up portion of the Prepetition 2L

| | |
|---|---|
| | Term Loan Obligations (the "**Tranche C Term Loan DIP Loans**") until paid in full. |
| **AVAILABILITY PERIOD & DRAW SCHEDULE:** | The Term Loan DIP Credit Facility shall be available from the Interim Closing Date to the earlier of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the Term Loan DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as hereinafter defined) (the "**Availability Period**"). The Borrower may request draws under the Term Loan DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the Term Loan DIP Agent in substantially the form of <u>Exhibit C</u> attached hereto (the "**Notice of Borrowing**"), duly executed by an authorized officer of the Borrower (the "**Draw Schedule**"): |

    (i)    <u>Interim Term Loan DIP Loans</u>:  On or after the Interim Closing Date and prior to the Final Closing Date, the Borrower may request loans in one or more borrowings in an aggregate principal amount not to exceed $41,150,000 (the "**Interim Term Loan DIP Amount**"), strictly in accordance with the Approved Term Loan DIP Budget (as defined below) (subject to the Permitted Variances (as defined below)), subject to the satisfaction or any waiver by the Required Term Loan DIP Lenders of the conditions precedent required hereby and in accordance with the provisions of this Term Sheet and the "Use of Proceeds" hereof and the terms of the Interim Order (as defined below) (the "**Interim DIP Term Loans**"); and

    (ii)   <u>Final Term Loan DIP Loans</u>:  On or after the Final Closing Date, the Borrower may request loans in one or more borrowings in an aggregate principal amount (the "**Final Term Loan DIP Amount**") not to exceed the Term Loan DIP Commitment, less amounts drawn under the Interim Term Loan DIP Loans (the "**Final Term Loan DIP Loans**", together with the Interim Term Loan DIP Loans, the "**Term Loan DIP New Money Loans**", and the Term Loan DIP New Money Loans together with the Roll-Up Amount, the "**Term Loan DIP Loans**"), strictly in accordance with the Approved Term Loan DIP Budget (subject to the Permitted Variances), subject to the satisfaction or any waiver by the Required Term Loan DIP Lenders of the conditions precedent required hereby and in accordance with the provisions of this Term Sheet and the "Use of Proceeds" hereof and the terms of the Final Order (as defined below); *provided* that the Final Term Loan DIP Amount includes $16,330,000 which will only be available in the event of the Maturity Extensions.

As soon as reasonably practicable after the funding of the Interim DIP Term Loans, the proceeds of all Term Loan DIP New Money Loans (other than the Roll-Up Amount) shall be funded into a deposit account of the Borrower that shall be subject to the Term

| | |
|---|---|
| | Loan DIP Liens (as defined below) in favor of the Term Loan DIP Agent, which shall be perfected pursuant to the DIP Orders. |
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to the Interim DIP Loan" (including, without limitation, entry of the Interim Order) shall have been satisfied or waived by the Required Term Loan DIP Lenders in accordance with this Term Sheet.<br><br>"**Final Closing Date**" means the date on which the "Conditions Precedent to the Final DIP Loan" as set forth below (including, without limitation, entry of the Final Order) shall have been satisfied or waived by the Required Term Loan DIP Lenders in accordance with this Term Sheet. |
| **DIP LOAN DOCUMENTATION; DIP TERM SHEET CONTROLS:** | At the option of the Term Loan DIP Lenders, in their sole discretion, the Debtors shall execute definitive financing documentation with respect to the Term Loan DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to each of the Term Loan DIP Agent, the Term Loan DIP Lenders and the Debtors (the "**Term Loan DIP Documents**"), which such Term Loan DIP Documents shall contain the terms and conditions set forth in this Term Sheet and such other terms as the Borrower, the Term Loan DIP Agent and the Term Loan DIP Lenders shall agree, it being understood that such Term Loan DIP Documents shall be substantially based on the Prepetition 1L Term Loan Credit Agreement and the Loan Documents (as defined in the Prepetition 1L Term Loan Credit Agreement) and shall otherwise be on terms no less favorable to the Term Loan DIP Agent and the Term Loan DIP Lenders than the terms under the Prepetition 1L Term Loan Credit Agreement.  The provisions of the Term Loan DIP Documents shall, upon execution, supersede the provisions of this Term Sheet; *provided* that if the Term Loan DIP Lenders determine not to require the Debtors to execute additional Term Loan DIP Documents, the provisions of this Term Sheet, the Interim Order and the Final Order shall govern the Term Loan DIP Credit Facility.  The provisions of the Term Loan DIP Documents shall be consistent with this Term Sheet, the Interim Order and, once entered, a final order with respect to the Chapter 11 Cases and the Term Loan DIP Credit Facility, in form and substance satisfactory to the Term Loan DIP Agent and the Term Loan DIP Lenders, granting final approval of the Term Loan DIP Credit Facility, the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"). |
| **USE OF PROCEEDS:** | Subject to Bankruptcy Court approval, proceeds of the Term Loan DIP Credit Facility will be used strictly in accordance with this Term Sheet, the Term Loan DIP Documents (if any) and the Approved Term Loan DIP Budget (subject to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, which shall include the indefeasible payment in full of all Bridge |

6

|  | Financing Obligations upon entry of the Interim Order, (b) for bankruptcy-related costs and expenses (including the Recognition Proceedings), and (c) for costs and expenses related to the Term Loan DIP Credit Facility. |
|---|---|
|  | No cash collateral or proceeds of the Term Loan DIP Credit Facility may be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with, the Term Loan DIP Credit Facility or any Prepetition Credit Agreement (as defined below); provided that the official committee of unsecured creditors (the "**Creditors' Committee**"), if any, may use up to $50,000 to investigate (but not seek formal discovery or commence any challenge, objection or prosecute) any such claims or causes of action; provided further that the foregoing shall not affect the ability of the Information Officer in the Canadian Proceedings to conduct an ordinary course security review, as appropriate. |
|  | No cash collateral or proceeds of the Term Loan DIP Credit Facility may be distributed to, or used for the benefit of, any non-Debtor affiliates or subsidiaries of the Debtors, including Sungard Availability Services (UK) Limited or applied toward (directly or indirectly) its administration (the administration process of Sungard Availability Services (UK) Limited, the "**UK Administration**") (or to an administrator in England) without the prior written approval of the Required Term Loan DIP Lenders. |
| **APPROVED TERM LOAN DIP BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | By no later than the Petition Date, the Debtors shall prepare and deliver to the Term Loan DIP Agent and the Term Loan DIP Lenders a weekly cash flow forecast for the 13-week period commencing on the Petition Date, and such weekly cash flow forecast shall be approved by the Required Term Loan DIP Lenders in their sole discretion and shall set forth, among other things, the projected cash receipts and cash disbursements of the Debtors for the period covered thereby (the "**Approved Term Loan DIP Budget**"). |
|  | By no later than 12:00 PM (Eastern Time) on Wednesday of the calendar week following the week in which the Petition Date occurs (the "**First Reporting Date**"), and no later than 12:00 PM (Eastern Time) on each Wednesday thereafter (together with the First Reporting Date, each a "**Reporting Date**"), the Debtors shall deliver to the Term Loan DIP Agent and the Term Loan DIP Lenders (and their advisors), a variance report (each, a "**Weekly Variance Report**") setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in the then-in-effect Approved Term Loan DIP Budget for the Monthly Testing Period (as defined below). |

By no later than 12:00 PM (Eastern Time) on the first Reporting Date that occurs after the four (4)-week anniversary of the First Reporting Date (the "**Initial Variance Testing Date**") and by not later than 12:00 PM (Eastern Time) on each Wednesday thereafter (each such date, a "**Monthly Variance Testing Date**" and each such subsequent four-week period ending on the Sunday preceding each such Monthly Variance Testing Date, the "**Monthly Testing Period**"), the Debtors shall provide to the Term Loan DIP Agent and the Term Loan DIP Lenders a report reasonably detailing (i) the aggregate receipts of the Debtors and aggregate disbursements of the Debtors, in each case, during the applicable Monthly Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between (a) the aggregate receipts received by the Debtors during such Monthly Testing Period against the aggregate receipts for such Monthly Testing Period as set forth in the applicable Approved Term Loan DIP Budget and (b) the aggregate disbursements made by the Debtors during such Monthly Testing Period against the aggregate disbursements for such Monthly Testing Period as set forth in the applicable Approved Term Loan DIP Budget (a "**Monthly Variance Report**," together with the Weekly Variance Report, the "**Approved Variance Reports**").

The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):

As of the Initial Variance Testing Date, for the period commencing on the Petition Date and ending on the four-week anniversary of the Petition Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 85% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved Term Loan DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including Chapter 11 Trustee fees and professional fees and expenses incurred by the Debtors, the information officer appointed in the Recognition Proceedings (the "**Information Officer**"), the Term Loan DIP Agent and/or the Term Loan DIP Lenders)) to exceed 115% (on a cumulative basis taking into account the variance for any prior Testing Period) of the estimated operating disbursements for such items in the then-in-effect Approved Term Loan DIP Budget.

As of any subsequent Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 90% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved Term Loan DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including Chapter 11 Trustee fees and professional fees and

8

<table>
<tr>
<td></td>
<td>expenses incurred by the Debtors, the Information Officer, Term Loan DIP Agent and/or the Term Loan DIP Lenders)) to exceed 110% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements for such items in the then-in-effect Approved Term Loan DIP Budget.

Additional variances, if any, from the Approved Term Loan DIP Budget, and any proposed changes to the Approved Term Loan DIP Budget, shall be subject to the written approval of the Required Term Loan DIP Lenders. For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by email.

Commencing at 12:00 P.M. (Eastern Time) on the Wednesday of the fourth full calendar week after the Petition Date, and continuing at 12:00 P.M. (Eastern Time) on the Wednesday of every fourth week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the Required Term Loan DIP Lenders in their sole discretion, it shall become the "Approved Term Loan DIP Budget" for purposes of this Term Sheet and the DIP Orders.   Any amendments, supplements or modifications to the Approved Term Loan DIP Budget or an Approved Variance Report shall be subject to the prior written approval of the Required Term Loan DIP Lenders prior to the implementation thereof.  If the Required Term Loan DIP Lenders have not objected, in writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved Term Loan DIP Budget or an Approved Variance Report, within five (5) business days after the Term Loan DIP Agent's and each Term Loan DIP Lender's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the Required Term Loan DIP Lenders.  Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the Required Term Loan DIP Lenders, the Debtors shall be subject to and be governed by the terms of the Approved Term Loan DIP Budget then in effect.</td>
</tr>
<tr>
<td>**FIRST PRIORITY SECURITY INTEREST:**</td>
<td>All Term Loan DIP Loans and other liabilities and obligations owed to the Term Loan DIP Lenders and the Term Loan DIP Agent under or in connection with this Term Sheet, the Term Loan DIP Documents and/or the DIP Orders (collectively, the "**Term Loan DIP Obligations**"), in all cases subject to (a) the Carve-Out (as defined in the Interim Order), (b) solely with respect to assets of Sungard AS Canada in Canada, the administration charge granted by the Canadian Court in the Recognition Proceedings in respect of certain Canadian related professional fees in an aggregate amount not to exceed $500,000 (the "**Administration Charge**"), (c) the prepetition and postpetition liens of the ABL Agent (as defined</td>
</tr>
</table>

below) on the ABL Priority Collateral (as defined below) and (d) the Prepetition Permitted Liens (as defined below), shall be:

(i)   pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code;

(ii)   pursuant to sections 364(c)(2) secured by a fully perfected first-priority lien on the Term Loan DIP Collateral (as defined below), to the extent that such Term Loan DIP Collateral is not subject to the Prepetition Permitted Liens;

(iii)   pursuant to section 364(c)(3), secured by a fully perfected junior lien on Term Loan DIP Collateral, to the extent such Term Loan DIP Collateral is subject to a Prepetition Permitted Lien; and

(iv)   pursuant to section 364(d)(1), secured by a fully perfected first-priority priming lien on Term Loan DIP Collateral, *provided* that such lien shall be subordinate to the Prepetition Permitted Liens but senior to all other liens (including the Prepetition Liens) (collectively, the liens described in clauses (ii), (iii) and (iv), the "**Term Loan DIP Liens**").

The Term Loan DIP Liens under Section 364(d)(1) shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve-Out (as defined in the Interim Order), the Administration Charge (solely with respect to assets of Sungard AS Canada in Canada), the prepetition and postpetition liens of the ABL Agent on the ABL Priority Collateral and any other Prepetition Permitted Liens.

As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Credit Agreements (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the liens securing the Prepetition 1L Term Loan Obligations as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

| | |
|---|---|
| **PREPETITION ABL FACILITY** | The Debtors owe at least $29,000,000 in principal plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition ABL Obligations**") pursuant to that certain Revolving Credit Agreement, dated as of August 6, 2019 (as |

| | |
|---|---|
| | amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition ABL Credit Agreement** and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition ABL Credit Documents**") by and among Sungard AS New Holdings III, LLC as borrower, certain other Debtors as guarantors, the financial institutions party thereto from time to time as lenders (the "**Prepetition ABL Lenders**") and PNC Bank, National Association as administrative and collateral agent (the "**ABL Agent**" and together with the Prepetition ABL Lenders, the "**Prepetition ABL Secured Parties**" and the Prepetition ABL Secured Parties, together with the Prepetition 1L Term Loan Secured Parties and the Prepetition 2L Term Loan Secured Parties, the "**Prepetition Secured Parties**"). |
| | The Prepetition ABL Obligations are secured by (i) a first priority lien on "ABL Priority Collateral" as defined in that certain Intercreditor Agreement (the "**ABL Priority Collateral**"), dated August 6, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**ABL Intercreditor Agreement**"), among the ABL Agent, the Prepetition 1L Term Loan Agent (as defined below), the Prepetition Existing 2L Term Loan Agent (as defined below) and the Prepetition New 2L Term Loan Agent  (as defined below) and (ii) a third priority lien on "Term Loan Priority Collateral" as defined in the ABL Intercreditor Agreement (the "**Term Loan Priority Collateral**"). |
| **PREPETITION 1L FACILITY** | The Debtors owe at least $108,233,409 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition 1L Term Loan Obligations**") under that certain *Credit Agreement*, dated as of December 22, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition 1L Term Loan Credit Agreement**" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition 1L Term Loan Documents**") by and among Sungard AS New Holdings III, LLC, as borrower, Holdings, the financial institutions party thereto from time to time as lenders (the "**Prepetition 1L Term Loan Lenders**"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacities, the "**Prepetition 1L Term Loan Agent**" and together with the Prepetition 1L Term Loan Lenders, the "**Prepetition 1L Term Loan Secured Parties**").  The Prepetition 1L Term Loan Obligations include $7.21 million of principal plus accrued interest, premiums (if any), costs, fees, expenses and other obligations incurred pursuant to that certain Amendment No. 2 to Credit Agreement, dated as of April 7, 2022 (the "Bridge Financing Obligations"). |

| | |
|---|---|
| | The Prepetition 1L Term Loan Obligations are secured by (i) a first priority lien on Term Loan Priority Collateral and (ii) a second priority lien on ABL Priority Collateral. |
| **PREPETITION EXISTING 2L FACILITY** | The Debtors owe at least $8,912,330 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition Existing 2L Term Loan Obligations**") under that certain Junior Lien Credit Agreement, dated as of December 22, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Existing 2L Term Loan Credit Agreement**") and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Existing 2L Term Loan Documents**") by and among Sungard AS New Holdings III, LLC, as borrower, Holdings, the financial institutions party thereto from time to time as lenders (the "**Prepetition Existing 2L Term Loan Lenders**"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacities, the "**Prepetition Existing 2L Term Loan Agent**" and together with the Prepetition Existing 2L Term Loan Lenders, the "**Prepetition Existing 2L Term Loan Secured Parties**"). <br><br> The Prepetition Existing 2L Term Loan Obligations are secured by (i) a second priority lien on Term Loan Priority Collateral and (ii) a third priority lien on ABL Priority Collateral (in each case, other than the assets of, and the equity in, Sungard Availability Services (Canada) Ltd., Sungard Availability Services Holdings (Europe), Inc. and Sungard Availability Services, Ltd., and equity of Sungard Availability Services (France) SAS, Guardian iT, Sungard Availability Services Holdings (UK) Limited and Sungard Availability Services (UK) Limited). |
| **PREPETITION NEW 2L FACILITY** | The Debtors owe at least $277,622,988 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition New 2L Term Loan Obligations**" and together with the Prepetition Existing 2L Term Loan Obligations, the "**Prepetition 2L Term Loan Obligations**"; the Prepetition 2L Term Loan Obligations together with the Prepetition 1L Term Loan Obligations, the "**Prepetition Term Loan Obligations**"; and the Prepetition Term Loan Obligations together with the Prepetition ABL Obligations, the "**Prepetition Obligations**") under that certain Junior Lien Credit Agreement, dated as of May 3, 2019, as amended by Amendment No. 1 as of August 1, 2020, as amended by Amendment No. 2 as of December 10, 2020, and as further amended by Amendment No. 3 as of December 22, 2020 (as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition New 2L Term Loan Credit Agreement**" and together with the Prepetition Existing 2L Term Loan Credit Agreement, the "**Prepetition 2L Term Loan Credit Agreements**"; the Prepetition |

| | |
|---|---|
| | 2L Term Loan Credit Agreements together with the Prepetition 1L Term Loan Credit Agreement, the "**Prepetition Term Loan Credit Agreements**"; and the Prepetition Term Loan Credit Agreements together with the Prepetition ABL Credit Agreement, the "**Prepetition Credit Agreements**") and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition New 2L Term Loan Documents**") by and among Sungard AS New Holdings III, LLC as borrower, Holdings, the financial institutions party thereto from time to time as lenders (the "**Prepetition New 2L Term Loan Lenders**" and together with the Prepetition 1L Term Loan Lenders and the Prepetition Existing 2L Term Loan Lenders, the "**Prepetition Term Loan Lenders**" and the Prepetition Term Loan Lenders together with the Prepetition ABL Lenders, the "**Prepetition Lenders**"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacities, the "**Prepetition New 2L Term Loan Agent**" and together with the Prepetition 1L Term Loan Agent and the Prepetition Existing 2L Term Loan Agent, the "**Prepetition Term Loan Agents**" and the Prepetition Term Loan Agents together with the ABL Agent, the "**Prepetition Agents**" and the Prepetition New 2L Term Loan Agent together with the Prepetition New 2L Term Loan Lenders, the "**Prepetition New 2L Term Loan Secured Parties**" and, together with the "Prepetition Existing 2L Term Loan Secured Parties, the "**Prepetition 2L Term Loan Secured Parties**").

The Prepetition New 2L Term Loan Obligations are secured by (i) a second priority lien on Term Loan Priority Collateral and (ii) a third priority lien on ABL Priority Collateral. |
| **ADEQUATE PROTECTION FOR PREPETITION SECURED PARTIES:** | As set forth and provided in the Interim Order. |
| **TERM LOAN DIP COLLATERAL:** | "**Term Loan DIP Collateral**" means, collectively, all assets of the Borrower and each Guarantor (and, in the case of each Debtor, its bankruptcy estate) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, |

13

| | |
|---|---|
| | royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, and subject to entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.<br><br>All of the Term Loan DIP Liens described herein with respect to the Term Loan DIP Collateral shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.  Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the Term Loan DIP Lenders or the Term Loan DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the Term Loan DIP Agent in the Term Loan DIP Collateral, or to enable the Term Loan DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the Term Loan DIP Collateral. |
| **ORIGINAL ISSUE DISCOUNT:** | The Tranche A Term Loan DIP Loans (other than the Roll-Up Amount) to be made under the Term Loan DIP Credit Facility shall be made at a discount of 3.00% (the "**Original Issue Discount**") of the Tranche A Term Loan DIP Commitments. Notwithstanding the foregoing, the Borrower shall repay to the Term Loan DIP Lenders the full principal amount of the Term Loan DIP Loans borrowed by the Borrower in accordance with the terms of this Term Sheet and the Term Loan DIP Documents, without setoff, deduction, offset or counterclaim, it being understood and agreed that the Original Issue Discount shall be deemed fully-earned on the Interim Closing Date and shall be due and payable upon the funding of each Tranche A Term Loan DIP Loan and shall be non-refundable when paid. The parties agree that the Original Issue Discount shall be treated for U.S. tax purposes as adjustments to purchase price and as original issue discount and all parties agree to report such amounts accordingly. |
| **DIP FEES:** | The Debtors shall pay the following fees:<br><br>(i)  to the Initial Term Loan DIP Lenders, on a pro rata basis in accordance with their Term Loan DIP Commitments and Term Loan DIP Loans, a 4.00% backstop fee (the "**Backstop Fee**") (taken as a percentage of each Initial Term Loan DIP Lender's Term Loan DIP Commitment), payable in kind on the new-money portion of the Term Loan DIP Credit Facility and earned upon entry of the Interim Order,<br><br>(ii) to the Term Loan DIP Lenders, on a pro rata basis in accordance with their Term Loan DIP Commitments and Term Loan DIP Loans, |

14

<table>
<tr><td></td><td>

a. 2.5% transaction fee payable in cash on the principal amount of the Term Loan DIP New Money Loans that is repaid with the proceeds of any sale of any Debtors' assets outside of the ordinary course of business to a purchaser other than the Consenting Stakeholder Purchaser (as defined in the RSA); and

b. a 1.5% fee per annum (the "**Term Loan DIP Commitment Fee**") on the unused portion of the Term Loan DIP Commitments (other than, for the avoidance of doubt, the Roll-Up Amount), payable monthly in cash on the average unused amount of the Interim Term Loan DIP Amount or the Final Term Loan DIP Amount, as the case may be, between entry of the Interim Order or the Final Order, as the case may be, and the date the Interim Term Loan DIP Amount or the Final Term Loan DIP Amount, as the case may be, has been fully funded; and

(iii)    to the Term Loan DIP Agent, an agency fee as set forth in the letter agreement between the Term Loan DIP Agent and the Borrower (the "**Agency Fee**" and together with the Backstop Fee, the Exit Fee and the Term Loan DIP Commitment Fee, the "**DIP Fees**"), payable in accordance with the terms of such letter agreement.

</td></tr>
<tr><td>**INTEREST RATE:**</td><td>

Interest will be payable on the unpaid principal amount of all Tranche A Term Loan DIP Loans and all accrued and unpaid interest thereon at a rate per annum equal to the Adjusted LIBO Rate (as defined in the Prepetition 1L Term Loan Credit Agreement) for an Interest Period (as defined in the Prepetition 1L Term Loan Credit Agreement) of one month plus 9.50%, payable monthly in cash (provided that, on any monthly interest payment date, the Borrower may elect to pay up to 8.50% of such interest in kind) on the first (1st) business day of each month in arrears. To the extent the Borrower elects to pay such interest in kind, such interest in respect of the Tranche A Term Loan DIP Loans shall be capitalized, compounded and added to the principal amount of the Tranche A Term Loan DIP Loans outstanding on the relevant interest payment date.

Interest will be payable on the unpaid principal amount of all Tranche B Term Loan DIP Loans and all accrued and unpaid interest thereon at a rate per annum equal to the Adjusted LIBO Rate (as defined in the Prepetition 1L Term Loan Credit Agreement) for an Interest Period (as defined in the Prepetition 1L Term Loan Credit Agreement) of one month plus 7.50%, payable monthly in cash (provided that, on any monthly interest payment date, the Borrower may elect to pay up to 6.50% of such interest in kind) on the first (1st) business day of each month in arrears. To the extent the Borrower elects to pay such interest in kind, such interest in respect of the Tranche B Term Loan DIP Loans shall be capitalized,

</td></tr>
</table>

15

|  | compounded and added to the principal amount of the Tranche B Term Loan DIP Loans outstanding on the relevant interest payment date. |
|---|---|
|  | Interest will be payable on the unpaid principal amount of all Tranche C Term Loan DIP Loans and all accrued and unpaid interest thereon at a rate per annum equal to the Adjusted LIBO Rate (as defined in the Prepetition 1L Term Loan Credit Agreement) for an Interest Period (as defined in the Prepetition 1L Term Loan Credit Agreement) of one month plus 6.75%, payable monthly in cash (provided that, on any monthly interest payment date, the Borrower may elect to pay up 5.75% of such interest in kind) on the first (1st) business day of each month in arrears. To the extent the Borrower elects to pay such interest in kind, such interest in respect of the Tranche C Term Loan DIP Loans shall be capitalized, compounded and added to the principal amount of the Tranche C Term Loan DIP Loans outstanding on the relevant interest payment date. |
|  | All interest and fees under this Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the Term Loan DIP Loans is paid. |
|  | The Eurocurrency Rate applicable to each DIP Loan for the initial one-month period beginning on the date on which such DIP Loan is funded and each succeeding one-month thereafter shall be determined in accordance with the provisions of the Prepetition 1L Term Loan Credit Agreement for determining the Eurocurrency Rate for an Interest Period of one month applicable to a Eurodollar Rate Loan (as defined in the Prepetition 1L Term Loan Credit Agreement) thereunder, which provisions are incorporated by reference herein *mutatis mutandis*; provided that, in no event shall the Eurocurrency Rate be less than 1.00%. |
| **DEFAULT RATE:** | At all times automatically following the occurrence and during the continuance of an Event of Default, principal, interest and all other amounts due in respect of the Term Loan DIP Obligations shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **RESTRUCTURING TRANSACTIONS:** | The Debtors shall simultaneously pursue the Sale Scenario and the Equitization Scenario, each as defined in the RSA. |
| **MATURITY DATE:** | The Term Loan DIP Loans (together with all other Term Loan DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
|  | (i)  120 calendar days after the Petition Date, subject to no more than two (2) extensions (each, a "**Maturity Extension**") of thirty (30) days each, if (x) such Maturity Extension is |

approved in writing by the Required Term Loan DIP Lenders or (y) on the date that is the then-current Maturity Date:

    a.   no Event of Default shall have occurred and be continuing;

    b.   the Debtors shall have provided the Required Term Loan DIP Lenders an "extension budget" for the corresponding 30-day period covered by such Maturity Extension which has been approved by the Required Term Loan DIP Lenders and which demonstrates that the Debtors can maintain a minimum liquidity of no less than $2,000,000 of unrestricted cash in deposit accounts subject to the liens of the Term Loan DIP Agent, excluding any new-money DIP Term Loan Credit Facility amounts to be funded for that extension period;

    c.   an executed asset purchase agreement, which is reasonably satisfactory to the Required Term Loan DIP Lenders and which remains in full force and effect, for the sale of Lognes campus owned by Sungard Availability Services (France) SAS; and

    d.   the Debtors shall have received at least one "Qualified Bid" (as defined in the RSA) for all, substantially all, or any combination of the Debtors' assets from a party or parties other than the Consenting Stockholder Purchaser (as defined in the RSA) that has not been withdrawn in an amount(s) greater than the applicable "Reserve Price" (as defined in the RSA);

(ii)   thirty (30) calendar days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or before such date;

(iii)   the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;

(iv)   the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;

(v)   the date of entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or

<table>
<tr><td></td><td>examiner with enlarged powers relating to the operation of the Debtors' business;

(vi)   the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to Chapter 7 of the Bankruptcy Code; and

(vii)   the date of acceleration of all or any portion of the Term Loan DIP Loans and the termination of the Term Loan DIP Commitments in respect thereof upon the occurrence of an Event of Default (as defined below).</td></tr>
</table>

| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the Term Loan DIP Loans in whole or in part at any time upon delivery of written notice to the Term Loan DIP Agent no later than 11:00 a.m., New York City time, three (3) business days prior to the date of such prepayment (or such later time as the Required Term Loan DIP Lenders may agree to acting reasonably).  All optional prepayments shall be applied to the Term Loan DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below. Any amounts so prepaid may not be reborrowed. |
|---|---|
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | The Debtors shall immediately pay or prepay the Term Loan DIP Loans and all other Term Loan DIP Obligations (together with a cash reserve established by the Term Loan DIP Agent to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows:<br><br>(i)   100% of the net cash proceeds of any Term Loan Priority Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code (other than a sale to the Consenting Stakeholder Purchaser) simultaneously with the consummation thereof, after funding the Carve-Out (as defined in the Interim Order), the Administration Charge (solely with respect to assets of Sungard AS Canada in Canada) and reserving proceeds (a) sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Term Loan DIP Budget and (b) in an amount negotiated in good faith by the Term Loan DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of the Debtors' bankruptcy estates following the closing of such sale;<br><br>(ii)   100% of the net cash proceeds of any other sale or other disposition by the Borrower or any Guarantor of any Term Loan Priority Collateral, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business); |

(iii) 100% of the net cash proceeds of any sale of, or any dividend, distribution, return of capital or other return on investment in respect of, the equity interests of any non-Debtor subsidiary of the Borrower or any Guarantor that are received by the Borrower or any Guarantor;

(iv) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Term Loan DIP Budget) by the Borrower or any Guarantor that constitute Term Loan Priority Collateral; and

(v) 100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the Required Term Loan DIP Lenders.

If any sale or disposition includes both ABL Priority Collateral and Term Loan Priority Collateral, and the Term Loan DIP Agent, the agent under the "ABL DIP Facility" (as defined in the Interim Order) (the "**ABL DIP Facility**") and the Prepetition Secured Parties are unable, after negotiating in good faith, to agree on the allocation of the purchase price between the ABL Priority Collateral and the Term Loan Priority Collateral, any of such agents may apply to the Bankruptcy Court to make a determination of such allocation, and the Bankruptcy Court's determination in a final non-appealable order shall be binding upon the parties.

Voluntary and mandatory payments or prepayments and proceeds of Term Loan DIP Collateral received by the Borrower or any Guarantor outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the Required Term Loan DIP Lenders), after giving effect to the Carve-Out (as defined in the Interim Order), the Administration Charge (solely with respect to assets of Sungard AS Canada in Canada), and any other payments required pursuant to the DIP Orders:

(1) first, to pay all documented out-of-pocket expenses of the Term Loan DIP Lenders and the Term Loan DIP Agent (including, without limitation, fees and expenses of counsel and external advisors);

(2) second, to pay an amount equal to all accrued and unpaid

| | |
|---|---|
| | interest owing to the Term Loan DIP Lenders; |
| | (3)   third, to repay any principal amounts outstanding in respect of the Term Loan DIP Loans (including any interest or other amounts that have been paid in kind and added to the principal balance thereof), first to the Tranche A Term Loan DIP Loans, second to the Tranche B Term Loan DIP Loans, and third to the Tranche C Term Loan DIP Loans; |
| | (4)   fourth, to pay all other amounts owing to the Term Loan DIP Lenders and the Term Loan DIP Agent; and |
| | (5)   last, the balance, if any, after all of the Term Loan DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition Agents for the benefit of the Prepetition Lenders. |
| | For the avoidance of doubt, payments that are required to be made to the Term Loan DIP Lenders as specified above shall be apportioned to each Term Loan DIP Lender ratably based upon such Term Loan DIP Lender's ratable share of the sum of the applicable Term Loan DIP Loans outstanding at such time. |
| | Section 2.13 of Prepetition 1L Term Loan Credit Agreement is hereby incorporated by reference herein *mutatis mutandis*. |
| **CONDITIONS PRECEDENT TO THE INTERIM TERM LOAN DIP TERM LOANS ON THE INTERIM CLOSING DATE:** | The obligations of the Term Loan DIP Lenders to make any Interim DIP Loan on the Interim Closing Date will be subject to satisfaction, or written waiver, by the Required Term Loan DIP Lenders, of each of the following conditions precedent in connection with the related draw request: |
| | (i)   Debtors shall have timely delivered to the Term Loan DIP Agent the Approved Term Loan DIP Budget or any update thereto required to be delivered in accordance with this Term Sheet; |
| | (ii)   Debtors shall have delivered to the Term Loan DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time three (3) business days prior to the requested funding date for such Interim DIP Loan (or such later time as the Required Term Loan DIP Lenders may agree to); |
| | (iii)   Debtors shall have delivered to the Term Loan DIP Agent a Closing Certificate, substantially in the form attached hereto as Exhibit D, duly executed by the chief executive officer, president or chief financial officer of the Debtors, delivered to the Term Loan DIP Agent, appropriately completed, by which such officer shall certify to the Term Loan DIP Agent and the Term Loan DIP Lenders that all of the conditions precedent to |

the Interim DIP Loan to be made on the Interim Closing Date have been satisfied (at any time delivered, a "**Closing Certificate**");

(iv) the interim order (in form and substance acceptable to the Required Term Loan DIP Lenders) (the "**Interim Order**") shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the Term Loan DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required Term Loan DIP Lenders and the Debtors shall be in compliance in all respects with the Interim Order;

(v) all of the "first day" motions, orders and related pleadings shall have been delivered in advance to counsel to the Term Loan DIP Agent and Term Loan DIP Lenders;

(vi) the Required Term Loan DIP Lenders shall be reasonably satisfied that the liens and security interests of the Term Loan DIP Agent in the Term Loan DIP Collateral have been perfected by the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to the Carve-Out (as defined in the Interim Order), the Administration Charge (solely with respect to assets of Sungard AS Canada in Canada), Prepetition Permitted Liens and the ABL Agent's prepetition and postpetition liens on ABL Priority Collateral;

(vii) Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the Term Loan DIP Collateral (which shall be deemed satisfied if such insurance as required by under the Prepetition 1L Term Loan Credit Agreement remains in place);

(viii) no Default or Event of Default under the Term Loan DIP Credit Facility or the under the Interim Order shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan to be made on the Interim Closing Date;

(ix) all representations and warranties of the Debtors hereunder shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects);

(x) subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and

perform its obligations under this Term Sheet and the Interim Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(xi)    receipt by the Term Loan DIP Agent and each Term Loan DIP Lender of a certificate, in form and substance reasonably satisfactory to the Required Term Loan DIP Lenders, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable, of such Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute this Term Sheet and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof; and

(xii)   substantially concurrently with the Interim Closing Date, all fees and out-of-pocket expenses of the Term Loan DIP Agent and each Initial Term Loan DIP Lender relating to the Term Loan DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim Order.

Modifications of the Interim Order shall require the prior written consent of the Required Term Loan DIP Lenders.

| | |
|---|---|
| | For the purposes of this Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, a material adverse change in, (i) the business, operations, properties, prospects, liabilities or financial condition of the Debtors, taken as a whole, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases or the Recognition Proceedings, (ii) the ability of any Debtor to perform its obligations under this Term Sheet or any other DIP Document to which it is a party, (iii) the validity or enforceability against any Debtor of this Term Sheet or any other DIP Document to which it is a party or (iv) the rights and remedies of the Term Loan DIP Agent or any Term Loan DIP Lender hereunder or thereunder. |
| **CONDITIONS PRECEDENT TO ANY SUBSEQUENT INTERIM TERM LOAN DIP TERM LOANS:** | The obligations of the Term Loan DIP Lenders to make any Interim DIP Loan after the Interim Closing Date will be subject to satisfaction, or written waiver, by the Required Term Loan DIP Lenders, of each of the following conditions precedent in connection with the related draw request:<br><br>(i)  Debtors shall have delivered to the Term Loan DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time three (3) business days prior to the requested funding date for such Interim DIP Loan (or such later time as the Required Term Loan DIP Lenders may agree to);<br><br>(ii) no Default or Event of Default under the Term Loan DIP Credit Facility or under the Interim Order, as applicable, shall have occurred and be continuing before or after giving effect to such Interim DIP Loan;<br><br>(iii) all representations and warranties of the Debtors hereunder and under the other Term Loan DIP Documents shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects);<br><br>(iv) the Interim Order shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required Term Loan DIP Lenders, and the Debtors shall be in compliance in all respects with the Interim Order; and<br><br>(v)  prior to or substantially concurrently with the making of such Interim DIP Loan, all fees and out-of-pocket expenses of the Term Loan DIP Agent and each Initial Term Loan DIP Lender relating to the Term Loan DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in accordance with the terms of the Interim Order. |

23

| CONDITIONS PRECEDENT TO THE FINAL TERM LOAN DIP LOAN ON THE FINAL CLOSING DATE: | The obligations of the Term Loan DIP Lenders to make any Final DIP Loan on the Final Closing Date shall be subject to satisfaction, or written waiver, by the Term Loan DIP Agent and each Term Loan DIP Lender of each of the following conditions precedent in connection with the related draw request: |
|---|---|
| | (i)     Debtors shall have timely delivered to the Term Loan DIP Agent the Approved Term Loan DIP Budget or any update thereto required to be delivered in accordance with this Term Sheet; |
| | (ii)     Debtors shall have delivered to the Term Loan DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time three (3) business days prior to the requested funding date for such Final DIP Loan (or such later time as the Required Term Loan DIP Lenders may agree to); |
| | (iii)     Debtors shall have delivered to the Term Loan DIP Agent a Closing Certificate, duly executed by the chief executive officer, president or chief financial officer of the Debtors, delivered to the Term Loan DIP Agent, appropriately completed, by which such officer shall certify to the Term Loan DIP Agent and the Term Loan DIP Lenders that all of the conditions precedent to the Final DIP Loan to be made on the Final Closing Date have been satisfied; |
| | (iv)     the Final Order (in form and substance acceptable to the Required Term Loan DIP Lenders) shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the Term Loan DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required Term Loan DIP Lenders  and the Debtors shall be in compliance in all respects with the Final Order; |
| | (v)     the Required Term Loan DIP Lenders shall be reasonably satisfied that the liens and security interests of the Term Loan DIP Agent in the Term Loan DIP Collateral have been perfected by the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to Prepetition Permitted Liens); |

<table>
<tr><td>(vi)</td><td>no Default or Event of Default under the Term Loan DIP Credit Facility or the under the Final Order shall have occurred and be continuing on the Final Closing Date or after giving effect to the Final DIP Loan to be made on the Final Closing Date;</td></tr>
</table>

(vi)    no Default or Event of Default under the Term Loan DIP Credit Facility or the under the Final Order shall have occurred and be continuing on the Final Closing Date or after giving effect to the Final DIP Loan to be made on the Final Closing Date;

(vii)    all representations and warranties of the Debtors hereunder shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects);

(viii)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this Term Sheet and the Final Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Final Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(ix)    substantially concurrently with the Final Closing Date, all fees and out-of-pocket expenses of the Term Loan DIP Agent and each Initial Term Loan DIP Lender relating to the Term Loan DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) in accordance with the terms of the Final Order.

(x)    Term Loan DIP Agent shall have received additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies, in form and substance reasonably acceptable to the Required Term Loan DIP Lenders;

(xi)    to the extent requested pursuant to the terms of this Term Sheet, receipt by the Term Loan DIP Agent and the Term Loan DIP Lenders of duly executed and delivered copies of the Term Loan DIP Documents

25

|  | (including, without limitation a debtor-in-possession credit agreement), in each case in form and substance acceptable to the Required Term Loan DIP Lenders; and |
|  | (xii)  the entry by the Canadian Court of a 'recognition order' and supplemental orders, as applicable, in form and substance substantially consistent with this Term Sheet and otherwise acceptable to the Required Term Loan DIP Lenders, among other things, recognizing the order of the Bankruptcy Court approving the Term Loan DIP Credit Facility, and recognizing the Case of Sungard AS Canada as a 'foreign main proceeding'. |
|  | Modifications of the Final Order shall require the prior written consent of the Required Term Loan DIP Lenders. |
| **CONDITIONS PRECEDENT TO ANY SUBSEQUENT FINAL DIP LOAN:** | The obligations of the Term Loan DIP Lenders to make any Final DIP Loan after the Final Closing Date shall be subject to satisfaction, or written waiver, by the Required Term Loan DIP Lenders, of each of the following conditions precedent in connection with the related draw request: |
|  | (i)  Debtors shall have delivered to the Term Loan DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time three (3) business days prior to the requested funding date for such Final DIP Loan (or such later time as the Required Term Loan DIP Lenders may agree to); |
|  | (ii)  no Default or Event of Default under the Term Loan DIP Credit Facility or under the Final Order, as applicable, shall have occurred and be continuing before or after giving effect to such Final DIP Loan; |
|  | (iii)  all representations and warranties of the Debtors hereunder and under the other Term Loan DIP Documents shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects); |
|  | (iv)  the Final Order shall not have been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the Required Term Loan DIP Lenders, and the Debtors shall be in compliance in all respects with the Final Order; and |
|  | (v)  prior to or substantially concurrently with the making of such Final DIP Loan, all fees and out-of-pocket expenses of the Term Loan DIP Agent and each Initial Term Loan DIP Lender |

26

| | |
|---|---|
| | relating to the Term Loan DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full in accordance with the terms of the Final Order. |
| **REPRESENTATIONS AND WARRANTIES:** | Subject to entry of the Interim DIP Order, the representations and warranties set forth in Sections 5.01 (except any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code), 5.02, 5.03 (except any restrictions with respect to the Prepetition Credit Agreements), 5.06 (except the Chapter 11 Cases, the Recognition Proceedings, and any litigation that is stayed by operation of the Bankruptcy Code or the CCAA), 5.08 (except the Term Loan DIP Liens), 5.09, 5.10 (other than Taxes that are excused or stayed by an order of the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases or the Recognition Proceedings), 5.11, 5.12 (except that Sungard Availability Services Vericenter, Inc. has been merged out of existence and except for the Term Loan DIP Liens), 5.13, 5.14, 5.15, 5.17 and 5.19 of the Prepetition 1L Term Loan Credit Agreement are incorporated herein by reference and, together with the applicable schedules hereto, shall be deemed made by the Debtors for the benefit of the Term Loan DIP Agent and the Term Loan DIP Lenders in respect of the Term Loan DIP Credit Facility and the Term Loan DIP Obligations, *mutatis mutandis*, as if fully set forth herein.  Defined terms used therein but not otherwise defined herein shall have the meanings given to them in the Prepetition 1L Term Loan Credit Agreement; <u>provided</u>, that, as used therein, "Closing Date" shall mean the Interim Closing Date; "Loan Party" means "Borrower and each Guarantor"; "Loan Documents" means this Term Sheet, the DIP Orders and the other Term Loan DIP Documents; "Loans" and "Term Loans" mean the Term Loan DIP Loans; "Permitted Liens" means the Prepetition Permitted Liens; "Administrative Agent" means the Term Loan DIP Agent; and "Lender" means a Term Loan DIP Lender. |
| **AFFIRMATIVE COVENANTS:** | Each Debtor shall: |
| | (i)   timely deliver, or cause to be timely delivered, to the Term Loan DIP Agent and each Term Loan DIP Lender the Approved Term Loan DIP Budget and the Approved Variance Reports, all in accordance with the provisions set forth in the DIP Orders; |
| | (ii)   maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of such person; |
| | (iii)  (a) cooperate, consult with, and provide to the Term Loan DIP Agent and each Term Loan DIP Lender all such information as required or as reasonably requested by the Term Loan DIP |

27

Agent or such Term Loan DIP Lender, (b) participate in meetings (which shall be telephonic or virtual unless otherwise agreed) with the Term Loan DIP Lenders and their respective management teams and professional advisors, on not less than a weekly basis, at which the Debtors shall provide to the Term Loan DIP Lenders access to all information reasonably requested upon prior reasonable notice, as well as (i) weekly financing performance updates, (ii) weekly updates on the Business Plan (as defined in the RSA), including, without limitation, operational and strategic initiatives (including cost cutting and lease rationalization initiatives), (iii) weekly updates on the UK Administration from an administrator of Teneo Holdings LLC and (iv) updates regarding the sale process, all of which may be provided verbally, and (c) permit representatives and independent contractors of the Term Loan DIP Agent and each Term Loan DIP Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, the Term Loan DIP Agent and the Term Loan DIP Lenders may not exercise their rights under this clause (c) more often than two times during any calendar year ; *provided further* that when an Event of Default exists, the Term Loan DIP Agent or any Term Loan DIP Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.

(iv)   comply with the Approved Term Loan DIP Budget (subject to the Permitted Variances) and with provisions of this Term Sheet and the Interim Order and/or the Final Order (as applicable);

(v)   comply in all respects with the schedule of (i) Milestones set forth in Section 11.03 of the RSA (as in effect on the Interim Closing Date) and (ii) Sale Process Milestones set forth in Section 11.04 of the RSA (as in effect on the Interim Closing Date);

(vi)   take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the Term Loan DIP Agent or any Term Loan DIP

28

Lender to carry out the provisions of this Term Sheet, the other Term Loan DIP Documents and the DIP Orders;

(vii)  except to the extent contemplated by the Approved Term Loan DIP Budget or otherwise consented to by the Required Term Loan DIP Lenders in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations of the Debtors;

(viii)  take, or cause to be taken, all appropriate action to remain the sole owner of the Term Loan DIP Collateral, free of liens other than the Prepetition Permitted Liens, the ABL Agent's liens securing the ABL DIP Facility (subject to the terms of the ABL Intercreditor Agreement), liens permitted to be incurred or exist pursuant to clause (i) of the Negative Covenant section hereof, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court or the Canadian Court that is in form and substance reasonably acceptable to the Required Term Loan DIP Lenders (collectively, "**Permitted Liens**");

(ix)  take, or cause to be taken, all appropriate action to comply with all material applicable laws applicable to the Debtors or the Term Loan DIP Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Change;

(x)  subject to the Approved Term Loan DIP Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;

(xi)  provide copies of all pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Chapter 11 Cases or the Canadian Court in the Recognition Proceedings to the Term Loan DIP Agents and the Term Loan DIP Lenders at least three (3) days in advance of such filing or as promptly as practicable;

(xii)  promptly provide such additional information concerning the Debtors, the sale process, or the Term Loan DIP Collateral as the Term Loan DIP Agent or any Term Loan DIP Lender may reasonably request;

(xiii)  maintain its cash management system in a manner reasonably acceptable to the Required Term Loan DIP Lenders (which

29

shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered);

(xiv)   deposit all distributions, dividends and other payments (other than payments of intercompany trade payables in the ordinary course of business) made by or on account of non-Debtor subsidiaries of the Debtors (including, without limitation, repayment of loans to Sungard AS UK to provide funding for the UK Administration) in a segregated account established by the Debtors (or in another account after receiving the prior written consent of the Term Loan DIP Agent (acting at the direction of the Required Term Loan DIP Lenders in their sole discretion)) at or prior to the time of receipt thereof, and maintain all such funds in such account unless otherwise approved in writing by the Term Loan DIP Agent (acting at the direction of the Required Term Loan DIP Lenders in their sole discretion) unless such distributions, dividends and other payments are remitted directly to the Term Loan DIP Agent for application to the Term Loan DIP Loans;

(xv)  cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once per calendar week, if reasonably requested by the Term Loan DIP Lenders, to discuss the Approved Term Loan DIP Budget, the Approved Variance Report, the Chapter 11 Cases, the sale process, and the financial condition, performance and business affairs of the Debtors;

(xvi) to the extent practicable under the circumstances, provide the Term Loan DIP Agent, its financial advisor and its counsel with written notice by no later than 11:00 AM (Eastern Time) three (3) business days (notice by email is sufficient, provided that such notice shall be deemed received upon the recipient's acknowledgment thereof) prior to any transfer of $100,000 or more on account of a prepetition critical vendor claim.  On each Reporting Date, the Debtors shall also provide the Term Loan DIP Agent and each Term Loan DIP Lender with a report scheduling the payments made by the Debtors to their critical vendors during the previous calendar week; and

(xvii)   use commercially reasonable efforts to obtain and maintain, beginning fifteen (15) days after entry of the Interim Order, a private rating in respect of the Term Loan DIP Loans from at least two of Standard & Poor's Rating Services, Fitch Ratings Inc. and Moody's Investor Service, Inc. (but not a specific rating).

| | |
|---|---|
| **NEGATIVE COVENANTS:** | Unless otherwise provided in the Approved Term Loan DIP Budget, no Debtor shall, without the express, prior written consent of the |

Required Term Loan DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following:

(i)   create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except the Carve-Out, the Administration Charge (solely with respect to the assets of Sungard AS Canada in Canada), the ABL Agent's prepetition and postpetition liens on ABL Priority Collateral, liens permitted by the Prepetition Credit Agreements which, other than the Prepetition Permitted Liens or other liens that are permitted to be senior to the Term Loan DIP Liens by the Required Term Loan DIP Lenders acting reasonably, are junior to the liens securing the Term Loan DIP Credit Facility, the "Replacement Liens" set forth and as defined in the DIP Orders and other liens securing obligations in an aggregate principal amount at any time outstanding not to exceed $100,000;

(ii)   other than the Restructuring Transactions, convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, other than (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required Term Loan DIP Lenders, (b) dispositions described in clause (ii) under "Mandatory Prepayments" above, (c) any disposition which would indefeasibly satisfy the Term Loan DIP Obligations in full in cash, (d) asset sales in the ordinary course of business, (e) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and dispositions of property no longer used or useful in the conduct of the business of the Debtor, (e) dispositions of property to another Debtor (other than Topco) and (f) dispositions of property not otherwise permitted so long as the aggregate fair market value of all assets so disposed shall not exceed $250,000;

(iii)   create, incur assume or permit to exist any indebtedness outside of the ordinary course of business, other than (a) the Term Loan DIP Obligations, (b) indebtedness permitted pursuant to Section 7.03 of the Prepetition 1L Term Loan Credit Agreement (other than postpetition indebtedness pursuant to Section 7.03(k), (l) and (n) of the Prepetition 1L Term Loan Credit Agreement) and (c) the ABL DIP Facility;

(iv)   amend, modify or compromise any material term or material amount owed under a real property lease or material contract without the prior written consent of the Required Term Loan DIP Lenders;

31

(v)    incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment without the prior written consent of the Required DIP Lenders, other than in accordance with the Approved Term Loan DIP Budget, subject to the Permitted Variances; *provided* that any distributions made by foreign non-Debtors to the Debtors shall be placed in a segregated account to be established by the Debtors, and that no funds shall be withdrawn from such account without the prior written consent of the Term Loan DIP Agent (acting at the direction of the Required Term Loan DIP Lenders) unless such distributions are remitted directly to the Term Loan DIP Agent for application to the Term Loan DIP Loans;

(vi)    create or acquire any ownership interest in any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;

(vii)    create or permit to exist any other superpriority claim which is pari passu with or senior to the claims of the Term Loan DIP Lenders under the Term Loan DIP Credit Facility, except for the Carve-Out (as defined in the Interim Order), the Administration Charge (solely with respect to the assets of Sungard AS Canada in Canada), the Prepetition ABL Obligations or obligations under ABL DIP Facility;

(viii) modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the Term Loan DIP Lenders (in their capacities as such) without the prior written consent of the Required DIP Lenders;

(ix)    file or propose any plan of reorganization, other than a plan filed in connection with the Equitization Scenario (as defined in the RSA), that does not indefeasibly satisfy the Term Loan DIP Obligations in full in cash or that is materially inconsistent with the RSA;

(x)    pay pre-petition indebtedness, except for adequate protection payments as set forth in the Interim Order, repayment of the Prepetition ABL Obligations as set forth in the Interim Order and the repayment of the Bridge Financing Obligations;

(xi)    engage in any activities that would result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or

(xii)   transfer any cash or cash equivalents that constitute Term Loan DIP Collateral to a subsidiary of Holdings that is not a

|  | Guarantor without the prior written approval of the Required Term Loan DIP Lenders.<br><br>As used in this Term Sheet, "**Restricted Payment**" means, with respect to any person, (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, or any redemption, purchase, retirement, defeasance, sinking fund or similar payment or any claim for rescission with respect to, any indebtedness (other than adequate protection payments in respect of the pre-petition indebtedness as expressly provided for herein, in the Interim Order or in the Approved Term Loan DIP Budget); and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding, in each case of (a) through (d), other than any payment to any Debtor (other than Topco). |
| **EVENTS OF DEFAULT:** | Each of following shall constitute an "Event of Default":<br><br>(i)   the entry of an Interim Order or Final Order in form or substance that is not acceptable to the Required Term Loan DIP Lenders in their sole discretion;<br><br>(ii)  failure by any Debtor to be in compliance in all material respects with provisions of this Term Sheet (subject to applicable grace periods), any other DIP Document or any DIP Order;<br><br>(iii) any request made by any Debtor for, or the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the Required Term Loan DIP Lenders;<br><br>(iv)  failure of any (a) Milestone set forth in Section 11.03 of the RSA (as in effect on the Interim Closing Date) or (b) Sale Process Milestone set forth in Section 11.04 of the RSA (as in effect on the Interim Closing Date) to be satisfied by the specified deadline therefor;<br><br>(v)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by |

materiality or Material Adverse Change, in all respects) when made;

(vi)    the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the Term Loan DIP Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is pari passu with or senior to the Term Loan DIP Liens, excluding the Carve-Out, the Administration Charge (solely with respect to assets of Sungard AS Canada in Canada), liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the Required Term Loan DIP Lenders;

(vii)   any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the Term Loan DIP Agent or any Term Loan DIP Lender or any of their agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Document or under any DIP Order in favor of the Term Loan DIP Lenders or Term Loan DIP Agent;

(viii)  (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this Term Sheet, any other DIP Document or any DIP Order, or the disallow any Term Loan DIP Obligations, in whole or in part, or (b) any material provision of this Term Sheet, any other DIP Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the Required Term Loan DIP Lenders);

(ix)    without the prior written consent of the Required Term Loan DIP Lenders, the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 of the Bankruptcy Code (other than approval of a sale pursuant to the terms of the RSA) or a plan of reorganization or liquidation in any of the Chapter 11 Cases, other than a plan filed in connection with the Equitization Scenario (as defined in the RSA), that, in either case, does not provide for indefeasible payment in full in cash to the Term Loan DIP Agent and the Term Loan DIP Lenders of all Term Loan DIP Obligations upon closing of such sale or the effective date of such plan;

(x) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xi) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the Term Loan DIP Collateral with an aggregate value of at least $100,000;

(xii) the conversion of any Chapter 11 Case into a case pursuant to Chapter 7 of the Bankruptcy Code;

(xiii) the termination of any of the Debtors' exclusive right to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code;

(xiv) (1) the occurrence of any Consenting First Lien Lender/Second Lien Lender Termination Event (unless waived in writing by the Required Consenting First Lien Lenders or the Required Consenting Second Lien Lenders, as applicable) under the RSA or (2) the RSA is terminated for any reason;

(xv) a dismissal of the Chapter 11 Cases;

(xvi) a request by the Debtors to obtain any financing not consented to by the Required Term Loan DIP Lenders (other than any financing provided by a third party which seeks authority to pay all of the Term Loan DIP Obligations in full in cash upon the closing of such financing);

(xvii) the filing of any chapter 11 plan or related disclosure statement not consented to by the Required Term Loan DIP Lenders, other than a Chapter 11 plan that indefeasibly satisfies all Term Loan DIP Obligations in full in cash;

(xviii) the filing of any motion seeking approval of a sale of any Term Loan DIP Collateral without the consent of the Required Term Loan DIP Lenders (other than any sale permitted under clause (ii) of "Negative Covenants");

(xix) failure to pay principal, interest or other Term Loan DIP Obligations in full when due, including without limitation, on the Maturity Date; or

(xx) the occurrence of an event of default under the ABL DIP Facility.

35

| | |
|---|---|
| **REMEDIES UPON EVENT OF DEFAULT:** | As set forth in the DIP Orders and any applicable order of the Canadian Court. |
| **OTHER BANKRUPTCY MATTERS:** | All reasonable and documented prepetition and post-petition fees, costs and expenses of the Term Loan DIP Agent and the Initial Term Loan DIP Lenders relating to the Term Loan DIP Credit Facility and the Chapter 11 Cases (including, without limitation, prepetition and post-petition fees and disbursements of counsel and advisors), subject to the DIP Orders, shall be payable by the Borrower following written demand and without the requirement for Bankruptcy Court approval.  A copy of each summary invoice therefor shall be provided by the Term Loan DIP Agent and the Initial Term Loan DIP Lenders to the Office of the U.S. Trustee, counsel to the Prepetition Secured Parties and counsel for any statutory committee. |
| | The Borrower shall indemnify, pay and hold harmless, the Term Loan DIP Agent and each Term Loan DIP Lender (and each of their respective directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| | The DIP Orders shall contain releases and exculpations for the Term Loan DIP Agent and each Term Loan DIP Lender (in any capacity) and the Prepetition Term Loan Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions. |
| | Subject to the entry of the Interim Order, section 363(k) of the Bankruptcy Code and the Intercreditor Agreements, the Term Loan DIP Agent (at the direction of the Required Term Loan DIP Lenders) shall have the unconditional right to credit bid ("**Credit Bid**") the outstanding Term Loan DIP Obligations (and any other applicable obligations) in connection with a sale to the Consenting Stakeholder Purchaser as set forth in the RSA or any other non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale. |
| | Subject to the entry of the Interim Order, section 363(k) of the Bankruptcy Code and the Intercreditor Agreements, the Prepetition 1L Agent, at the direction of the Required Lenders (as defined in the Prepetition 1L Term Loan Credit Agreement) shall have the unconditional right to Credit Bid the Prepetition 1L Term Loan Obligations in connection with a sale to the Consenting Stakeholder Purchaser as set forth in the RSA or any other non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy |

| | |
|---|---|
| | Code, any plan or otherwise, including any deposit in connection with such sale.

Subject to the entry of the Interim Order, section 363(k) of the Bankruptcy Code and the Intercreditor Agreements, the Prepetition 2L Agents, at the direction of the Required Lenders (as defined under the applicable Prepetition 2L Term Loan Credit Agreements), shall have the unconditional right to Credit Bid the Prepetition 2L Term Loan Obligations in connection with a sale to the Consenting Stakeholder Purchaser as set forth in the RSA or any other non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale. |
| **KEIP & KERP** | The Interim Order and Final Order shall provide for a carve-out from the cash proceeds realized by the Debtors from the closing of one or more Acceptable Sale(s) (as defined in the RSA) equal to or in excess of the Reserve Price (as defined in the RSA) in an amount sufficient to fund all amounts due under a key employee incentive plan and key employee retention plan, which plans shall be in form and substance reasonably acceptable to the Required Term Loan DIP Lenders and approved by the Bankruptcy Court. |
| **ROLL-UP REDUCTION PROVISION** | In the event that the Term Loan DIP Obligations exceed the Collateral Realization Amount (as defined below), then the Roll-Up Amount shall be automatically recharacterized as Prepetition 2L Term Loan Obligations and then, to the extent necessary, as Prepetition 1L Term Loan Obligations, until the Term Loan DIP Obligations equals the Collateral Realization Amount.

The "**Collateral Realization Amount**" is the sum of (i) the cash proceeds realized by the Debtors from the closing of one or more Acceptable Sale(s) (as defined in the RSA) equal to or in excess of the Reserve Price (as defined in the RSA) and (ii) the credit bid amount, if any, by the Term Loan DIP Lenders in connection with any consummated sale of Term Loan DIP Collateral to the Term Loan DIP Lenders or their designee. |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this Term Sheet and any DIP Order, such DIP Order shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this Term Sheet, any other DIP Document or any DIP Order may be amended other than by an instrument in writing signed by (i) two (2) or more unaffiliated Term Loan DIP Lenders holding, in the aggregate, at least 50.1% in principal amount of the outstanding Term Loan DIP Obligations (the "**Required Term Loan DIP Lenders**") held by the Term Loan DIP Lenders and (ii) the Debtors.

Notwithstanding the foregoing, any amendment, consent, waiver, supplement or modification to this Term Sheet, any other Term Loan DIP Documents or any DIP Order that has the effect of (i) increasing |

37

129353723v21

| | |
|---|---|
| | the Term Loan DIP Commitments of any Term Loan DIP Lender (other than as expressly provided herein in connection with any Maturity Extension), (ii) decreasing the amount of or postponing the payment of any scheduled principal, interest or fees payable to any Term Loan DIP Lender (other than as a result of any extension of the Maturity Date by the Initial Term Loan DIP Lenders to a date not later than 240 days after the Petition Date), (iii) altering the pro rata nature of disbursements (other than in connection with the allocation of Final Commitments to Participating Term Loan DIP Lenders as provided in "Term Loan DIP Credit Facility") by or payments to Term Loan DIP Lenders or the application of prepayments in this Term Sheet, (iv) amending or modifying the definition of "Required Term Loan DIP Lenders" or any provision of this section "AMENDMENT AND WAIVER", (v) releasing all or substantially all of the Guarantors of the Term Loan DIP Obligations, or (vi) releasing all or substantially all of the Term Loan DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court or the Canadian Court with the prior written consent of the Required Term Loan DIP Lenders, in each case, shall require the written consent of each Term Loan DIP Lender directly and adversely affected thereby. |
| **ASSIGNMENTS:** | The Term Loan DIP Lenders may assign all or any part of the Term Loan DIP Loans or the Term Loan DIP Commitments from time to time with the consent of the Required Term Loan DIP Lenders; provided that no consent of the Required Term Loan DIP Lenders shall be required for any assignment to a Term Loan DIP Lender, an affiliate of a Term Loan DIP Lender or an Approved Fund (as defined in the Prepetition 1L Term Loan Credit Agreement).  The parties to each assignment shall execute and deliver to the Term Loan DIP Agent an assignment agreement in substantially the form of Exhibit E attached hereto (an "**Assignment Agreement**"). Subject to receipt and recording thereof by the Term Loan DIP Agent, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a Term Loan DIP Lender hereunder, and the assigning Term Loan DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder. <br><br> No assignment of the Term Loan DIP Loans or the Term Loan DIP Commitments shall be permitted unless the applicable assignee executes and agrees to be bound by the RSA and the transactions contemplated therein or otherwise consents/commits to the Restructuring Transactions. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet. |

129353723v21

| | The Debtors submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to trial by jury. |
|---|---|
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| **CONSENT OF PREPETITION SECURED PARTIES:** | Each of the Prepetition Term Loan Secured Parties (including on behalf of each of its respective successors and assigns), subject to the terms and conditions set forth in this Term Sheet, acknowledges (i) the use of cash collateral, subject to the terms hereof, the Interim Order and the Final Order, as applicable, (ii) the Term Loan DIP Credit Facility, including the Term Loan DIP Liens, as described in this Term Sheet and in the Interim Order and the Final Order, as applicable, (iii) the Restructuring Transactions and (iv) the Approved Term Loan DIP Budget. |
| **PATRIOT ACT:** | The Term Loan DIP Lenders hereby notify the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub. L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Term Loan DIP Lenders to identify the Borrower in accordance with the Act. |
| **COUNSEL TO TERM LOAN DIP AGENT AND TERM LOAN DIP LENDERS:** | Proskauer Rose LLP and Gray Reed & McGraw LLP. |

[*Remainder of page intentionally left blank*]

**EXHIBIT B-1 TO TERM SHEET**

**GUARANTORS**

| GUARANTOR | JURISDICTION OF ORGANIZATION |
|---|---|
| SUNGARD AS NEW HOLDINGS III, LLC | Delaware |
| SUNGARD AVAILABILITY SERVICES HOLDINGS, LLC | Delaware |
| SUNGARD AVAILABILITY SERVICES HOLDINGS (EUROPE), INC. | Delaware |
| SUNGARD AVAILABILITY SERVICES TECHONOLOGY, LLC | Delaware |
| INFLOW LLC | Delaware |
| SUNGARD AVAILABILITY SERVICES HOLDINGS (CANADA), INC. | Delaware |
| SUNGARD AVAILABILITY SERVICES, LTD. | Delaware |
| SUNGARD AVAILABILITY SERVICES, LP | Pennsylvania |
| SUNGARD AVAILABILITY NETWORK SOLUTIONS, INC. | Delaware |
| SUNGARD AVAILABILITY SERVICES (CANADA) LTD./SUNGARD, SERVICES DE CONTINUITE DES AFFAIRES (CANADA) LTEE | Ontario |
| SUNGARD AS NEW HOLDINGS II, LLC | Delaware |

## EXHIBIT B-2 TO TERM SHEET

## GUARANTY

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit B-2 is attached.

1.  The Guaranty.

Each of the Guarantors hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) of the Term Loan DIP Obligations, including, without limitation, (a) the principal of and interest on each DIP Loan made to the Borrower pursuant to this Term Sheet or any other DIP Document, (b) all other Term Loan DIP Obligations under this Term Sheet, any other DIP Document or any DIP Order owing to the Term Loan DIP Agent or any Term Loan DIP Lender, and (c) the punctual and faithful performance, keeping, observance, and fulfillment by the Borrower of all of the agreements, conditions, covenants, and obligations of the Borrower contained in this Term Sheet, any other DIP Document or any DIP Order (all of the foregoing being referred to collectively as the "**Guaranteed Obligations**." Upon the failure by the Borrower to pay punctually any such amount or perform such obligation, subject to any applicable grace or notice and cure period, each of the Guarantors agrees that it shall forthwith on demand pay such amount or perform such obligation at the place and in the manner specified in the Term Sheet, any other DIP Document or any DIP Order, as the case may be. The Borrower hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) the Guaranteed Obligations.

2.  Guaranty Unconditional.  The obligations of each of the Guarantors hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)  any extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations, whether (in any such case) by operation of law or otherwise, or any failure or omission to enforce any right, power or remedy with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations;

(b)  any modification or amendment of or supplement to this Term Sheet, any other DIP Document or any DIP Order, including, without limitation, any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(c)  any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any other person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations;

(d)  any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower or any other guarantor of any of the Guaranteed

Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or any other guarantor of the Guaranteed Obligations, or any of their respective assets or any resulting release or discharge of any obligation of the Borrower or any other guarantor of any of the Guaranteed Obligations;

(e)      the existence of any claim, setoff or other rights which the Guarantors may have at any time against the Borrower, any other guarantor of any of the Guaranteed Obligations, the Term Loan DIP Agent, any Term Loan DIP Lender, or any other person, whether in connection herewith or in connection with any unrelated transactions;

(f)      the enforceability or validity of the Guaranteed Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower or any other guarantor of any of the Guaranteed Obligations, for any reason related to this Term Sheet, any other DIP Document or any DIP Order, or any provision of applicable law, decree, order or regulation purporting to prohibit the payment by the Borrower or any other guarantor of the Guaranteed Obligations, of any of the Guaranteed Obligations or otherwise affecting any term of any of the Guaranteed Obligations;

(g)      the failure of the Term Loan DIP Agent to take any steps to perfect and maintain any security interest in, or to preserve any rights to, any security or collateral for the Guaranteed Obligations, if any;

(h)      the election by, or on behalf of, any one or more of the Term Loan DIP Agent or any Term Loan DIP Lender, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters;

(i)      any borrowing or grant of a security interest by the Borrower, as debtor-in-possession, under Section 364 of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters;

(j)      the disallowance, under Section 502 of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters, of all or any portion of the claims of the Term Loan DIP Agent or any Term Loan DIP Lender for repayment of all or any part of the Guaranteed Obligations;

(k)      the failure of any other guarantor to sign or become party to this Guaranty or any amendment, change, or reaffirmation hereof; or

(l)      any other act or omission to act or delay of any kind by the Borrower, any other guarantor of the Guaranteed Obligations, the Term Loan DIP Agent, any Term Loan DIP Lender or any other person or any other circumstance whatsoever that might, but for the provisions of this Section 2, constitute a legal or equitable discharge of any Guarantor's obligations hereunder or otherwise reduce, release, prejudice or extinguish its liability under this Guaranty.

3.      Continuing Guarantee; Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances.  Each of the Guarantors' obligations hereunder shall constitute a continuing and irrevocable guarantee of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until Security Termination, subject to all the foregoing conditions, upon which date the guarantees made

hereunder shall automatically terminate. If at any time any payment of the principal of or interest on any DIP Loan, any DIP Obligation or any other amount payable by the Borrower or any other party under the Term Sheet, any other DIP Document or any DIP Order (including a payment effected through exercise of a right of setoff) is rescinded, or is or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by the Term Loan DIP Agent or any Term Loan DIP Lender in their discretion), each of the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

      4.      <u>General Waivers; Additional Waivers</u>.

      (a)      <u>General Waivers</u>. Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand or action on delinquency, protest, the benefit of any statutes of limitations and, to the fullest extent permitted by applicable law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against the Borrower, any other guarantor of the Guaranteed Obligations, or any other person.

      (b)      <u>Additional Waivers</u>. Notwithstanding anything herein to the contrary, each of the Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives, to the fullest extent permitted by applicable law:

      (i)      any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

      (ii)      (A) notice of acceptance hereof; (B) notice of any Term Loan DIP Loans or other financial accommodations made or extended under the Term Sheet, any other DIP Document or any DIP Order or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Guarantor's right to make inquiry of the Term Loan DIP Agent and the Term Loan DIP Lenders to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any fact that might increase such Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments, the Term Sheet, any other DIP Document or any DIP Order; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Guarantor hereunder) and demands to which each Guarantor might otherwise be entitled;

      (iii)      its right, if any, to require the Term Loan DIP Agent or any Term Loan DIP Lender to institute suit against, or to exhaust any rights and remedies which the Term Loan DIP Agent or any of the Term Loan DIP Lenders have or may have against the other Guarantors or any third party or against any Term Loan DIP Collateral provided by the other Guarantors or any third party; and each Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and paid in full in cash) of the other Guarantors or by reason of the cessation from any cause whatsoever of the liability of the other Guarantors in respect thereof;

      (iv)      (A) any rights to assert against the Term Loan DIP Agent or the Term Loan DIP Lenders any defense (legal or equitable), set-off, counterclaim, or claim that such Guarantor may now or at any time hereafter have against the other Guarantors or any other party liable to the Term Loan DIP Agent or the Term Loan DIP Lenders; (B) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future

lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; (C) any defense such Guarantor has to performance hereunder, and any right such Guarantor has to be exonerated, arising by reason of: (1) the impairment or suspension of the Term Loan DIP Agent's or the Term Loan DIP Lenders' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) the alteration by the Term Loan DIP Agent or the Term Loan DIP Lenders of the Guaranteed Obligations; (3) any discharge of the other Guarantors' obligations to the Term Loan DIP Agent or the Term Loan DIP Lenders by operation of law as a result of the Term Loan DIP Agent's or the Term Loan DIP Lenders' intervention or omission; or (4) the acceptance by the Term Loan DIP Agent or the Term Loan DIP Lenders of anything in partial satisfaction of the Guaranteed Obligations; and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder; and

(v)     any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the Term Loan DIP Agent or the Term Loan DIP Lenders; or (B) any election by the Term Loan DIP Agent or the Term Loan DIP Lenders under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against the Guarantors.

5.     Subordination of Subrogation; Subordination of Intercompany Indebtedness.

(a)     Subordination of Subrogation. Until the Guaranteed Obligations have been fully and finally performed and paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor), the Guarantors (i) shall have no right of subrogation with respect to such Guaranteed Obligations and (ii) waive any right to enforce any remedy which the Term Loan DIP Agent or any of the Term Loan DIP Lenders now have or may hereafter have against the Borrower, any endorser or any guarantor of all or any part of the Guaranteed Obligations or any other person, and until such time as the Guarantors waive any benefit of, and any right to participate in, any security or collateral given to the Term Loan DIP Agent or the Term Loan DIP Lenders to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to the Term Loan DIP Agent or the Term Loan DIP Lenders. Should any Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights, each Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off that such Guarantor may have to the payment in full in cash of the Guaranteed Obligations until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor) and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor). Each Guarantor acknowledges and agrees that this subordination is intended to benefit the Term Loan DIP Agent and the Term Loan DIP Lenders and shall not limit or otherwise affect such Guarantor's liability hereunder or the enforceability of this Guaranty, and that the Term Loan DIP Agent, the Term Loan DIP Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this paragraph 5(a).

(b)     Subordination of Intercompany Indebtedness. Each Guarantor agrees that any and all claims of such Guarantor against the Borrower or any other Guarantor hereunder (each an "**Obligor**") with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Guaranteed Obligations, or against any of its properties shall be

subordinate and subject in right of payment to the prior payment, in full and in cash, of all Guaranteed Obligations; provided that, such Guarantor may receive payments from any Obligor with respect to Intercompany Indebtedness unless an Event of Default has occurred and is continuing. Notwithstanding any right of any Guarantor to ask, demand, sue for, take or receive any payment from any Obligor, all rights, liens and security interests of such Guarantor, whether now or hereafter arising and howsoever existing, in any assets of any other Obligor shall be and are subordinated to the rights of the Term Loan DIP Agent and the Term Loan DIP Lenders in those assets. No Guarantor shall have any right to foreclose upon any asset of any Obligor in respect of Intercompany Indebtedness, whether by judicial action or otherwise, until Security Termination. If all or any part of the assets of any Obligor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such Obligor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such Obligor is dissolved or if substantially all of the assets of any such Obligor are sold, then, and in any such event constituting a dissolution or sale described above that constitutes an Event of Default (such events being herein referred to as an "**Insolvency Event**"), any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon or with respect to any indebtedness of any Obligor to any Guarantor ("**Intercompany Indebtedness**") shall be paid or delivered directly to the Term Loan DIP Agent for application to the Guaranteed Obligations, due or to become due, until such Guaranteed Obligations shall have been fully paid and satisfied (in cash). Should any payment, distribution, security or instrument or proceeds thereof be received by the applicable Guarantor upon or with respect to the Intercompany Indebtedness after any Insolvency Event and prior to the satisfaction of all of the Guaranteed Obligations and the termination of all financing arrangements pursuant to this Term Sheet, any other DIP Document or any DIP Order, such Guarantor shall receive and hold the same in trust, as trustee, for the benefit of the Term Loan DIP Agent and the Term Loan DIP Lenders and shall forthwith deliver the same to the Term Loan DIP Agent, for the benefit of the Term Loan DIP Lenders, in precisely the form received (except for the endorsement or assignment of such Guarantor where necessary), for application to any of the Guaranteed Obligations, due or not due, and, until so delivered, the same shall be held in trust by such Guarantor as the property of the Term Loan DIP Agent and the Term Loan DIP Lenders. If any such Guarantor fails to make any such endorsement or assignment to the Term Loan DIP Agent, the Term Loan DIP Agent or any of its officers or employees is irrevocably authorized to make the same. Each Guarantor agrees that until Security Termination, no Guarantor will assign or transfer to any person (other than the Term Loan DIP Agent) any claim any such Guarantor has or may have against any Obligor except as expressly permitted by this Term Sheet, any other DIP Document or any DIP Order.

For purposes of this Exhibit B-2, "**Security Termination**" means the expiration or termination of the Term Loan DIP Commitments and the payment in full in cash of the principal of and interest on each DIP Loan and all fees payable hereunder and all other Guaranteed Obligations payable hereunder (other than contingent indemnification obligations as to which no claim has been received by any Debtor).

**EXHIBIT C TO TERM SHEET**

**FORM OF NOTICE OF BORROWING**

**Date: _____**

THIS NOTICE OF BORROWING (this "**Notice**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of [      ] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among SUNGARD AS NEW HOLDINGS III, LLC, a Delaware limited liability company (the "**Borrower**") and Guarantors (as defined therein) party thereto, the Term Loan DIP Lenders (as defined therein), ACQUIOM AGENCY SERVICES LLC, as administrative agent and collateral agent for the Term Loan DIP Lenders (in such capacities, the "**Term Loan DIP Agent**"), and the other parties party thereto, in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of Texas pursuant to chapter 11 of title 11 of the United States Code on [____ __], 2022.  Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet.  To the extent the provisions set forth in this Notice conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as [the chief executive officer, president or chief financial officer] of the Borrower, hereby certifies to the Term Loan DIP Agent and the Term Loan DIP Lenders, on behalf of the Borrower, and not in any individual capacity, that he/she is authorized to execute this Notice and hereby gives notice to the Term Loan DIP Agent and the Term Loan DIP Lenders of the Borrower's request to borrow a [Interim][Final] DIP Loan in the amount of $_____ on _____.

The undersigned hereby requests that such funds be disbursed to the following account:

> Name of Bank: [____]
> ACH Routing Number: [____]
> Account No.: [____]
> Wire Transfer ABA: [____]
> SWIFT: [____]

[The undersigned, as the [chief executive officer, president or chief financial officer] of the Borrower, hereby certifies to the Term Loan DIP Agent and each Term Loan DIP Lender, on behalf of Borrower, and not in any individual capacity, that as of the date hereof, each of the conditions precedent set forth below and in the Term Sheet has been satisfied (or waived in writing by the Required Term Loan DIP Lenders):

129353723v21

1.      No Default or Event of Default has occurred and is continuing or will occur under the Term Loan DIP Credit Facility or [the Interim Order][2][the Final Order][3] before or after giving effect to the [Interim][Final] DIP Loan.

2.      All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects).][4]

*[Signature page follows]*

---

[2] To be included for any borrowing made after the Interim Closing Date and prior to the Final Closing Date.
[3] To be included for any borrowing made after the Final Closing Date.
[4] To be included for any borrowing made on any date other than the Interim Closing Date or the Final Closing Date.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice as of the date first set forth above.

**BORROWER**:

**SUNGARD AS NEW HOLDINGS III, LLC**


By: _____
Name:
Title:

## EXHIBIT D TO TERM SHEET

## FORM OF CLOSING CERTIFICATE

## SUNGARD AS NEW HOLDINGS III, LLC

**Date: _____**

     THIS CLOSING CERTIFICATE (this "**Certificate**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of [_____ __], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among SUNGARD AS NEW HOLDINGS III, LLC, a Delaware limited liability company (the "**Borrower**") and Guarantors (as defined therein) party thereto, the Term Loan DIP Lenders (as defined therein), ACQUIOM AGENCY SERVICES LLC, as administrative agent and collateral agent for the Term Loan DIP Lenders (in such capacities, the "**Term Loan DIP Agent**"), and the other parties party thereto, in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of Texas pursuant to chapter 11 of title 11 of the United States Code on [_____ __], 2022.  Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet.  To the extent the provisions set forth in this Certificate conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

     The undersigned, as the [chief executive officer, president or chief financial officer] of each Debtor, hereby certifies to the Term Loan DIP Agent and each Term Loan DIP Lender, on behalf of such Debtor, and not in any individual capacity, that (i) he/she is authorized to execute this Certificate and (ii) as of the date hereof, each of the conditions precedent set forth below and in the Term Sheet has been satisfied (or waived in writing by the Required Term Loan DIP Lenders):

[Conditions Precedent to the Interim Closing Date][5]

1. The Interim Order has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the Term Loan DIP Collateral) and has not been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the Required Term Loan DIP Lenders, and the Debtors are in compliance in all respects with the Interim Order.

2. All of the "first day" motions, orders and related pleadings have been provided to the Term Loan DIP Agent and each Initial Term Loan DIP Lender.

---

[5] The following list should be included in the Closing Certificate delivered for the initial Interim DIP Loan.

3.      Debtors have insurance (including, without limitation, commercial general liability and property insurance) with respect to the Term Loan DIP Collateral in such amounts and scope as is disclosed to the Term Loan DIP Agent.

4.      No Default or Event of Default has occurred and is continuing under the Term Loan DIP Credit Facility or the Interim Order, as applicable, on the Interim Closing Date, or after giving effect to the Interim DIP Loan.

5.      All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which are true and correct in all respects).

6.      Subject to Bankruptcy Court approval, (i) each Debtor has the corporate power and authority to make, deliver and perform its obligations under the Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) is required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of the Term Sheet and the Interim Order except for consents, authorizations and filings which have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change.

[Conditions Precedent to the Final Closing Date][6]

1.      All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which are true and correct in all respects).

2.      No Default or Event of Default has occurred and is continuing under the Term Loan DIP Credit Facility or the Final Order on the Final Closing Date, or after giving effect to the Final DIP Loan.

3.      Subject to Bankruptcy Court approval, (i) each Debtor has the corporate power and authority to make, deliver and perform its obligations under the Term Sheet and the Final Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) is required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of the Term Sheet and the Final Order except for consents, authorizations and filings which have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change.

---

[6] The following list should be included in the Closing Certificate delivered for the initial Final DIP Loan.

4.      [Debtors have delivered to the Term Loan DIP Agent and the Term Loan DIP Lenders duly expected and delivered copies of the Term Loan DIP Documents (including, without limitation, a debtor-in-possession credit agreement).][7]

5.      The Final Order approving the Term Loan DIP Credit Facility has been entered by the Bankruptcy Court, which Final Order has not been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in any manner without the consent of the Required Term Loan DIP Lenders, and the Debtors are in compliance in all respects with the Final Order.

[*Signature page follows*]

---

[7] To be included to the extent that the DIP Documents are requested by the DIP Agent or the DIP Lenders.

IN WITNESS WHEREOF, each of the undersigned has duly executed and delivered this Certificate as of the date first set forth above.

**DEBTORS**:

**SUNGARD AS NEW HOLDINGS III, LLC
SUNGARD AVAILABILITY SERVICES
          HOLDINGS, LLC
SUNGARD AVAILABILITY SERVICES
          HOLDINGS (EUROPE), INC.**

By: _____
Name:
Title:

**SUNGARD AVAILABILITY SERVICES
TECHONOLOGY, LLC
INFLOW LLC
SUNGARD AVAILABILITY SERVICES
HOLDINGS (CANADA), INC.
SUNGARD AVAILABILITY SERVICES, LTD.**

By: _____
Name:
Title:

**SUNGARD AVAILABILITY SERVICES, LP**

By: _____
Name:
Title:

**SUNGARD AVAILABILITY NETWORK
SOLUTIONS, INC.**

By: _____
Name:
Title:

**SUNGARD AVAILABILITY SERVICES
(CANADA), LTD.**

By: _____
Name:
Title:

**SUNGARD AS NEW HOLDINGS II, LLC**

By: _____
Name:
Title:

**SUNGARD AS NEW HOLDINGS, LLC**

By: _____
Name:
Title:

<u>**EXHIBIT E TO TERM SHEET**</u>

**FORM OF ASSIGNMENT AGREEMENT**

THIS ASSIGNMENT AGREEMENT (this "**Assignment Agreement**") is entered into as of [_____ __], 20[__] by and between the Assignor named on the signature page hereto ("**Assignor**") and the Assignee named on the signature page hereto ("**Assignee**").  Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of [____ __], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among SUNGARD AS NEW HOLDINGS III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors (as defined therein) party thereto, the Term Loan DIP Lenders (as defined therein), the Term Loan DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of Texas pursuant to chapter 11 of title 11 of the United States Code on [____ __], 2022.  Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet.  To the extent the provisions set forth in this Assignment Agreement conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

Assignor and Assignee hereby agree as follows:

1.      Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor, the interests set forth on the schedule attached hereto (the "**Schedule**"), in and to Assignor's rights and obligations under the Term Sheet as of the effective date set forth on the Schedule (the "**Effective Date**").  Such purchase and sale is made without recourse, representation or warranty except as expressly set forth herein.  On the Effective Date, Assignee shall pay to Assignor an amount equal to the aggregate amounts assigned pursuant to the Schedule (exclusive of unfunded portions of the Term Loan DIP Commitment, as applicable).

2.      Assignor (i) represents that as of the Effective Date, it is the legal and beneficial owner of the interests assigned hereunder and such interest is free and clear of any adverse claim or lien; (ii) makes no other representation or warranty and assumes no responsibility with respect to any statement, warranties or representations made in or in connection with the Term Sheet or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Debtors or the performance or observance by the Debtors of any of their respective obligations under the Term Sheet or any other instrument or document furnished pursuant thereto.

3.      Assignee (i) confirms that it has received a copy of the Term Sheet, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (ii) agrees that it will, independently and without reliance upon the Term Loan DIP Agent, Assignor or any other Term Loan DIP Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Term Sheet; (iii) irrevocably appoints and authorizes the Term Loan DIP Agent to take such action as the Term Loan DIP Agent on its behalf and to exercise such powers under the Term Sheet as are delegated the Term Loan DIP Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will be bound by the Term Sheet and perform in accordance with their terms all obligations which by the terms of the Term Sheet are required to be performed by it as a Term Loan DIP Lender; and (v) represents and warrants that it has experience and expertise in the making or the purchasing of loans such as the Term Loan DIP Loans, and that it has acquired

the interests described herein for its own account and without any present intention of selling all or any portion of such interests.

4.     Each of Assignor and Assignee represents and warrants to the other party hereto that it has full power and authority to enter into this Assignment Agreement and to perform its obligations hereunder in accordance with the provisions hereof, that this Assignment Agreement has been duly authorized, executed and delivered by such party and that this Assignment Agreement constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity.

5.     Upon the effectiveness of this Assignment Agreement pursuant to <u>Section 6</u> below, (i) Assignee shall be a party to the Term Sheet and, to the extent provided in this Assignment Agreement, have the rights and obligations of a Term Loan DIP Lender thereunder, (ii) Assignor shall, to the extent provided in this Assignment Agreement, relinquish its rights and be released from its obligations under the Term Sheet and (iii) the Term Loan DIP Agent shall thereafter make all payments in respect of the interest assigned hereby (including payments of principal, interest, fees and other amounts) to Assignee. Assignor and Assignee shall make all appropriate adjustments in payments for periods prior to the Effective Date by the Term Loan DIP Agent or with respect to the making of this assignment directly between themselves.

6.     This Assignment Agreement shall become effective as of the Effective Date upon the satisfaction of each of the following conditions:  (i) the execution of a counterpart hereof by each of Assignor [and][,] Assignee[, and the Required Term Loan DIP Lenders],[8] (ii) to the extent requested by the Term Loan DIP Agent in its reasonable discretion, the receipt by the Term Loan DIP Agent of such forms, certificates or documents prescribed by the applicable tax-related governmental authority as applicable in connection with this Assignment Agreement, properly completed and executed by Assignee, and (iii) the receipt by the Term Loan DIP Agent of originals or telecopies of the counterparts described above.

7.     Each of Assignor and Assignee hereby agrees from time to time, upon request of the other such party hereto, to take such additional actions and to execute and deliver such additional documents and instruments as such other party may reasonably request to effect the transactions contemplated by, and to carry out the intent of, this Assignment Agreement.

8.     Neither this Assignment Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Assignment Agreement) against whom enforcement of such change, waiver, discharge or termination is sought.

9.     In case any provision in or obligation under this Assignment Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining

---

[8] Insert as appropriate if consent is required.

provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.    THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

11.    This Assignment Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

12.    This Assignment Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto were upon the same agreement.

13.    Delivery of an executed signature page of this Assignment Agreement by facsimile transmission or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof or thereof.

*[Signature page follows]*

       The parties hereto have caused this Assignment Agreement to be executed and delivered as of the date first written above.

**[NAME OF ASSIGNOR]**,
as Assignor


By: _____
Name: _____
Title: _____

**[NAME OF ASSIGNEE]**,
as Assignee


By: _____
Name: _____
Title: _____

[[     ],
as Required Term Loan DIP Lender


By: _____
Name: _____
Title:

_____
][9]

_____

[9] Insert as appropriate if consent is required.

[Signature Page to Assignment Agreement]

**<u>SCHEDULE</u>**

**TO**

**ASSIGNMENT AGREEMENT**

**Assignor:** _____

**Assignee:** _____

**Effective Date:** _____

**Borrower:** _____

**Term Loan DIP** _____
**Agent:**

Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of [____ __], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among SUNGARD AS NEW HOLDINGS III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors (as defined therein) party thereto, the Term Loan DIP Lenders (as defined therein), the Term Loan DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of Texas pursuant to chapter 11 of title 11 of the United States Code on [____ __], 2022.

**Interests Assigned:**

| Term Loan DIP Commitment / Term Loan DIP Loans | Term Loan DIP Commitments | Term Loan DIP Loans |
|---|---|---|
| Assignor Amounts | $_____ (Interim)<br>$_____ (Final) | $_____ (Tranche A)<br>$_____ (Tranche B)<br>$_____ (Tranche C) |
| Amounts Assigned | $_____ (Interim)<br>$_____ (Final) | $_____ (Tranche A)<br>$_____ (Tranche B)<br>$_____ (Tranche C) |
| Assignor Amounts (post-assignment) | $_____ (Interim)<br>$_____ (Final) | $_____ (Tranche A)<br>$_____ (Tranche B)<br>$_____ (Tranche C) |

| Assignee Amounts (post-assignment) | $_____ (Interim) | $_____ (Tranche A) |
| | $_____ (Final) | $_____ (Tranche B) |
| | | $_____ (Tranche C) |

**Assignor Information:**

Address for Notices:

_____
_____
Attention:  _____
Telephone: _____
Facsimile:  _____

**Assignor Wire Instructions:**
Bank Name:
ABA #:
Swift Code:
Acct Name:
Acct #:

**Assignee Information:**

Address for Notices:

_____
_____
Attention:  _____
Telephone: _____
Facsimile:  _____

**Assignee Wire Instructions:**
Bank Name:
ABA #:
Swift Code:
Acct Name:
Acct #:

## EXHIBIT F TO TERM SHEET

## AGENCY PROVISIONS

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit F is attached.

1.     Appointment and Authorization. Each Term Loan DIP Lender hereby irrevocably appoints, designates and authorizes the Term Loan DIP Agent to take such action on its behalf under the provisions of this Term Sheet and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Term Sheet, together with such powers as are reasonably incidental thereto. Each Term Loan DIP Lender hereby acknowledges and agrees that the Term Loan DIP Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Term Loan DIP Agent have or be deemed to have any fiduciary relationship with any Term Loan DIP Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Term Sheet or otherwise exist against the Term Loan DIP Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein with reference to the Term Loan DIP Agent, any syndication agent or documentation agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The permissive authorizations, entitlements, powers and rights (including the right to request that any Debtor take an action or deliver a document and the exercise of remedies following an Event of Default) granted to the Term Loan DIP Agent herein shall not be construed as duties. The Term Loan DIP Agent shall not have any responsibility for interest or income on any funds held by it hereunder and any funds so held shall be held un-invested pending distribution thereof.  The provisions of this Exhibit F are solely for the benefit of Term Loan DIP Agent and the Term Loan DIP Lenders and no Debtor shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under the Term Sheet, Term Loan DIP Agent shall act solely as agent of Term Loan DIP Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Debtor.

2.     Delegation of Duties. The Term Loan DIP Agent may perform any and all of its duties and exercise its rights and powers under this Term Sheet by or through one or more sub-agents appointed by the Term Loan DIP Agent. The Term Loan DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through its related parties. The exculpatory provisions of this Exhibit F shall apply to any such sub-agent and to the related parties of the Term Loan DIP Agent and any such sub-agent, and shall apply to their respective activities as Term Loan DIP Agent. The Term Loan DIP Agent shall not be responsible for the negligence or misconduct of any sub-agents that it appoints except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Term Loan DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

3.     Default; Term Loan DIP Collateral

a.   Upon the occurrence and continuance of an Event of Default, the Term Loan DIP Lenders agree to promptly confer in order that the Required Term Loan DIP Lenders or the Term Loan DIP Lenders, as the case may be, may agree upon a course of action for the enforcement of the rights of the Term Loan DIP Lenders; and the  Term Loan DIP Agent shall be entitled to refrain from taking any action (without incurring any liability to any person for so refraining) unless and until the  Term Loan DIP Agent shall have received instructions from the Required Term Loan DIP Lenders or the Term Loan DIP Lenders, as the case may be and indemnification acceptable

to it. All rights of action under this Term Sheet and all right to the Term Loan DIP Collateral, if any, hereunder may be enforced by the Term Loan DIP Agent and any suit or proceeding instituted the Term Loan DIP Agent in furtherance of such enforcement shall be brought in its name as the Term Loan DIP Agent without the necessity of joining as plaintiffs or defendants any other Term Loan DIP Lender, and the recovery of any judgment shall be for the benefit of the applicable Term Loan DIP Lender, subject to the fees and expenses of the Term Loan DIP Agent. In actions with respect to any Term Loan DIP Collateral or other property or assets of Holdings or any subsidiary of Holdings, the Term Loan DIP Agent is acting for the ratable benefit of each Term Loan DIP Lender. Any and all agreements to subordinate (whether made heretofore or hereafter) other indebtedness or obligations of the Debtors to the Term Loan DIP Obligations shall be construed as being for the ratable benefit of each Term Loan DIP Lender.

b.   Each Term Loan DIP Lender authorizes and directs the Term Loan DIP Agent to enter into this Term Sheet and any security documents on behalf of and for the benefit of the Term Loan DIP Lenders (or if previously entered into, hereby ratifies the Term Loan DIP Agent's (or any predecessor collateral agent's) previously entering into such agreements and security documents).

c.   Except to the extent unanimity is required hereunder, each Term Loan DIP Lender agrees that any action taken by the Required Term Loan DIP Lenders in accordance with the provisions of this Term Sheet, and the exercise by the Required Term Loan DIP Lenders of the power set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon, all of the Term Loan DIP Lenders.

d.   The Term Loan DIP Agent is hereby authorized (but not obligated) on behalf of the Term Loan DIP Lenders, without the necessity of any notice to or further consent from any Term Loan DIP Lender, from time to time to take any action with respect to any Term Loan DIP Collateral or security documents which may be necessary to create, perfect and maintain perfected the liens upon the Term Loan DIP Collateral granted pursuant to the security documents.

e.   The Term Loan DIP Agent shall not have any obligation whatsoever to any Term Loan DIP Lender or to any other person to assure that the Term Loan DIP Collateral exists or is owned (whether in fee or by leasehold) by the person purporting to own it or is cared for, protected, or insured or has been encumbered or that the liens granted to the Term Loan DIP Agent (or any predecessor collateral agent) herein or pursuant to the security documents have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights granted or available to such Agent in this paragraph 3 of this Exhibit F or in any of the security documents; IT BEING UNDERSTOOD AND AGREED THAT IN RESPECT OF THE TERM LOAN DIP COLLATERAL, OR ANY ACT, OMISSION, OR EVENT RELATED THERETO, THE TERM LOAN DIP AGENT MAY ACT IN ANY MANNER IT MAY DEEM APPROPRIATE, IN ITS SOLE DISCRETION, AND THAT THE TERM LOAN DIP AGENT SHALL NOT HAVE ANY DUTY OR LIABILITY WHATSOEVER WITH RESPECT TO ANY TERM LOAN DIP COLLATERAL OR THE SECURITY DOCUMENTS TO ANY TERM LOAN DIP LENDER, IN THE ABSENCE OF ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT. Notwithstanding anything herein to the contrary, the Term Loan DIP Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the security documents; (ii) take any necessary steps to preserve rights against any parties with respect to any Term Loan DIP Collateral; or (iii) take any

action to protect against any diminution in value of the Term Loan DIP Collateral.

f.   In furtherance of the authorizations set forth in this paragraph 3 of this Exhibit F, each Term Loan DIP Lender hereby irrevocably appoints (i) the Term Loan DIP Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such Term Loan DIP Lender (1) to enter into any security document (including, without limitation, any appointments of substitute trustees under any security document), (2) to take action with respect to the Term Loan DIP Collateral and security documents to create, perfect, maintain, and preserve the Term Loan DIP Lenders' Term Loan DIP Liens therein, and (3) to execute instruments of release or to take other action necessary to release Term Loan DIP Liens upon any Term Loan DIP Collateral to the extent authorized herein and (ii) the Term Loan DIP Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such Term Loan DIP Lender to execute instruments of release or to take other actions necessary to release Debtors to the extent authorized herein. The powers and authorities herein conferred on the Term Loan DIP Agent may be exercised by the Term Loan DIP Agent through any person who, at the time of the execution of a particular instrument, is an officer of the Term Loan DIP Agent (or any person acting on behalf of the Term Loan DIP Agent pursuant to a valid power of attorney). The power of attorney conferred by this clause (f) to the Term Loan DIP Agent is granted for valuable consideration and is coupled with an interest and is irrevocable (subject to paragraph 1) so long as the Term Loan DIP Obligations, or any part thereof, shall remain unpaid or the Term Loan DIP Lenders are obligated to make any DIP Loan hereunder.

4.   Liability of Term Loan DIP Agent.

a.   THE TERM LOAN DIP AGENT SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN BY IT UNDER OR IN CONNECTION WITH THIS TERM SHEET OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR FOR ANY ERROR OF JUDGMENT, OR FOR ANY ACT DONE OR STEP TAKEN OR OMITTED BY IT IN GOOD FAITH, OR FOR ANY MISTAKE IN ACT OR LAW, OR FOR ANYTHING WHICH IT MAY DO OR REFRAIN FROM DOING IN CONNECTION HEREWITH, IN EACH CASE (EXCEPT FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN CONNECTION WITH ITS DUTIES EXPRESSLY SET FORTH HEREIN AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT).

b.   The Term Loan DIP Agent shall not be responsible in any manner to any Term Loan DIP Lender or participant for any recital, statement, representation or warranty made by any Debtor or any officer thereof, contained herein, or in any certificate, report, statement or other document referred to or provided for in, or received by the Term Loan DIP Agent under or in connection with, this Term Sheet, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Term Sheet, or for the creation, perfection or priority of any Term Loan DIP Liens purported to be created by any of the Term Loan DIP Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, or to make any inquiry respecting the performance by any Debtor of its obligations hereunder or, or for any failure of any Debtor or any other party to hereto to perform its obligations hereunder or thereunder. The Term Loan DIP Agent shall not be under any obligation to any Term Loan DIP Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Term Sheet, or to inspect the properties, books or records of any Debtor or any affiliate thereof.

c.   The Term Loan DIP Agent shall not be required to use, risk or advance its own funds or otherwise incur financial liability in the performance of any of its duties or the exercise of any of

its rights and powers hereunder (including, but not limited to, no obligation to grant any credit extension or to make any advance hereunder) if it has grounds for believing the repayment of such funds or indemnity satisfactory to it against, or security for, such risk or liability is not reasonably assured to it.. In no event shall the Term Loan DIP Agent be liable, directly or indirectly, for any special, indirect, punitive or consequential damages, including but not limited to, lost profits, even if the Term Loan DIP Agent has been advised of the possibility of such damages and regardless of the form of action. In no event shall the Term Loan DIP Agent be responsible or liable for any failure (e) or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, pandemics, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

5.    <u>Reliance by Term Loan DIP Agent</u>

    a.    The Term Loan DIP Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, electronic mail, or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and shall be entitled to consult and seek advice and statements of legal counsel (including counsel to any subsidiary of Holdings), independent accountants and other experts selected by the Term Loan DIP Agent. The Term Loan DIP Agent shall be fully justified in failing or refusing to take any action under any the Term Sheet unless it shall first receive such advice or concurrence of the Required Term Loan DIP Lenders or all the Term Loan DIP Lenders under this Term Sheet as it deems appropriate (and shall not be liable for any loss or expense that arises as a result of its failure to act while awaiting such advice or concurrence) and, if it so requests, it shall first be indemnified to its satisfaction by the Term Loan DIP Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Term Loan DIP Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Term Sheet in accordance with a request or consent of the Required Term Loan DIP Lenders or all the Term Loan DIP Lenders under this Term Sheet, if required hereunder, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Term Loan DIP Lenders. Where this Term Sheet expressly permits or prohibits an action unless all the Term Loan DIP Lenders under this Term Sheet, or the Required Term Loan DIP Lenders otherwise determine, the Term Loan DIP Agent shall, and in all other instances, may, but shall not be required to, initiate any solicitation for the consent or a vote of the requisite Term Loan DIP Lenders.

    b.    Phrases such as "satisfactory to the Term Loan DIP Agent", "approved by the Term Loan DIP Agent", "acceptable to the Term Loan DIP Agent", "as determined by the Term Loan DIP Agent", "in the Term Loan DIP Agent's discretion", "selected by the Term Loan DIP Agent", and phrases of similar import authorize and permit the Term Loan DIP Agent to approve, disapprove, determine, act or decline to act in its discretion, it being understood that the Term Loan DIP Agent in exercising such discretion under Term Sheet shall be acting on the instructions of the Required Term Loan DIP Lenders (or Term Loan DIP Lenders to the extent required hereunder) and shall be fully protected in, and shall incur no liability in connection with, acting (or failing to act) pursuant to such instructions.

    c.    The Term Loan DIP Agent shall be entitled to rely upon advice of counsel concerning legal matters and such advice shall be full protection and authorization for any action taken by the Term Loan DIP Agent in good faith thereon.

d.   If at any time the Term Loan DIP Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the Term Loan DIP Collateral (including, but not limited to, orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of the Term Loan DIP Collateral), the Term Loan DIP Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate; and if the Term Loan DIP Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, the Term Loan DIP Agent shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

e.   In the event any IRS form, certification or other documentation expires or becomes obsolete or inaccurate in any respect, any Lender shall promptly provide to the Term Loan DIP Agent an updated version of such form, certificate or other documentation or promptly notify the Term Loan DIP Agent in writing of its legal inability to do so. Each Term Loan DIP Lender shall severally indemnify Acquiom Agency Services LLC, both in its individual capacity and in its capacity as Term Loan DIP Agent, for any liability for tax withholding amounts paid or withheld from any account or payment pursuant to applicable law arising from the failure of the Term Loan DIP Lender to timely provide an accurate, correct and complete IRS Form W-9, IRS Form W-8 or such other documentation contemplated under this paragraph.

6.   Notice of Default. The Term Loan DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Term Loan DIP Agent for the account of the Term Loan DIP Lenders, unless the Term Loan DIP Agent shall have received written notice from a Term Loan DIP Lender, the Borrower or any other Debtor referring to this Term Sheet, describing such Event of Default and stating that such notice is a "notice of default." The Term Loan DIP Agent will promptly notify the Term Loan DIP Lenders of its receipt of any such notice. The Term Loan DIP Agent shall take such action with respect to such Event of Default as may be directed by the Required Term Loan DIP Lenders in accordance with this Term Sheet; provided that unless and until the Term Loan DIP Agent has received any such direction, the Term Loan DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Term Loan DIP Lenders; provided further, the Term Loan DIP Agent shall not be required to take any action under this Term Sheet, or to prosecute or defend any suit in respect of this Term Sheet, unless it is indemnified hereunder to its satisfaction.

7.   Credit Decision; Disclosure of Information by Term Loan DIP Agent. Each Term Loan DIP Lender acknowledges that neither the Term Loan DIP Agent nor any sub-agent or related party of the Term Loan DIP Agent has made any representation or warranty to it, and that no act by the Term Loan DIP Agent or any sub-agent or related party thereof hereinafter taken, including any consent to or acceptance of any assignment or review of the affairs of Holdings, any of its subsidiaries or any affiliate thereof, shall be deemed to constitute any representation or warranty by the Term Loan DIP Agent or any sub-agent or related party thereof to any Term Loan DIP Lender as to any matter, including whether the Term Loan DIP Agent or any sub-agent or the related parties thereof have disclosed material information in their possession. Each Term Loan DIP Lender represents to the Term Loan DIP Agent that it has, independently and without reliance upon the Term Loan DIP Agent or any sub-agent or related party thereof and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, each other Debtor and their respective subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Term

Sheet and to extend credit to the Borrower hereunder. Each Term Loan DIP Lender also represents that it will, independently and without reliance upon the Term Loan DIP Agent or any sub-agent or related party thereof and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Term Sheet, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Debtors. Except for notices, reports and other documents expressly required to be furnished to the Term Loan DIP Lenders by the Term Loan DIP Agent herein, the Term Loan DIP Agent shall not have any duty or responsibility to provide any Term Loan DIP Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Debtors or any of their respective affiliates which may come into the possession of the Term Loan DIP Agent or any sub-agent or related party thereof.

8. <u>Indemnification of the Term Loan DIP Agent</u>. WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, THE TERM LOAN DIP LENDERS SHALL INDEMNIFY UPON DEMAND THE TERM LOAN DIP AGENT AND EACH RELATED PARTY THEREOF (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF THE BORROWER AND WITHOUT LIMITING THE OBLIGATION OF THE BORROWER TO DO SO), IN ACCORDANCE WITH THEIR RESPECTIVE APPLICABLE PERCENTAGES, AND HOLD HARMLESS THE TERM LOAN DIP AGENT AND EACH RELATED PARTY THEREOF FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES INCURRED BY IT (INCLUDING THE TERM LOAN DIP AGENT'S OR SUCH RELATED PARTY'S OWN NEGLIGENCE); <u>PROVIDED</u> THAT NO TERM LOAN DIP LENDER SHALL BE LIABLE FOR THE PAYMENT TO THE TERM LOAN DIP AGENT OR ANY RELATED PARTY THEREOF OF ANY PORTION OF SUCH INDEMNIFIED LIABILITIES RESULTING FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT; <u>provided</u>, <u>however</u>, that no action taken in accordance with the directions of the Required Term Loan DIP Lenders or the Term Loan DIP Lenders, as applicable, shall be deemed to constitute gross negligence or willful misconduct for purposes of this paragraph 8 of this <u>Exhibit F</u>. Without limitation of the foregoing, each Term Loan DIP Lender shall reimburse the Term Loan DIP Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including counsel fees) incurred by the Term Loan DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Term Sheet, or any document contemplated by or referred to herein, to the extent that the Term Loan DIP Agent is not reimbursed for such fees or expenses by or on behalf of the Borrower.

9. <u>Term Loan DIP Agent in its Individual Capacity</u>. Acquiom Agency Services LLC and its affiliates may make loans to, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Holdings and its affiliates as though Acquiom Agency Services LLC were not the Term Loan DIP Agent hereunder and without notice to or consent of the Term Loan DIP Lenders. The Term Loan DIP Lenders acknowledge that, pursuant to such activities, Acquiom Agency Services LLC or its affiliates may receive information regarding Holdings or its affiliates (including information that may be subject to confidentiality obligations in favor of Holdings or such affiliate) and acknowledge that the Term Loan DIP Agent shall not be under any obligation to provide such information to them. With respect to its Term Loan DIP Loans, Acquiom Agency Services LLC shall have the same rights and powers under this Term Sheet as any other Term Loan DIP Lender and may exercise such rights and powers as though it were not the Term Loan DIP Agent hereunder, and, to the extent Acquiom Agency Services LLC makes any Term Loan DIP Loans hereunder, the terms "Term Loan DIP Lender" and "Term Loan DIP Lenders" include Acquiom Agency Services LLC in its individual capacity as such.

10.  <u>Successor Agent</u>.  Subject to the appointment of a successor as set forth herein, (i) the Term Loan DIP Agent may resign at any time upon 30 days' notice to the Term Loan DIP Lenders with a copy of such notice to the Borrower or (ii) the Term Loan DIP Agent may be removed by the Required Term Loan DIP Lenders at any time at their discretion upon 30 days' notice to the Term Loan DIP Agent with a copy of such notice to the Borrower. If the Term Loan DIP Agent resigns or is removed under this Term Sheet, the Required Term Loan DIP Lenders shall appoint from among the Term Loan DIP Lenders a successor administrative agent for the Term Loan DIP Lenders (with, so long as no Event of Default exists, the consent of the Borrower, which shall not be unreasonably withheld or delayed). Upon the acceptance of its appointment as successor administrative agent hereunder, such successor administrative agent shall succeed to all the rights, powers and duties of the retiring or removed Term Loan DIP Agent, the retiring or removed Term Loan DIP Agent shall be discharged from all of its duties and obligations hereunder and the term "Term Loan DIP Agent" shall mean such successor administrative agent and the retiring or removed Term Loan DIP Agent's appointment, powers and duties as the Term Loan DIP Agent shall be terminated. After any retiring or removed Term Loan DIP Agent's resignation or removal hereunder as Term Loan DIP Agent, the provisions of this <u>Exhibit F</u> shall inure to the benefit of such retiring or removed Term Loan DIP Agent, its sub-agents or attorneys in fact and the Term Loan DIP Agent's sub-agents or related parties as to any actions taken or omitted to be taken by any of them while the retiring or removed Term Loan DIP Agent was Term Loan DIP Agent under this Agreement. If no successor administrative agent has accepted appointment as Term Loan DIP Agent by the date which is 30 days following a retiring or removed Term Loan DIP Agent's notice of resignation or its receipt of notice of removal, the retiring or removed Term Loan DIP Agent's resignation or removal shall nevertheless thereupon become effective and the Term Loan DIP Lenders shall perform all of the duties of the Term Loan DIP Agent hereunder until such time, if any, as the Required Term Loan DIP Lenders appoint a successor agent as provided for above. Any corporation or other company into which the Term Loan DIP Agent may be merged or converted or with which it may be consolidated, or any corporation or other company resulting from any merger, conversion or consolidation to which the Term Loan DIP Agent shall be a party, or any corporation or other company succeeding to the business of the Term Loan DIP Agent shall be the successor of the Term Loan DIP Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

11.  <u>Disbursements of DIP Loan Payments</u>.

(a)      <u>DIP Loan Payments</u>.  Payments of principal, interest and fees in respect of the Term Loan DIP Loans will be settled on the date of receipt if received by the Term Loan DIP Agent on the first (1st) business day of each calendar month or on the business day immediately following the date of receipt if received on any day other than the first (1st) business day of each calendar month.

(b)      <u>Return of Payments</u>.

(i)      If the Term Loan DIP Agent pays an amount to a Term Loan DIP Lender under this Agreement in the belief or expectation that a related payment has been or will be received by the Term Loan DIP Agent from any Debtor and such related payment is not received by the Term Loan DIP Agent, then the Term Loan DIP Agent will be entitled to recover such amount from such Term Loan DIP Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)      If the Term Loan DIP Agent determines at any time that any amount received by the Term Loan DIP Agent under this Agreement must be returned to any Debtor, then, notwithstanding any other term or condition of the Term Sheet, the Term Loan DIP Agent will not be required to distribute any portion thereof to any Term Loan DIP Lender.  In addition, each Term Loan DIP Lender will repay to the Term Loan DIP Agent on demand any portion of such amount that the

Term Loan DIP Agent has distributed to such Term Loan DIP Lender, together with interest at such rate, if any, as the Term Loan DIP Agent is required to pay to such Debtor, without setoff, counterclaim or deduction of any kind.

**EXHIBIT C**

**Approved Budget**

# Cash Flow Forecast – 4 Months

| DIP BUDGET | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Post-Pet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | Post-Pet 4/17 | Post-Pet 4/24 | Post-Pet 5/1 | Post-Pet 5/8 | Post-Pet 5/15 | Post-Pet 5/22 | Post-Pet 5/29 | Post-Pet 6/5 | Post-Pet 6/12 | Post-Pet 6/19 | Post-Pet 6/26 | Post-Pet 7/3 | Post-Pet 7/10 | Post-Pet 7/17 | Post-Pet 7/24 | Post-Pet 7/31 | Post-Pet 8/7 | Post-Pet Total |
| $USD 000s | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Forecast |
| **Total Receipts** | $ 4,764 | $ 5,987 | $ 6,343 | $ 5,593 | $ 5,593 | $ 6,382 | $ 6,382 | $ 5,720 | $ 5,720 | $ 6,720 | $ 6,720 | $ 5,635 | $ 5,635 | $ 5,635 | $ 5,635 | $ 5,635 | $ 4,957 | $ 99,058 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Payroll | 3,019 | - | 3,339 | - | 2,779 | - | - | 3,339 | - | 3,419 | - | 3,339 | - | 2,779 | - | 3,339 | - | 25,349 |
| Facilities | 1,252 | 1,252 | 6,567 | 1,149 | 1,098 | 1,111 | 1,089 | 6,801 | 1,316 | 1,287 | 1,300 | 6,469 | 1,173 | 1,192 | 1,131 | 1,132 | 6,724 | 42,043 |
| Cost of Sales | 1,875 | 570 | 578 | 328 | 658 | 360 | 241 | 690 | 391 | 313 | 351 | 55 | 863 | 319 | 173 | 481 | 855 | 9,102 |
| Equipment/Capex | 475 | 471 | 446 | 1,396 | 450 | 446 | 446 | 830 | 1,833 | 830 | 831 | 395 | 1,449 | 395 | 395 | 395 | 1,813 | 13,298 |
| Taxes | 327 | 6 | 181 | 27 | 1 | 65 | 2 | 217 | 0 | 109 | 42 | 183 | 18 | 55 | 52 | 174 | 37 | 1,496 |
| Other Operating Disb. | 2,688 | 592 | 884 | 1,277 | 972 | 2,881 | 647 | 805 | 1,008 | 2,818 | 626 | 485 | 819 | 3,045 | 646 | 499 | 886 | 21,576 |
| **Total Operating Disbursements** | 9,634 | 2,891 | 11,995 | 4,178 | 5,958 | 4,863 | 2,425 | 12,682 | 4,548 | 8,776 | 3,150 | 10,926 | 4,322 | 7,785 | 2,397 | 6,020 | 10,316 | 112,864 |
| **Operating Cash Flow** | $ (4,870) | $ 3,096 | $ (5,652) | $ 1,414 | $ (365) | $ 1,520 | $ 3,958 | $ (6,962) | $ 1,172 | $ (2,055) | $ 3,571 | $ (5,291) | $ 1,313 | $ (2,150) | $ 3,238 | $ (385) | $ (5,359) | $ (13,806) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Bridge Interest & Exit Fees | 262 | 29 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 291 |
| DIP Term Loan Interest & Fees | 20 | 164 | - | - | - | - | 771 | - | - | - | 811 | - | - | - | - | 1,330 | - | 3,097 |
| PNC ABL Roll-Up Interest & Fees | 365 | 66 | - | - | - | - | 94 | - | - | - | 177 | - | - | - | - | 110 | 51 | 863 |
| Professional Fees | 850 | - | 1,183 | - | - | - | 1,890 | 1,183 | - | - | - | 5,458 | - | - | - | 8,119 | 7,690 | 26,372 |
| KEIP/KERP | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,000 | - | - | - | 4,000 |
| Utility Deposits | 1,500 | 1,500 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,000 |
| UK Administration Funding | - | 5,000 | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10,000 |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | 250 | - | - | 250 | 500 |
| Critical Vendors | 1,500 | 1,500 | 333 | 333 | 333 | - | - | - | - | - | - | - | - | - | - | - | - | 4,000 |
| **Total Non-Operating Disbursements** | 4,497 | 8,259 | 6,516 | 333 | 333 | - | 2,756 | 1,183 | - | - | 989 | 5,458 | - | 250 | - | 13,559 | 7,991 | 52,124 |
| **Net Cash Flow** | (9,367) | (5,163) | (12,168) | 1,081 | (698) | 1,520 | 1,202 | (8,144) | 1,172 | (2,055) | 2,582 | (10,748) | 1,313 | (2,400) | 3,238 | (13,943) | (13,350) | (65,930) |
| Beginning Cash | 3,479 | 24,710 | 19,547 | 7,379 | 8,460 | 27,761 | 29,281 | 30,483 | 22,339 | 23,511 | 21,455 | 24,037 | 12,829 | 14,143 | 11,743 | 29,830 | 15,887 | 3,479 |
| Net Cash Flow | (9,367) | (5,163) | (12,168) | 1,081 | (698) | 1,520 | 1,202 | (8,144) | 1,172 | (2,055) | 2,582 | (10,748) | 1,313 | (2,400) | 3,238 | (13,943) | (13,350) | (65,930) |
| Bridge Financing / (Repayment) | (7,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (7,000) |
| PNC Repayments | (402) | - | - | - | - | - | - | - | - | - | - | (460) | - | - | - | - | (537) | (1,399) |
| Interim DIP Borrowings | 38,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 38,000 |
| Final DIP Borrowings | - | - | - | - | 20,000 | - | - | - | - | - | - | - | - | - | 14,850 | - | - | 34,850 |
| **Ending Cash** | $ 24,710 | $ 19,547 | $ 7,379 | $ 8,460 | $ 27,761 | $ 29,281 | $ 30,483 | $ 22,339 | $ 23,511 | $ 21,455 | $ 24,037 | $ 12,829 | $ 14,143 | $ 11,743 | $ 29,830 | $ 15,887 | $ 2,000 | 2,000 |
| **Memo: Debt Balances** | | | | | | | | | | | | | | | | | | |
| DIP Term Loan & Roll-Up | 42,857 | 42,857 | 42,857 | 42,857 | 183,063 | 183,211 | 183,359 | 183,507 | 183,655 | 183,804 | 183,953 | 184,101 | 184,251 | 184,400 | 230,476 | 230,659 | 230,843 | 230,843 |
| PNC ABL | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 26,148 | 25,688 | 25,688 | 25,688 | 25,688 | 25,688 | 25,151 | 25,151 |

1. New Money DIP – DIP Term Loan shown above is gross of 4% Backstop Fee and 3% OID; 1L and 2L roll-ups assumes 2:1, with full 1L commitment and remainder fulfilled by 2L. Assumes Cash interest on Tranche A and PIK interest on Tranche B and C to the maximum amount permitted.
2. Beginning cash and PNC ABL balance excludes the $13.5M of restricted PNC cash that will be used to paydown PNC ABL at start of case. PNC ABL balance may vary based on borrowing base availability and working capital needs.
3. Debt Balances exclude undrawn DIP Term Loan commitment of $3.4M after Final DIP approval.

**EXHIBIT D**

**Milestones**

**Milestones**

Pursuant to Paragraph 34 of the Interim Order, the following Milestones shall apply DIP Facilities unless waived in writing by the Required ABL DIP Lenders and Required Term Loan DIP Lenders.  Capitalized terms shall have the meanings ascribed to them in the Restructuring Support Agreement.

| Date | Event |
|---|---|
| By no later than April 11, 2022 | The Debtors shall have commenced the Chapter 11 Cases. |
| By no later than April 14, 2022 | The Bankruptcy Court shall have entered the Interim DIP Order. |
| By no later than April 22, 2022 | The Debtors shall have filed the motion for approval of the Bidding Procedures. |
| By no later than May 11, 2022 | The Debtors shall have provided a draft Lease Rationalization Plan to the Consenting Stakeholders. |
| By no later than May 13, 2022 | The Bankruptcy Court shall have entered the Final DIP Order and the Bidding Procedures Order. |
| By no later than May 20, 2022 | The Debtors shall have delivered a draft Business Plan to the Consenting Stakeholders. |
| By no later than May 21, 2022 | The Debtors and the Required Consenting Stakeholders shall have agreed on an acceptable Lease Rationalization Plan. |
| By no later than June 3, 2022 | The Debtors shall have filed the Plan, the Disclosure Statement, and the Solicitation Materials. |
| By no later than June 7, 2022 | The Debtors and the Required Consenting Stakeholders shall have agreed on an acceptable Business Plan. |
| By no later than June 27, 2022 | The Required Consenting Stakeholders shall have provided the Debtors with the Reserve Price. |
| By no later than two (2) Business Days after the Required Consenting Stakeholders provide the Debtors with the Reserve Price | The Debtors shall have filed with the Bankruptcy Court a notice of the Reserve Price. |

| | |
|---|---|
| To the extent applicable, by no later than seven (7) days after the Debtors' determination that the Consenting Stakeholder Purchaser's bid for all, substantially all, or any group of the Debtors' assets is the Successful Bid for such assets pursuant to the Bidding Procedures Order | The Consenting Stakeholder Purchaser shall have made the Required Consenting Stakeholder Election with respect to such assets. |
| To the extent applicable, by no later than July 29, 2022 | The Bankruptcy Court shall have entered an order approving the Disclosure Statement and the Confirmation Order. |
| To the extent applicable, by no later than August 5, 2022 | The Plan Effective Date shall have occurred or, in the event of the Sale Scenario to the Consenting Stakeholder Purchaser, the consummation of such sale shall have occurred. |

| *Milestones for the Sale of Pantheon* | |
|---|---|
| **Date** | **Event** |
| By no later than May 14, 2022 | The deadline to submit second round bids shall have occurred. |
| By no later than June 30, 2022 | A definitive agreement for a sale with a purchase price reasonably acceptable to the Required Consenting Stakeholders shall have been executed. |
| By no later than September 15, 2022 | The closing of such sale shall have occurred. |

| *Milestones for Either (i) All or Substantially All Remaining Assets of the Debtors or (ii) One or More Subsets Thereof, Which Must Include Bravo and/or Eagle and May Include Any Other Remaining Assets* | |
|---|---|
| **Date** | **Event** |
| By no later than July 7, 2022 | The Bid Deadline shall have occurred. |
| By no later than July 12, 2022 | To the extent more than one Qualified Bid in excess of the applicable Reserve Price is received for (i) all or substantially |

| | all assets or (ii) one or more subsets thereof, an auction for such assets shall have occurred. |
|---|---|
| By no later than July 14, 2022 | The Bankruptcy Court shall have entered an order approving the sale of such assets; provided, however, that in the event the Consenting Stakeholder Purchaser's bid is the only Qualified Bid for such assets, this Milestone shall be automatically extended by seven (7) days and, should the Consenting Stakeholder Purchaser elect to consummate such transaction through the Plan pursuant to the Required Consenting Stakeholder Election, this Milestone shall not apply.  To the extent Bravo or Eagle is not included in such transaction, the sale of Bravo or Eagle will be subject to Milestones to be agreed upon, by no later than July 14, 2022, by the Debtors and the Required Consenting Stakeholders which shall include Milestones for (i) the Bid Deadline, (ii) an auction, (iii) the Bankruptcy Court's entry of an order approving the sale, and (iv) the closing of the sale. |
| By no later than July 29, 2022 | Subject to Sections 11.03(xiv) and 11.04(i)(C) of the Restructuring Support Agreement, the closing of sale(s) of all or substantially all assets of the Debtors, including Bravo and Eagle, shall have occurred; provided, however, that (i) such date may be extended for an additional one month, solely to the extent that the Company Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the closing of such sale have occurred other than the receipt of regulatory or other approval of a governmental unit necessary for occurrence of the closing and (ii) the Parties shall negotiate in good faith for a further reasonable extension of the closing date of such sale if the Company Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the closing of such sale have occurred other than the receipt of regulatory or other approval of a governmental unit necessary for occurrence of the closing. |