```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                        .
IN RE:                                  .  Case No. 22-90018-bdrj
                                        .  Chapter 11
SUNGARD AS NEW HOLDINGS LLC,            .
and SUNGARD AVAILABILITY                .
SERVICES, LTD.,                         .  515 Rusk Street
                                        .  Houston, TX  77002
                Debtors.                .
                                        .  Monday, October 17, 2022
. . . . . . . . . . . . . . . .         .  2:00 p.m.
```

```
   TRANSCRIPT OF NOTICE OF (I) SUCCESSFUL BID AND SALE HEARING
 AND (II) RESET OF COMBINED HEARING TO APPROVE THE ADEQUACY OF
  THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN [705]
             BEFORE THE HONORABLE DAVID R. JONES
              UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES:

```
For the Debtors:          Jackson Walker
                          By:  REBECCA CHAIKIN, ESQ.
                               VICTORIA ARGEROPLOS, ESQ.
                          1401 McKinney Street, #1900,
                          Houston, TX 77010
                          (713) 752-4413

                          Jackson Walker
                          By:  JENNIFER F. WERTZ, ESQ.
                          100 Congress Avenue, Suite 1100
                          Austin, TX 78701
                          (512) 236-2247
```

APPEARANCES CONTINUED.

```
Audio Operator:           Vriana Portillo, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com
```

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):

For the Debtors:         Akin Gump Strauss Hauer & Feld, LLP
                         By:  MARTY BRIMMAGE, ESQ.
                              ZACHARY DAIN LANIER, ESQ.
                         2300 North Field Street, Suite 1800
                         Dallas, TX 75201-2481
                         (214) 969-2800

                         Akin Gump Strauss Hauer & Feld LLP
                         By:  MEREDITH A. LAHAIE, ESQ.
                              KEVIN ZUZOLO, ESQ.
                              PHILLIP DUBLIN, ESQ.
                         One Bryant Park
                         Bank of America Tower
                         New York, NY 10036-6745
                         (212) 872-1000

For Westchester Fire     McElroy Deutsch Mulvaney & Carpenter
Insurance Company,       By:  MICHAEL MORANO, ESQ.
Federal Insurance        300 Delaware Avenue, Suite 1014
Company, Ace American    Wilmington, DE 19801
Insurance Company Ace    (302) 300-4515
INA Insurance, and
their affiliated
sureties:

For HCL America Inc.:    Archer & Greiner P.C.
                         By:  JERROLD KULBACK, ESQ.
                         1025 Laurel Oak Road
                         Voorhees, NJ 08043
                         (856) 795-2121

                         Archer & Greiner P.C.
                         By:  HARRISON BREAKSTONE, ESQ.
                         1211 Avenue of the Americas
                         Suite 2750
                         New York, NY 10036
                         (212) 682-4940

For Vertiv               Vorys, Sater, Seymour and Pease LLP
Corporation:             By:  TIFFANY STRELOW COBB, ESQ.
                         52 East Gay Street
                         Columbus, Ohio 43215
                         (614) 464-8322
```

```
TELEPHONIC APPEARANCES (Continued):

For Medical Mutual of     Frantz Ward LLP
Ohio:                     By:  JOHN KOSTELNIK, ESQ.
                          200 Public Square, Suite 3000
                          Cleveland, Ohio 44114
                          (216) 515-1636


For ELC Beauty:           Lowenstein Sandler LLP
                          By:  ERIC CHAFETZ, ESQ.
                          65 Livingston Avenue
                          Roseland, NJ 07068
                          (973) 597-6118


For the Ad Hoc Group      Proskauer
of Term Loan Lenders      By:  CHARLES DALE, ESQ.
and Term Loan DIP         One International Place
Lenders and Agent:        Boston, Massachusetts 02110-2600
                          (617) 526-9870


                          Proskauer
                          By:  MEGAN R. VOLIN, ESQ.
                          Eleven Times Square
                          (Eighth Avenue & 41st Street)
                          New York, New York  10036-8299
                          (212) 969-3859


                          Gray Reed
                          By: JASON S. BROOKNER
                          1601 Elm Street, Suite 4600
                          Dallas, Texas 75201
                          (469) 320-6132


For PNC Bank, National    Thompson Coburn Hahn & Hessen LLP
Association:              By:  JOSHUA DIVACK, ESQ.
                          488 Madison Avenue
                          New York, NY 10022
                          (212) 478-7340


For 401 North Broad       Kurtzman Steady, LLC
Lessee, LLC:              By:  JEFFREY KURTZMAN, ESQ
                          555 City Avenue, Suite 480
                          Bala Cynwyd, PA 19004
                          (215) 839-1222
```

```
TELEPHONIC APPEARANCES  (Continued):

For the Official          Pachulski Stang Ziehl & Jones LLP
Committee of Unsecured    By:  BENJAMIN LAWRENCE WALLEN, ESQ.
Creditors:                440 Louisiana Street, Suite 900
                          Houston, TX 77002
                          (713) 691-9385


                          Pachulski Stang Ziehl & Jones LLP
                          By:  SHIRLEY S. CHO, ESQ.
                          10100 Santa Monica Boulevard
                          13th Floor
                          Los Angeles, CA  90067-4003
                          (310) 277-6910
For Oracle:               S. Mayer Law
                          By:  SYLVIA MAYER, ESQ.
                          P.O. Box 6542
                          Houston, TX 77265
                          (713) 893-0339


For Selective             Gibbons P.C.
Insurance Co. of          By: BRETT THEISEN, ESQ.
America:                  One Gateway Center
                          Newark, NJ 07102
                          (973) 596-4923


For CoBank ACB:           Faegre Drinker Biddle & Reath LLP
                          By:  MICHAEL STEWART, ESQ.
                          2200 Wells Fargo Center
                          90 S. Seventh Street
                          Minneapolis, Minnesota 55402
                          (612) 766-7000


                          Faegre Drinker Biddle & Reath LLP
                              KRISTEN L. PERRY, ESQ.
                          1717 Main Street, Ste. 5400
                          Dallas, TX 75201-7367
                          (469) 357-2548


For Russo Family          Cole Schotz P.C.
Limited Partnership:      By:  DANIEL GEOGHAN, ESQ.
                          1325 Avenue of the Americas
                          19th Floor
                          New York, NY 10019
```

```
TELEPHONIC APPEARANCES (Continued):

For 11:11 Systems,        Perkins Coie LLP
Inc.:                     By:  JOHN D. PENN, ESQ.
                          500 N. Akard
                          Suite 3300
                          Dallas, TX 75201
                          (214) 965-7734


For the U.S.              Office of the U.S. Trustee
Department of Justice:    By:  STEPHEN DOUGLAS STATHAM, ESQ.
                          515 Rusk Street, Suite 3516
                          Houston, TX 77002
                          (713) 718-4650


For Salesforce.com,       Forshey & Prostok LLP
Inc.:                     By:  JEFFREY PHILIPP PROSTOK, ESQ.
                          777 Main Street, Suite 1550
                          Ft. Worth, TX 76102
                          (817) 877-8855

For Alter Domus:          Norton Rose Fulbright US LLP
                          By:  ROBERT BERNARD BRUNER, ESQ.
                          1301 McKinney, Suite 5100
                          Houston, TX 77010
                          (713) 651-5216


For Chubb Insurance       Duane Morris LLP
Companies:                By:  DREW MCGEHRIN, ESQ.
                          30 South 17th Street
                          Philadelphia, PA 19103-4196


For the FIS Entities:     Baker & Hostetler LLP
                          By:  DANIELLE MEROLA, ESQ.
                          200 South Orange Avenue
                          SunTrust Center, Suite 2300
                          Orlando, FL 32801
                          (407) 649-4000


For BlackLine Systems,    Felderstein Fitzgerald Willoughby
Inc.                      Pascuzzi & Rios LLP
                          By:  PAUL PASCUZZI, ESQ.
                          500 Capitol Mall, Suite 2250
                          Sacramento, CA 95814
                          (916) 329-7400
```

```
TELEPHONIC APPEARANCES (Continued):

For ChangePoint          Ferguson Braswell Fraser Kubasta PC
Canada:                  By:  RACHAEL L. SMILEY, ESQ.
                         2500 Dallas Parkway, Suite 600
                         Plano, TX 75093
                         (972) 826-4457

Also Present:            ALEX ORCHOWSKI
                         Kroll
```

1

1        (Proceedings commence at 2:00 p.m.)

2            THE COURT:  Officially, good afternoon, everyone.

3  This is Judge Jones; the time is two o'clock Central.  Today is

4  August [sic] the 17th, 2022.  This is the docket for Houston,

5  Texas.  On the two o'clock docket we have the jointly

6  administered cases under case number 22-90018, <u>Sungard AS New</u>

7  <u>Holdings</u>.

8            Folks, please don't forget to record your electronic

9  appearance.  That's a quick trip to my website.  Couple mouse

10  clicks.  You can do that at any time prior to the conclusion of

11  the hearing.  But that is the way that we will record your

12  appearance this afternoon.

13            The first time that you speak, if you would, please

14  state your name and who you represent.  It really does help the

15  court reporters do what is a very difficult job.

16            If you came in late, I have activated the hand

17  raising feature.  If you haven't already done so and know you

18  are going to be speaking, if you could go ahead and give me a

19  "five star," I will get you unmuted.  Obviously, you can change

20  your mind at any point in time.

21            And finally, we are recording these in Courtspeak,

22  we'll get the audio of this afternoon's hearing up on the

23  docket shortly after the conclusion of the hearing this

24  afternoon.

1          All right.  Ms. Lahei, are you starting us off this

2    afternoon?

3          MS. LAHEI:  I am, Your Honor.  Good afternoon.

4    Meredith Lahei, Akin Gump Strauss Hauer & Feld, counsel for the

5    Debtors.  I'm joined today by my partners Phil Dublin and Marty

6    Brimmage, and my colleagues Zach Lanier and Kevin Zuzolo.

7    I would like, if I could, Your Honor, to make a few opening

8    remarks before I turn the proceeding over to my colleagues.

9          THE COURT:  All right.

10         MS. LAHEI:  Today is an important day, obviously, for

11   Sungard.  We are seeking approval of the sale of our marquee

12   assets to 11:11, who you might recall is also the buyer of our

13   CMS business.  We are also seeking confirmation of our plan,

14   which will now be implementing the winddown of these estates.

15         As Your Honor has seen, this has not been an easy

16   process.  These are complicated, interconnected assets that

17   operate in a fairly niched space.  Indeed, the last time we

18   appeared before Your Honor, we did not know if we would be

19   successful at selling the assets or if the lenders would be

20   taking the assets back through a plan of organization.

21         Assuming Your Honor approves the sales we presented

22   today, we will be selling substantially all of our assets to

23   two buyers and distributing the proceeds through a liquidating

24   plan.  On the plus side, the sale of these businesses will

25   ensure continued employment for many of our employees and many

1    of our contract counterparties and landlords will see that our

2    contracts are going to be assumed and cure amounts paid.  We

3    also expect the sales will generate proceeds sufficient to pay

4    our admin, priority, and secured claims, which leaves a small

5    distribution to made for our first lien credit agreement claim

6    holders.

7            On a less than positive side, Your Honor, as we

8    previewed at least at the last hearing, I am sorry to report

9    that there will not be a distribution made past the first lien

10   credit agreement claims, meaning that there will be no

11   distribution made to the second lien credit agreement claims or

12   to general unsecured creditors.  Of course, this has been a

13   very difficult reality for the company and its constituents,

14   but it's been a reality that of course has been dictated by the

15   sale processes themselves, sale processes that carried on far

16   longer than the timeline contemplated by our bid procedures.

17           Given all of the facts and circumstances at play, we

18   do truly think that this is the best possible outcome available

19   for all stakeholders, including our employees and our contract

20   counterparties.

21           In a minute, I will turn this podium to Mr. Lanier

22   and Mr. Zuzolo, to provide the Court with additional facts and

23   evidence in support of the release that we're requesting.

24   Before I do that, however, I would like to do two things.

1           First, I want to make Your Honor aware of a service

2  issue that was brought to our attention yesterday.

3  Unfortunately, as a result of miscommunication between certain

4  of the debtor's advisors, the notice of confirmation hearing

5  and the notice of filing of the plan supplement were not served

6  by U.S. Mail on the master service list.  These papers were

7  filed on the docket prior to ECF upgrade outage, and the

8  parties that were receiving notice by ECF didn't receive those.

9  This includes obviously any parties who filed an objection.

10          However, Your Honor, due process is important.  The

11  debtor wants to address any concern about receipt of notice by

12  any other parties in a way designed to ensure that those

13  parties were not timely served, have exactly the same

14  opportunity to review the documents and raise objections as

15  those who were served by ECF.  Mr. Zuzolo will walk you through

16  the mechanics that we're proposing, but I did want preview that

17  issue for Your Honor.

18          And second, at the risk of jumping the gun a bit on

19  today's activities, I wanted to acknowledge a few people and

20  parties who have made today and really these Chapter 11 cases

21  possible.  First and most importantly, I would like to thank

22  our management team.  That is Mike Robinson, our CEO, who you

23  will see on the screen before you.  T.J. Anderson, our CFO, and

24  Bill Price, our general counsel.  We are, I can personally

25  attest to the fact that these guys have been working seven days

1  a week, 24 hours a day, around the clock to deliver the best

2  possible results for our stakeholders.   Among other things,

3  they have understood and prioritized, and I can't emphasize

4  that enough, the importance of the workforce here and they have

5  done their best to ensure minimal disruption of the lives of

6  our employees.  They care about these businesses; they care

7  about the folks that run these businesses.  I think that's

8  reflected in the results of the sale process in the cases that

9  you see here today.

10       In addition to our management team, I would also like

11 to extend a thank you to our primary creditor constituency, and

12 particular to our term lenders and our creditor committee and

13 their respective advisors, (indiscernible).  Those groups

14 understood, as I'm sure Your Honor has seen, early on what the

15 (indiscernible) for these cases, they both just got it out of

16 the gate.  They did their jobs.  We think they did them well.

17 And they did them in a way that did not create unnecessary

18 distractions or expense in a case that frankly could not afford

19 any incremental cost.  The support of both of those groups has

20 been critical to our ability to propose a plan in these Chapter

21 11 cases and we are very grateful for their approach.

22       With that, unless Your Honor has any questions for

23 me, I will cede the podium to Mr. Lanier in the first instance,

24 to present the sales transaction.

1          THE COURT:  All right, thank you.  I may come back to

2    you, but let me hear what your other two colleagues have to

3    say.   Mr. Lanier, you're starting us off?

4          MR. LANIER:  Thank you, Your Honor, and good

5    afternoon.  Zach Lanier, Akin Gump Strauss Hauer & Feld for the

6    debtors.

7          As Ms. Lahei mentioned today, we are seeking approval

8    of a sales transaction to 11:11 Systems Inc.  This sale will be

9    the third and final significant sale that's happened in these

10   Chapter 11 cases, and the second sale in these cases to 11:11

11   Systems.

12         As Your Honor will recall, on August 31st, this Court

13   approved a sale of the debtor's co-location work services

14   business, to 365 Data Centers.  And on September 14th, this

15   Court approved a sale to 11:11 for substantially all assets

16   related to the debtor's Cloud and Managed Service business

17   which was, as Your Honor will recall, we refer to as CMS.

18   With the sale of debtor's network, location, and CMS business

19   units, the debtor's primary managing business unit is their

20   after-recovery services.  What sometimes we refer to as the

21   "evil assets" in this document.  These assets were thoroughly

22   marketed both prior to and during the Chapter 11 case.  At the

23   original bid deadline of July 7th, under the bidding procedures

24   this Court approved on May 11th, the debtors received no actual

25   bids for the recovery services business.  As stated at prior

1   hearings and pleadings, the debtors were preparing to

2   reorganize around the recovery services business but were also

3   continuing to evaluate the potential alternatives for this

4   business.

5          At the discussion and diligence process, 11:11

6   Systems progressed on the CMS transaction, 11:11 emerged as a

7   potential buyer for the "evil assets."  Ultimately, after weeks

8   of good faith and arm's length negotiations with 11:11 and a

9   consultation with the consultation parties, the debtors

10  executed an asset first agreement with 11:11 Systems on

11  September 30th.  The debtors announced the sale thereafter on

12  October 5th and filed the notice on the docket with the

13  executed APA -- we shared the terms of that APA on -- at Docket

14  Number 705.

15         The main terms of the sale are as follows:  The

16  buyer, 11:11, will pay $60 million in cash at the closing,

17  assume liability related to the purchase of assets for a period

18  from and after closing, and pay cure costs associated with the

19  purchase contract, subject to a sharing mechanism that kicks in

20  once the cure cost exceeds $7 million.

21         Importantly, as Ms. Lahei mentioned, the buyer will

22  also be offering employment to a large segment of the debtor's

23  current workforce.  And the APA requires that those offers be

24  made on substantially similar terms in the (indiscernible).

1           Significantly, the buyer is required to pay the

2    debtors an amount equal to $1.5 million per week, commencing on

3    October 18th and continuing on Monday of each week until the

4    closing occurs.  This payment, as Your Honor will appreciate,

5    is the key piece to the bargain that will inform the debtor's

6    decisions to proceed with the sale of the recovery services

7    business and help ensure or give lender support for the sale.

8           Based on the results of the debtor's sale process,

9    the debtors believe that the sale of recovery service business

10   to 11:11 represents the highest and best offer for the purchase

11   of assets.  Today's sale is also the capstone, as Ms. Lahei

12   mentioned, of the debtor's sale efforts.  And with approval of

13   this sale, the debtors will still remain in business here, and

14   will proceed to ensure that proceeds from the sale wind down.

15          To that end, the buyers of 365 and 11:11 and their

16   respective advisors have been working around the clock to close

17   a very complex set -- complex and interconnected set of sale

18   transactions.

19          While selling the recovery services to 11:11

20   simplifies those transactions, each remain complicated assets

21   and services that as of the petition date were sold as an

22   integrated unit.

23          If the Court approves today's sale, and to close the

24   sale, the sale of the co-location network services, Business

25   365, and the CMS Recovery Services Business, to 11:11 as fast

1   as humanly possible.  What we anticipate for that closing to

2   occur soon, but we cannot predict the exact date at this time.

3   In any event, the requirements of our proposed sale order will

4   a file notice of closing one business day prior to closing.

5         With respect to the cure costs, the buyer's deadline

6   to designate contracts for assumption of assignment was five

7   business days prior to today's hearing.  Given the holiday last

8   week, that meant that it would be filed -- proposed assumed

9   contracts on October 7th.  That coincided with the period in

10  which the Court's DPS system was down, so we filed that in

11  accordance with the chamber's procedures and instructed

12  (indiscernible) served on the effective counterparties and the

13  master (indiscernible).

14        There were a few clean-up changes that were made to

15  the list between then and today's hearing, and we filed a

16  revised list, I believe, as of speaking at Docket Number 755.

17  Those clean-ups were certain contracts where the information

18  was listed incorrectly.  And there were a few agreements that

19  were inadvertently left off that we intended to include.  But

20  all the counterparties that further wished those changes were

21  made, had notice of what those changes, and those changes were

22  in large part requested by those counterparties.

23        As to the prior sale, of what the counterparties at

24  large have been noted, that the contracts may be assumed since

1   June 13th and June 14th of the summer, when we filed the

2   initial list of the potentially assumed contracts.

3           Last night, Docket Number 743 filed a brief reply in

4   support of the sale.  As we say in the reply and as with our

5   past sales, none of the objections have been filed, or served

6   that the sale should not be approved or that the sale is not in

7   the best interest of the estate.  All of the debtor's key

8   stakeholders, including the competition parties, are supportive

9   of the sale.

10          That being said, there were certain cure related

11  objections that are applicable to the 11:11 sale.  We have

12  attempted to summarize those for the benefit of the Court and

13  interested parties, in the exhibit that was attached to the

14  reply.  As noted, these objections have either been resolved or

15  adjourned to a later date, to allow the parties time to agree

16  to consensual resolution of the issues raised by those

17  objections.

18          In addition to the objections listed on the chart, I

19  will also note for the record that we received informal

20  comments for an objection from IBM Capital.  Because they did

21  not file a formal objection, I represent that I will make a

22  statement on the record that their informal objection is

23  preserved as the parties continue to work out those issues.

24          Finally, this afternoon we received an informal reach

25  out from the landlord for a lease at 777 Carlstadt, New Jersey,

1   which is subject to assumption assignment in connection with

2   the sale transaction.  We understand that those discussions are

3   active, but the latest as of minutes before this hearing was

4   that we understand that the landlord and the buyer, 11:11, have

5   reached an accommodation that is different from what was in the

6   lease, or the APA, but our understanding of that accommodation

7   is that as a condition to closing, it's providing an LC, a

8   security deposit for that lease.  The parties have agreed that

9   a cash deposit would suffice until such time as a replacement

10  LC could be obtained.

11          You know, from the debtor's perspective, this is the

12  first of course, we're hearing on this, so we're still reacting

13  to it.  But that is our understanding of what the parties

14  agreed, and as long as there is no liability for the debtor's

15  estate, I think he can get comfortable with the resolution that

16  the parties 11:11 and the buyer have reached.

17          With that, I will -- I have taken up enough airtime

18  for now, I will let others speak if there's anything that

19  others wish to say.

20          THE COURT:  Certainly.  So I will make the circle for

21  everyone in just a second.  So I want -- help me -- I want to

22  make sure I have this in my mind.  So you've got -- you want to

23  close this as soon as you possibly can, but you've also got a

24  number of cure issues and maybe not so great notice out there.

25  How are going to reconcile all of that?

```
 1            MR. LANIER:  Your Honor, we are in active discussions
 2    with all of the parties about these issues.  You know, the
 3    debtors are cognizant of the notice issues.  They are cognizant
 4    of the open cure objections.  And we're cognizant of the need
 5    to make sure that we don't trip over anyone's due process
 6    rights.  So while we're intending to close as soon as humanly
 7    possible, the debtor's intent is not to close in such a way
 8    that would damage or impair any of those parties' rights.
 9            THE COURT:  Now, do I have counsel for 11:11 on the
10    video?
11            MR. PENN:  Your Honor, John Penn on behalf of 11:11.
12            THE COURT:  So, Mr. Penn, I went to help you get this
13    done.  And so to the extent that you can give me information,
14    it would really be helpful.  Do you have a realistic closing
15    date?
16            MR. PENN:  We are doing everything possible to close
17    by tomorrow.
18            THE COURT:  Ah.  Okay.
19            MR. PENN: (Indiscernible.)
20            THE COURT:  And so, is it --
21            MR. PENN:  And moving heaven and earth and getting
22    people in position to go.
23            THE COURT:  Got it.  And so you -- is it a fair
24    statement to say that you are going to close on a core group of
25    assets with the understanding that with respect to those leases
```

1  and contracts that are kind of up in the air, you are going to

2  do your best to make good business deals.  And if you can't,

3  you'll proceed ahead.  And if you do, then you'll take them.

4  Is that a fair statement?

5         MR. PENN:  That is a fair statement, because the

6  agreement allows for the contract -- if there is no deal with

7  the separate parties, the agreement allows for them to be moved

8  over onto the excluded contract.

9         THE COURT:  No, I got that.  And let me finish the

10  thought and then you'll understand why I'm asking these

11  questions.  What I was going to propose, if it's helpful, is to

12  give you a status hearing, a scheduling hearing -- call it

13  whatever you want.  In, let's say, two weeks.  And I will have

14  the debtor send out a notice that says, with a final version of

15  the assumed -- or the contracts and leases to be assumed, it

16  says, "You've got to stand up and wave your hand by this

17  hearing date, or you have forever waived your right to

18  challenge a cure amount or anything."  And obviously, if you're

19  in communications and you get deals done, you don't need that

20  hearing.  But it's -- what I was trying to do, was to figure

21  out a way that I could give you a definite end to knowing

22  exactly where you stood.  Now, if this isn't helpful at all,

23  please tell me and I'm happy not to try and help.

24         MR. PENN:  I'm hearing this notice issue for the

25  first time at the hearing, which is a bit of surprise.  To the

1  extent that the Court was thinking of that, I would put a

2  caveat in there that if they had not otherwise been served for

3  the ECS system, because I wouldn't want to re-open the door for

4  anyone that had received that one.

5        THE COURT:  No, this -- absolutely.  This is for --

6  this is only to minimum due process and if folks have had

7  minimum due process and haven't acted, then that's -- it's not

8  intended to benefit those.  It's just to the extent that anyone

9  got omitted, and you need a deadline by which you can start

10  making business decisions, or your clients do.  And I get that.

11  And to me, that just seemed like a rational balance, is to give

12  you a quick hearing, have the Debtors serve out a final list,

13  even if it's somewhat duplicative of what got served today or

14  yesterday.  All fine by me.  More notice is always better.  And

15  that way you then -- you know exactly where you stand at a

16  relatively quick amount of time.  Does that sound rational to

17  you?

18        MR. PENN:  Yep.  Your Honor, I believe that we are in

19  violent agreement with -- if we can build the caveat in, just

20  so we don't re-open the door.  That's all I want.

21        THE COURT:  No, no, no.  It was never intended to go

22  back and start over.  It was only intended to supplement anyone

23  that may have been missed.  That was all.

24        MR. PENN:  Understood.

25        THE COURT:  All right.  Thank you.

1          MR. PENN:  Just trying to do the drafting at the

2    front end.

3          THE COURT:  No, absolutely.  And Mr. Zuzolo, I may

4    have stolen some of your thunder.  Is this along the lines of

5    what you were thinking, or do you have something that is just

6    more efficient?

7          MR. ZUZOLO:  No, Your Honor, that is exactly along

8    the lines of what we were thinking.  We have added to the

9    proposed confirmation order that was filed slightly before this

10   hearing.  The provision that is similar to this, that I was

11   planning to walk through at that portion of the hearing.  But

12   your gist of what you've described is what we are intending to

13   do for parties.

14         THE COURT:  And I didn't see that amended order had

15   been filed.  Can you tell me the paragraph?  And I have --

16         MR. ZUZOLO:  So this is Docket 753.

17         THE COURT:  53?  Or 54?  No, you're right, 54 is the

18   new sale order.  You're right.  Sorry.  So 753-1.

19         MR. ZUZOLO:  Yes.  Correct.  And this at the end of

20   the proposed order at Paragraph 37.  And Your Honor, I'll just

21   note that the reason we built these protections into the

22   confirmation order is because we didn't actually believe there

23   was a significant issue with respect to the sale notice.  The

24   sale notice that did not go out to the appropriate service

25   list, actually was -- there was a subsequent notice distributed

```
1    two days later on October 7th, that did serve the appropriate

2    parties with respect to the sale hearing.  So we didn't quite

3    have the same issue with respect to the notice of the

4    confirmation hearing and the objections thereby, as we did with

5    the sale.

6              THE COURT:  Right.

7              MR. ZUZOLO:  And I'm happy to provide some more

8    context around this particular provision, it's modeled off of a

9    provision from the (indiscernible) that Judge Isgar used when

10   there was a similar notice concern with respect to a -- it must

11   have been a 24 hour pre-pack, but it was a very quick pre-pack

12   case where there was a concern that appropriate parties may not

13   have gotten the opportunity to object to confirmation.

14             THE COURT:  And so tell me -- I've read Paragraph 37,

15   with respect to any issues you have, with respect to rejection

16   and assumption issues.  How does this address that?

17             MR. ZUZOLO:  Your Honor, this is not intended to

18   address assumption and rejection issues with respect to the

19   sale.  As I noted, and Mr. Lanier can correct me if I'm wrong,

20   I believe the assumption of rejection - or the assumption with

21   respect to the ease of sale, was properly served and there were

22   not any issues.

23             THE COURT:  I thought that Mr. Lanier told me that

24   you were making changes even as of today.  Did I misunderstand

25   that?
```

1          MR. LANIER:  Your Honor, to clarify, the changes that

2    were made today, there are -- I want to say there are five

3    changes.  Three of those relate to a counterparty who we listed

4    the wrong contract information on.  They were on the list, and

5    they were served the notice.  When they reached out after

6    serving and said, hey how you got that date wrong.

7          THE COURT:  Okay, so you --

8          MR. LANIER:  Or hey, you got the title of this

9    agreement wrong.

10          THE COURT: Right.

11          MR. LANIER:  And then that was one set of issues.

12    The other set -- the other issue was there was one contract

13    that was included that shouldn't have been included because it

14    is a terminated contract, so there is nothing to assume.  So

15    that was taken off the list.  And then there was one

16    counterparty who the debtors were of the view that there was

17    only one specific agreement with that counterparty, but there

18    are actually two agreements with that counterparty, and we just

19    missed the second one, and that was pointed out to us by that

20    counterparty.  In the notice we filed, and I noticed very, very

21    shortly before this hearing.

22          But in the notice, we saw right before this hearing,

23    we clearly delineated, you know, certain contracts.  One

24    contract was removed because it is no longer an executory

25    contract.  A couple contract information was corrected, and a

1  couple contracts were added.  All of that was done with the

2  counterparty's knowledge and consent.

3          THE COURT:  Fair enough.  The most important thing

4  that you were engaged with those folks that were affected -- is

5  what you are telling me.

6          MR. LANIER:  Exactly.

7          THE COURT:  Got it.  All right.  Then Mr. Penn, let

8  me ask you, I'm -- I may have worried you unnecessarily, and I

9  if I did so, my apologies.  The offer -- and you're free once

10 we get onto the next part of this -- you are free to step off

11 and talk to your team or your client as may be appropriate.

12 And if you decide that you need some -- if you would like to

13 have a hearing out there, just to deal with any issues, if it's

14 helpful, I'm more than happy to do it.  And if it's

15 unnecessary, there is obviously always someone else who wants

16 the time.

17          MR. PENN:  Absolutely.  Thank you, Your Honor.

18 Probably after the conclusion of the hearing we can get back in

19 touch with the Court, after we've talked to both our team and

20 the Akin team.  At some point we're going to need a cutoff

21 point to deal with any parties who we have not come to terms

22 with, if there is outstanding adequate assurance or cure issue.

23 And so just a question of mechanics of how to get about that

24 process.

 1          THE COURT:  All right.  Then, fair enough.  Let me

 2  ask, is there anybody else that wants to be heard with respect

 3  to the sale motion or any particular cure issue that has been

 4  reserved or the method in which it's been reserved or the

 5  proposed way of resolving those issues?

 6          MR. KULBACK:  Your Honor, it's Jerry Kulback.

 7          THE COURT:  I'm sorry, I heard two folks at exactly

 8  the same time, and I couldn't distinguish either name.

 9          MR. KULBACK: Jerry Kulback with Archer & Greiner on

10  behalf of HCL America Inc.

11          THE COURT:  Yes, sir.

12          MR. KULBACK:  And HCL Comnet Services.

13          THE COURT:  All right.

14          MR. KULBACK:  Your Honor, we have filed a combined

15  limited objection to the plan to the sale and to a motion --

16  the 9019 motion to approve the rejection of a lease at the

17  Houston, Texas Data Center.  And we have been discussing that

18  objection with counsel for the debtor as well as counsel for

19  11:11. And I think that we have been able to preserve all the

20  issues for a later date, but I do want to at least bring some

21  things to Your Honor's attention in case they aren't resolved.

22          Your Honor may recall that HCL is a customer of

23  Sungard and has equipment and data and its customers' equipment

24  and data in seven data centers.  Three of the leases for those

25  data centers were assumed and assigned to 365 under the Bravo

1    sale, which was already approved, and those were:  Richardson,

2    Texas, 1500 Spring Garden Street in Philadelphia, and Smyrna,

3    Georgia.  But two of those leases are proposed to be assumed

4    and assigned to 11:11 under the (indiscernible) sale that's

5    before, Your Honor.  That's the 777 Central Boulevard Carlstadt

6    Data Center and 401 North Broad Street, Philadelphia.  And two

7    of the leases for two data centers are proposed at some point

8    to be rejected, and those data centers closed, and that's

9    Thornton, Colorado and Houston, Texas.

10           In no way is HCL trying to stand in the way of a plan

11   confirmation or a sale, but what we are concerned with --

12   significant concerns, is loss of data and disruption that would

13   occur and havoc that would occur in the event that services

14   would not continue to be rendered smoothly as the sale closures

15   and the services are transitioned.

16           Our contract is proposed on the list of contracts to

17   be assumed by 11:11 in connection with the sale.  They are

18   listed and it is my understanding that 11:11 wants to assume

19   the entire business relationship that the debtors that

20   currently have with HCL.  And we are not -- we don't really

21   have any objection to that; however, given that 11:11 is only

22   taking two of the leases -- three of the leases went to 365 and

23   two are being -- eventually will be rejected and those data

24   centers closed.  We have significant concerns exactly how this

25   is going to work.

1          We have engaged with counsel to try to work through

2     these issues on a business solution level, and in fact, my

3     understanding, and it is listed in the APA, is that there will

4     be a master services agreement and transition services

5     agreement between the two buyers and the debtor that will

6     account for some of the issues that we have as to exactly how

7     this is going to look going full basis.  We haven't seen those

8     agreements yet.  Those are really adequate assurance issues

9     that I don't know if it was Mr. Zuzolo or other counsel,

10    Mr. Lanier, had indicated, are adequate assurances being

11    reserved for a later date in case we can't work through these

12    issues.

13         With respect to the other two data centers that are

14    proposed to be rejected, one of those, the Thornton, Colorado

15    data center is to be rejected under the plan, as a contract

16    eventually that is neither assumed -- is not being assumed in

17    connection with either sale.  So by default, it would be

18    rejected.

19         My understanding, and we have recently received as of

20    this morning a stipulation between the landlord and the debtor

21    with respect to that data center, that it will remain open, and

22    that lease will not be rejected at least until further order of

23    the Court, and no sooner than January 31st will we have to

24    vacate that facility.  That should give us sufficient time.  We

25    have engaged with the landlord directly at that facility to try

1   to work something out.  But we do want to indicate that that is

2   -- was a concern of ours.

3           Houston, Texas, is also a concern because that is --

4   on the 9019 motion -- I don't believe the 9019 motion is on for

5   today.  But just to lay it out, because these are all the same

6   issues -- they're all transition issues, Your Honor, that we're

7   concerned with.  That one is proposed to be closed also at the

8   end of January.  We have engaged with Digital Realty, who is

9   the landlord of that facility, to undertake providing services

10  for us at that facility.  Though that would -- none of this has

11  come to pen to paper yet with any of the landlords or with

12  11:11.  11:11 is certainly going to have to modify our master

13  services agreement since they only are going to be providing

14  services at five of the seven data centers we're currently at.

15  And we certainly understand that and are willing to engage with

16  everyone in that regard.  But we do note for the record that,

17  as of right now, if we aren't able to reach business solutions

18  with everyone, January 31st is just not a doable time to find a

19  new location and move with these amount of data that we're

20  talking about.

21          As our objection that we filed, which is Document --

22  Docket Number 723 indicates, and the supporting declaration of

23  Prashanth Ponugoti that was filed at Docket 724, we would need

24  at least a year to find and sufficiently smoothly transition

25  some of this out.

1          We hope we never have to get there where these issues

2     are before Your Honor, and hope we can get business solutions

3     to all of this, but I did want to lay it out.  And we did ask

4     for one thing that I would -- and I did discuss this with

5     Mr. Lanier prior to this hearing, is we just want to make sure

6     while the stipulations, both under the 9019 motion and with the

7     Thornton, Colorado landlord indicate that the leases will be --

8     will not be rejected at least until January 31st, we would like

9     assurances that services are actually going to be provided to

10    HCL at least through that date.  Whether it's through the

11    debtor, 11:11 if the sale does close tomorrow, or 365, or under

12    some sort of an agreement between them.  I'm assuming this is

13    part of a transition services agreement that's being negotiated

14    behind the scenes that we haven't seen.  But we do want to make

15    sure that at least through January 31st, we are going to have

16    services rendered under our contract that is proposed to be

17    assumed assigned.

18          THE COURT:  All right.  So, help me understand,

19    because it always -- it always bothers me when one party asks

20    me for relief, and another party says, it's all okay with me,

21    but I'm reserving all of my rights.  I actually don't know how

22    to reconcile those two, because every order I sign will

23    terminate someone's rights.  And so I want to make sure that I

24    have a good understanding of whatever agreement it is that you

25    have reached with the debtor, and what you anticipate --

```
 1                MR. KULBACK:  With respect --

 2                THE COURT:  -- happening.  Is it that if you can't

 3   get comfortable with adequate assurance that you're reserving

 4   your right to come in and challenge the assumption?  That, I

 5   understand.  If it's something more than that, I need help.

 6                MR. KULBACK:  With respect to the sale issue with

 7   11:11, yes.  If we can't get comfortable with adequate

 8   assurance and don't otherwise work a business deal, that we

 9   would be able to come in with respect to assumption of that

10   contract.

11                THE COURT:  All right.  And, Mr. Lanier, I think that

12   was contemplated, correct?

13                MR. LANIER:  That's correct, Your Honor.

14                THE COURT:  Okay.

15                MR. LANIER:  At the end of the day, we think a

16   business solution is available here because if the question is

17   whether or not the contract would be assumed, I think the

18   parties' incentives are clear.  I think something can be struck

19   here.

20                THE COURT:  I totally understand that.  You've made

21   it very clear that you're reserving out what I'm just going to

22   call "assumption issues."  Whether it be cure costs, whether it

23   be adequate assurance of future performance, whatever it might

24   be, you've made it very clear that you're reserving those.  But

25   I want to make it also equally clear that there is nothing
```

1    that's being reserved beyond that in terms of the requested

2    sale.  I'm either going -- I'm going to rule on it or not.

3                MR. LANIER:  That's the debtors' understanding.

4                MR. KULBACK:  Understood, Your Honor.

5                THE COURT:  All right.  Thank you.

6                MR. KULBACK:  That -- and that is HCL's

7    understanding, as well, Your Honor.

8                THE COURT:  Okay.  Thank you.  That's -- I just

9    didn't want there to be any misunderstandings.

10               So, I know there was at least someone else that

11   wanted to address the Court.

12               MR. STATHAM:  Steve Statham for U.S. Trustee,

13   Your Honor.  May I be heard?

14               THE COURT:  Of course.  And I know that there was

15   another gentleman other than you, Mr. Statham.  I see him

16   laughing now.  Got it.  Okay.  Mr. Statham?

17               MR. STATHAM:  Thank you, Your Honor.  Either from

18   Mr. Lanier or Mr. Zuzolo, I think I understood that the

19   concerns about noticing are perhaps resolved by a subsequent

20   notice.  On October 7th it went out to the entire general

21   mailing list.  Am I correct in that understanding, gentlemen?

22               MR. LANIER:  Correct.  On October 7th, the debtors

23   served the notice of proposed assumed contracts in connection

24   with the 11:11 sale on all the affected counterparties by email

25   or mail.  And then we also, as I understand, served that list

1  on our typical master service list.

2          MR. STATHAM:  All right.  Good.  Thank you.

3          Thank you, Your Honor.

4          THE COURT:  Yes, sir.

5          All right.  Mr. Geoghan?  I think that you've got me

6  muted?  I think you still have the -- have you hit "five star"

7  for me?  You had not.  There you go.

8          MR. GEOGHAN:  How is that, Your Honor?

9          THE COURT:  Loud and clear.  Thank you, sir.

10          MR. GEOGHAN:  Thank you, Your Honor.  Your Honor,

11  it's Dan Geoghan from Cole Schotz representing Russo

12  Development -- Russo Family, excuse me.  Your Honor, I'm here

13  on the 777 Lease.  And this is not an issue of notice

14  (indiscernible) statement of reservation of rights, and we do

15  need to discuss it a little bit.  Your Honor, we learned this

16  morning that the purchaser will be unable to provide the

17  necessary adequate assurance.  Meaning in the form of they're

18  required to provide a letter of credit.

19          We contacted debtors' counsel today about it,

20  (indiscernible) letter of credit or replacement letter of

21  credit for security.  We contacted debtors' counsel.  They

22  asked that we come to some level of agreement and give them

23  some time, the representation and thought being that the sale

24  would not close until sometime close to the end of October,

25  giving 11:11 time to come up with an appropriate letter of

1  credit.

2       Your Honor, they have -- my understanding now from

3  listing to Mr. Penn, they intend to close as soon as tomorrow.

4  The parties are attempting to negotiate an appropriate business

5  resolution.  Possibly a cash deposit with time to get to a

6  letter of credit, or otherwise.  But nothing has been agreed

7  to, papered, dealt with, and we just learned about it.  And it

8  gives me great pause and concern that there's going to be an

9  attempt to close tomorrow, I don't have an agreement, I don't

10 have security, but I do have someone's letter of credit, and

11 that's the debtors.

12      And it gives us great pause as to what our next steps

13 are if they really intend to try and close tomorrow.  I don't

14 have any expectation that we will have a commercial deal and

15 arranged by then.  And I can't have that letter of credit get

16 terminated by the closing.  I'm open to suggestions, possibly

17 we draw the letter credit and hold it in escrow.  But we need

18 to -- I think if the closing is going to occur tomorrow, and

19 this becomes a little bit more than a reservation of rights --

20 and I apologize that we didn't file an earlier objection, but

21 we thought we were all good until we learned it this morning.

22      THE COURT:  All right.  So if I could, I just want to

23 make sure because you are far more engaged with this than I

24 currently am.  So you are concerned that the lease is assumed

25 and assigned as part of a closing, and that somehow the letter

1  of credit, which currently acts as your security, is

2  terminated, and you're left without replacement security.  Is

3  that a fair summary?

4          MR. GEOGHAN:  Correct, Your Honor.  And the parties

5  are seeking to negotiate a replacement in the form of cash.

6  But I am not positive, certain.  We have no certainty that that

7  will get done before closing tomorrow.

8          THE COURT:  No, I got it.  Mr. Lanier?

9          MR. LANIER:  Your Honor, this is all happening

10  somewhat in real time.  I will say from the debtors'

11  perspective, you know, our main view of all this is that we're

12  here to protect the estate.  If there's going to be a

13  resolution that can be worked out and documented in time for

14  closing tomorrow, then that's fine.  If not, then, you know, we

15  will take stock of where we stand at that point and make an

16  appropriate decision that ensures that the debtors are not

17  adversely affected by any agreement between the landlord, or

18  not, and 11:11.

19          THE COURT:  Sure.

20          MR. LANIER:  I will also note that we anticipated

21  this occurring, to some extent, under our asset purchase

22  agreement, such that if 11:11 is not able to obtain a

23  replacement LC and the landlord draws on such LC before -- as

24  part -- before closing, then 11:11 has to reimburse us the

25  amount that is drawn.

1           So we believe we can come to a solution here.  I

2  think it's just being worked out in real time, so I don't know

3  if we have a firm perspective.  But, you know, the last I heard

4  was there was agreement between the landlord and the buyer

5  that, of course, has not been documented.  So I think it's

6  probably best to reserve on this issues for now, until the

7  parties have a chance to discuss further.

8           THE COURRT:  All right.  Mr. Penn, you want to weigh

9  in on this at all?

10          MR. PENN:  Yes, Your Honor.  I can confirm that we

11 are working diligently to reach the accommodation for the

12 replacement security; that there are just logistical issues in

13 obtaining a letter of credit issuance, which is why we were

14 discussing the cash replacement with the landlord.  As I

15 understand it, although I'm not in that negotiation, that it's

16 basically at the handshake phase, that it's moving towards

17 documentation, and we're doing everything possible to get that

18 documentation in place to be in a position to close as quickly

19 as possible.

20          THE COURT:  All right.  And so let me ask you this.

21 Is that -- if I ask you not to close before noon tomorrow, am I

22 really -- are you going to be in a position to close before

23 noon tomorrow?

24          MR. PENN:  Noon might be a really, really, really

25 heavy lift.  But by the time the wires close, I remain

1   optimistic that we can get it done by then.

2           THE COURT:  So here is -- and let me also ask

3   probably the most important question, is the current LC secured

4   by property of the estate?

5           MR. LANIER:  The LC is under our ABL facility, so

6   it's part of the DIP once it's drawn on.

7           THE COURT:  All right.  Seems to me there's a

8   relatively easy fix to all of this, and probably just means

9   there need to be a couple of other conversations this afternoon

10  and this evening.  What if I gave you a short hearing tomorrow

11  at noon, and again ask that no close -- and again, if this is a

12  problem, I can speed this up.  Is that we have a short hearing

13  at noon just to find out where we are, and if in fact we really

14  do have a problem.  Does that sound like a way to address

15  this --

16          MS. LAHAIE:  Your Honor --

17          THE COURT:  Ms. Lahaie, yes, ma'am.

18          MS. LAHAIE:  Your Honor, I apologize, and I apologize

19  for speaking out of turn on Mr. Lanier's matter.  And I --

20  we're getting into territory that I was hoping we would be able

21  to avoid on this court hearing and airing some dirty laundry

22  Your Honor is probably sensing hasn't been fully dealt with

23  behind the scenes.

24          I'll speak for the company.  I do not think the

25  company is going to be in a position to close tomorrow.  And I

1  think Your Honor is getting a sense that there are more loose

2  ends from the company's perspective than we would like to see

3  to be in a position to close.  And Mr. Lanier, I think, is

4  effectively articulating that we need to make sure that

5  whatever arrangements are reached, whatever accommodations are

6  made, that nothing is being done that either impacts the value

7  of the estate, or results in any kind of (audio interference)

8  et cetera.

9          So I am hearing -- and this is certainly not the

10 first time we've heard 11:11 articulate a very strong desire to

11 close tomorrow.  I have my own concerns, Your Honor.  And I

12 speak for the company and all of its advisors, I do not think

13 we're going to be in a position to close tomorrow.  So I'm

14 happy to have a place holder hearing, Your Honor.  I do not

15 know that we're going to have all the issues teed up by noon

16 tomorrow.  But maybe there will be some issues we can ask for

17 Your Honor to help out on.  But it may also make sense.  I

18 think the parties have another call scheduled this afternoon to

19 go through the closing list and figure out where we are on the

20 issues.  And I think there clearly are some businessperson

21 discussions that still need to take place between our senior

22 management and 11:11's senior management.  But again, I was

23 hoping not to get into this particular topic, but that's where

24 we are.

25          THE COURT:  Got it.  Well, it seems to me -- and I

1    agree, I would rather have productive conversations going on in

2    the background.  But it just sounds to me as though if we had

3    no closing before noon -- and again, I hear what everybody is

4    saying.  But I'll give you a -- I'll give you a hearing at

5    noon.  And I'm perfectly happy if you email Mr. Alonzo

6    beforehand and say we've got this all worked out, don't need

7    it.  Or if we do need it, we can then get a better update with

8    respect to schedule and where we are, and what remains

9    outstanding.  Because again, I think this is relatively easy to

10   solve.  But I need -- obviously I need folks to talk.

11          But with that, (audio interference) Geoghan, does

12   that give you some level of comfort that you'll at least --

13   you'll get to have another conversation, or two, or four,

14   between now and tomorrow, before a closing occurs, to address

15   this issue?

16          MR. LANIER:  And you said Sean, if heard correctly.

17          THE COURT:  I said Geoghan, and I am probably

18   mispronouncing your name.  My apologies.

19          MR. GEOGHAN:  I'm sorry, Your Honor.  And yes, if the

20   parties can agree to -- and it's -- first, it's pronounced

21   Geoghan.

22          THE COURT:  Geoghan, I apologize.

23          MR. GEOGHAN:  And second, if the parties can agree to

24   not close before noon while we engage -- and I do represent the

25   parties have engaged in some fashion.  I think it's been very

1  limited at first, right now, to have a discussion around

2  finding replacement security.  If there's agreement not to

3  close, we're happy to continue to discuss and see if we can

4  come to an arrangement before then.  As I said, my only concern

5  is that someone decides to close and leaves us swinging.  So

6  that is our only concern.  If the parties agree to hold off

7  until noon, we'll agree to talk.

8          THE COURT:  I don't need the parties' agreement.

9  There won't be a closing before noon tomorrow, and you have a

10 hearing tomorrow at noon.  And we'll either have a --

11         MR. GEOGHAN:  Thank you.

12         THE COURT:  -- resolution, or we won't.  Okay.

13         MR. GEOGHAN:  Thank you, Your Honor.  I appreciate

14 that.  That is more than acceptable to us.

15         THE COURT:  And just so that we're clear, there may

16 be a closing at 12:01.  But there won't be a closing before

17 noon.

18         MR. GEOGHAN:  Thank you, Your Honor.

19         MR. KULBACK:  Your Honor?

20         THE COURT:  Yes, sir.

21         MR. KULBACK:  Jerry Kulback for HCL again.  HCL is in

22 the 777 Carlstadt, New Jersey location, as well as Estée Lauder

23 is one of our larger customers in that location.  And our

24 understanding is the lease is being assumed and assigned.  I

25 understand the issue of the replacement letter of credit.  I

1    just want to make sure that if we confirm a plan today, that it

2    will not be rejecting that lease to the extent that they can't

3    otherwise work out an agreement regarding the letter of credit.

4            THE COURT:  Well, nothing -- well, if they can't work

5    out an acceptable way of adequate assurance of future

6    performance, then rejection is absolutely in the near future.

7    There isn't an alternative.  But I think that this is an issue

8    that there just needs to be another couple of conversations.

9    This is not hard.  This is easy.  I think it's just time that's

10   caused the difficulty.  But you'll get an update tomorrow at

11   noon.

12           MR. KULBACK:  Thank you.

13           THE COURT:  Yes, sir.

14           All right.  I forgot who I was with.  Mr. Lanier?  Am

15   I back to you?

16           Or let me just make -- complete making the circle.

17   Is there anyone else that had an issue that they wanted to

18   address?

19           Mr. Theisen, I think I see you talking?  Hold on.

20   Mr. Theisen, was -- did I see you talking?  Hang on.  How about

21   now?

22           MR. THEISEN:  Can you hear me, Your Honor?

23           THE COURT:  Yes, sir  Thank you.

24           MR. THEISEN:  Thank you.  Brett Theisen of Gibbons

25   P.C. on behalf of Selective Insurance Company of America.  I

1  understand that, you know, Mr. Lanier is reserving all the

2  adequate assurance objections, which we have one pending.  I

3  just wanted to address two issues with the proposed sale order.

4  I think Number 28 is, I guess as I read this is the order that

5  was just filed, appears to be where those objections are

6  preserved.  It's just a little unclear.  The language to me is

7  a little unclear and ambiguous.

8            THE COURT:  So let me --

9            MR. THEISEN:  That's number --

10           THE COURT:  So let me catch up with you.  So you are

11  looking at 754, Paragraph 28?

12           MR. THEISEN:  Correct, Your Honor.

13           THE COURT:  All right.  Hold on just one second.  Let

14  me get with you.  So I don't think 28 preserves anything.

15           MR. THEISEN:  Well, I -- nor do I, Your Honor.  I'm

16  not sure if that was the attempt to preserve them, or if

17  another amended order was going to be filed.  But I think, if

18  they're being preserved, it should be in the order.

19           THE COURT:  Mr. Lanier.

20           MR. LANIER:  Your Honor, I'm reading through the

21  language again.  I think that the issue might be the paragraph

22  and the order that preserves parties' rights may only apply to

23  a cure objection.  To the extent that it's helpful to state on

24  the record that we understand those cure objections to also

25  encompass adequate assurance objections, that the status

1  reflected in the reply we filed on the docket as to specific

2  contracts, including Mr. Theisen's client, then you know, that

3  is the debtors' intent, that those objections are preserved.

4          THE COURT:  Why don't we --

5          MR. LANIER:  If we need to make modifications to the

6  order to make that clear, we're happy to.

7          THE COURT:  Could we just add a sentence that says

8  any timely filed objections to the assumption of any executory

9  contract or lease are preserved pending further order?  That

10 work?

11         MR. LANIER:  That's fine with me, Your Honor.  I

12 think as long as it's clear that those objections have been

13 marked as preserved.

14         THE COURT:  Mr. Theisen, does that work for you?

15         MR. LANIER:  Because some objections have been

16 resolved.

17         THE COURT:  No, of course.  I -- so if you wanted to

18 say any timely filed outstanding objections, I'm perfectly

19 comfortable with that.

20         MR. LANIER:  Excellent.  Thank you.

21         MR. THEISEN:  Thank you, Your Honor.  And then the

22 second issue is with Paragraph 42.  This is specific to my

23 client, Selective also objected to -- it has certain property

24 at the Carlstadt, New Jersey facility that we object to being

25 sold.  That property belongs to Selective, not the debtors.

1   So we'd just like to be added to the list of parties in

2   Paragraph 42.

3           MR. LANIER:  Your Honor, that's fine.  Part of the

4   issue here is we have three different Carlstadt, New Jersey

5   locations.  So, without specificity, we may not know exactly

6   which facility that is.  It could be one that's being assumed.

7   But obviously the point stands that the debtors cannot sell

8   assets that don't belong to the debtors.

9           THE COURT:  Yeah, totally agree.  And it seems to me

10  that you can make a tweak to 42 --

11          MR. LANIER:  Yeah.

12          THE COURT:  -- and it just becomes a non-issue.  But

13  I agree with your black letter statement of the law, you can't

14  sell what you don't own.

15          MR. THEISEN:  Very good.  Thank you, Your Honor.

16  That's all.

17          THE COURT:  All right.  Anyone else?

18          All right.  Mr. Lanier, where does that leave us?

19          MR. LANIER:  Your Honor, if no other party has any

20  other comments, we respectfully would ask that the sale be

21  approved.  We can upload a revised sale order reflecting the

22  changes that we just discussed to the redline, to the version

23  at 754.

24          THE COURT:  All right.  And anyone else wish to be

25  heard?

1          All right.  Again, I know that this is complicated,

2  and I very much appreciate everybody's willingness to try and

3  find a way to get this done.  I do find that I have

4  jurisdiction over the proposed sale pursuant to 28 U.S.C.

5  Section 1334.  Sale of estate assets and the assumption of

6  assignment of various contracts and leases constitutes a core

7  proceeding under 28 U.S.C. Section 157.  I further find that I

8  have the requisite constitutional authority to enter a final

9  order consistent with the other sales.

10          I compliment the debtor and its advisors on being as

11  transparent in their motives and procedures as anyone could

12  possibly be.  Again, in my mind it serves as a model as to what

13  this should be like, not always what I get.  But I think the

14  sale process, the process the parties have engaged in, is as

15  transparent as it can be in what the code demands.

16          I will find that the exercise of the business

17  judgment of the debtor to proceed forward with the sale to

18  11:11 not only constitutes reasonable business judgment, but

19  represents the exercise of the  most prudent business judgment

20  on behalf of the estate.

21          I will approve the sale subject to, again, the

22  reservation of all timely-filed unresolved objections to the

23  assumption and assignment of various executory contracts and

24  leases to be resolved either by agreement or in a future

25  proceeding, which I am willing to do on an extremely expedited

1  basis if the parties are not able to find common ground.

2         With that, Mr. Lanier, if you will, I know that there

3  were other findings and conclusions set forth.  Again, the last

4  order that I had a chance to look at as I read the redline at

5  754-1, I had looked at the prior sale order which, as we sit

6  here right now, I can't remember the number.  There are other

7  findings and conclusions which I have read, agree with, and do

8  adopt in their entirety.

9         To the extent that I've made additional statements

10  and or findings and conclusions on the record which are not set

11  forth in the proposed order, they are incorporated by reference

12  pursuant to Bankruptcy Rule 7052.

13         Mr. Lanier, if you will get those very minor tweaks

14  that we talked about, if you can get somebody on your team to

15  do them while we are addressing confirmation, I will -- we will

16  make sure we get that done today so that Mr. Penn can continue

17  his good work, and other conversations can continue about

18  trying to bridge the gap on some of these outstanding issue.

19         MR. LANIER:  We will do so.  Thank you, Your Honor.

20         THE COURT:  Okay.  Thank you.

21         All right.  Mr. Zuzolo.

22         MR. ZUZOLO:  Good afternoon, Your Honor.  Kevin

23  Zuzolo of Akin Gump Strauss Hauer & Feld as counsel to the

24  debtors.  In addition to the sale transaction, we also have

25  before you today final approval of the debtors' disclosure

1  statement and confirmation of the plan.

2          I want to note that Mr. Michael Robinson, the

3  company's chief executive officer, that Ms. Lahaie introduced

4  earlier, is attending the hearing virtually.  We will have a

5  proffer of Mr. Robinson that will be presented during the

6  evidentiary portion of our confirmation hearing.

7          Your Honor, let me provide a quick road map of how we

8  got here today, if I may, because this case did take some

9  twists and turns, but ultimately we are here today with a

10 successful outcome.  And you and many other parties have

11 already heard a few times of the dual sale process, and

12 potential equitization of the funded debt that the debtors were

13 pursuing.  But just for purposes of establishing the correct

14 record for solicitation, I will recite a few of the relevant

15 facts.

16         The debtors' process -- sales process proceeded.  And

17 when we got to the point where the debtors were prepared to

18 solicit a plan of -- a plan for acceptance or rejection, the

19 debtors had received already approval of two of their sales.

20 But with respect to the third business line, the Eagle sale,

21 and the data recovery business, there were still -- the debtors

22 were still receiving interest, but it was unclear whether the

23 most value-maximizing transaction for these cases would have

24 been to sell that business or to reorganize around it.

25         And therefore, with respect to the combined plan and

1   disclosure statement that was conditionally approved by the

2   Court on September 7th, that plan was a dual track plan that

3   provides for the flexibility of either transaction.  And I'm

4   referring to the first amended combined plan disclosure

5   statement that was filed at Docket 627, and that's the plan

6   that went out for solicitation.

7           Your Honor, you've obviously just approved the sale

8   of the Eagle asset, so it is obvious where we are at today.

9   But, to aid other parties in interest, and to have a plan that

10  actually reflected the transaction that is being approved

11  today, the debtors filed the second amended combined plan

12  disclosure statement on October 13th at Docket Number 734.  And

13  the revisions to this plan removes the portions that were only

14  relevant to the equitization scenario, and made other changes

15  consistent with the Eagle sale.  And now this plan contemplates

16  the distribution of sale proceeds and the wind down of the

17  debtors' estate.

18          On October 14th, we filed the proposed confirmation

19  order, and that's at Docket Number 742.  I am happy to report,

20  I believe we have successfully resolved all of the plan

21  objections, and therefore we have filed a revised version of

22  the plan earlier today at Docket Number 751, as well as a

23  revised version of the proposed confirmation order, that is at

24  Docket Number 753, to reflect those agreed resolutions with the

25  parties.

1              Your Honor, with that introduction, if I may, I would

2    propose that I offer into evidence -- in support of our

3    confirmation hearing today, I have some documents to offer, and

4    then I would also offer the proffer of our witness,

5    Mr. Robinson, if that is acceptable.

6              THE COURT:  Of course.  Let me just check and see.

7    Does anyone believe that they have an outstanding objection to

8    confirmation that remains unresolved?

9              All right.  Then --

10             MR. STEWART:  Your Honor, this is Michael Stewart

11   from Faegre Drinker Biddle & Reath --

12             THE COURT:  Yes, sir.

13             MR. STEWART:  -- on behalf of CoBank.

14             THE COURT:  Yes, sir, Mr. Stewart.

15             MR. STEWART:  We appreciate very much Akin Gump's

16   efforts to address the CoBank objection.  Comparable to HCL, we

17   have concerns regarding the security of our data.  We've got

18   information regarding thousands of bank customers, and they

19   have provided language which is helpful.

20             I did -- shortly before the hearing started to ask

21   Mr. Lanier for a few tweaks.  But -- the language that he has

22   proposed is very close to what would be acceptable, but I would

23   like him to take a look at those additional tweaks.

24             THE COURT:  Mr. Lanier, first of all, are you -- do

25   you have in your possession the requested tweaks?

```
 1              MR. LANIER:  Hold on.  I do.  Hold on.
 2              THE COURT:  Then why don't you take a look at them,
 3   unless you were going to do part of the presentation.  Perhaps
 4   you can back-channel Mr. Stewart and figure out if you -- if
 5   the two of you have an issue or you don't.  Could I ask you to
 6   do that?
 7              MR. LANIER:  Yes.
 8              THE COURT:  All right.  Thank you.
 9              And Mr. Stewart, don't let me forget you.  But if you
10   don't have a resolution -- or even if you do, if you'd just
11   come back on at the end and just update me, please, sir.
12              MR. STEWART:  Will do.  Thank you, Your Honor.
13              THE COURT:  All right.  Thank you.
14              Anyone else?
15              MR. KULBACK:  Your Honor?
16              THE COURT:  Yes.
17              MR. KULBACK:  Your Honor, Jerry Kulback again for
18   HCL.  We are part of the same reservation language that
19   Mr. Stewart is referring to, so I would ask to be included in
20   any tweaks to that paragraph and their discussions.
21              THE COURT:  Certainly.  Mr. Lanier, sounds like your
22   tweak is getting bigger.
23              All right.  Anyone else?
24              MR. LANIER:  Understood, Your Honor.  I'll let
25   Mr. Zuzolo continue.  I'll work in the background.
```

 1            THE COURT:  All right.  Thank you.

 2            MR. ZUZOLO:  Thank you, Your Honor.  And I agree.

 3  That's fine, yes.  There is language in the proposed

 4  confirmation order that we filed that was intended to address

 5  their objections.  Happy to see if we can work out any further

 6  issues while we're here today.

 7            And as I was saying, I did want to just offer some

 8  documents into evidence if I may.  I am referring to the

 9  debtors' amended witness and exhibit list that was filed at

10  Docket Number 752 prior to this hearing.  Is it okay if I refer

11  to that?

12            THE COURT:  Absolutely.

13            MR. ZUZOLO:  Thank you.  So the first document would

14  be Number 7 on that list.  It's the First Amended Combined

15  Disclosure Statement and Joint Chapter 11 Plan.  The second

16  document, Number 8, a Certificate of Publication, at Docket

17  Number 671.  Number 9, the affidavit of service for the

18  combined hearing notice.  Number 11, the notice of filing of

19  plan supplement, at Docket Number 708.  Number 13, the Second

20  Amended Combined Disclosure Statement and Joint Chapter 11 Plan

21  at Docket Number 734.  Number 14, the notice of filing of the

22  first amended plan supplement at Docket Number 740.  Number 15,

23  the declaration of Alex Orchowski of Kroll Restructuring, the

24  solicitation and balloting agent, at Docket Number 741.  And

25  Number 16, the Second Amended Combined Disclosure Statement and

1    Joint Chapter 11 Plan at Docket Number 751, which was the one

2    filed earlier today.

3            That would be the extent of the document submissions,

4    Your Honor.

5            THE COURT:  All right.  So let me make sure, because

6    they're scattered around just a bit.  Let me make sure I get

7    this right.  With respect to the amended exhibit list that is

8    filed at 752, you are seeking the admission of what's

9    identified on that list as Exhibits 7 through 15.  Is that

10   correct?

11           MR. ZUZOLO:  Yes.  For purposes of confirmation, I

12   had I believe skipped over 10 and 12, but I will also move

13   those in, as well.

14           THE COURT:  I was trying to catch up, so let's do

15   that again.  So on that list is 7, 8, 9, 11, 13, 14, and 15.

16   Correct?

17           MR. ZUZOLO:  And Number 16, Your Honor.

18           THE COURT:  And 16.  Any objections?

19       (No audible response)

20           THE COURT:  Then they are admitted.

21       (Debtors' Exhibits 7, 8, 9, 11, 13, 14, 15, and 16

22   admitted into evidence)

23           MR. ZUZOLO:  Thank you, Your Honor.  As I mentioned,

24   I would like to offer the proffer of Mr. Michael Robinson, the

25   debtors' chief executive officer, for today's hearing, if I

1   may.

2            THE COURT:  Certainly.  Mr. Robinson, first of all,

3   good afternoon.

4            MR. ROBINSON:  Good afternoon, Judge Jones.

5            THE COURT:  So you've done this before.  Listen

6   carefully to the testimony.  When the presentation is

7   completed, I'm going to swear you in.  I'm going to ask you if

8   you listened closely to it, if it's accurate, and if you adopt

9   it as your sworn testimony in support of confirmation, as well

10  as final approval of the disclosure statement.  Understood?

11           MR. ROBINSON:  Yes, sir.

12           THE COURT:  Thank you.

13           Whenever you're ready.

14           MR. ZUZOLO:  Thank you, Your Honor.  If Mr. Robinson

15  were called to testify, he would state the following:  I

16  currently serve as the Chief Executive Officer and President of

17  Sungard AS and have served in this position since May 2019.  I

18  also serve on the board of managers of Sungard's ultimate

19  parent company, Sungard AS New Holdings LLC, and the applicable

20  governing body of each of the debtors' entities.  I also served

21  as the declarant of the debtors' first-day motions.

22           I actively participated in the negotiation and

23  transaction contemplated by the plan, including the sale

24  transaction, and have been approved by the Court.  I reviewed

25  and I'm generally familiar with the terms and provisions of the

1  debtors' plan and disclosure statement, including the plan

2  supplement; thus, I am familiar with and have personal

3  knowledge of the matters relating to confirmation of the

4  debtors' plan including the transactions described therein.

5          The plan is a significant achievement for the debtors

6  and their stakeholders and it's the culmination of many months

7  of arm's-length negotiations with the debtors' stakeholders and

8  third-party purchasers.  I believe the plan and disclosure

9  statement and related exhibits, as well as the plan supplement,

10 are accurate and correct to the best of my knowledge and belief

11 and contain adequate information in sufficient detail to enable

12 holders of claims entitled to vote on the plan to make an

13 informed decision as to whether to accept or reject the plan.

14 I believe the documents in the plan supplement, including all

15 amendments, modifications and supplements, are consistent with

16 and integral to the plan's implementation.

17         The terms of the agreement contemplated by the plan

18 are fair and reasonable and were negotiated in good faith and

19 at arm's length and in the best interest of the debtors' (audio

20 interference) estate, and all holders of claims and interests.

21 The plan places claims and interests into ten separate classes

22 with each class differing from the claims and interests in each

23 other class in a legal or factual matter -- nature, excuse me

24 -- and the classifications are based on relevant criteria.

25         The debtors took effort to comply and I believe they

1    did comply with the notice and solicitation requirements under

2    the Bankruptcy Code, including with respect to the additional

3    notice that the debtors are proposing to provide today pursuant

4    to the proposed confirmation order.  The debtors solicited

5    acceptances or rejections of the plan from holders of claims in

6    Class 3, the only class entitled to both.  All Class 3

7    creditors have submitted a ballot and voted to accept the plan.

8           Based on my knowledge, the plan complies with all

9    applicable provisions of the Bankruptcy Code and the applicable

10   confirmation requirements, including but not limited to the

11   following:

12          The plan provides for equal treatment within classes

13   and identifies the means of implementation for the plan.

14          I believe that all relevant parties, including their

15   affiliates and advisors, have acted in good faith in connection

16   with all of their respective activities relating to formation

17   of the plan and the solicitation and acceptances of the plan.

18          The plan provides for the appointment of a plan

19   administrator to oversee and administer the wind-down of the

20   debtors' estates, and that plan administrator will be selected

21   prior to the effective date of the plan.

22          The plan does not require any government or

23   regulatory approval.

24          All holders of claims and interests and all impaired

25   classes will recover at least as much as they would in a

1   hypothetical Chapter 7 liquidation as evidenced by the

2   liquidation analysis provided in the plan supplement.

3          The plan provides for the payment in full of all

4   allowed administrative and priority claims and applicable

5   statutory fees.

6          The plan provides for the wind-down of the debtors

7   remaining assets and affairs.  Provided that the plan is

8   confirmed and consummated, all the debtors' remaining assets

9   will be distributed pursuant to its terms; the debtors' estates

10  will be dissolved following a wind-down period; and ultimately,

11  the Chapter 11 cases will be closed.  As a result, I believe

12  that, prior to the closing of these cases, the debtors expect

13  to have sufficient funds to make all payments contemplated by

14  the plan.

15         The purpose of the plan is not to avoid taxes or

16  avoid the application of Section 5 of the Securities Act of

17  1933.

18         No class of creditors is receiving more than

19  100 percent of the value of their claims.  No class of equal

20  priority is receiving more favorable treatment under the plan.

21  No class that is junior to the deemed rejecting classes will

22  receive or retain property on account of their claims or

23  interests in such junior class.

24         The releases set forth in Article XII of the plan are

25  the result of good faith, arm's-length negotiations among the

1  debtors and their key stakeholders and are integral components

2  of the transaction contemplated by the plan.

3          The releases by holders of claims and interests are

4  consensual because each releasing party was provided with

5  notice and an opportunity to opt out of the third-party

6  releases contained in the plan.  The released parties have

7  provided sufficient consideration and contributions to these

8  Chapter 11 cases in exchange for the third-party release.

9          The exculpation provisions in the plan represent an

10  integral part of the plan and are the product of good-faith,

11  arm's-length negotiation.

12          The injunction provisions of the plan are key because

13  they enforce the release, exculpation and gatekeeper provisions

14  that are centrally important to the plan.

15          It is important to the debtors to begin implementing

16  the proposed transactions contemplated in the plan as soon as

17  possible so that they can bring a swift conclusion to these

18  Chapter 11 cases.

19          With that, I submit the proffered testimony of

20  Mr. Robinson, and ask the Court to admit it into evidence in

21  support of final approval of the adequacy of the disclosure

22  statement and confirmation of the plan.

23          THE COURT:  All right.  Thank you.

24          Mr. Robinson, if you'd please raise your right hand,

25  sir.

```
 1              MICHAEL ROBINSON, DEBTORS' WITNESS SWORN
 2              THE COURT:  All right.  Thank you.  Did you listen
 3   closely to everything that was said?
 4              MR. ROBINSON:  I did.
 5              THE COURT:  Did you understand it all?
 6              MR. ROBINSON:  Yes, I do, Your Honor.
 7              THE COURT:  Everything that was stated true and
 8   correct, to the best of your knowledge?
 9              MR. ROBINSON:  Yes, it is, Your Honor.
10              THE COURT:  Do you adopt the statements as your sworn
11   testimony in support of final approval of the disclosure
12   statement as well as confirmation of the proposed plan?
13              MR. ROBINSON:  I do.
14              THE COURT:  All right.  Thank you, sir.
15              Anyone have any cross-examination for Mr. Robinson?
16         (No audible response)
17              THE COURT:  Then, Mr. Robinson, I certainly --
18              MS. CHO:  Your Honor?
19              THE COURT:  Yes.
20              MS. CHO:  Oh, I'm sorry.  Shirley Cho, Your Honor, of
21   Pachulski Stang Ziehl & Jones on behalf of the Committee.  I
22   don't have any cross-exam for Mr. Robinson, but before -- I
23   didn't know if we were approaching here the part where you're
24   about to bang the gavel, and I just did want to briefly address
25   the Court.
```

```
 1                THE COURT:  Oh, no.  Of course.

 2                Let me ask one more time.  Anyone have any cross-

 3    examination for Mr. Robinson?  Then --

 4                MR. STATHAM:  Steve Statham for the U.S. Trustee,

 5    Your Honor.

 6                THE COURT:  Yes, sir.

 7                MR. STATHAM:  Sorry.  I may not have any questions

 8    for Mr. Robinson, but I know there was a notice issue that the

 9    debtor was concerned about.  And before we released him, I was

10    hoping Mr. Zuzolo might explain what the plan is what the

11    procedure is going to be regarding that notice.  Mr. Robinson

12    may or may not have testimony or information he needs to relate

13    to the Court, at least on that point.

14                THE COURT:  So, Mr. Statham, I have got Paragraph 37

15    pulled up on my screen.  We're going to talk about it just a

16    little bit more.  I don't think it involves Mr. Robinson.  I

17    was going to tell Mr. Robinson that I did not want him to

18    leave, but that he was excused as a witness; and if it turns

19    out I'm wrong about needing Mr. Robinson, then he can certainly

20    be recalled.

21                Does that work for you, Mr. Statham?

22                MR. STATHAM:  Absolutely, Your Honor.  Thank you.

23                THE COURT:  Thank you.

24                And Mr. Robinson, again, if you'd please hang around,

25    to put it in plain English.
```

1          MR. ROBINSON:  Yes, Your Honor.

2          THE COURT:  All right.  Mr. Zuzolo, any additional

3  testimony that you intend to adduce this afternoon?

4          MR. ZUZOLO:  No, Your Honor.  That would be the

5  conclusion of the evidence.

6          THE COURT:  All right.  Thank you.

7          Anyone else wish to offer any testimony or any

8  documentary evidence?

9      (No audible response)

10         THE COURT:  All right.  Then we'll consider the

11 record closed.  Debtor wish to make any closing comments?

12         MR. ZUZOLO:  Yes, Your Honor.  I would just note for

13 -- with respect to the confirmation objections, we did file a

14 reply at Docket Number 744, and that included a chart with

15 respect to the outstanding objections.  We -- at the time we

16 filed, we had -- still had a number of unresolved objections,

17 but we have resolved them.  I know there's some background

18 discussions happening with some of the other parties, so we'll

19 see where we -- end up with there.  But I would put the

20 objections into just a couple broad buckets.

21         We had objections from the Chubb insurers and Chubb

22 surety providers, which were -- the resolutions were reflected

23 in the revised plan that we filed.  And I was asked to submit a

24 statement that -- to correct a typo in the resolution

25 reflecting Chubb Surety's objection.  And so I'll refer to

1    Docket Number 751 of our amended plan, second amended plan.

2              And on Page 49 of the redline, and I'm looking at

3    Article IX.F, Surety Bonds, Subsection (c), there is a

4    reference in about the fourth line down to the parenthetical

5    starting on the third line, "Notwithstanding the provisions set

6    forth in Article XII.B of the plan, including Subsection 4

7    thereof," there actually is no Subsection 4.  That should be

8    Subsection 1.  And we will correct that typo prior to

9    submitting a final order to Your Honor.

10             Your Honor, there were a few taxing authority

11   objections that we resolved by adding language to the proposed

12   confirmation order, which is already reflected -- some of the

13   language that was already there in the prior version, and we

14   added some -- two additional parties at Paragraph 34.  And we

15   added reservations of rights language with respect to the FIS

16   objection at -- that was filed at Docket Number 722.

17             I think I might have hit all of the objections that

18   were marked as unresolved, other than with respect to the

19   U.S. Trustee's objection that was unresolved.  I understand

20   that the U.S. Trustee's objection actually has been resolved.

21   They had objected to the exculpation provisions of the plan

22   based on the Fifth Circuit's recent decision in Highland.  We

23   had made changes to the exculpated party definition based on

24   the request of the Trustee.  In the alternative, what we've

25   done is added the -- what we call the "gatekeeper provision"

1 which would require parties to seek -- essentially seek relief

2 from the Court to the extent that they wanted to prosecute a

3 claim or cause of action that otherwise would have been subject

4 to the exculpation parties, but now it's no longer --

5 exculpation provision, excuse me, but now is no longer part of

6 that provision based on the changes we've made to accommodate

7 the U.S. Trustee.

8          So I did just want to note that -- I believe that

9 that is appropriate under the circumstances.  It was

10 essentially approved by the Highland, and I think it has been

11 used in other circumstances before Your Honor, and is an

12 appropriate way to resolve the objection in these cases.

13          THE COURT:  All right.  Mr. Statham, you agree that

14 for purposes of today Highland Capital has been addressed?

15          MR. STATHAM:  I do, Your Honor.  Mr. Zuzolo was going

16 to talk about one sentence in subpart (i) regarding a claim

17 that the debtors intended to release under the plan.  I was

18 hoping he could address that.  And with that, we'll be

19 concluded.

20          MR. ZUZOLO:  Yes.  Give me one second while I just

21 get there.  And I believe, Mr. Statham, this is in the

22 definition of covered party or covered claims.  Is that

23 correct?

24          MR. STATHAM:  Under subpart (i) in Article -- I guess

25 it's XII.F, reflecting that -- claims that the -- not including

1    claims that the debtor released under the plan.  We were hoping

2    for some clarification on what that exactly is intending.

3              MR. ZUZOLO:  Yeah, I mean -- understood.  That

4    language is simply intended to mean that -- to the extent a

5    claim has been released under the plan, obviously it cannot be

6    -- not be brought.  I don't think there's any issue with this

7    if somebody believes a claim is not released under the plan and

8    still proceeds under these procedures to seek relief to pursue

9    it.  Obviously, one of the defenses there is going to be that

10   that claim has been released under the plan, and it will be

11   disclosed in the appropriate manner.  I think that's all that

12   was intended by that language.

13             MR. STATHAM:  Great.  Thanks very much, sir.

14             MR. ZUZOLO:  You're welcome.

15             MR. STATHAM:  Thank you, Your Honor.

16             THE COURT:  All right.  Hopefully, as we move

17   forward, we will revisit the old definitions of direct and

18   derivative, and expand the gatekeeper just a bit to implement

19   -- this is just old style.  Brimmage will remember what this is

20   like.  But other than that, everyone's too young.

21             Ms. Cho, on behalf of the Committee, did you have

22   anything you wanted to add?

23             MS. CHO:  Yes.  That for that cue, Your Honor.

24   Shirley Cho again, for the record.  Pachulski Stang Ziehl &

25   Jones.  On with me is Ben Wallen.  Just on behalf of Pachulski

1   and (indiscernible) advisors, the Committee's professionals and

2   the Committee, we wanted to just take this opportunity to

3   congratulate the debtor and its team on getting the final sale

4   approved, and really getting this across the finish line,

5   hopefully here soon.

6           We have reviewed all the redlines put on the docket,

7   Your Honor, including the second amended plan and confirmation

8   order.  We're happy to hear that the U.S. Trustee's objection

9   has been resolved.  And with that, Your Honor, we have no

10  objection to entry of the confirmation order.

11          THE COURT:  All right.  Thank you.

12          Anyone else wish to be heard?

13          THE COURT:  Mr. Dale, I see you --

14          MR. STEWART:  Your Honor, this is Michael Stewart on

15  behalf of -- I'm sorry, Your Honor.  This is Michael Stewart on

16  behalf of CoBank.  I don't know if Mr. Lanier has had a chance

17  to look at the tweaks.  Similar to the conversation you had

18  earlier, this is a relatively straightforward business

19  resolution.

20          CoBank, as we indicated in our objection, was told by

21  the debtor that we had till the end of January to vacate the

22  current location.  But actually, the way the plan currently

23  reads, is it is subject to the risk of being told to leave

24  earlier.  We're just looking for assurances that what the

25  debtor has told us will be reflected in the confirmation order.

1    And I know the debtor is working very diligently with the

2    landlord there at the present time.

3            THE COURT:  So let me ask it a slightly different

4    way.

5            Mr. Lanier, were the tweaks acceptable?

6            MR. LANIER:  We're still running it by our client and

7    waiting for sign-off, but I don't expect they'll have an issue.

8            THE COURT:  All right.

9            MR. ZUZOLO:  Your Honor, if --

10           THE COURT:  Yes.

11           MR. ZUZOLO:  If I may, maybe I can kind of address

12   kind of a little bit more of the debtors' perspective on this

13   provision.  I understand the concern, right?  The current plan

14   states that leases will be rejected as of the effective date to

15   the extent that they are not assumed.  And we understand that

16   particular customers have raised the issue with certain

17   locations that, as we sit here today, yes, would be subject to

18   that effective date rejection, which is causing some concern to

19   the extent that our effective date milestone is October 31st.

20   But, as Mr. Lanier stated, it is the intention that we are

21   working with the landlords to extend those dates

22   (indiscernible).

23           And so what we have done in Paragraph 35 is

24   essentially say that that automatic effective date rejection

25   provision in the plan is not going to apply to these specific

1  locations.  And instead, those locations will not be rejected

2  until essentially a further order of the Court or opportunity

3  for a hearing.  In the middle of Paragraph 35, we say,

4  "Notwithstanding anything to the contrary herein or the plan,

5  the effective date of the rejection for the specified leases

6  shall not occur unless the preserved objections are either

7  withdrawn by the specified customers or overruled following a

8  hearing by the bankruptcy court."

9              THE COURT:  No, I --

10             MR. ZUZOLO:  So we understand that those parties do

11 want to preserve their rights with respect to raising issues on

12 rejection, and that's what we've attempted to do here in this

13 order.

14             THE COURT:  I thought not only did you attempt to do

15 it, it was a very eloquent way of walking the line.  So I got

16 it.  And if anyone else feels differently, happy to hear

17 arguments, but it seems to be about as clear as it can be with

18 the additional language.

19             Let me ask Mr. Dale --

20             MR. KULBACK:  Your Honor --

21             THE COURT:  Yes, sir.  Sorry.  Go ahead.

22             MR. KULBACK:  Your Honor, Jerry Kulback again for

23 HCL.  That provision also applies to HCL.  We had reviewed that

24 prior to today's hearing and that language was acceptable.

25 Again, I do want to see any tweaks to that before it's final,

1   just to make sure it doesn't change any of our rights.

2          I also want to again mention that while this is

3   extending the time or deeming no rejection to occur with

4   respect to the leases, I'm asking again for some assurances

5   from either the debtor or 11:11 or 365 that services will

6   actually be provided at those locations.  It's different than

7   just having the lease not being rejected.  And what I'm still a

8   little bit confused about is if 11:11 is looking to close as

9   early as tomorrow, and employees are going to become employees

10  of 11:11, but those leases aren't being assumed and assigned to

11  11:11, who is actually going to be rendering the services?

12         I'm assuming that it's going to be under a transition

13  services agreement between 11:11 and the debtor, but I haven't

14  heard that yet on this call, and I would like some assurances

15  that we will have someone actually providing the services after

16  the sale closes and after confirmation.

17         THE COURT:  All right.  So, with respect to the

18  request for assurance, I'm going to let you have that

19  conversation offline.  I don't think it's appropriate for it to

20  occur during a confirmation hearing.  Again, I think that that

21  is a commercial discussion that I should not be engaged in.

22         What I will tell you is that to the extent that you

23  believe that -- and this goes not only for you, but for

24  everyone -- the protection of data is extremely important to

25  me.  I rank it right behind my affinity for employees.  And to

1   the extent that someone believes that there is data that is
2   endangered, and you can put some concrete representations
3   behind it, you are free to seek emergency relief.  I promise
4   you that I will take it up promptly and that we will work
5   through.  And also, with my having told everybody that data is
6   extremely important to me, I am confident that that message
7   will be carried forward.  All right.
8           MR. KULBACK:  Thank you, Your Honor.  I appreciate
9   it.
10          THE COURT:  Yes, sir.
11          Mr. Dale, I wanted to come back to you.  I saw you
12   talking, but I couldn't hear you.  Now I've got --
13          MR. DALE:  Your Honor, can you hear me now?
14          THE COURT:  I can.  Thank you, sir.
15          MR. DALE:  Thank you, Your Honor.  Charles Dale from
16   Proskauer Rose on behalf of the debtors' prepetition ad hoc
17   group of term lenders and post-petition DIP lenders.  Your
18   Honor, I'll be very brief.  The good news, I think, for you,
19   Judge, is that you haven't had to hear very much from me during
20   this case.
21          Your Honor, this case presented some very serious
22   challenges, as you'll recall, that was instigated by a
23   liquidity crisis triggered by power costs, runaway power costs
24   in Europe.  And back in April we started with some very
25   challenging circumstances.  You know, we were going to need to

1  separate three inextricably related businesses from one another

2  and we weren't sure whether this business would be sold or

3  whether my clients and others would become the ultimate owners.

4         Fortunately, Your Honor, we encountered Ms. Cho and

5  her colleagues at Pachulski and their clients.  We had a very

6  nice working relationship with the company and its advisors,

7  the team at Akin that you heard from, FTI, Houlihan.

8  Mr. Statham of the U.S. Trustee's Office was very accommodating

9  to us.

10         And we appreciate everybody pitching in, Your Honor.

11  But we wouldn't be here today if it weren't for the fact that

12  Your Honor and your staff were as accommodating and as

13  accessible as you were.  And I just wanted to conclude this

14  case, at least from our point of view, and hope you won't have

15  to hear from me again, by thanking you, Judge, for all of the

16  hard work that's gone into arriving at the place we are today.

17         THE COURT:  Thank you for the kind words, and they

18  pertain to everyone on the call.

19         Anyone else?

20     (No audible response)

21         THE COURT:  All right.  Then I've got before me a

22  request for final approval of the debtors' disclosure statement

23  as well as confirmation of the proposed plan.  I do find that I

24  have jurisdiction over both requests pursuant to 28 U.S.C.

25  Section 1334.  Approval of disclosure statements and

1   confirmation of plans are both core proceedings under 28 U.S.C.

2   Section 157.  Finally, I have the requisite constitutional

3   authority to enter a final order with respect to both requests.

4          Before I address both those, I wanted to take just a

5   couple minutes.  And I'm always in awe when I watch the best

6   professionals in the world pivot to match the circumstances of

7   the case.  And there are -- there's certainly ample evidence

8   that this was one of those cases where the skill sets were just

9   in full exhibition, and it is just such an honor to watch.

10          Again, I've said it before.  I'll repeat it again.

11   Mr. Dublin, Ms. Lahaie, you have an awesome team.  You let the

12   youngsters do work.  You let them develop their skill sets.

13   That is so important to the future of the profession, as well

14   as providing the guidance that sometimes listening is always

15   preferable to talking.  And that is very evident in this case.

16          Ms. Cho, again, I don't always get committees that

17   are rational or reasonable, in my view.  But I want to

18   compliment your committee, as well as your guidance in this

19   case, about recognizing that value comes from many sources, and

20   understanding the context of the case and making those requests

21   and asserting those rights that are appropriate under the case.

22   So I compliment you for your wisdom and guidance of the

23   Committee, as well as the Committee's just recognition of where

24   things were.

25          Mr. Robinson, it's not often that I meet management

1    that is competent, intelligent, and above all practical.  You

2    have exhibited all of those qualities in this case, and I'm

3    talking both to you as well as your team.  You're just front

4    and center.  If you'd done something bad, I'd be yelling only

5    at you.  So it goes both ways.

6            But I very much appreciate the approach.  I know this

7    is not the result that you wanted.  But you made the best

8    decisions you could under the circumstances that you were faced

9    with, and I compliment the excellence that has been exhibited.

10           There are a whole host of people that made this work,

11   and I can't go through every single one of you.  It would take

12   forever, and everyone would just turn off their videos at some

13   point.  But I really do appreciate everyone being practical in

14   their approach.  And again, you don't make the facts, you just

15   deal with what you're presented; and this was a wonderful

16   example of dealing with a set of facts that were less than

17   ideal.  And often in these cases, when you're asked to redo a

18   capital stack, the pie's always big enough -- or it's mostly

19   big enough, and you're just matching up time and cash flows and

20   that sort of thing.  And this one, everyone wanted a pie and

21   you had a tart, and there really wasn't enough to go around.

22   And I really appreciate the approach.

23           With respect to the second amended combined plan

24   disclosure statement, with that portion of the document that

25   constitutes the disclosure statement, with the benefit of

1    hindsight, I will find that the disclosure statement contains

2    adequate information as that term is defined under Section 1125

3    of the Code, and I will give final approval to the disclosure

4    statement.

5            With respect to the plan itself, I'm required to

6    conduct an independent analysis both under 1123 and 1129.   I

7    will find, based upon the evidence adduced on the record, my

8    review of the plan, that the plan satisfies the mandatory

9    requirements of Section 1123(a), does not otherwise run afoul

10   of the permissive requirements of 1123(b) or other applicable

11   sections of the Bankruptcy Code.

12           With respect to Section 1129, again, based upon the

13   evidence that has been adduced, both documentary as well as

14   testimonial, I will find that the proposed plan satisfies the

15   requirements of 1129(a)(1), (a)(2), (a)(3), (a)(4), (a)(5).  I

16   find that the requirement of 1129(a)(6) do not apply to this

17   case.  I'll find that the proposed plan satisfies the

18   requirements of 1129(a)(7).  I'll find that the requirements of

19   1129(a)(8) have not been met.  I'll find that the proposed plan

20   satisfies the requirements of 1129(a)(9) and (a)(10).  As this

21   is a plan of liquidation, I'll find that (a)(11) has been

22   satisfied.  I'll also find that the requirements of 1129(a)(12)

23   have been met.  I'll further find that (a)(13), (a)(14),

24   (a)(15), and (a)(16) are not applicable to this case.

25           Having found that all of the requirements of 1129(a)

1   have either been satisfied or are not applicable, other than

2   1129(a)(8), I'll go to 1129(b).  Based upon the evidence, I

3   will find that the plan does not discriminate unfairly.  It is

4   fair and equitable with respect to each class of claims or

5   interests that is impaired under and has not accepted the plan.

6          Further find there's only one plan I've been asked to

7   consider.  Therefore, the requirements of 1129(c) have been

8   satisfied.

9          And I appreciate Mr. Zuzolo learning 1129(d).  I

10  always like it when someone addresses that.  Makes me happy.

11  But I will find that principal purpose of the plan is not the

12  avoidance of taxes or the avoidance of the application of

13  Section 5 of the 1933 Securities Act.

14         Further find that 1129(e) is not applicable to this

15  case.  And based upon those findings and conclusions, and again

16  subject to the submission of a conforming proposed order -- I'd

17  also like a conforming copy of the plan disclosure statement

18  filed -- I will confirm the second amended plan, again, as

19  supplemented by the plan supplement and as amended on the

20  record here this afternoon.

21         I do want to -- if we could, Mr. Zuzolo, I do want to

22  -- if we could go to Paragraph 37, which was the due process

23  protection provision.  And again, I --

24         MR. ZUZOLO:  Sure thing.

25         THE COURT:  -- I don't know who came up with the idea

1    -- great idea.  Again, it's just an example of taking something

2    that Judge Isgur did with respect to one problem and adapting

3    it to deal with another issue.  I think that, again, it's an

4    eloquent solution.

5         There is a hearing date that is there with a blank,

6    and I'll set it -- you had requested October 26th.  I'll set it

7    October 26th at one o'clock Central.  I do, if in that --

8         MR. ZUZOLO:  Thank you, Your Honor.

9         THE COURT:  I do, in that sentence -- you see the

10   language after the time that says, "and if no objections are

11   filed, the debtor will file a notice canceling the conference"?

12   That's kind of what got you in trouble in the first place.

13   Take it out.  Have somebody show up.  I'll be there.  It will

14   take five minutes, and it meets a due process requirement that

15   you're trying to deal with.

16        I also would like for you -- to the last sentence,

17   since we're setting up a process, I want you to delete that

18   last sentence that begins "Any person or governmental unit."

19   To the extent that the right exists, we're not changing it, and

20   I don't want to create an additional right.  What we're

21   proposing to do is to see if there's anybody out there.  If

22   there is, I'll set the schedule.  I don't want people acting

23   outside that schedule.

24        I also think that it is imperative that we get this

25   done as quickly as we can.  I do think there's been cause

1  established to have the 14-day stay waived and to have a plan

2  -- or to have confirmation order effective upon entry.

3          Let's see.  I think that's -- again, I think that's

4  everything.  I do think that the tweaks to deal with the

5  Highland Capital decision, which obviously you folks didn't

6  know about when the original version was filed.  Again, this is

7  one of those things -- I actually think when you think about

8  this, this is actually helpful from -- giving enforceability to

9  those issues in a plan that we've always worried about

10 slightly.  And I think with continued development of, including

11 release provisions that deal with direct and derivative claims,

12 as well as expanding how the gatekeeper injunction, which I've

13 long been an advocate of -- you'll find them in things I've

14 done going back for 30 years -- couple of tweaks here and there

15 and actually plans and the enforceability of the plans are

16 actually strengthened, not weakened.  But again, I got it.

17 That's my opinion and you don't care about that, on that issue.

18          With that, unless -- or let's talk about timing.  I

19 would like to get this done today.  I want to get Mr. Penn

20 focused on getting this done, because I do want to make sure

21 that as many jobs as can be preserved are preserved, and that a

22 closing occurs as quickly as possible.

23          I'd like to get all of the tweaks made to the orders

24 and uploaded today, and I'm committed to not leaving until I've

25 signed those.  Mr. Zuzolo, do you think that's possible today?

1        MR. ZUZOLO:  Your Honor, I certainly do think that's

2  possible today, and I was going to suggest that we certainly

3  will endeavor to do that.

4        THE COURT:  So just remember the longer I sit here

5  with nobody to talk to, the crankier I get.  So hopefully that

6  will expedite the process for everyone.

7        Mr. Penn, is there anything else that you need from

8  me to assist in moving forward?

9        MR. PENN:  No, Your Honor.  Thank you.  But I will

10  tell you that we have reviewed the revised order that the Akin

11  team sent over and have signed off on it, so we're not a holdup

12  on this one.

13        THE COURT:  Got it.  All right.  So there will be

14  just a couple of more tweaks.  I don't think that you'll care

15  about any of them, but you do have one more version that you're

16  going to need to take a quick look at.  All right?

17        MR. PENN:  Will do.

18        THE COURT:  All right.  Anything else from anybody?

19        MR. STATHAM:  Your Honor, Steve Statham.  May I

20  briefly be heard?

21        THE COURT:  Of course.

22        MR. STATHAM:  Thank you, Your Honor.  I was of the

23  understanding that a significant block of folks actually hadn't

24  received their opt-out opportunities.  And while I would agree

25  with the Court that the due process protection built in

1    Paragraph 37 touches on that, it wasn't clear to me that these

2    folks were actually going to get their opt-out opportunities.

3    And I'm reluctant to let go until I at least hearing something

4    to the effect that there's an opt-out option that's out there,

5    to the extent these folks haven't been given one.

6                  THE COURT:  So Mr. Statham --

7                  MR. ZUZOLO:  Your Honor?

8                  THE COURT:  Of course.  Go ahead.

9                  MR. ZUZOLO:  I just wanted to correct something.  It

10   is not an issue of folks not having an opportunity to opt out.

11   The opt-out notices or the opt-out ballots were all properly

12   sent out to all creditors that should have received it.  The

13   one piece that has the issue with the service was simply when

14   we reset the date to notify parties of the new plan objection

15   and opt-out deadlines, that was the service issue.  It was not

16   an issue of folks not receiving the opportunity to opt out.

17                 MR. STATHAM:  Got it.  Thanks, Your Honor.  That

18   resolves my concern.  I appreciate the Court's indulgence.

19                 THE COURT:  No, no, no.  Certainly.  Again, I had

20   trouble following that through, as well.  And that was the

21   comment I made about canceling hearings.  You don't want ever

22   want to cancel the hearings.  You have somebody show up and

23   continue the hearing.  That way, you stay out of trouble.

24                 MR. STATHAM:  Yes, sir.

25                 THE COURT:  All right.  Anything else from anyone?

1       (No audible response)

2            THE COURT:  All right.  Then everyone have a

3    wonderful day, and we'll be adjourned.  Thank you.

4       (Proceedings concluded at 3:42 p.m.)

5                              * * * * *

6

7

8

9

10

11

12

13

14                  **C E R T I F I C A T I O N**

15

16            I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428     DATE:  October 18, 2022

25   ACCESS TRANSCRIPTS, LLC